**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | 08 Civ. 03814 (LAP) |
| METRO AFFILIATES, INC., et. al. | |
| | Chapter 11 Cases |
| Debtors. | Case No.: 02-42560 (PCB) (Jointly Administered) |
| GREENWICH INSURANCE COMPANY, | |
| Appellant, | |
| vs. | |
| GREENWICH STREET CAPITAL PARTNERS II, L.P., | |
| Appellee. | |

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF APPELLANT GREENWICH INSURANCE COMPANY**

---

WOLFF & SAMSON, PC
140 Broadway
Forty-Sixth Floor
New York, New York 10005
212-973-0572

*Attorneys for Appellant Greenwich Insurance
Company*

Counsel:   Karen L. Gilman (KG-5161)
           Kenneth N. Laptook (KL-8357)

1132211.2

## TABLE OF CONTENTS

BASIS OF APPELLATE JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ............... 1

STATEMENT OF THE CASE ........................................................................ 4

STATEMENT OF FACTS .............................................................................. 7

ARGUMENT ................................................................................................. 16

POINT I ......................................................................................................... 16

    A.    THE COURT BELOW ERRED IN FINDING THAT THE
        CONTRACT WAS EXECUTORY AND IN GRANTING
        GSCP'S MOTION FOR SUMMARY JUDGMENT ............................. 16

    B.    EQUITY REQUIRES THAT ATLANTIC EXPRESS BE
        DEEMED TO HAVE REQUESTED PAYMENT FROM GSCP .......... 21

POINT II ........................................................................................................ 23

    THE COURT BELOW ERRED IN DENYING GREENWICH'S CROSS-MOTION
    FOR SUMMARY JUDGMENT ................................................................ 23

    A.    THE COURT BELOW ERRED IN DENYING GREENWICH'S
        CROSS-MOTION FOR SUMMARY JUDGMENT BASED ON
        THE  GSCP COMMITMENT LETTER AND THE ATLANTIC
        EXPRESS COMMITMENT LETTER ...................................................... 24

    B.    THE COURT BELOW ERRED IN DENYING GREENWICH'S
        CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS
        CLAIM OF UNJUST ENRICHMENT ..................................................... 25

    C.    THE COURT BELOW ERRED IN DENYING GREENWICH'S
        CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS
        CLAIM OF DETRIMENTAL RELIANCE ............................................. 28

POINT III ....................................................................................................... 32

    GREENWICH IS ENTITLED TO PREVAIL  ON THE BASIS OF EQUITABLE
    ESTOPPEL .................................................................................................. 32

CONCLUSION ............................................................................................... 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adiel v. Coca-Cola Bottling Co.*, 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995) ....................25, 30

*Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) .................................29

*Boland v. Parmelee*, 1997 WL 642250 (N.D.N.Y Oct. 15, 1997)..................................................18

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004).............................26

*Carney v. Philippone*, 332 F.3d 163 (2d Cir. 2003) ........................................................................3

*In re Chateaugay Corp.*, 102 B.R. 335 (S.D.N.Y. 1989) ...................................................17, 18, 19

*Committee of Unsecured Creditors of Rama Group of Cos. v. Gottesman Co.*,
2002 WL 1012974 (W.D.N.Y. May 6, 2002)................................................................................26

*In re Craig*, 144 F.3d 593 (8th Cir. 1998) .....................................................................................18

*Daewoo International (Am.) Corp. Creditor Trust v. SSTS America Corp.*, 2004
WL 830079 (S.D.N.Y. April 13, 2004) ........................................................................................20

*Donk v. Miller*, 365 F.3d 159 (2d Cir. 2004) ..................................................................................3

*Dolmetta v. Uintah National Corp.*, 712 F.2d 15 (2d Cir. 1983).................................................26

*In re Drexel Burnham Lambert Group*, 151 B.R. 674 (S.D.N.Y. 1993) .......................................20

*EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394 (2d Cir. 1997) .....................................................25

*Esquire Radio & Electrics, Inc. v. Montgomery Ward & Co.*, 804 F.2d 787 (2d
Cir. 1986).......................................................................................................................................29

*Geneva Pharms. Tech. Corp. v. Barr Laboratoriess, Inc.*, 2003 WL 1345136
(S.D.N.Y. March 19, 2003)...........................................................................................................29

*Girls Clubs of America Inc. v. Boys Clubs of America Inc.*, 1989 WL 297861
(S.D.N.Y. May 12, 1989)..............................................................................................................22

*In re Golden Books Family Entertainment Co.*, 269 B.R. 300 (Bankr. D. Del.
2001) ..............................................................................................................................................18

*Hermes International v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104 (2d
Cir. 2000)........................................................................................................................................16

*Heublein v. United States*, 996 F.2d 1455 (2d Cir. 1993)..............................................16

*Hotel Syracuse, Inc. v. City of Syracuse Industrial Development Agency*, 155 B.R. 824 (N.D.N.Y. 1993) ........................................................................................................18

*Kaulbach v. Keoseian*, 783 F. Supp. 170 (S.D.N.Y. 1992) ..........................................30

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) .........................................................26

*In re Leibinger-Roberts, Inc.*, 105 B.R. 208 (Bankr. E.D.N.Y. 1989)...........................19

*Lippe v. Genlyte Group, Inc.*, 2002 WL531010 (S.D.N.Y. April 8, 2002) ....................22

*MacDraw, Inc. v. The CIT Group Equipment Financing, Inc.*, 157 F.3d 956 (2d Cir. 1997) .....................................................................................................................3

*In re Omni Mutual, Inc.*, 193 B.R. 678 (S.D.N.Y. 1996) ................................................3

*In re Penn Trafffic Co.*, 524 F.3d 373 (2d Cir. 2008) ...................................................18

*In re Placid Oil Co.*, 72 B.R. 135 (Bankr. N.D. Tex. 1987).........................................19

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir. 1996) ........................32, 33

*Sharon Steel Corp v. National Fuel Gas Distributing Corp.*, 872 F.3d 36 (3d Cir 1989) ............................................................................................................................18

*Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc.*, 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001)...............................................................................18

*In re Spectrum Information Technologies*, 190 B.R. 741 (E.D.N.Y. 1996) ...................19

*Spencer Trask Software & Information Services LLC v. RPost International Ltd.*, 383 F. Supp. 2d 428 (S.D.N.Y. 2003)............................................................................26

*Stanish v. Polish Roman Catholic Union of America*, 484 F.2d 713 (7th Cir. 1973) ...........................................................................................................................31

*In re Sundial Asphalt Co.*, 147 B.R. 72 (Bankr. E.D.N.Y. 1992)..................................18

*Thayer v. Dial Industrial Sales, Inc.*, 85 F. Supp. 2d 263 (S.D.N.Y. 2000)..................29

*U.S. East Telecomms., Inc. v. U.S. West Communications Services, Inc.*, 38 F.3d 1289 (2d Cir. 1994)..................................................................................................25, 27

*United States ex rel. Schuster v. Vincent*, 524 F.2d 153 (2d Cir. 1975) ........................................22

## STATE CASES

*Albrechta v. Broome County Industrial Development Agency*, 274 A.D.2d 651, 710 N.Y.S.2d 709 (3d Dept. 2000) ........................................................................26

*Bennett v. John*, 543 N.Y.S.2d 143 (N.Y. App. Div. 2d Dep't 1989)............................................25

*Blue Cross of Central New York, Inc. v. Wheeler*, 93 A.D.2d 995, 461 N.Y.S.2d 624 (1983)........................................................................................................28

*Bradkin v. Leverton*, 26 N.Y.2d 192, 196, N.Y.S.2d 192 (1970) ....................................25

*City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 685 N.Y.S.2d 381 (4th Dep't 1999)........................................................................................................26

*LAHR Construction Corp. v. J. Kozel & Son*, 168 Misc. 2d 759, 640 N.Y.S.2d 957 (N.Y. Sup. Ct. 1996) ........................................................................................29

*Miller v. Schloss*, 218 N.Y. 400, 218 N.Y. 400 (1916)................................................25

*Osetek v. Osetek*, N.Y.S.2d 884 (N.Y. App. Div. 2d Dep't 1980) ..................................22

*Sweedler v. Oboler*, 319 N.Y.S.2d 89, 65 Misc. 2d 789 (N.Y. Misc. 1971) ................................22

*United Systems Associate v. Norstar Bank Upstate New York*, 566 N.Y.S.2d 793 (N.Y. 3d Dep't 1991)........................................................................................26

## STATUTES

11 U.S.C. § 365(c)(2)........................................................................................16, 17, 21

28 U.S.C. §158(a)(1)..............................................................................................1

Bankruptcy Code § 365 ..........................................................................................1

Chapter 11 of the United State Code, 11 U.S.C. § 101 et seq ........................................5

## RULES

Fed. R. Civ. P. 56(c) ..............................................................................................16

# TREATISES

*Countryman, Executory Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973)................................................................................................................18

Restatement 2d of Contracts, § 90(1)(1979).........................................................29, 31

# MISCELLANEOUS

H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977) ..........................................17, 19

S. Rep. No. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S. Cong. Code & Admin. News 5787, 5844, 6303 ................................................................................17

## BASIS OF APPELLATE JURISDICTION

This is an appeal from a final judgment of the United States Bankruptcy Court for the Southern District of New York.  The Court has jurisdiction over this appeal pursuant to 28 U.S.C. §158(a)(1).

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

1.      Whether the Bankruptcy Court erred by granting GSCP's motion for summary judgment and dismissing the adversary proceeding with prejudice.

2.      Whether the Bankruptcy Court erred by denying Greenwich's motion for summary judgment.

3.      Whether the Bankruptcy Court erred in concluding that Bankruptcy Code § 365 is applicable to this transaction and bars Greenwich's claims.

4.      Whether the Bankruptcy Court erred by finding that the agreement created by the letter or letters (a) from GSCP to Atlantic Express Transportation Group, Inc., dated July 19, 2001 ("July 19th Letter"), and (b) from Atlantic Express Transportation Group, Inc. to Greenwich, dated July 20, 2001 ("July 20th Letter"), was executory as of the Petition Date.

5.      Whether the Bankruptcy Court erred in finding that the July 19th Letter was not a promise to provide the funds to pay the debt obligation of Atlantic Express to Greenwich.

6.      Whether the Bankruptcy Court erred in concluding that GSCP had made no promise to Greenwich when GSCP had made such an (oral) promise and when the July 19th Letter and the July 20th Letters unconditionally promise to place Atlantic Express Transportation Group, Inc. in funds for the purpose of paying Greenwich.

1

7.      Whether the Bankruptcy Court erred in finding that Greenwich could not recover on its unjust enrichment claim.

8.      Whether the Bankruptcy Court erred when it determined that (a) that the July 19th Letter and the July 20th Letter constituted an express agreement between GSCP and Atlantic Express which superceded the oral promise made by GSCP to Greenwich, (b) GSCP did not act in such a way as to incur obligations outside the written contract, and that (c) therefore, Greenwich was not entitled to recover on its unjust enrichment claim against GSCP.

9.      Whether the Bankruptcy Court erred in finding that GSCP was not unjustly enriched notwithstanding (a) the undisputed facts that GSCP held a 91% ownership interest in Atlantic Express Transportation Group ("AETG") (which, in turn owned 100% of Atlantic Express Transportation Corp.("AETC:") and that GSCP's investment exceeded $100 million, when, by virtue of those facts, GSCP received a benefit as a result of Greenwich having issued a bond that made it possible for Atlantic Express to obtain the insurance essential for it to operate its business, and (b) the fact that Greenwich paid a debt (to Cannanwill) that was effectively an obligation of GSCP.

10.     Whether the Bankruptcy Court erred in finding that Greenwich failed to show that GSCP had received a benefit and been enriched or that it had acted in such a way as to incur obligations to Greenwich.

11.     Whether the Bankruptcy Court erred in concluding that (a) GSCP had not made a promise to Greenwich that it would provide Atlantic Express with the funds necessary to pay Greenwich, (b) even if GSCP made such a promise and Greenwich

relied upon it, the July 19th Letter and the July 20th Letter superceded that promise and, therefore, Greenwich could not prevail on its detrimental reliance claim.

The standard of review as to all issues on an appeal from an order granting or denying summary judgment is *de novo*. Donk v. Miller, 365 F.3d 159, 163-164 (2d Cir. 2004); Carney v. Philippone, 332 F.3d 163, 167 (2d Cir. 2003); MacDraw, Inc. v. The CIT Group Equipment Financing, Inc., 157 F.3d 956, 963 (2d Cir. 1997); In re Omni Mut., Inc., 193 B.R. 678, 680 (S.D.N.Y. 1996).

## STATEMENT OF THE CASE

Plaintiff, Greenwich Insurance Company ("Greenwich") seeks to recover from defendant Greenwich Street Capital Partners II, L.P. ("GSCP") on its promise to provide the funds necessary for GSCP's subsidiaries, Atlantic Express Transportation Group ("AETG") and Atlantic Express Transportation Corp. ("AETC")(collectively, "Atlantic Express"), to satisfy their obligations to Greenwich in connection with two premium finance surety bonds (the "Bonds") issued by Greenwich.  The purpose of the Bonds was to enable Atlantic Express to obtain financing from Cananwill, Inc. ("Cananwill"), pursuant to a Commercial Insurance Premium Finance and Security Agreement (the "Premium Finance Agreement"), for the purchase of liability insurance that was essential to Atlantic Express's continued operation of a fleet of school buses.

In issuing the Bonds,[1] Greenwich relied explicitly upon GSCP's specific promise that it would provide Atlantic Express with up to $10 million to be used solely to satisfy its obligations to Greenwich and to Cananwill in connection with the Bonds and the Premium Finance Agreement.

Notwithstanding its promise, GSCP did not make those funds available, Atlantic Express defaulted on its obligations to Cananwill under the Premium Finance Agreement, and Greenwich was subsequently required to pay Cananwill more than one million dollars pursuant to the Bonds.

One month after the default, AETG, AETC and various of their subsidiaries and affiliates each filed a voluntary petition with the United States Bankruptcy Court for the

---

[1] Greenwich and NAC Reinsurance Corporation (now known as XL Reinsurance America, Inc.) were co-sureties on the bonds.

Southern District of New York, seeking relief under Chapter 11 of the United State Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

On July 23, 2003, Greenwich brought this adversary proceeding by filing a Complaint seeking to recover from GSCP the amount it had paid Cananwill. Greenwich's claim rests upon GSCP's promise to Greenwich, embodied in their communications and in the written commitment from GSCP to AETG, made for the express purpose of inducing Greenwich to issue the Bonds and upon which Greenwich relied, that GSCP would provide Atlantic Express with the funds required to meet its obligations to Cananwill and Greenwich.  Greenwich also seeks recovery from GSCP based on the doctrines of unjust enrichment and detrimental reliance.

On October 10, 2003, GSCP filed its Answer to the Complaint, denying liability and asserting various defenses.  GSCP's principal contention is that its written agreement to provide funds to AETG is a "financial accommodation" which, at the time Atlantic Express filed for Chapter 11 relief, constituted an executory contract whose enforcement is barred by Section 365(c)(2) of the Bankruptcy Code.  Greenwich contends that the agreement is not executory and should be enforced and that, in any event, it is entitled to recover on the basis of unjust enrichment and detrimental reliance.

On September 15, 2004, GSCP filed a Motion for Summary Judgment Pursuant to Section 365(c)(2) of the United States Bankruptcy Code, seeking dismissal of the Complaint.  On September 30, 2004, Greenwich filed its Response in Opposition to GSCP's motion, accompanied by its own cross-motion for summary judgment.  On December 15, 2004, the Court heard oral argument on the motion and cross-motion.  On March 6, 2008, the Hon. Prudence Carter Beatty, United States Bankruptcy Judge, issued

a Memorandum Decision (the "Decision") followed by a March 12, 2008 Order (the "Order"): (a) granting GSCP's motion for summary judgment; (b) denying Greenwich Insurance Company's cross-motion for summary judgment; and (c) dismissing the Adversary Proceeding with prejudice.  On March 20, 2008, Greenwich timely filed its Notice of Appeal.

## STATEMENT OF FACTS

GSCP is a limited partnership which functions as a private equity investment fund. (Deposition of Sanjay H. Patel, taken on February 5, 2004 ("Patel Tr."), Exhibit P to the Affidavit of Kenneth N. Laptook, dated September 29, 2004, ("Laptook Aff."), at 10:21-11:6)

Prior to the Atlantic Express bankruptcy filing on August 16, 2002, GSCP and its affiliates owned 91% of AETG. (Deposition of Nathan Schlenker, taken on July 30, 2004 and on September 9, 2004 ("Schlenker Tr."), Laptook Aff., Ex. Q[2] at 21:20-22:6)  AETG, in turn, owned 100% of AETC. (Patel Tr. 21:17-22; Schlenker Tr. 16:8-14)  GSCP's investment in Atlantic Express prior to the bankruptcy filing was in excess of $100 million dollars and rising. (Patel Tr. 36-37, 42)  Even after the reorganization, GSCP remained the significant shareholder in Atlantic Express. (Patel Tr. 42:15-22)

From at least January 2001 through August 2002, GSCP controlled a majority of the seats on the board of directors of both AETG and AETC. (Patel Tr. 22:10-24, 24:4-10, 25:3-6; Schlenker Tr. 19:11-20:4)  In fact, those companies shared identical boards of directors (Schlenker Tr. 16:19-22, 18) and GSCP kept itself informed with respect to the business of Atlantic Express through the board of directors meetings as well as periodic reports by the CFO and the President to one of the board members "associated with" GSCP. (Schlenker Tr. 32:8-25)

AETG and its subsidiaries were in the business of operating school buses and related services in various municipalities throughout United States. (Schlenker Tr. 28:10-

---

[2] Because the pages are numbered consecutively in the two Schlenker transcripts, they are joined here as one exhibit.

19)  Prior to the bankruptcy filing, they operated some 6,000 school buses across the country and had revenues of approximately $400 million a year. (Patel Tr.  43:20-44:5)

Atlantic Express first contacted Greenwich in early 2001, seeking a $6.2 million premium finance surety bond. (Deposition of Kieran Moran, taken on April 16, 2004 ("Moran Tr."), Laptook Aff., Ex. R at 6:14-8:12; Deposition of Ronald E. Wiss, taken on April 16, 2004 ("Wiss Tr."), Laptook Aff., Ex. S at 15:8-15)  The bond was essential because, without it, Cananwill was unwilling to enter into a premium financing agreement with Atlantic Express. (Schlenker Tr. 96:6-11)  Greenwich ultimately issued that bond and, in connection with the transaction, AETC and AETG executed a Commercial Surety and Indemnity Agreement, dated January 5, 2001 (the "Indemnity Agreement")(Laptook Aff., Ex. A; Wiss Tr. 16:20-17:19; Schlenker Tr. 90:10-91:7)

Article 1 of the Indemnity Agreement defines "Bond" as "Any bond, undertaking, guaranty or other contractual obligation undertaken by Surety on behalf of or at the request of Principal, before or after the date of this Agreement, and any renewal or extension of said obligation," and defines "Surety" as "GREENWICH INSURANCE COMPANY, its affiliates, subsidiaries or reinsurers, and any other persons or entities which it may procure to act as a surety, co-surety or obligor on any Bond, or any other person or entity who executes a Bond at its request."[3]

Article 2 of the Indemnity Agreement provides that:

(a)     Undersigned [AETG and AETC] agrees to pay to Surety upon demand:

(i)     all losses, costs, damages, attorney's fees, including outside or in-house counsel staff, and expenses of whatever kind or nature which Surety may incur or pay by reason of, or in

---

[3]  Thus, XL America, Inc., as co-surety on the Bonds, is a Surety under the Indemnity Agreement.

consequence of, the execution by Surety of any Bond and/or in enforcing the terms of this agreement, with interest thereon;

(ii)    the amount of any claim made against Surety on any Bond, whether disputed or not. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond. Such collateral may be held by Surety until it has received evidence satisfactory to Surety of its complete discharge from all claims or potential claims under any Bond(s), and until it has been fully reimbursed for all loss, cost, expenses and attorney's fees incurred by reason of its issuance of any Bond(s) and in enforcing this Agreement and unpaid premiums.

Article 3 of the Indemnity Agreement provides, in paragraph 3(p), as follows:

3.    General Provisions
. . .

(p) Undersigned [Atlantic Express] agree to give Surety [Greenwich] prompt notice of any facts which might give rise to a claim upon any Bond.

(Laptook Aff., Exh. A)

In the spring of 2001, Atlantic Express was attempting to obtain liability insurance coverage for its bus fleet through Liberty Mutual Insurance Company. (Schlenker Tr. 101:14-102:15)  That insurance was critical to Atlantic Express because without liability insurance it would be unable to operate its buses. (Schlenker Tr. 81:4-9; Patel Tr. 44:11-17)  However, Atlantic Express, which suffered recurring cash-flow problems (Patel Tr. 37:14-38:23), was unable to pay the $11+ million premium on the Liberty insurance policy as an up-front lump-sum payment.  It therefore sought to finance that lump-sum premium through Cananwill, as it had done on previous occasions. (Schlenker Tr. 71:9-23, 76:4-12, 85:3-13, 100:16-20, 101:14-17, 102:10-20)  Cananwill insisted, as it had in the past, that Atlantic Express obtain a surety bond to protect it in the event Atlantic Express failed to make the required payments. (Schlenker Tr. 96:6-11)

In approximately May of 2001, therefore, Atlantic Express again contacted Greenwich, seeking the additional surety bond in the amount of approximately $11 million that it needed in order to enter into a new premium finance agreement with Cananwill. (Moran Tr. 11:23-12:9; Wiss Tr. 19:11-20)

Greenwich conducted a further underwriting investigation and discovered that the financial condition of Atlantic Express had deteriorated during the year. (Moran Tr. 12:10-14:4; Wiss Tr. 21:23-22:5)  As a result, Greenwich was unwilling to rely solely upon the existing Indemnity Agreement that had been executed by AETG and AETC in January, and demanded additional security in the form of collateral or a third-party indemnity before it would issue the additional surety bonds. (Moran Tr. 14:22-15:10; Wiss Tr. 20:21-21:19)  Atlantic Express informed Greenwich that it was unable to provide collateral but that it would discuss the matter of additional security with its owners. (Moran Tr. 15:14-19)

In approximately late June of 2001, Kieran Moran ("Moran"), an underwriter employed by Greenwich, participated in a conference call with Nat Schlenker ("Schlenker") of Atlantic Express,[4] Bradley Kane ("Kane") of GSCP[5] and representatives of Atlantic Express' insurance brokers. (Moran Tr. 15:20-16:10)  The purpose of the call was to give Greenwich some comfort regarding GSCP as an additional source of security. Kane presented Moran with an overview of GSCP and explained that it could not sign an

---

[4] Schlenker was the CFO of AETG and AETC from September 1990 through January 2002. Thereafter he functioned as a consultant to those firms until August of 2002 when he resumed his position as CFO and remained in that post until May of 2004. (Schlenker Tr. 8:15-9:17, 14:3-20)

[5] Kane was an "associate" employed by GSCP and was the liaison between it and Atlantic Express (Schlenker Tr. 147:10-16) and the person at GSCP responsible for the Atlantic Express investment (Moran Tr. 22:19-24). He also had the authority, on behalf of GSCP, to approve the terms of the various agreements negotiated between Atlantic Express and GSCP. (Jewell Tr. 97:21-98:3)

indemnity agreement because it would then have to disclose that obligation to its investors. Kane told Moran that GSCP would protect Greenwich in the transaction and would guarantee the Atlantic Express obligation but that, in order to circumvent the disclosure problem, they had to do it in a way that the writing did not show it was an obligation running directly from GSCP to Greenwich. (Moran Tr. 17:8-19:17)

In order to induce Greenwich to issue the Bonds, GSCP executed a written commitment to Atlantic Express, in the form of a letter dated July 19, 2001, in which GSCP promised to provide the funds needed to meet AETG's payment obligations to Cananwill in connection with the Premium Finance Agreement and to Greenwich in connection with the Bonds issued to Cananwill (the "GSCP Commitment Letter") (Laptook Aff., Ex. B). The GSCP Commitment letter provides, in relevant part, as follows:

> This letter shall confirm that Greenwich Street Capital Partners II, L.P. will make available to you [AETG] funds, in an aggregate amount not to exceed $10 million, from time to time until such time that all obligations to Greenwich Insurance Company under, or in respect of, the Cananwill Commercial Insurance Premium Finance Agreement … are met in their entirety. Such funds may be used by you solely to satisfy your direct or indirect payment obligations to Cananwill, Inc. under, or in respect of, the Cananwill Commercial Insurance Premium Financing Agreement … and to Greenwich Insurance Company under, or in respect of, the bond dated July 20, 2001 issued by Greenwich Insurance Company to Cananwill, Inc.[6]

AETG transmitted the GSCP Commitment Letter to Greenwich by means of a second letter, dated July 20, 2001 (the "Atlantic Express Commitment Letter"), which provides, in relevant part, as follows:

---

[6] As of the date of the letter no bond had yet been issued. Ultimately, Greenwich issued two bonds dated August 8, 2001, rather than one dated July 20, 2001, to secure Atlantic Express' payment obligations to Cananwill under the Premium Finance Agreement. (Wiss Tr. 53:22-55:25)

> In the event that draws are necessary under the [GSCP] commitment letter as aforesaid, and if AETG shall fail to make a request for funding under the [GSCP] commitment letter upon demand by Greenwich Insurance Company, or if GSCP shall fail to honor a request by AETG for funding under the [GSCP] commitment letter, then Greenwich Insurance Company shall be entitled to specific performance against AETG of the obligations of AETG under this letter or cause AETG to enforce AETG's rights under the [GSCP] commitment letter.

(Laptook Aff., Ex. C)  The specific language of both letters was negotiated by e-mail and telephone, in early July 2001, directly between Greenwich, represented by Ron Wiss ("Wiss") and GSCP, represented by Ron Jewell ("Jewell"), a Dechert LLP partner. (Deposition of Ronald Jewell, taken on September 10, 2004 ("Jewell Tr.") Laptook Aff., Ex. T, at 30:18-24, 33:16-34:13)  Atlantic Express did not participate in those negotiations.

At the very same time, but without disclosure to Greenwich, GSCP and AETG entered into a Funding Agreement (the "Funding Agreement")(Laptook Aff., Ex. D) and a Commitment Fee and Collateral Agreement (Supplemental Affidavit of Charles I. Poret, dated October 18, 2004 ("Poret Supp. Aff"), Ex. 2) both dated July 20, 2001.  The Funding Agreement purported, in paragraph 1, to supercede the GSCP Commitment Letter of the previous day and provided specifically, in paragraph 3, that GSCP's commitment to provide funds to AETG  would terminate upon the commencement of a bankruptcy proceeding by or against AETG or its subsidiaries. (Laptook Aff., Ex. D)[7] Although Jewell had begun drafting the Funding Agreement a month earlier, he did not disclose its existence or its terms to Wiss during their negotiations, and Greenwich learned of it for the first time during the course of this lawsuit. (Jewell Tr. 24:7-17, 25:6-

---

[7] The Commitment Fee and Collateral Agreement imposed certain obligations upon AETG in connection with any funds to be provided by GSCP.

8, 73:10-74:2, 74:16-24, 75:20-25, 78:7-14, 80:23-81:21; Wiss Tr. 59:22-25, 63:24-64:8, 64:14-65:5)[8]

On or about August 2, 2001, Greenwich (and XL America, Inc.), pursuant to the request of Atlantic Express and in reliance upon the GSCP Commitment Letter, the Atlantic Express Commitment Letter and the Indemnity Agreement, executed and issued, as co-sureties, on behalf of Atlantic Express (as principal) to Cananwill (as obligee) Premium Finance Bond No. 45033904 in the penal sum of $5.5 million, and Premium Finance Bond No. 45033905 in the penal sum of $5,000,000 (collectively, the "Bonds") (Laptook Aff., Exs. E and F), thereby securing Atlantic Express's financial obligations to Cananwill under the Premium Finance Agreement. Thereafter, Cananwill and Atlantic Express entered into the Premium Finance Agreement. (Laptook Aff., Ex. G)

Almost a year later, on or about July 10, 2002, Atlantic Express defaulted on its obligations to Cananwill under the Premium Finance Agreement by failing to make the last monthly installment payment. (Schlenker Tr. 193:6-22; Patel Tr. 68:23-69:3) According to Schlenker, although he informed Mr. Gatto, the president of Atlantic Express, that there was not enough money on hand to pay Cananwill, there was no discussion within the company as to whether a request should be made on GSCP for funds pursuant to the GSCP Commitment Letter and, in fact, no such demand was made. (Schlenker Tr. 195:3-13, 197:5-12, 202:18-23)

---

[8] Jewell acknowledged understanding that the purpose of the surety bonds sought from Greenwich was to ensure that Cananwill would be paid if Atlantic Express failed to pay (Jewell Tr. 36:19-23). But he claimed to have no understanding of why Wiss or Greenwich wanted the GSCP Commitment Letter that he negotiated. (Jewell Tr. 45:2-10) He insisted that it was not the purpose of that agreement to give Greenwich additional security but that, instead, the document was just something Greenwich wanted for its files. (Jewell Tr. 82:25-83:18) Asked whether the GSCP Commitment Letter provided that GSCP would pay Cananwill or Greenwich if Atlantic Express defaulted, Jewell replied "absolutely not." (Jewell Tr. 83:19-24)

On July 15, 2002, Cananwill issued a Notice of Intent to Cancel Insurance (Laptook Aff., Ex. H) and on August 2, 2002, it issued a Notice of Cancellation. (Laptook Aff., Ex. I)  Two weeks later, on August 16, 2002, the bankruptcy petitions were filed by Atlantic Express.

Despite its unequivocal obligation, pursuant to paragraph 3(p) of the Indemnity Agreement, to promptly notify Greenwich, Atlantic Express did not inform Greenwich that it was unable to pay Cananwill, that it had defaulted on its obligations under the Premium Finance Agreement, or that Cananwill had cancelled that agreement. (Laptook Aff., Ex. A; Schlenker Tr. 201:5-202:6)  And although Schlenker now maintains that he made no request on GSCP for funds pursuant to the GSCP Commitment Letter (Schlenker Tr. 203:7-9), in the fall of 2002 he told Wiss that GSCP had known about the default when it occurred and that he had made a demand for funds from GSCP but had not received any substantive response. (Wiss Tr. 74:9-76:18, 88:6-19, 91:15-92:13)[9]

Greenwich first learned of Atlantic Express's default on August 19, 2002, when it received a demand letter from Cananwill. (Wiss Tr. 78:2-16; Laptook Aff., Ex. J)  On September 5, 2002, Wiss wrote to Schlenker at Atlantic Express advising him of Cananwill's claim, inquiring about available defenses and reminding him of their conversation the previous day in which Wiss insisted that AETG make a demand on GSCP for funds pursuant to the GSCP Commitment Letter. (Wiss Tr. 86:7-87:13; Laptook Aff., Ex. K)  On September 23, 2002, Wiss again wrote to Schlenker, asking about available defenses and about what demands for funds Atlantic Express had made upon GSCP. (Wiss Tr. 94:21-95:5; Laptook Aff., Ex. L)

---

[9] At about the same time, Schlenker also told Moran that he had made a demand on GSCP for funds pursuant to the GSCP Commitment Letter. (Moran Tr. 27:22-28:13) Schlenker now says he doesn't recall whether he told Wiss and/or Moran that he had made such a demand on GSCP. (Schlenker Tr. 218:7-11)

By letter dated October 24, 2002, Schlenker informed Wiss that AETG knew of no defenses to Cananwill's claim against the Bonds. (Laptook Aff., Ex. M)  On the following day, Wiss wrote to GSCP, advising it of Cananwill's claim and demanding payment of the $1,082,410.48 then owed to Cananwill. (Wiss Tr. 88:6-87:17; Laptook Aff., Ex. N)  In that letter, Wiss reminded GSCP of its obligations under the GSCP Commitment Letter and stated that Schlenker had told Greenwich that GSCP had refused his request for funds to satisfy Atlantic Express's obligations to Cananwill and Greenwich.

In early November 2002, Greenwich paid Cananwill $1,082,410.48, the amount owed by Atlantic Express under the Premium Finance Agreement, and received a Release and Assignment of Claim in return. (Wiss Tr. 82:18-83:2; Laptook Aff., Ex. O) Approximately six months later, Greenwich filed its Complaint.

## ARGUMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable in adversary proceedings by Bankruptcy Rule 7056, provides, in relevant part, that summary judgment "should be rendered if the pleadings … and any affidavits show that there is no issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party and all inferences must be drawn in favor of that party. Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000); Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)(summary judgment appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party.")  Greenwich respectfully submits that the bankruptcy court erred in applying that standard when it granted GSCP's motion for summary judgment and denied Greenwich's cross-motion for summary judgment.

## Point I

### A.    THE COURT BELOW ERRED IN FINDING THAT THE CONTRACT WAS EXECUTORY AND IN GRANTING GSCP'S MOTION FOR SUMMARY JUDGMENT

The bankruptcy court granted GSCP's motion for summary judgment on the basis that the GSCP Commitment Letter and the Atlantic Express Commitment Letter, taken together, constitute a financial accommodation for the benefit of Atlantic Express and an executory contract which, by virtue of 11 U.S.C. § 365(c)(2), cannot be enforced against GSCP either by Atlantic Express or by Greenwich standing in its shoes. (Decision, pp. 13-14)  Greenwich respectfully submits that the court erred with respect to both the facts and the law and that its decision should be reversed.

Bankruptcy Code § 365(c)(2) prohibits a trustee from assuming any <u>executory</u> contract to "make a loan or extend other debt financing or financial accommodations, to or for the benefit of the debtor . …"  In determining the applicability of § 365(c)(2), the first determination to be made is whether the contract in question is executory because <u>only</u> executory contracts are barred by the statute.  The court below, however, turned the analysis on its head, asserting that "<u>any</u> pre-petition agreement for a loan or financial accommodations that is unperformed on the petition date must per se be executory." (<u>Id</u>. p. 12) (emphasis supplied)  The court then proceeded, inevitably, to the conclusion that the GSCP Commitment Letter,[10] which is concededly a financial accommodation, was an unenforceable executory contract.  In doing so, the court simply rejected the commonly-applied "Countryman" test for determining whether a contract is executory, finding it "irrelevant in light of the purpose and plain meaning of Code § 365 (c)(2)." (<u>Id</u>. p. 12)

A dispassionate consideration of the facts and the law demonstrates that the GSCP Commitment Letter is not an executory contract and that § 365(c)(2) does not prohibit holding GSCP to its written promise.

While the Bankruptcy Code does not expressly define the term "executory contract," the legislative history states that it "generally includes contracts on which performance remains due to some extent on both sides." <u>In re Chateaugay Corp.</u>, 102 B.R. 335 (S.D.N.Y. 1989) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S. Cong. Code & Admin. News 5787, 5844, 6303).  It is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the

---

[10]  Considered alone or together with the Atlantic Express Commitment Letter.

performance of the other." Boland v. Parmelee, 1997 WL 642250, at *10-11 (N.D.N.Y

Oct. 15, 1997)[11] (citing In re Sundial Asphalt Co., 147 B.R. 72, 79 (Bankr. E.D.N.Y.

1992); Sharon Steel Corp v. National Fuel Gas Distrib. Corp., 872 F.3d 36, 39 (3d Cir

1989); In re Craig, 144 F.3d 593, 596 (8th Cir. 1998).  Thus, in order to characterize a

contract as "executory" there must be continuing obligations on the part of both parties to

the contract. See In re Golden Books Family Entertainment Co., 269 B.R. 300, 308

(Bankr. D. Del. 2001)

The fact that insignificant obligations may remain to be performed will not be

sufficient to render a contract executory. See e.g., Hotel Syracuse, Inc. v. City of

Syracuse Indus. Dev. Agency, 155 B.R. 824 (N.D.N.Y. 1993) (contract not executory

despite the fact that one party remained obligated to, among other things, "pay or cause to

be paid out of insurance funds, payments to contractors, materialmen, etc.").  The Second

Circuit has employed the Countryman "material breach" test to determine whether a

contract is executory.  Under that test, a contract is deemed executory only where

> the obligations of both the bankrupt and the other party to
> the contract are so far unperformed that the failure of either
> to complete the performance would constitute a material
> breach excusing the performance of the other.

In re Penn Trafffic Co., 524 F.3d 373 (2d Cir. 2008) quoting Countryman, *Executory

Contracts in Bankruptcy: Part I,* 57 Minn. L. Rev. 439, 460 (1973); Shoppers World

Cmty. Ctr., L.P. v. Bradlees Stores, Inc., 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001).

It is significant, on the facts of this case, that the "definition of executory contract

excludes from the purview of §365 of the Code those contracts . . . where the only

performance that remains is the payment of money." In re Chateaugay Corp., 102 B.R.

---

[11] Copies of all unreported cases are provided under Attachment A of this Brief.

335, 345 (S.D.N.Y. 1989)(citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977)).

Contracts are not considered executory where the only remaining obligation of one party

is the payment of money. In re Spectrum Info. Technologies, 190 B.R. 741 (E.D.N.Y.

1996) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), U.S. Code Cong. &

Admin. News 1978, pp. 6303-04) (employment agreements non-executory because there

was no material continuing obligation on the part of the employees and because the only

performance left on the part of debtor was the payment of money); In re Chateaugay

Corp., 102 B.R. 335, (Bankr. S.D.N.Y. 1989) (indemnity agreement is not executory

because the only obligation due is the payment of money); In re Leibinger-Roberts, Inc.,

105 B.R. 208, 213 (Bankr. E.D.N.Y. 1989)(shareholders' agreement non-executory

because only significant remaining obligation was payment of money); see also In re

Placid Oil Co., 72 B.R. 135 (Bankr. N.D. Tex. 1987).

Clearly, prior to Atlantic Express filing the bankruptcy petition, there remained no

unperformed obligation on the part of either GSCP (other than the obligation to pay) or

Atlantic Express under the GCSP Commitment Letter.[12]  GSCP argued below that, by

virtue of the Atlantic Express Commitment Letter, Atlantic Express had "an [as-yet

unexercised] affirmative duty to act to invoke" the GSCP Commitment Letter (Def.

Moving Br., p. 11, ¶25), which constituted a condition precedent to GSCP's obligation to

provide funds. (Def. Moving Br., p. 11-12, ¶25)  That argument is simply without merit.[13]

---

[12] The same is true with respect to the other parties involved in this transaction at or prior to the filing of the bankruptcy petitions. Greenwich, relying in part upon the two commitment letters, had issued the Bonds. Cananwill, relying in part upon the Bonds, had provided insurance premium funding. And Atlantic Express had defaulted on its payment obligations to Cananwill. The only remaining unperformed obligation was that of GSCP to provide Atlantic Express with the funds necessary to pay Cananwill and/or Greeenwich.

[13] The court below gave no consideration to this argument because, in its view, it made no difference whether Atlantic Express in fact made a demand for funds prior to the bankruptcy filing: all that mattered, in the court's view, was that, as of the filing date, those funds had not been provided. (Decision, p. 13) The court did, however, read into the two commitment letters an "implicit" obligation of Atlantic Express to

Nothing in the GSCP Commitment Letter suggests a "demand obligation" on the part of Atlantic Express. Neither does the language of the Atlantic Express Commitment Letter, which runs between Atlantic Express and Greenwich and does refer to "requests" for funds, serve to elevate those requests into a condition precedent to GSCP's obligation to provide funds. Atlantic Express defaulted on its payment obligations to Cananwill in mid-July of 2002 – a month before the bankruptcy filing – and GSCP was, at least as early as that default, obligated under the terms of the GSCP Commitment Letter to provide funds to Atlantic Express.

GSCP's obligation to pay arose upon the default of Atlantic Express in July 2002. See Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp., 2004 WL 830079 (S.D.N.Y. April 13, 2004) (obligation to pay debt arose when the party primarily obligated on the debt ceased "complying with the agreed upon payment plan."). Notification of the default, or demand for payment, does not control whether or not the obligation was created and existed. See In re Drexel Burnham Lambert Group, 151 B.R. 674, 683 (S.D.N.Y. 1993) ("the beneficiary of the guaranty need not inform the guarantor of a default as a prerequisite to the guarantor's obligation to pay."). GSCP's only remaining performance obligation under the GSCP Commitment Letter, which arose pre-petition and relates to a pre-petition obligation of Atlantic Express, is that of payment – and a mere payment obligation is insufficient to render a contract executory.

---

repay the monies advanced by GSCP (Id. p. 13, n 6): there is nothing, however, in those two documents to support that conclusion.

**B.    EQUITY REQUIRES THAT ATLANTIC EXPRESS BE DEEMED TO HAVE REQUESTED PAYMENT FROM GSCP**

GSCP contends that because Atlantic Express failed to formally request funds under the GSCP Commitment Letter prior to the petition date, any payment obligation on its part can only have arisen post-petition and is barred by 11 U.S.C. §365(c)(2). The mischief that would flow from accepting such a disingenuous proposition, particularly on the facts of this case, is self-evident. Equity mandates that any such request, if indeed required under the GSC Commitment Letter and/or the Atlantic Express Commitment Letter, be deemed to have been made.

When Atlantic Express defaulted on the last payment due under the Premium Finance Agreement, in July 2002, the Liberty insurance policy had already long-since expired (Laptook Aff. Ex. G). With a bankruptcy filing fast approaching, and with no practical advantage to be derived from making the premium payment, Atlantic Express and GSCP faced a choice between utilizing $1 million of GSCP's money to pay Cananwill or foisting that million-dollar burden onto Greenwich which, as they knew, would be required to pay Cananwill pursuant to the Bonds.[14]  Under those circumstances it would not be surprising if Atlantic Express consciously decided not to make a "demand" on its parent company for that million dollars and not to give Greenwich the information that would enable it to do so. Rather than fulfill their obligations, GSCP and

---

[14] Logic and common sense compel the conclusion that, even then, GSCP contemplated and intended that following the imminent bankruptcy it would invoke the bar of §365 to defeat any attempt by Greenwich to recover pursuant to the GSCP Commitment Letter. See, for example, the undisclosed Funding Agreement, drafted by GSCP's attorney, Ron Jewell, which purports to supercede the GSCP Commitment Letter and provides that GSCP's funding obligations shall terminate in the event of an Atlantic Express bankruptcy (Laptook Aff. Ex. D, ¶¶ 1 and 3).

Atlantic Express chose, wrongfully, to ignore them and to do so at Greenwich's expense.[15]

"'Equity regards as done what ought to have been done . . . and resolves uncertainties against those whose wrongful acts or omissions created them.'" <u>Girls Clubs of America Inc. v. Boys Clubs of America Inc</u>., 1989 WL 297861, (S.D.N.Y.  May 12, 1989) (quoting <u>United States ex rel. Schuster v. Vincent</u>, 524 F.2d 153, (2d Cir. 1975)). A party that has a duty to act but fails to do so cannot reap the benefits of its own inaction, especially where failure to act would prove beneficial to that party. <u>See</u> <u>e.g.,</u> <u>Lippe v. Genlyte Group, Inc.</u>, 2002 WL531010 (S.D.N.Y. April 8, 2002) ("substance must be elevated over form, and the parties' intent under the Agreement must control.")(citation omitted); <u>see also</u> <u>Osetek v. Osetek</u>, N.Y.S.2d 884, 75A.D.2d 869, 427 (N.Y. App. Div. 2d Dep't 1980)(where plaintiff husband permitted taxes on property held jointly with wife to fall into arrears, causing it to be sold at a tax foreclosure sale and allowing plaintiff to repurchase residence in his own name, equity required plaintiff to execute and deliver a deed transferring the ownership of such property to himself and his former wife as plaintiff would otherwise "reap an inequitable benefit from his own wrongful conduct."); <u>Sweedler v. Oboler</u>, 319 N.Y.S.2d 89, 65 Misc. 2d 789 (N.Y. Misc. 1971)(where purchaser paid for merchandise but failed and refused to endorse certified checks, bank could not avoid payment by asserting that checks were not endorsed, as equity required that the purchaser's "obligation to have fulfilled the antecedent condition of payment" could not be avoided).

---

[15] Of course, Greenwich could not itself make a pre-petition demand on either Atlantic Express or GSCP because, despite its obligation to do so under the Indemnity Agreement, Atlantic Express did not inform Greenwich that a default had occurred.

Thus, even if Atlantic Express failed to make a pre-petition demand on GSCP, and even if such a demand was required as a condition precedent to GSCP's obligation to fund Atlantic Express under the GSCP Commitment Letter, the injustice that would result if GSCP were permitted to thereby avoid its obligation is so great that equity must deem that demand for payment to have been made.

Greenwich respectfully submits that, for all of the foregoing reasons, and because, as is discussed below, Greenwich is entitled to judgment against GSCP regardless of whether the GSCP Commitment Letter is not enforceable based upon Bankruptcy Code § 365(c)(2), the decision below granting GSCP's motion for summary judgment and dismissing the Complaint should be reversed.

## Point II

### THE COURT BELOW ERRED IN DENYING GREENWICH'S CROSS-MOTION FOR SUMMARY JUDGMENT

The bankruptcy judge denied Greenwich's cross-motion for summary judgment on the grounds that (a) the Commitment Letter(s) constituted a financial accommodation which *per se* must be an executory contract and Bankruptcy Code § 365(c)(2) prohibits the enforcement of that contract; (b) in support of its unjust enrichment claim, Greenwich failed to show (i) that GSCP had been enriched or (ii) that it had acted in such a way as to incur obligations to Greenwich outside the written contractual structure; and (c) in support of its promissory estoppel claim, Greenwich failed to demonstrate any promise made to it by GSCP.

Greenwich respectfully submits that the court erred with respect to each of those rulings and that the decision below should be reversed.

A.    THE COURT BELOW ERRED IN DENYING GREENWICH'S CROSS-MOTION FOR SUMMARY JUDGMENT BASED ON THE GSCP COMMITMENT LETTER AND THE ATLANTIC EXPRESS COMMITMENT LETTER

As is discussed in Point I, above, enforcement of the GSCP Commitment Letter (and the Atlantic Express Commitment Letter) is not barred by Section 365(c)(2) of the Bankruptcy Code and Greenwich is, therefore, entitled to judgment on its claim.

Pursuant to the GSCP Commitment Letter, GSCP promised to provide Atlantic Express with up to $10 million to be used solely in order to ensure that all of Atlantic Express's obligations to Greenwich and to Cananwill were satisfied in their entirety. (Laptook Aff., Ex. B)  In July of 2002, Atlantic Express defaulted on the final installment payment due under the Premium Finance Agreement.  GSCP had a then-existing obligation under the GSCP Commitment Letter to provide Atlantic Express with the funds necessary to avoid and/or cure that default, but failed to do so.  Atlantic Express unquestionably had the right to enforce that obligation, but failed to do so.  The result of that inaction by GSCP and Atlantic Express was a loss to Greenwich in excess of $1 million.

Pursuant to the Atlantic Express Commitment Letter, Greenwich is entitled to, in effect, stand in the shoes of Atlantic Express and to enforce Atlantic Express's rights against GSCP under the GSCP Commitment Letter.  (Laptook Aff., Ex. C)

Greenwich submits that, for all of the reasons set forth above, the court below erred in denying its cross-motion for summary judgment and it is entitled to judgment against GSCP in the amount of its loss.

**B.    THE COURT BELOW ERRED IN DENYING GREENWICH'S CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM OF UNJUST ENRICHMENT**

The court below denied Greenwich's cross-motion for summary judgment on its claim of unjust enrichment, finding that Greenwich had failed to show: (a) that GSCP had been enriched; or (b) that GSCP had acted in such a way as to incur obligations to Greenwich outside the contractual structure. (Decision, p. 15)  Greenwich submits that the evidence supports its claim and that the decision below should be reversed.

A claim for unjust enrichment is a quasi-contractual claim and is cognizable, in the absence of a valid enforceable contract, where one party has received a substantial economic benefit to the detriment of another party.  See Bennett v. John, 543 N.Y.S.2d 143, 144 (N.Y. App. Div. 2d Dep't 1989)(monetary damages for unjust enrichment were appropriate where the plaintiff tenant expended substantial sums of money toward the improvement of the defendant's property while she was a tenant in occupancy in reliance upon a promise that she would be permitted to purchase premises); Adiel v. Coca-Cola Bottling Co., 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995).  It is "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which ex aequo et bono belongs to another." Bradkin v. Leverton, 26 N.Y.2d 192, 196, N.Y.S.2d 192, 197 (1970) (quoting Miller v. Schloss, 218 N.Y. 400, 218 N.Y. 400 (1916); see EFCO Corp. v. U.W. Marx, Inc., 124 F.3d 394, 401 (2d Cir. 1997) (a party "may incur 'quasi-contractual obligations to a third party with whom it has not contracted, by virtue of its direct representations to that party.'" (quoting U.S. East Telecomms., Inc. v. U.S.

West Communications Services, Inc., 38 F.3d 1289, 1297 (2d Cir. 1994)); Comm. of Unsecured Creditors of Rama Group of Cos. v. Gottesman Co., 2002 WL 1012974 (W.D.N.Y. May 6, 2002) (where debtor agreed pre-petition to pay a broker a commission if it procured a buyer and broker undisputedly procured a buyer prior to the filing of bankruptcy, it was "equitable and just" that broker should receive his commission, even though closing occurred post-petition, because the debtor and, indirectly, its unsecured creditors would be unjustly enriched if the commission was not paid); United Systems Assoc. v. Norstar Bank Upstate New York, 566 N.Y.S.2d 793 (N.Y. 3d Dep't 1991) (action for unjust enrichment appropriate to "recover moneys from a defendant who has received a benefit where his debt is satisfied or where he has been spared an expense or loss.")

In order to state a claim for unjust enrichment under New York law, a plaintiff must show that (i) the defendant was enriched; (ii) at the plaintiff's expense; and (iii) that it is against equity and good conscience to permit the defendant to retain that which is sought to be recovered. Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004); Kaye v. Grossman, 202 F.3d 611 (2d Cir. 2000); Dolmetta v. Uintah Natl. Corp., 712 F.2d 15 (2d Cir. 1983); Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F.Supp.2d 428, 448 (S.D.N.Y. 2003); Albrechta v. Broome County Industrial Development Agency, 274 A.D.2d 651, 710 N.Y.S.2d 709, 711 (3d Dept. 2000). The "essence" of such a claim "is that one party has received money or a benefit at the expense of another." City of Syracuse v. R.A.C. Holding, Inc., 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999). As the judge below noted, as part of its analysis "the court will [also] inquire whether a party 'acted in such a way as to incur obligations

to the [party claiming unjust enrichment] outside the contractual structure.'" (Decision, p. 15)(quoting <u>U.S. East Telecomms., Inc.</u>, <u>supra</u>.)

GSCP unquestionably acted in such a way as to incur obligations to Greenwich outside the contractual structure.  When Atlantic Express was unable to obtain critical bonding from Greenwich without additional security or assurances, GSCP provided those assurances directly to Greenwich.  During a telephone conference call in late June 2001, GSCP's Bradley Kane told Greenwich's Keith Moran that GSCP would protect Greenwich in the transaction and would guarantee the Atlantic Express obligation, but that it would have to be done by a writing that did not show an obligation running directly from GSCP to Greenwich, <u>i.e.</u>, the "contractual structure" for effectuating that promise could not be a direct agreement between Greenwich and GSCP. (Moran Tr. 17:8-19:17)  The mechanism utilized by the parties to effectuate that promise was the GSCP Commitment Letter.  By virtue of Mr. Kane's assurances to Greenwich and GSCP's subsequent execution of the Commitment Letter, GSCP surely acted in such a way as to incur obligations to Greenwich outside the contractual structure.[16]

The court below concluded that Greenwich had failed to show that GSCP was unjustly enriched because "[a]ny benefit conferred on GSCP could only have been the indirect result of being the majority shareholder [of Atlantic Express.]" (Decision, p. 15) But the benefit conferred on GSCP was twofold.  First, it is true that Greenwich's payment of $1 million to Cananwill to satisfy Atlantic Express's obligation to pay for insurance coverage it had actually received and which was critical to its business,

---

[16] The court's contrary conclusion rests substantially on its observation that "the actions and express statements of GSCP made it clear to Greenwich that GSCP would not guarantee Atlantic Express's obligations." (Decision, p. 15) In fact, however, by its actions and its statements GSCP communicated to Greenwich that it would ensure that Atlantic Express satisfied its obligations but that, for unrelated reasons, it could not do so through a document that reflected a direct obligation running from GSCP to Greenwich.

certainly enhanced the value of Atlantic Express and thereby benefited GSCP.  It is also true that, pursuant to the GSCP Commitment Letter, GSCP was obligated to provide that million dollars to Atlantic Express – as a practical matter, therefore, the debt to Cananwill was an obligation of GSCP.  Thus, GSCP was enriched at the expense of Greenwich because Greenwich paid an obligation that should have been paid by GSCP.  Blue Cross of Central New York, Inc. v. Wheeler, 93 A.D.2d 995, 996, 461 N.Y.S.2d 624, 626 (1983) ("Unjust enrichment may occur not only where a person "receives money or property, but also where he otherwise receives a benefit. He receives a benefit where his debt is satisfied or where he is saved expense or loss.").

Greenwich submits that GSCP, having received a substantial economic benefit to the detriment of Greenwich, has been unjustly enriched and that the court below erred in denying Greenwich's cross-motion on its unjust enrichment claim.

### C.    THE COURT BELOW ERRED IN DENYING GREENWICH'S CROSS-MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM OF DETRIMENTAL RELIANCE

The court below denied Greenwich's cross-motion for summary judgment on its detrimental reliance claim, finding that: (a) any oral promises made to Greenwich by GSCP during their telephone conversations were superceded by the written GSCP Commitment Letter and Atlantic Express Commitment Letter; and that (b) GSCP's statement during those telephone conversations that it would not guarantee the bond payments for Atlantic Express was a clear and unambiguous statement that no promise was made. (Decision p. 16)  Greenwich respectfully submits that the evidence is sufficient to support its claim and that the decision below should be reversed.

The doctrine of detrimental reliance, which, under New York law is analyzed as a claim of promissory estoppel, <u>Thayer v. Dial Indus. Sales, Inc.</u>, 85 F. Supp. 2d 263, 271 (S.D.N.Y. 2000), may be invoked where an otherwise unenforceable promise was expected to and did induce detrimental reliance by the promisee and therefore should be held binding and enforceable to prevent injustice. <u>Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.</u>, 2003 WL 1345136 (S.D.N.Y. March 19, 2003)(citations omitted); <u>see</u> <u>also</u> Restatement 2d of Contracts, § 90(1)(1979) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.")

Recovery under a promissory estoppel theory "is not dependent on the existence of a contract or the particulars of consideration in the classic sense.  A promissory estoppel action, in contexts in which it is recognized, arises out of a breached promise in circumstances under which it is fair to hold the promisor to the terms of his promise." <u>LAHR Constr. Corp. v. J. Kozel & Son</u>, 168 Misc. 2d 759, 640 N.Y.S.2d 957, (N.Y. Sup. Ct. 1996).  Promissory estoppel has three elements: "'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reasons of his reliance.'" <u>Arcadian Phosphates, Inc. v. Arcadian Corp.</u>, 884 F.2d 69, 73 (2d Cir. 1989)(<u>quoting</u> <u>Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.</u>, 804 F.2d 787, 793 (2d Cir. 1986)).

The party asserting detrimental reliance need only demonstrate that, through the representations or promises made by another party or its agents, they were induced to enter into an agreement and thereafter undertook action that was consistent with those

representations. See Adiel v. Coca-Cola Bottling Co., 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995). The "proper measure of damages to a plaintiff who alleges detrimental reliance is the value of plaintiff's performance." von Kaulbach v. Keoseian, 783 F. Supp. 170, 178 (S.D.N.Y. 1992).

In mid-2001, GSCP had a $100 million investment in Atlantic Express. Atlantic Express needed liability insurance in order to operate its fleet of school buses. It also needed to finance the $11+ million lump-sum premium payment required to get that insurance. Cananwill refused to finance that premium payment for Atlantic Express without a surety bond. Greenwich refused to issue that surety bond without additional security in the form of collateral or a third-party indemnity. Atlantic Express could not provide that security, and asked GSCP to help. In a late June 2001 conference call, Bradley Kane, of GSCP, told Kieran Moran, of Greenwich, that GSCP would protect Greenwich in the transaction and would guarantee the Atlantic Express obligation but that, in order to avoid having to disclose that commitment to its investors, they would have to do it in a way that the writing did not show it was an obligation running directly from GSCP to Greenwich. (Moran Tr. 17:8-19:17) Certainly, that statement constituted a "clear and unambiguous promise" by GSCP to Greenwich that it would ensure that Greenwich got paid if it issued the bonds that Atlantic Express so badly needed. Equally certainly, that statement was made for the sole and express purpose of inducing Greenwich to issue those bonds.

Thereafter, in furtherance of GSCP's promise, Greenwich and GSCP negotiated, and GSCP subsequently executed, the GSCP Commitment Letter.[17] Unquestionably, GSCP executed the GSCP Commitment Letter, demonstrating to Greenwich its

---

[17] At the same time, Atlantic Express executed and delivered the Atlantic Express Commitment Letter.

contractual commitment to provide Atlantic Express with whatever funds were needed to satisfy its obligations to Greenwich in connection with the Bonds, for the sole and express purpose of inducing Greenwich to issue those Bonds.

There can be no doubt that GSCP intended Greenwich to understand that it would stand behind Atlantic Express's obligations in connection with the Bonds and would ensure that Greenwich got paid.  The fact that, as Mr. Kane explained, in order to avoid disclosure to its investors GSCP could not embody that promise in a writing (such as a guaranty) that showed a direct contractual obligation running from GSCP to Greenwich, in no way detracts from the understanding of both Greenwich and GSCP as to the promise GSCP was making: that it would provide the money for Atlantic Express to pay Greenwich.[18]  Under those circumstances, it was certainly both reasonable and foreseeable that Greenwich would rely on that promise – after all, it was GSCP's specific intention that Greenwich would do so.[19]

Greenwich relied on GSCP's promise and issued the Bonds.  Atlantic Express defaulted on its obligations to Cananwill and to Greenwich.  GSCP has refused to fulfill its promise to provide funds to Atlantic Express sufficient to satisfy its obligations to Greenwich.  As a result, Greenwich has incurred damages in excess of $1 million dollars.

Based on the foregoing, Greenwich respectfully submits that the court below erred in denying its cross-motion for summary judgment on the basis of detrimental reliance and that the decision below should be reversed.

---

[18] Thus, the court's suggestion that the commitment letters "supercede any oral agreements" is misplaced. On the contrary, those letters were the mechanism for implementing those agreements.

[19] Even had GSCP done no more than show Greenwich the GSCP Commitment Letter, in order to persuade it to issue the bonds to Atlantic Express, that would have been sufficient to support a detrimental reliance claim.  See Restatement 2d of Contracts § 90(1), supra (a promise reasonably intended to induce action on the part of a third person, i.e., not the promise, and which does induce such action is binding if justice requires); see also Stanish v. Polish Roman Catholic Union of America, 484 F.2d 713, 722 (7th Cir. 1973).

**Point III**

**GREENWICH IS ENTITLED TO PREVAIL**
**ON THE BASIS OF EQUITABLE ESTOPPEL**

Greenwich issued the Bonds in good faith on the basis of the statements made by GSCP and of the GSCP Commitment Letter and the Atlantic Express Commitment Letter which, it resonably believed, constituted an enforceable promise by GSCP to provide the funds to satisfy Atlantic Express's obligations to Greenwich.

Discovery in this case revealed a course of conduct on the part of GSCP and Atlantic Express that is tantamount to fraud.  Simultaneous with the execution of the GSCP Commitment Letter, GSCP and Atlantic Express entered into the Funding Agreement and the Commitment Fee and Collateral Agreement (Poret Supp. Aff. Exs. 1 and 2) which were concealed from Greenwich and which purport to revoke the GSCP Commitment Letter and, with it, the promise that Greenwich relied upon in issuing the Bonds.  Several weeks later, GSCP and Atlantic Express sat silent as Greenwich issued those Bonds, unaware that the agreement it relied upon had been revoked.  GSCP never provided funds to Atlantic Express to satisfy its obligations to Greenwich and Atlantic Express claims never to have asked for those funds.  As a result of their conduct, Greenwich has incurred damages in excess of one million dollars.

Under New York law, the party asserting equitable estoppel must show that the party to be estopped (1) engaged in conduct which amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts. Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996).  In addition, the party alleging estoppel must "show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the

party estopped; and (3) a prejudicial change in his position." <u>Id</u>. at 302.  The doctrine is a reflection of the law's overarching concern with fairness, a concern so fundamental that an appellate court may even take the unusual course of considering the issue if raised for the first time on appeal, though only in cases where (1) consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding. Id. at 302.

The conduct of GSCP and Atlantic Express, described above, more than satisfies the criteria set forth in <u>Readco</u> for the invocation of equitable estoppel.  Greenwich submits that, based on the foregoing, GSCP should be estopped from denying its liability to Greenwich for the damages incurred by Greenwich as a result of Atlantic Express's default.

## **CONCLUSION**

For all of the foregoing reasons, plaintiff Greenwich Insurance Company respectfully submits that the decision of the court below granting defendant GSCP's motion for summary judgment and denying Greenwich's cross-motion for summary judgment should be reversed.

WOLFF & SAMSON PC

   /s/ Karen L. Gilman
Karen L. Gilman, Esq. (KG-5161)
140 Broadway
Forty-Sixth Floor
New York, New York 10005
Tel: (212) 973-0572
Fax: (973) 530-2207
Attorneys for Plaintiff
Greenwich Insurance Company

Dated: May 30, 2008

# ATTACHMENT "A"

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

**H**

In re Bradlees Stores, Inc.

S.D.N.Y.,2001.

United States District Court, S.D. New York.
In re: BRADLEES STORES, INC., et al., Debtors.
SHOPPERS WORLD COMMUNITY CENTER,
L.P., Appellant,
v.
BRADLEES STORES, INC., et al., Appellees.
**Nos. 00-16033 (BRL), 00-16035(BRL),
00-16036(BRL), 01-CV-3934 (SAS).**

Sept. 20, 2001.

Paul Traub, Maura Russell, Barbie D. Lieber,
Traub, Bonacquist & Fox, LLP, New York, NY,
Sander A. Rikleen, Francis C. Morrissey, Hutchins,
Wheeler & Dittmar, a Professional Corporation,
Boston, MA, for Appellant Shoppers World Com-
munity Center, L.P.
Adam C. Rogoff, Cadwalader, Wickersham & Taft,
New York, NY, for Appellee Bradlees Stores, Inc.
Thomas E. Lauria, Frank L. Eaton, White & Case,
LLP, Miami, FL, for Appellee S & S/B Lease Dis-
position LLC.

### MEMORANDUM DECISION

SCHEINDLIN, J.

*1 Bradlees Stores, Inc. ("Bradlees") moved before
the United States Bankruptcy Court for the South-
ern District of New York for an order authorizing
its sale of certain lease designation rights and the
disposition of related leases. Shoppers World Com-
munity Center, L.P. ("SWCC") objected to that mo-
tion. The Bankruptcy Court entered a Memorandum
Decision and Order overruling SWCC's objection.
SWCC appeals from the Bankruptcy Court's order
pursuant to 28 U.S.C. § 158.

For the reasons set forth below, the Memorandum
Decision and Order of the Bankruptcy Court is af-
firmed.

## I. PROCEDURAL BACKGROUND

Bradlees is a publicly held company that, until re-
cently, operated 105 discount stores located in the
Northeastern United States.[FN1] SWCC is the owner
of a retail shopping center located in Framingham,
Massachusetts, that it purchased from Sears in
November, 1995. SWCC is the primary landlord for
space in the Framingham shopping center (the
"Premises") that is leased to Wellons Realty Trust
("Wellons"), and affiliate of the Stop & Shop Com-
panies, Inc. ("Stop & Shop"), and subleased to
Bradlees.

> FN1. Under authorization from the Bank-
> ruptcy Court, Bradlees liquidated its entire
> inventory and, as of February 5, 2001, was
> no longer operating its stores.

Bradlees filed a voluntary Chapter 11 petition in the
Bankruptcy Court for the Southern District of New
York on June 23, 1995 (*"Bradlees I"* ). As part of
*Bradlees I,* SWCC and Bradlees entered into a set-
tlement agreement (the "Settlement Agreement")
resolving certain disputes regarding Bradlees' occu-
pancy of the Premises. On December 26, 2000,
Bradlees filed a second Chapter 11 petition
(*"Bradlees II"* ). As part of *Bradlees II,* Bradlees
moved before the Bankruptcy Court for an order
authorizing an agreement (the "Lease Designation
Agreement") in which Bradlees would sell its rights
to designate certain leases (the "Lease Designation
Rights") to S & S/B Lease Disposition LLC ("S &
S/B"), an affiliate of Stop & Shop, and would sell
the related leases (the "Leases") through S & S/B.
SWCC objected to this motion to the extent that it
related to Bradlees' right to occupy the Premises.
On March 28, 2001, the Bankruptcy Court entered a
Memorandum Decision and Order (the "Sale De-
cision") overruling SWCC's objection and authoriz-
ing the Agreement.

## II. APPLICABLE STANDARD OF REVIEW

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

In bankruptcy cases, a District Court sits as an appellate court and applies the well-known dual standards of review. The Bankruptcy Court's findings of fact will only be set aside if they are clearly erroneous. *See* Fed. R. Bankr.P. 8013; *In re Artha Mgmt., Inc.,* 91 F.3d 326, 328 (2d Cir.1996). Questions of law are subject to *denovo* review. *SeeIn re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir.1992); *Seaman Furniture Co. of Union Square, Inc. v. Seaman-Mitchell Assoc. (In re Seaman Furniture Co. of Union Square),* No. 96 Civ. 4268, 1996 WL 741604, at *1 (S.D.N.Y. Dec. 27, 1996).

## III. FACTUAL BACKGROUND

### A. The Overlease and Sublease

On October 18, 1974, Stop & Shop, Bradlees' former corporate parent, entered into a thirty-year term lease with SWCC's predecessor in interest, Shoppers World Inc. (the "Overlease").[FN2] *See* Sale Decision, Ex. 3 to Appendix to Brief for Appellant SWCC ("Appellant App."), at 1 n. 1. Among other things, the Overlease included the following provisions: (1) that the Premises would be used, if at all, as a department store under the name "Bradlees" or such other name as the tenant might use for its department store line of business, (2) that the tenant would have the right to assign the Overlease or sublet all or part of the Premises with the landlord's consent (the "Lease Designation Rights"), and (3) that such assignments or subleases could only be made to (a) a subsidiary or affiliate of Stop & Shop, (b) an entity acquiring all or substantially all of Stop & Shop's assets or (c) an entity succeeding Stop & Shop's interest by merger, consolidation or similar procedure (the "Overlease Assignment Restrictions"). *See* Overlease, Ex. H to 3/8/01 Affidavit of SWCC's Counsel Sander A. Rikleen ("Rikleen Aff."), Ex. 2 to Appellant App.; Sale Decision at 4-5.

> FN2. The Overlease was later acquired by Homart Development Co., predecessor to Sears. SWCC acquired the shopping center

from Sears in November, 1995. *See* Appellant App. at 5 n. 6.

*2 In December, 1988, Stop & Shop assigned its rights and interests under the Overlease to Wellons. *See* Sale Decision at 5. Wellons then executed a sublease for the Premises with Bradlees, an affiliate of Stop & Shop (the "Sublease").[FN3] *Seeid.*The Sublease contains a cross-reference to the Overlease that applies the limitations in the Lease Designation Rights, including the Overlease Assignment Restrictions, to the Sublease. *Seeid* .

> FN3. The named sublessee was Bradlees of New England, Inc., which merged into Bradlees in 1994.

### B. The Massachusetts Actions

In July, 1992, Bradlees was sold to a newly created, independent company, thus ending the affiliation of Bradlees with Stop & Shop. *Seeid.*In January, 1994, a notice of default was sent from SWCC's predecessor-in-interest, Homart Development Co., to Wellons (the "Default Notice").*Seeid.*The Default Notice insisted that Wellons was in default of the Overlease Assignment Restrictions because Bradlees was no longer an affiliate of Stop & Shop. *Seeid.*In response, Wellons and Stop & Shop commenced litigation in which they sought injunctive relief and damages resulting from the Default Notice. *SeeStop & Shop Supermarket Co. v. Homart Dev. Corp.,* No. 94 Civ. 233 (Norfolk Superior Court) (the "Stop & Shop Action").

In March, 1995, Bradlees sued Sears in the Massachusetts Federal Court for Sears' alleged breaches of the Overlease. *SeeBradlees Stores, Inc. v. Sears Dev. Co. (f/k/a/ Homart Dev. Co.) & Shoppers World Cmty Ctr., L.P.,* No. 85 Civ. 10685 (D.Mass.) (the "Bradlees Action"). SWCC was joined as a defendant when it purchased Shoppers World Complex from Sears later that year. Bradlees alleged, among other things, that Sears had taken certain actions with respect to the Premises that impeded Bradlees' ability to fully utilize the Premises

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

and interfered with Bradlees' rights of use and quiet enjoyment of the Premises. *See* Sale Decision at 6.

In June, 1995, Wellons sued Sears in Massachusetts Federal Court for breach of the Overlease. *SeeBrian Hotarek, et al. Tr. of Wellons Realty Trust v. Sears Dev. Co. (f/k/a/ Homart Dev. Co.) and Shoppers World Cmty Ctr., L.P.,* 95 Civ. 11269 (D.Mass.) (the "Wellons Action"). Wellons later amended its complaint to incorporate claims for injunctive relief and damages resulting from the Default Notice. *See* Sale Decision at 6.

The Bradlees Action and the Wellons action were consolidated (the "Consolidated Action"). In the Consolidated Action, Sears claimed that Bradlees was not authorized to occupy the Premises because it was no longer an affiliate of Stop & Shop, as required by the Overlease Assignment Restrictions. *Seeid.*Sears also counterclaimed for a declaration that Bradlees' use of the Premises was a violation of the Overlease and was therefore impermissible. *Seeid.*

C. *Bradlees I* and the Settlement Agreement

On June 23, 1995, Bradlees filed a petition under Chapter 11 of the Bankruptcy Code (*Bradlees I* ).*Seeid.* at 2. In November 1997, Bradlees filed a motion in the Bankruptcy Court seeking a declaration that the automatic stay imposed by section 362 of the Bankruptcy Code prohibited Sears and SWCC from prosecuting defenses and counterclaims that challenged the validity of the Sublease and Bradlees' occupancy of the Premises. *Seeid.* at 6. The Bankruptcy Court directed the matter to mediation. *Seeid.*Mediation resulted in a settlement agreement that was approved by the Bankruptcy Court on May 5, 1998. *See* Settlement Agreement, Appendix to Brief of Appellees ("Appellees App."), at A0213.

**\*3** The Settlement Agreement provided, among other things, that:

\* The Bradlees Action would be dismissed with

prejudice. *Seeid.* ¶ 3.

\* Sears would immediately pay $600,000 to Bradlees in full and final settlement of all of Bradlees' claims relating to the construction at and configuration of Shoppers World Complex. *Seeid.* ¶ 1.

\* SWCC would recognize Bradlees' occupancy of the premises regardless of the outcome of the Wellons Action. Specifically, while the Wellons litigation was pending, SWCC would not seek to disturb Bradlees' use, enjoyment and possession of the Premises based on the fact that Bradlees was no longer an affiliate of Stop & Shop or based on SWCC's contention that Bradlees' use of the Premises violated the Overlease. If Wellons were to win the Wellons Action, SWCC would recognize Bradlees as Wellons' proper subtenant. If Wellons were to lose the Wellons Action, SWCC would enter into a direct lease with Bradlees on the same terms and conditions as the Sublease. *Seeid.* ¶ 5.

\* Bradlees would operate the Premises only under the name "Bradlees." *Seeid.* ¶ 6.

\* Both before and after conclusion of *Bradlees I,* Bradlees was only permitted to assign its right to occupy the Premises to its affiliates and/or subsidiaries (the "Assignment Restrictions"). If Bradlees sought to assign its rights to occupy in a manner not specifically permitted in the Settlement Agreement, SWCC would be free to assert that such events were grounds to terminate the Overlease. *Seeid.*

The parties also agreed that performance of the Settlement Agreement was "not intended, and shall not be deemed, to waive, limit or affect SWCC's or Bradlees' rights to object to future conduct or events which are not specifically permitted under [the] Settlement Agreement."*Id.*

On May 5, 1998, the Bankruptcy Court entered an order approving the Settlement Agreement. *See* Sale Decision at 7. Thereafter, SWCC promptly paid $600,000 to Bradlees and executed releases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Case 1:08-cv-03814-LAP    Document 9-2    Filed 05/30/2008    Page 5 of 32 Page 4
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))

and delivered them to Bradlees. *See* Check from Sears to Bradlees, Ex. E to Rikleen Aff., at 57; Releases, Ex. E to Rikleen Aff., at 58-61. The Massachusetts Federal Court then dismissed the Bradlees Action with prejudice. *See* Stipulation of Dismissal, Ex. E to Rikleen Aff., at 62.

The Settlement Agreement did not resolve the Wellons Action. *See* Settlement Agreement ¶ 4. On November 27, 2000, the District Court granted partial summary judgment in the Wellons action to Sears and SWCC, establishing Wellons' breach of the Overlease. *See* Sale Decision at 7; Order, Ex. G to Rikleen Aff. ("Wellons Order").

The Bankruptcy Court confirmed the reorganization plan in *Bradlees I* (the *"Bradlees I* Plan) on January 27, 1999. *See id.* at 2. Although the *Bradlees I* Plan was substantially consummated, the case was not closed. *See id.*

D. *Bradlees II* and the Lease Designation Agreement

*4 After confirmation of the *Bradlees I* Plan, Bradlees continued to suffer substantial operating losses. *See* Order Approving Lease Designation and Disposition Agreement ("Sale Order"), Appellee App. at A0059, ¶¶ K-L. After Bradlees failed to secure a purchaser for its business as a going concern, Bradlees began an orderly wind-down of its operations. *See id.* ¶ N. To that end, Bradlees solicited offers for the sale of various store locations and other assets. *See id.* On Decemeber 26, 2000 (the "Petition Date"), Bradlees filed new petitions pursuant to Chapter 11 of the Bankruptcy Code (*Bradlees II* ).FN4 *See* Sale Decision at 2.

> FN4. *Bradlees I* and *Bradlees II* have been consolidated for procedural purposes only and are being jointly administered. *See* 1/25/01 Affidavit of Peter Thoran, Chairman and CEO of Bradlees ("Thoran Aff."), Ex. 1 to Appellant App., ¶ 4.

After the Petition Date, Bradlees and S & S/B ar-

rived at an agreement pursuant to which S & S/B would acquire Bradlees' designation rights for its unexpired non-residential leases. *See* Lease Agreement and Disposition Agreement Between Bradlees and S & S/B ("Lease Designation Agreement"), Ex. A to Sale Order. Specifically, Stop & Shop agreed to pay a minimum of $150 million to Bradlees for the right to acquire the leases and the exclusive right to select and identify third-party designees to whom any or all of the leases might be sold and assigned. *See id.* at 8-10. After Stop & Shop's recovery of expenses and payment of the $150 million guaranteed amount, all proceeds from the sale or assignment of the leases were to be distributed 75 percent to Bradlees and 25 percent to Stop & Shop until an aggregate amount of $20 million was distributed. *See id.* at 11-12. Thereafter, all remaining proceeds would be distributed 50 percent to Bradlees and 50 percent to Stop & Shop, subject to a possible reimbursement in favor of Bradlees relating to certain potential rejection damages as set forth in the Lease Designation Agreement. *See id.*

On January 5, 2001, Bradlees filed a motion in the Bankruptcy Court requesting an order (1) approving the Lease Designation Agreement, (2) authorizing Bradlees to sell the designation rights for its unexpired non-residential real property leasehold interests to S & S/B, (3) authorizing Bradlees to assume and assign and sell (through S & S/B) the unexpired leases to assignee(s) free and clear of all liens, claims, encumbrances and interests, and (4) granting related relief. *See* Motion of Debtors ("Proposed Sale Order"), Appellee App. at A0001. Among other things, Bradlees argued that section 365(f) of the Bankruptcy Code permitted it to assign its designation rights under the Sublease stripped of any contractual restrictions on assignment. *See id.* ¶¶ 66-73.

SWCC timely objected to the Proposed Sale Order to the extent that it related to Bradlees' right to occupy the Premises (the "Objection"). SWCC gave three grounds for its objection: (1) Bradlees could not invoke section 365(f) to avoid the Assignment

Not Reported in F.Supp.2d 2001 WL 1112308-LAP    Document 9-2    Filed 05/30/2008    Page 6 of 32 Page 5
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

Restrictions in the Settlement Agreement because the Settlement Agreement was not an executory contract, as required by section 365; (2) Bradlees was judicially estopped from assigning its Lease Designation Rights in the manner sought; and (3) Bradlees had waived the protections of section 365(f) in the Settlement Agreement. On February 6, 2001, the Bankruptcy Court entered an order approving the Lease Designation Agreement and authorizing Bradlees to sell its lease designation rights for its unexpired leases to S & S/B. *See* Sale Order. However, Bradlees' interest in the Premises was excluded from the Lease Designation Agreement pending resolution of SWCC's Objection.

E. The Bankruptcy Court's Sale Decision

**\*5** On March 28, 2001, the Bankruptcy Court entered its Memorandum Decision and Order overruling SWCC's Objection in its entirety. *See* Sale Decision. *First,* the court found that the Settlement Agreement was an executory contract for purposes of section 365 and that the Assignment Restrictions were unenforceable under section 365(f). *See id.* at 10-15. *Second,* the court held that Bradlees was not judicially estopped from seeking to avoid the Assignment Restrictions because Bradlees had taken no "factual position" that was inconsistent with the positions it took in *Bradlees I.Id.* at 9. *Third,* the court held that the Settlement Agreement was devoid of any waiver and that paragraph six of the Settlement Agreement contained an "explicit *reservation of rights." Id.* at 8 (emphasis in original).

III. DISCUSSION

On appeal, SWCC challenges all three of the Bankruptcy Court's holdings. SWCC again contends that: (1) Bradlees cannot invoke the protections of section 365(f) because the Settlement Agreement in not an executory contract; (2) Bradlees is judicially estopped from seeking to avoid the Assignment Restrictions; and (3) the language of the Settlement Agreement waives Bradlees' right to avoid the As-

signment Restrictions pursuant to section 365(f).

A. Applicability of Section 365(f)

Section 365 of the Bankruptcy Code permits a debtor to assume or reject any pre-petitition executory contract or unexpired lease. *See* 11 U.S.C. § 365(a); *In re Cannonsburg Envtl. Assoc., Ltd.,* 72 F.3d 1260, 1266 (6th Cir.1996) (holding that section 365 applies only to pre-petition agreements); *In re Merry-Go-Round Enter., Inc.,* 208 B.R. 637, 643 (Bankr.D.Md.1997) (same); *In re Leslie Fay Co.'s, Inc.,* 168 B.R. 294, 300 (Bankr.S.D.N.Y.1994) (same). Pursuant to section 365(f), a debtor may assign unexpired leases free from anti-assignment restrictions. *See* 11 U.S.C. § 365(f). SWCC argues that Bradlees is not entitled to the protections of section 365(f) because the Settlement Agreement was not an executory contract within the meaning of section 365. *See* Brief for Appellant SWCC ("Appellant Brief") at 10. SWCC's argument is based on two contentions. *First,* SWCC insists that the proper test for determining whether a contract is executory is the Countryman Test and that the Bankruptcy Court incorrectly concluded that the Settlement Agreement meets this test. *See id.* at 10. *Second,* SWCC argues that the Bankruptcy Court erred when it used the less stringent "Functional Approach" to conclude that the Settlement Agreement was executory. *See id.* at 15.

Before addressing the question of whether or not the Settlement Agreement is executory, it should be noted that the Agreement is clearly a pre-petition contract for purposes of section 365. It is well-settled that a settlement agreement is a contract that is construed according to general principles of contract law. *See Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999) (citing *Goldman v. Comm'r,* 39 F.3d 402, 405 (2d Cir.1994); *Rexnord Holdings, Inc. v. Bidderman,* 21 F.3d 522, 525 (2d Cir.1994)). In this case, where the Settlement Agreement was approved more than two and a half years before the commencement of *Bradlees II,* it was clearly entered into pre-petition.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d 08-cv-03814-LAP    Document 9-2    Filed 05/30/2008    Page 7 of 32 Page 6
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

The fact that the Agreement was entered into as part of *Bradlees I,* an earlier Chapter 11 case, is irrelevant because the two Chapter 11 cases are separate and distinct.[FN5] *See In re Jartran, Inc. (Jartran II),* 886 F.2d 859, 870 (7th Cir.1989) (the "second chapter 11 filing [was] ... distinct from the first filing ..."); *In re Toy King Distributors, Inc.,* 256 B.R. 1, 103 (Bankr.M.D.Fla.2000) ("[A] subsequent new case, filed after the reorganized debtor has confirmed a Chapter 11 plan in an earlier case, creates an entirely new estate."); *In re Jamesway Corp.,* 202 B.R. 697, 701 (Bankr.S.D.N.Y.1996) ("[T]he estate created in one bankruptcy case is distinct from that created upon the commencement of a subsequent case ...").[FN6] Having established that the Settlement Agreement is a pre-petition contract, I now turn to the question of whether that contract is executory.

> FN5. The distinction between consecutively filed bankruptcy cases is particularly applicable in this case because Bradlees substantially consummated its first plan of organization and filed its second Chapter 11 case in order to effect an orderly liquidation of assets. *See Jartran II,* 886 F.2d at 870 (holding that second Chapter 11 petition filed by debtor to liquidate its business, after it became clear that debtor could not meet obligations under prior confirmed plan, constituted a separate Chapter 11 case).

> FN6. In *In re Jamesway,* the Bankruptcy Court for the Southern District of New York held that the debtor's assumption of leases pursuant to section 365 in its first Chapter 11 case had no res judicata effect on the debtor's subsequently filed Chapter 11 case in which the debtor sought to reject some of the same leases. *See* 202 B.R. at 704. Explaining its holding, the court stated that the two Chapter 11 cases were "distinct cases involving different debtors." *Id.*

1. The Countryman Test

*6 The Bankruptcy Code does not define the term "executory contract ." The legislative history regarding this section states that "though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5844, 6303; *accord Nat'l Labor Relations Bd. (NLRB) v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6 (1984); *Eastern Air Lines v. Insur. Co. of State of Pennsylvania (In re Ionosphere Clubs* ), 85 F .3d 992, 998-99 (2d Cir.1996). Many courts have found the "some performance due" test in the legislative history too broad and sweeping. *See In re Riodizio, Inc.,* 204 B.R. 417, 424 (Bankr.S.D.N.Y.1997) (citing *Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233, 235 (7th Cir.1989)); *In re Spectrum Info. Tech., Inc.,* 190 B.R. 741, 746 (Bankr.E.D.N.Y.1996) ("Rarely does an agreement *not* involve unperformed obligations on both sides.") (emphasis in original); *In re Bluman,* 125 B.R. 359, 361-62 (Bankr.E.D.N.Y.1991). As a result, many courts have adopted Professor Countryman's "material breach" test. *See, e.g., Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.),* 50 F.3d 233, 239 (3d Cir.1995); *Gloria Mfg. Corp. v. Int'l Ladies Garment Workers' Union,* 734 F.2d 1020, 1021-22 (4th Cir.1984); *In re 375 Park Ave. Assoc., Inc.,* 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995); *In re Chateaugay Corp.,* 102 B.R. 355, 164 (S.D.N.Y.1989). The Countryman definition of an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973). Under this test, a contract will only be deemed executory if "material future performance obligations remain on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

both sides" of the contract. *In re Bluman,* 125 B.R. at 361-62 (citing *In re Chateaugay Corp.,* 102 B.R. at 345).

Some courts believe that the Countryman Test is too static and rigid, creating a higher threshold for defining an executory contract than Congress intended. *See* *In re Riodizio,* 204 B.R. at 424 (reviewing cases); *In re Gen. Dev. Corp.,* 84 F.3d 1364, 1374 (11th Cir.1996). Thus, a number of courts have replaced the Countryman Test with a more flexible and lenient "Functional Approach". This test focuses upon whether or not the estate will benefit from the assumption or rejection of the contract: "[e]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, [the contract] may nevertheless be deemed executory under the functional approach if its assumpt[ion][or] rejection would ultimately benefit the estate and its creditors." *In re Gen. Dev. Corp.,* 84 F.3d at 1374; *see also* *In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978); *Cohen v. The Drexel Burnham Lambert Group, Inc. (In re The Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 707-709 (Bankr.S.D.N.Y.1992); *In re Bluman,* 125 B.R. at 362.[FN7]

> FN7. There is substantial debate over the appropriateness of the Functional Approach. Courts that advocate the Functional Approach claim that the test more accurately reflects "the assume-reject election now codified" in section 365. *In re The Drexel Burnham Lambert Group, Inc.,* 138 B.R. at 690. In addition, advocates claim that the Functional Approach "conserves the time and effort that the parties and the court otherwise spend resolving the question of executoriness." *In re Riodizio,* 204 B.R at 422. Critics contend that the Functional Approach sidesteps the question of executoriness altogether and therefore ignores the statute's express requirement that the contract be executory. *See* *id.* at 422 ("[I]gnoring executoriness rewrites the

statute in a fundamental way") (citing *In re Child World, Inc.,* 147 B.R. 847, 851 (Bankr.S.D.N.Y.1992) ("Manifestly, th[e functional] approach ignores the statutory requirement that the contract to be assumed or rejected must be 'executory'.")); *Butler v. Resident Care Innovation Corp.,* 241 B.R. 37, 44 (Bankr.D.R.I.1999) ("[T]he functional analysis expressly ignores the statutory mandate that the contract be executory under § 365.").

*7 The Second Circuit has never expressly adopted either the Countryman Test or the Functional Approach. In its most recent pronouncement on the issue of what constitutes an executory contract, the court simply referred to the legislative history, stating that an executory contract is "a contract 'on which performance remains due to some extent on both sides'." *In re Ionosphere Clubs, Inc.,* 85 F.3d at 999 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. at 522 n. 6). Nevertheless, a number of courts in this circuit have used the Countryman Test for executoriness. *See, e.g.,* *In re Schneeweiss,* 233 B.R. 28, 31 (Bankr.N.D.N.Y.1998); *In re Spectrum Info. Tech., Inc.,* 190 B.R. at 747 (Bankr.E.D.N.Y.1996); *In re Spectrum Info. Tech., Inc.,* 193 B.R. 400, 404-405 (Bankr.E.D.N.Y.1996); *In re 375 Park Ave. Assoc., Inc.,* 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995); *In re Bluman,* 125 B.R. at 362-63; *In re Chateaugay Corp.,* 102 B.R. at 164. In some cases, these courts have tested for executoriness under both the more stringent Countryman Test and the more flexible Functional Approach. *See* *In re Schneeweiss,* 233 B.R. at 31; *In re Spectrum Info. Tech., Inc.,* 190 B.R. at 747; *In re Spectrum Info. Tech., Inc.,* 193 B.R. at 404-405; *In re Bluman,* 125 B.R. at 362-63.

In this case, the Bankruptcy Court examined the Settlement Agreement under both the Countryman Test and the Functional Approach and determined that the Settlement Agreement was an executory contract under either test. As explained below, this Court finds no error in the Bankruptcy Court's con-

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

clusion that the Settlement Agreement meets the more stringent Countryman Test. Accordingly, this Court need not review the Bankruptcy Court's application of the more lenient Functional Approach.

2. Analysis of the Settlement Agreement Under the Countryman Test

Under the Countryman Test, a contract is executory if failure of the parties to perform the obligations remaining due would constitute a material breach of the agreement. *See* Countryman at 460. To determine if failure of performance would constitute a material breach, courts look to state contract law. *See* *In re Riodizio,* 204 B.R. at 421; *In re Streets,* 882 F.2d at 235. Under New York law, a material breach is "one which would justify the other party to suspend his own performance, or a breach which is so substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976) (citations omitted); *see also, Katz v. Berisford Int'l PLC,* No. 96 Civ. 8695, 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 195 (S.D.N.Y.1990). The question of whether there has been substantial compliance or material breach is a question of fact. *See* *Besicorp Group, Inc. v. Thermo Electron Corp.,* No. 90 Civ. 434, 1993 WL 105163, at *7 (N.D.N.Y. April 6, 1993) (citing *O'Connell Mgmt. Co. v. Carlyle-XIII Managers, Inc.,* 765 F.Supp. 779, 783 (D.Mass.1991)). Therefore, the Bankruptcy Court's determination will only be reversed if its findings of fact were clearly erroneous. *See* Fed. R. Bankr.P. 8013; *In re Artha Mgmt., Inc.,* 91 F.3d at 328.

**\*8** The Bankruptcy Court found that, under the Settlement Agreement, substantial performance was due from both Bradlees and SWCC. It found that Bradlees had not substantially fulfilled its obligation to operate the Premises only under the name "Bradlees" or its obligation to assign its rights to the Premises only to an affiliate and/or subsidiary of Bradlees. *See* Sale Decision at 12. As for SWCC, the court found that it had not fulfilled its obliga-

tions under the Settlement Agreement to (1) "not disturb Bradlees' use, enjoyment and possession of the Premises based upon the fact that Bradlees is no longer an affiliate of Stop & Shop or based upon the contention that Bradlees' use of the Premises is not permitted in the Overlease;" (2) "recognize Bradlees as Wellons' proper subtenant if Wellons wins the Wellons action;" and (3) *"enter into a direct lease with Bradlees* on the same terms and conditions upon which Bradlees currently occupies the Premises." *Id.* at 11 (emphasis in original). SWCC contends that none of the outstanding obligations identified by the Bankruptcy Court constitute the kind of substantial underperformance contemplated by the Countryman Test.

SWCC argues that the Bankruptcy Court used "circular" reasoning when it invoked the Assignment Restrictions to conclude that substantial performance remained due from Bradlees because these restrictions are precisely what Bradlees is now seeking to "ignore". Appellant Reply at 5. SWCC's argument is not convincing for two reasons. *First,* other courts have found that, under the Countryman Test, a party's failure to comply with an assignment restriction may constitute substantial underperformance. *See* *Record Co., Inc. v. Bummbusiness, Inc. (In re Record Co.),* 8 B.R. 57, 59 (Bankr.S.D.Ind.1981) (holding that tenant's obligation to obtain landlord's consent to assignment of retail lease was a "crucial element" of tenant's performance of an agreement to purchase and reinforced the court's conclusion that the contract was executory). *Second,* SWCC's "circularity" argument improperly conflates the executoriness analysis with Bradlees' invocation of the protections afforded by section 365(f). The executoriness analysis examines an agreement on its face to determine whether there are material obligations that require substantial performance from the parties. As Bradlees specifically admits, but for its filing of a second Chapter 11 petition, the Assignment Restrictions would be valid and enforceable by SWCC. *See* Appellee Brief at 22. Bradlees simply argues that, because it commenced *Bradlees II,* these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 9
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

otherwise enforceable Assignment Restrictions are legally void for the purposes of section 365. *See* Sale Motion ¶¶ 67-73. Accordingly, the Bankruptcy Court did not use "circular" reasoning when it determined that substantial performance remained due from Bradlees under the Settlement Agreement.

SWCC also contends that the Bankruptcy Court erred when it found that substantial performance was due from SWCC. *See* Appellant Brief at 12-15. SWCC insists that its obligation not to disturb Bradlees' use, enjoyment and possession of the Premises during the pendency of the Wellons Action was "illusory" because that obligation merely restated a pre-existing legal duty "to comply with Massachusetts landlord/tenant law" which "prohibits a landlord from interfering with a tenant's use, enjoyment and possession of premises through self-help." *Id.* at 12-13. This argument is fundamentally flawed because SWCC's obligation to "not disturb" Bradlees is not merely a prohibition against self-help. Rather, the Settlement Agreement prohibits SWCC from using *any* tactics to disturb Bradlees' use, enjoyment and possession of the Premises while the Wellons litigation is pending. Given the protracted litigation between the parties, it is reasonable to assume that this provision was included as a means of assuring Bradlees that, pending resolution of the Wellons Action, SWCC would not commence new litigation based upon its contention that Bradlees' occupancy of the Premises was in violation of the Overlease. Because Massachusetts law *specifically permits* a landlord to use civil litigation to interfere with a tenant's use, possession and enjoyment of premises, *see* Appellant Brief at 13, SWCC's obligation is far from "illusory".

**\*9** SWCC also contends that its obligation to execute a direct lease with Bradlees in the event that it prevails in the Wellons action is a purely "ministerial" duty that does not render a contract executory. *Id.* at 14. SWCC cites *In re Streets* for the proposition that the requirement of delivery of title is not a significant underperformed obligation.

*See id.* at 14. However, that case is distinguishable. In *In re Streets,* the Seventh Circuit found that, under applicable state law, the purchaser became the equitable owner of the property upon entry into the contract and was entitled to immediate possession of the property regardless of whether the seller delivered title. *See id.* at 235. In sharp contrast, the delivery of a direct lease is essential to establishing Bradlees' right to occupy the Premises. Thus, SWCC's obligation to enter into a direct lease with Bradlees is clearly material for the purposes of executoriness. *See Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 472 (6th Cir.1989) (holding that vendee's obligation to deliver title was a material obligation still to be performed under land sale contract); *Butler v. Resident Care Innovation Corp.,* 241 B.R. 37 (Bankr.D. R.I.1999) (finding seller's failure to deliver deed constituted substantial underperformance of real estate contract where purchaser could not secure title while these obligations remained unperformed).

SWCC's reliance on the Third Circuit's decision in *In re Columbia Gas Systems, Inc.,* 50 F.3d 233 (3d cir.1995) is similarly flawed. In *Columbia Gas,* the Third Circuit held that a pre-petition settlement agreement was not an executory contract where the class members' only remaining obligations were to execute releases and complete supplemental contracts with the debtor. *See id.* In that case, the supplemental contracts that each class member was required to execute with the debtor merely restated terms that were "expressly stated in the settlement agreement itself" and were "designed to do no more than take the terms of the global settlement agreement ... and apply them to each class member." *Id.* at 243. Because the supplemental contracts "did not, [and were not] supposed to, alter the relationship forged by the settlement agreement," the court found that they were "functionally ministerial duties." *Id.*

Here, the direct lease contemplated by the Settlement Agreement bears no resemblance to the supplemental contracts deemed immaterial in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))

*Columbia Gas.* Unlike the supplemental contracts in *Columbia Gas,* the direct lease would include terms and conditions that are not mentioned in the Settlement Agreement itself; these terms would significantly "alter the relationship" that existed between SWCC and Bradlees prior to their execution. *In re Columbia Gas,* 50 F.3d at 242. As a result, SWCC's obligation to enter into a direct lease with Bradlees is not a mere "minesterial" duty.

*10 SWCC also contends that its obligation to recognize Bradlees as a proper subtenant if Wellons prevails in the Wellons Action is "illusory" because it simply requires SWCC to "abide by the Massachusetts Federal Court's decision in the Wellons Action." Appellant Brief at 12. While this argument may have some merit, the fact remains that SWCC's two other outstanding obligations-namely, not to disturb Bradlees' use, enjoyment and possession of the Premises and execution of a direct lease with Bradlees-constitute substantial performance that remained due under the Settlement Agreement. Because the Bankruptcy Court's determination that substantial performance remained due from both Bradlees and SWCC was not clearly erroneous, the court did not err when it concluded that the Settlement Agreement was an executory contract under the Countryman Test.

**B. Judicial Estoppel**

SWCC's next argument is that Bradlees is judicially estopped from seeking to assign its rights to occupy the Premises in *Bradlees II* based on its assertions relating to the Settlement Agreement in *Bradlees I. See* Appellant Brief at 18-22. "[J]udicial estoppel is not extrinsically a matter of fact or law." *Desjardins v. Van Buren Cmty. Hosp.,* 37 F.3d 21, 23 (1st Cir.1994); *see also In re Klein,* No. 90 C. 6765, 1991 WL 204925, at *3 (N.D.Ill. Sept. 27, 1991). The ultimate determination that judicial estoppel does or does not apply is generally a question of law for the court to review *de novo,* whereas issues of fact underlying that determination will only be reversed for clear error. *See In re Macrose Indus.*

*Corp.,* 186 B.R. 789, 797-98 (E.D.N.Y.1995); Fed. R. Bankr.P. 8013.

**1. Legal Standard for Judicial Estoppel**

The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken in a prior legal proceeding. *See In re Seaman Furniture Co. of Union Square,* 1996 WL 741604, at *2. It is a "rare remedy" used to avoid inconsistent outcomes and to prevent litigants from abusing the power of the court. *See Transport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania,* 123 F.Supp.2d 174, 189 (S.D.N.Y.2000) (citing *United States v. Hussein,* 178 F.3d 125, 130 (2d Cir.1999); *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71 (2d Cir.1997); *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir.1997)). To that end, a litigant who asserts judicial estoppel must establish (1) that "the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding" and (2) that the court has accepted the previous assertion in some manner. *AXA Marine and Aviation Ins. (U .K.) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.1996); *In re Seaman Furniture Co. of Union Square,* 1996 WL 741604, at *2 (citation omitted).

**2. Analysis**

*11 The Bankruptcy Court found that Bradlees' "promis[e]" in *Bradlees I* not to assign its rights to the Premises in contravention of the Assignment Restrictions did not prevent Bradlees from now seeking to make such an assignment because its present position was "purely legal." Sale Decision at 9. According to the Bankruptcy Court, Bradlees was simply arguing that, upon its second Chapter 11 filing, the Assignment Restrictions contained in the Sublease and Settlement Agreement became unenforceable under section 365(f). *See id.*

SWCC insists that Bradlees is now taking a factual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))

position that is contrary to the position it took in *Bradlees I.See* Appellant Brief at 19. In *Bradlees I,* SWCC explains, Bradlees represented to the Bankruptcy Court that the terms of the Settlement Agreement, including the Assignment Restrictions, "represented a favorable resolution" of its dispute with SWCC and were "in the best interest of its estate and its creditors."*Id.* Having taken this position in *Bradlees I,* SWCC contends that Bradlees is now estopped from taking the position that it may invoke the protections of section 365 to "avoid the terms of its judicially approved Settlement Agreement."*Id.*

The Bankruptcy Court did not err in rejecting SWCC's judicial estoppel argument. SWCC has failed to point to any *factual position* taken by Bradlees in its effort to invoke section 365(f) that is contrary to a position taken in *Bradlees I.* It is undisputed that, in *Bradlees I,* Bradlees urged the Bankruptcy Court to approve the Settlement Agreement, including the Assignment Restrictions. It is also undisputed that, in *Bradlees I,* Bradlees represented to the Bankruptcy Court that the Settlement Agreement was "fair, equitable and reasonable" and "in the best interests of its estate and its creditors."*See* Motion For Entry of an Order Approving Settlement ("Settlement Motion"), Ex. 2 to Appellant App., ¶¶ 19-20. These assertions are clearly factual positions and the Bankruptcy Court's approval of the Settlement Agreement constituted "judicial acceptance" of those positions. *SeeReynolds v. Comm'r,* 861 F.2d 469 (6th Cir.1988) (holding that, in the bankruptcy context, court acceptance of an agreement or stipulation constitutes "judicial acceptance" for purposes of judicial estoppel).

Bradlees' current claim that section 365(f) permits it to freely assign its rights to the Premises is based on only two factual propositions: (1) that the Settlement Agreement is an "executory contract" under section 365 and (2) that the Assignment Restrictions contained in the Sublease and Settlement Agreement constitute "anti-assignment provisions" under section 365(f)(1).*See* Sale Motion ¶¶ 67-73;

Appellee Brief at 12-18. Contrary to SWCC's suggestion, Bradlees does not, and need not, argue that the anti-assignment provisions would be detrimental to its estate or its creditors. Section 365(f)"works *by operation of law* to invalidate" lease assignment restrictions. *In re Jamesway Corp.,* 201 B.R. 73, 78 (Bankr.S.D.N.Y.1996) (emphasis added) (citing *In re Office Prod. of Am., Inc.,* 140 B.R. 407, 410 (Bankr.W.D.Tex.1992); *In re Howe,* 78 B.R. 226, 229 (Bankr.D.S .D.1987)). That section assumes, as a matter of law, that the free "assignment of unexpired leases will assist the debtor in its reorganization or liquidation efforts." *Seeid.*Therefore, once the Bankruptcy Court decided that the Settlement Agreement was an executory contract which included an anti-assignment provision, the voidability of the Assignment Restrictions was *purely a matter of law,* thereby precluding the application of judicial estoppel.[FN5] *Seeid.*

> FN5. SWCC's argument is not supported by the two cases it highlights in its brief because, in both of those cases, the estopped party took a clearly inconsistent factual position in two proceedings. In *Reynolds,* the Tax Commissioner was estopped from taking a position in a tax court proceeding that it had *conceded* was contrary to a position taken in an earlier court-approved settlement. *See*861 F.2d at 437. The only issue before the court of appeals was whether the Bankruptcy Court's approval of the settlement constituted sufficient "judicial acceptance" to invoke judicial estoppel. *Seeid.* at 470.In *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414 (3d Cir.1988), a debtor was estopped from making certain breach of contract and fraud claims against its creditor in a state court action that was commenced after the Bankruptcy Court had approved a settlement agreement between the parties. There, the doctrine of judicial estoppel applied because the debtor's state court claim

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

that the creditor's breach "was the catalyst to its Chapter [11] filing" was "clearly contrary to its Chapter [11] treatment of the [debtor's] claim as undisputed."*Id.* at 419-20.

## C. Waiver

**\*12** SWCC's final argument is that the Settlement Agreement waived Bradlees' right to invoke the protections of section 356(f). The issue of waiver, where the underlying facts are undisputed, is a question of law that this Court will review *de novo.See In re Macrose Indus. Corp.,* 186 B.R. at 797-98 (citing *Eastern Sys., Inc. v. West 45th St. Indus. Condominiums, Inc.,* 105 B.R. 219, 227 (Bankr.S.D.N.Y.1989) (addressing waiver as a question of law)).

### 1. Legal Standard for Waiver

"Waiver is the intentional relinquishment of a known right."*In re Seamans Furniture of Union Square,* 1996 WL 741604, at \*4; *In re Jamesway,* 201 B.R. at 76 (citing *Johnson* 304 U .S. 458, 464 (1938)). It must be evidenced by "a clear manifestation of intent and be unmistakable and unambiguous."*In re Jamesway,* 201 B.R. at 77 (citing *Port Distrib. Corp. v. Pflaumer,* 880 F.Supp. 204, 211 (S.D.N.Y.), *aff'd,*70 F.3d 8 (2d Cir.1995)). The party asserting waiver bears the burden of proof. *See id.;In re Seamans Furniture of Union Square,* 1996 WL 741604, at \*4. Thus, SWCC must prove that when Bradlees entered into the Settlement Agreement it intended to waive its right to invoke the protections of section 365(f) in a subsequent bankruptcy proceeding.

### 2. Analysis

The Bankruptcy Court held that the Settlement Agreement was "devoid of any waiver" of Bradlees' right to invoke the protections of section 365. Sale Decision at 8. Moreover, the court found that the parties agreed to "an explicit *reservation of rights"*

because the Agreement stated in pertinent part: "[T]he parties' performance of this Settlement Agreement is not intended, and *shall not be deemed, to waive, limit or affect* SWCC's or Bradlees' right to object to *future conduct* or events which are not specifically permitted under this Settlement Agreement ."*Id.* (emphasis in original) (quoting Settlement Agreement ¶ 6).

SWCC argues that the only "rational" way to interpret the Assignment Restrictions is as an agreement by Bradlees to "permanently waiv[e] its right to assign [its occupancy] rights pursuant to section 365(f) in the future."Appellant Brief at 23-24. SWCC reasons that Bradlees' consent to the Assignment Restrictions must relate to the future because, prior to the Settlement Agreement, Bradlees did not have any contractual right to assign its occupancy. *See id.*

SWCC also contends that the Bankruptcy Court improperly construed the Settlement Agreement as containing an explicit reservation of Bradlees' rights under section 365. *See id.First,* SWCC argues that the Bankruptcy Court's interpretation is belied by the express language of the Agreement. According to SWCC, the language that the Bankruptcy Court referred to simply "authorizes SWCC to object to any assignment of Bradlees' interest in the Premises 'not specifically permitted' by the Settlement Agreement, and expressly authorizes Bradlees to object to any future conduct of SWCC 'not specifically permitted' by the Settlement Agreement. It does no more ."*Id.* at 23 (quoting Settlement Agreement ¶ 6).*Second,* SWCC argues that the Bankruptcy Court's interpretation is incompatible with "common sense and any rational business purpose SWCC could have been seeking to achieve" in the Settlement Agreement.*Id.* at 24.It reasons that, because SWCC was bargaining for restrictions on Bradlees' right to use the Premises and assign its occupancy rights in the Premises during its pending Chapter 11 case, it would have been illogical for SWCC to have agreed to a provision that explicitly reserved Bradlees' right to disregard those restric-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

tions in the future. *See id.*

**\*13** A thorough review of the Settlement Agreement leads to the inescapable conclusion that it contained neither an explicit reservation nor a waiver. The Settlement Agreement states, in relevant part, that Bradlees has not waived its right *"to object* to future conduct or events that are *not specifically permitted"* by the Agreement. Settlement Agreement ¶ 6 (emphasis added). Because the Assignment Restrictions *are* specifically permitted in the Agreement, this language cannot be construed as an explicit reservation of the right to object to those restrictions.

At the same time, there is no indication that Bradlees explicitly waived its right to invoke section 365(f) in the future. SWCC bears the burden of proving Bradlees' "unmistakable and unambiguous" intent to waive its rights. *In re Jamesway,* 201 B.R. at 77. This burden must be strictly enforced in the context of section 365(f), where Congress has taken a strong stance against assignment restrictions that hinder debtors' rehabilitation efforts. *See In re Standor Jewelers West, Inc.,* 129 B.R. 200, 202 (9th Cir.1991); *In re U.L. Radio Corp.,* 19 B.R. 537 (Bankr.S.D.N.Y.1982) (noting that section 365(f) reflects the "express policy of Congress favoring assignment"); *In re Howe,* 78 B.R. at 231 ("[Section 365(f) reflects] the express Congressional policies favoring assumption and assignment of executory contracts and leases ..."); *Robb v. Schindler,* 142 B.R. 589, 591 (D.Mass.1992) (noting that section 365(f) voids anti-assignment clauses that restrict the ability of the debtor to realize the maximum value of its lease upon assignment). SWCC has argued persuasively that Bradlees could only have intended that the Assignment Restrictions would apply to future assignments. *See* Appellant Brief at 23-24. However, SWCC has not provided any evidence that Bradlees also intended to waive its right to invoke section 365(f) to avoid these restrictions in subsequent bankruptcy proceedings.[FN6] Accordingly, this Court declines to infer that such a waiver exists.[FN7]

FN6. SWCC cites a number of cases in which courts have enforced earlier, court-approved settlement agreements waiving a debtor's right to the automatic stay or other rights under the Bankruptcy Code. *See* Appellant Mem. at 24-26. However, in each of those cases, the court-ordered agreement contained an explicit waiver of a specific section of the Bankruptcy Code. *See, e.g., In re Springpark Assocs.,* 623 F.2d 1377, 1379 (9th Cir.1990) (court-ordered stipulation explicitly referred to "automatic stay issued pursuant to Rule 12-43, Rules of Bankruptcy Procedure"); *In re Atrium High Point Ltd. Partnership,* 189 B.R. 599, 603 (Bankr.M.D.N.C.1995) (court-ordered agreement explicitly stated that debtor would not oppose any motion "seeking relief from or modification of the automatic stay of 11 U.S.C. § 362(a) in any subsequent case ..."). In contrast, the Settlement Agreement in this case makes no mention of section 365(f).

FN7. Significant portions of the parties' memoranda of law are spent debating Bradlees' contention that the *Bradlees I* debtors could not have waived the right of the *Bradlees II* debtors to invoke the protections of section 365(f) because the *Bradlees I* debtors are "separate and distinct" from the *Bradlees II* debtors. *See* Appellee Brief at 21-26. Because I find that there was no waiver, I need not address this argument.

## IV. CONCLUSION

For the forgoing reasons, Bradlees was entitled to invoke the protections of section 365(f) to invalidate the Assignment Restrictions in the Settlement Agreement. Accordingly, the Bankruptcy Court's decision and order overruling SWCC's objection to the Lease Designation Agreement is affirmed.

S.D.N.Y.,2001.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.))**

In re Bradlees Stores, Inc.
Not Reported in F.Supp.2d, 2001 WL 1112308
(S.D.N.Y.), 47 Collier Bankr.Cas.2d 23

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 1
Not Reported in F.Supp., 1997 WL 642550 (N.D.N.Y.)
**(Cite as: 1997 WL 642550 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Matthew BOLAND, Plaintiff,
v.
John PARMELEE; Kristi F. Parmelee; and Old Port
Harbor, Inc., Defendants.
No. Civ.A.96CV311RSP/GJD.

Oct. 15, 1997.

Shaw & Currey, Ithaca, NY, for plaintiff, William
R. Shaw.

Hinman, Howard & Kattell, LLP, Binghamton, NY,
for defendants, Robert H. Wedlake, of Counsel.

**MEMORANDUM DECISION AND ORDER**
POOLER, J.

### INTRODUCTION

*1 Plaintiff Matthew Boland brought this action in
diversity against defendants John Parmelee
("Parmelee"), Kristi Parmelee ("Mrs.Parmelee"),
and Old Port Harbor, Inc. (the "Corporation"), fol-
lowing a long-running dispute between Boland and
Parmelee, former business partners, relative to
ownership rights in the Old Port Harbor Restaurant
in Ithaca, New York. After Boland terminated the
relationship and negotiated a contract for the sale of
his share of the business to Parmelee, Parmelee at-
tempted to utilize the protections of the Bankruptcy
Code to consummate the purchase for a fraction of
the sum negotiated. Boland now asserts claims for
declaratory judgment, breach of contract, conver-
sion of corporate assets, breach of fiduciary duty,
and fraud. Defendants made a motion for summary
judgment pursuant to Fed.R.Civ.P. 56, claiming
that (1) the contract sued upon is unenforceable be-
cause Parmelee's subsequent personal bankruptcy
relieved him of his obligation to fulfill the terms of
the contract; (2) Mrs. Parmelee and the Corporation
are not signatories to the contract and thus are not
liable under its provisions in any case; (3) Boland is

estopped from claiming any interest he owned in
the Corporation because of his failure to file a no-
tice of claim or otherwise contest the bankruptcy
proceeding; and (4) defendants are entitled to sum-
mary judgment on Boland's fraud claim.

### BACKGROUND

In early 1987, Boland and Parmelee entered into a
business arrangement with the purpose of opening a
restaurant in Ithaca, New York, known as the Old
Port Harbor. The exact nature of the relationship
is in dispute. Boland contends that the parties had
agreed that they would be equal partners in owner-
ship of the restaurant, while Parmelee contends that
was never his intent. As evidence of the equal re-
lationship, Boland points to the facts that (1) Bo-
land and Parmelee equally divided the duties and
responsibilities of running the restaurant; and (2)
Boland and Parmelee agreed to receive equal com-
pensation in salary and bonuses.

There is no dispute that the responsibilities were di-
vided as follows. Boland was responsible for the
"back of the house," i.e., for procuring the food and
overseeing its production, preparation, and ser-
vice. Parmelee was responsible for the front of the
house. In addition, Parmelee was responsible for
all management aspects of the business, such as fin-
ancial record keeping and bookkeeping, hiring and
training the wait staff, and overseeing the front of
the house operations. As part of his duties,
Parmelee kept the check ledgers, dealt with the ac-
countant, and handled all business aspects of estab-
lishing the business as a corporation. Parmelee
also does not dispute that he and Boland received
equal salaries and equally divided other cash dis-
bursements that were not placed on the books.

In 1987, the business was incorporated as Old Port
Harbor of Ithaca, Inc. On June 1, 1987, Parmelee,
as the director of the Corporation, issued 75 shares
of corporate stock to himself, 25 shares to his moth-
er, Margaret Parmelee, and no shares to Boland.
Parmelee contends that the reason for issuing the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642550 (N.D.N.Y.)
(Cite as: 1997 WL 642550 (N.D.N.Y.))

stock in this manner was that he contributed $10,000 to the start-up costs of the corporation and that his mother contributed money also. Boland disputes these contentions, arguing that the initial contributions were all loans from other people, and Parmelee paid back the loans with corporate monies. Parmelee maintains that he issued no shares to Boland because Boland made no financial investment in the company.

*2 At some point in 1987, Boland became concerned that no indicia of ownership in the Corporation had been issued to him despite the fact that he believed himself to be an equal owner. Individually and through his attorney, Charles Guttman, Boland requested correction to the corporate formation and met with the corporate attorney, Ed Mazza, and Parmelee. Boland alleges that he received assurances that the corporate shares would be issued properly. However, it is undisputed that no correction occurred until the New York State Division of Alcohol Beverage Control ("ABC") completed an investigation in August 1988 which revealed that although "Matthew Boland [wa]s an 'equal partner' in the subject business," Parmelee had not made that fact known at the time of licensing. Dkt. No. 16 Ex. C. ABC threatened disciplinary action if the corporate records were not corrected to reflect Boland's name in the Corporation. Id. Subsequently, on October 1, 1988, Mr. Parmelee and the Corporation issued a five share certificate of stock to Boland. Because the certificate was unsigned and was unaccompanied by any information regarding what percentage of ownership if represented or whether it was equal to Mr. Parmelee's percentage, Boland returned the certificate to Parmelee for clarification. Parmelee never responded to Boland's request for clarification.

The parties reached a point at which their differences were irreconcilable, and they decided to part. After months of negotiation, on July 12, 1990, Boland and Parmelee entered into an agreement for purposes of resolving their dispute over their respective interests in the Corporation and the

number of shares that should have been issued to Boland. Dkt. No. 14 Ex. A. The agreement provided that Parmelee would purchase Boland's interest in Old Port Harbor, Inc., for one-half the net value of the Corporation as of July 31, 1990. Id. The parties agreed that the July 31, 1990, value of the Corporation and "any other claims either party may have against the other as a result of their operation of the business" would be determined by an independent arbitrator, Andrew Sciarabba, CPA, based upon submissions of the parties. Id. The Agreement also provided that the arbitrator's findings would be binding upon both parties. Id. Finally, the Agreement set forth specific terms for Parmelee's payment to Boland following the arbitrator's determination. Id. Parmelee was to pay to Boland within 45 days of the arbitrator's determination either (1) the full amount due if less than $25,000, or (2) $25,000 cash plus a three year promissory note for the balance, secured by a security agreement on all corporate assets, a UCC-1 filing thereon, and the personal guarantee of Mrs. Parmelee. Id. In exchange, Boland was to sign over his interest in the corporation. Id. Boland, Parmelee, and the Corporation were to execute mutual releases. Id.

On May 5, 1992, Boland filed a demand for arbitration on Parmelee and the Corporation in New York State Supreme Court in Tompkins County. Dkt. No. 16, Ex. E. Parmelee responded by filing a petition to stay the arbitration. On May 21, 1993, Supreme Court, Tompkins County, ordered Parmelee and the Corporation to proceed to arbitration and to pay the costs incurred in the action. On April 21, 1994, the arbitrator valued the business at $167,160 as of July 31, 1990.

*3 On June 6, 1994, Parmelee filed a Chapter 13 petition in bankruptcy. In his Chapter 13 plan, Parmelee listed his obligation to Boland as an "unsecured nonpriority claim," which he proposed to pay pro rata based on the amount of principal. Dkt. No. 14 Ex. B. Parmelee expressly answered "None" to the Chapter 13 demand for a list of executory

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

contracts rejected by the debtor. *Id.* Boland's attorney conducted an examination of Parmelee during the course of the bankruptcy proceeding, but declined to file a notice of claim. The Bankruptcy Court ultimately confirmed Parmelee's Chapter 13 plan. The Bankruptcy Court discharged Parmelee's bankruptcy on January 18, 1996.

Boland filed suit in this court on February 20, 1996, seeking the following: (a) declaratory relief as to Boland's legal rights and relations with Parmelee, the Corporation, and Mrs. Parmelee [Claim 1]; (b) damages for (i) breach of an agreement dated July 12, 1990 (the "Agreement"), signed by Boland and Parmelee [[[Claims 2, 3, and 4], (ii) breach of fiduciary duty (against Parmelee only) [[[Claim 9], and (iii) fraud (against Parmelee only) [Claim 10]; (c) injunctive relief ordering specific performance on the Agreement and ordering the Corporation to refrain from making any significant decision, expenditure, or policy without Boland's prior written approval [Claim 5]; and (d) court orders (i) compelling Parmelee and the Corporation to permit Boland to inspect corporate records [Claim 6], (ii) compelling Parmelee to account for improper conversion of corporate assets and to transfer and assign to the Corporation all assets improperly diverted [Claim 7], and (iii) appointing a receiver for the Corporation (against the Corporation only) [Claim 8].

On February 7, 1997, defendants made a motion for summary judgment. Defendants contend principally that the Agreement is not enforceable because Parmelee's bankruptcy proceeding discharged his obligation to Boland. In support of their assertion, defendants argue (1) that Parmelee's obligation to Boland was not an executory agreement; (2) even if the obligation was an executory agreement, Parmelee rejected the Agreement; and (3) Boland is estopped from enforcing the agreement under the doctrine of "unclean hands." Parmelee also contends, without supporting argument, that he is entitled to summary judgment on the fraud claim [Claim 10]. Mrs. Parmelee and the Corporation argue additionally that they cannot be held liable un-

der the Agreement because they were not signatories and Parmelee had no agency authority to so bind them.

## DISCUSSION

### A. Standard

Summary judgment shall enter if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317,323 (1986). If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists. *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). If, as to the issue on which summary judgment is sought, there is evidence in the record from any source from which an inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995).

### B. Enforceability of the Agreement

*4 Boland's claims rest on his assertion that the Agreement was an executory contract for purposes of the Bankruptcy Code, 11 U.S.C. § 365. Dkt. No. 17 at 3-4. The Bankruptcy Code provides that an executory contract may be assumed or rejected. 11 U.S.C. § 365(a). If assumed, the debtor must fulfill the terms of the contract; if rejected, the other party to the executory contract may submit a claim to be paid by the bankruptcy estate. Bankruptcy Rule 3002(c)(4). If neither assumed nor rejected, Boland argues that the contract remains enforceable. Defendants argue that the Agreement did not constitute an executory contract within the meaning of 11 U.S.C. § 365. Dkt. 14 at 5.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Although the Bankruptcy Code does not define the term "executory contract," case law defines an executory contract as "**a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.**" *In re Sundial Asphalt Co.,* 147 B.R. 72, 79 (Bankr.E.D.N.Y.1992). Thus, according to this definition, if either party to the agreement fails to substantially perform the contract, constituting a material breach, the contract is executory for purposes of 11 U.S.C. § 365.

Here, neither party had performed the material terms of the contract, which involved not only the payment of money but also the transfer of title. The Agreement provided that once the value of the Corporation had been established by the arbitrator, Parmelee had to perform the following:

1. Deliver $25,000 in cash;
2. Deliver a promissory note for the remainder due;
3. Deliver a security agreement covering all corporate assets;
4. Deliver the guarantee of Kristi Parmelee; and
5. Execute mutual general releases.

It is undisputed that none of these acts were performed. The Agreement required Boland to then sign over all his right, title, and interest in the stock of the corporation and to provide a general release and any documentation necessary to transfer his interest in the corporation. It is undisputed that Boland never performed any of these tasks, which were conditioned on Parmelee's performance. Because neither party ever performed, the Agreement appears to have been totally executory at the time of Parmelee's bankruptcy.

Defendants cite *In re Columbia Gas System, Inc.,* 146 B.R. 106 (D.Del.1992), *aff'd,* 50 F.3d 233 (3d Cir.1995), for the proposition that settlement agreements are not executory contracts. However, Boland correctly points out that the instant Agreement

was more than just a settlement agreement in that it involved provision for the purchase and sale of an interest in property, which is treated as an executory contract. *See, e.g., In re Sundial Asphalt Co.,* 147 B.R. 72.

Defendants also argue that the instant Agreement merely constitutes an agreement involving the repayment of money and that such agreements are not considered executory. Boland does not dispute that agreements involving the mere repayment of money are not considered executory, but contends that the instant agreement does not fall in that category because it involves a transfer of title to property. I agree. The Agreement is clear that Parmelee agrees to purchase Boland's interest in the Corporation. Consequently, this argument is without merit. Similarly, defendants' argument that the Agreement is akin to a judgment is also flawed. This Agreement clearly states that it effects the purchase and sale of corporate stock. Thus, the Agreement is an executory contract for purposes of 11 U.S.C. § 365.

**\*5** Defendants argue that even if the Agreement was an executory contract for purposes of 11 U.S.C. § 365, Parmelee did not assume that agreement during the bankruptcy proceeding and therefore is not bound by it. Boland argues that by failing to expressly reject the Agreement, Parmelee assumed it by implication. I disagree. "11 U.S.C. § 365(a) makes clear that an assumption of an executory contract can only be effected through an express order of the court." *Kelly Lyn Franchise Co.,* 26 B.R. 441, 445 (Bankr.M.D.Tenn.1983). Here, the bankruptcy court never had an opportunity to order Parmelee to assume the Agreement because he failed to list the Agreement as an executory contract on his bankruptcy form. Consequently, I find that Parmelee did not assume the Agreement merely by failing to reject it.

Defendants argue next that in addition to not assuming the contractual obligation during the bankruptcy proceeding, Parmelee actually rejected the Agreement by demonstrating his intent not to honor

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

it. I disagree. Just as the Agreement could not be assumed by implication, it also could not be rejected by implication. It is clear in this district that an erroneous designation of a contractual obligation as one to an unsecured creditor in bankruptcy does not constitute assumption of the contract. *See Aetna Casualty and Surety Co. v. Gamel*, 45 B.R. 345 (Bankr.N.D.N.Y.1984). Similarly, such a designation does not constitute rejection of the contract. Consequently, I find that Parmelee did not reject the Agreement by designating the obligation as one to an unsecured creditor.

In summary, I find that Parmelee neither assumed nor rejected the Agreement. The effect of neither accepting nor rejecting an executory contract is that the contract remains in force. *See In re Shoppers Paradise, Inc.*, 8 B.R. 271 (Bankr.S.D.N.Y.1980); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y.1982), *aff'd*, 34 B.R. 385 (S.D.N.Y.1983). Consequently, I conclude that the Agreement remains enforceable, and I deny defendants' motion for summary judgment on these grounds.

### C. Estoppel

Defendants argue that because Boland knew of the bankruptcy proceeding and deposed Parmelee, but failed to file a claim in that proceeding, Boland is now precluded pursuant to the doctrines of "unclean hands" and "laches" from bringing this action. Defendants also contend that they are entitled to a judgment declaring Parmelee sole owner of the Corporation. Defendants cite no law in support of the novel proposition that by exercising his rights under the Bankruptcy Code, a party to an executory contract is forever precluded from enforcing that contract, and I find none. Boland asserts that he was within his rights in participating in the bankruptcy proceeding and sharply disputes defendants' claim that he acted inequitably. Construing the facts most favorably to the plaintiff, I conclude that defendants failed to demonstrate that they are entitled to judgment on these grounds. In addition, because defendants have made no cross-claim

against Boland seeking a declaratory judgment in their favor, I do not consider their request that the court declare Parmelee the sole owner of the Corporation.

### D. Enforceability of the Agreement as Against Mrs. Parmelee and the Corporation

*6 Defendants argue that the Agreement cannot be enforced as against these two defendants because neither is signatory to the contract and Parmelee lacked authority to bind them. The parties agree that this question must be resolved by reference to the law of agency, which involves the actual and apparent authority of Parmelee to act for Mrs. Parmelee and the Corporation. After examining the record, I conclude that defendants fail to establish undisputed facts which show that Parmelee lacked authority to bind Mrs. Parmelee or the Corporation. Because the agency relationship "may be established by conduct, oral agreement or written instrument," *Heine v. Papp*, 97 A.D.2d 929, 471 N.Y.S.2d 18, 19 (3d Dep't 1983), dismissal of the complaint at the summary judgment stage is inappropriate. The determination is a fact-intensive inquiry, which includes the issues of reliance and "reasonable belief" by the third party, Boland. *See, e.g., Hoysradt v. Nilles Ford-Mercury, Inc.*, 168 A.D.2d 824, 563 N.Y.S.2d 956, 957-58 (3d Dep't 1990). Boland presented evidence that Kristi Parmelee acted as a co-owner and assisted her husband in running the business. In addition, it is clear that Parmelee was the President of the Corporation. Because the evidence indicates that disputed factual issues exist relative to Parmelee's actual and apparent authority to bind Mrs. Parmelee and the Corporation, I deny summary judgment as to these two defendants.

### E. The Fraud Claim

Defendants assert that they seek summary judgment relative to Boland's fraud claim. Defs.' Mem., Dkt. No 14, at 4. However, defendants fail to present any arguments in support of this request. Because I am unable to determine on what basis defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 642550 (N.D.N.Y.)
**(Cite as: 1997 WL 642550 (N.D.N.Y.))**

Page 6

move, I deny defendants' motion relative to the fraud claim.

## CONCLUSION

Because genuine issues of material fact exist as to each of the grounds for defendants' motion, I deny defendants' motion for summary judgment.

IT IS SO ORDERED.

Not Reported in F.Supp., 1997 WL 642550 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

**H**

Daewoo Intern. (America) Corp. Creditor Trust v.
SSTS America Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DAEWOO INTERNATIONAL (AMERICA)
CORP. CREDITOR TRUST, Plaintiff,
v.
SSTS AMERICA CORP., and Shingsung Tongsang
Co., Ltd. Defendant.
**No. 02 Civ. 9629(NRB).**

April 13, 2004.

Steven Har, Duane Morris LLP, New York, NY, for
Plaintiff.
Eric S. Weinstein, Feldman, Weinstein, LLP, New
York, NY, for Defendant.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Plaintiff, Daewoo International (America) Corp.
Creditor Trust ("Daewoo" or "Plaintiff") and de-
fendants SSTS America Corp. ("SSTS America")
and Shinsung Tongsan Co., Ltd. ("SSTS Korea")
(collectively, "defendants") cross-move for sum-
mary judgment. Daewoo seeks an order awarding
judgment in its favor on all claims in the complaint
and defendants seek dismissal of plaintiff's com-
plaint in its entirety. For the following reasons,
both plaintiff's and defendants' motions are granted
in part and denied in part.

BACKGROUND

A. Plaintiff's Allegations Against SSTS [FN1]

> FN1. Our summary of plaintiff's allega-
> tions is based on plaintiff's Complaint and
> the parties' Local Rule 56.1 Statements.

Plaintiff alleges that in or about July 1995, SSTS
entered into an agreement (the "Agreement") with
Daewoo wherein Daewoo would provide loans and
financing to SSTS America in order to help it set up
and operate its business in the state of New York.
Under the Agreement, Daewoo would provide
SSTS America with loans to be paid back on a
monthly basis plus interest. According to the
plaintiff, the Agreement also called for Daewoo to
provide a line of credit to SSTS America in the
amount of up to $2,500,000 per year, which was to
be adjusted from time to time. Under this provision,
SSTS America was to purchase all goods through
Daewoo. Daewoo would then invoice SSTS Amer-
ica for the goods and SSTS America would pay
Daewoo the invoiced amount plus interest and a
commission. While the defendant made certain pay-
ments in accordance with the Agreement, plaintiff
alleges that it failed to pay all monies owed.

B. The Present Action

Plaintiff filed the instant action against defendants
in New York State Supreme Court asserting causes
of action for breach of contract, account stated,
goods sold and delivered, breach of guaranty, un-
just enrichment and quantum meruit. On December
4, 2002, the case was removed to this Court, and on
January 24, 2003 SSTS America filed its answer in-
cluding as affirmative defenses the rights of re-
coupment and setoff. On April 4, 2003 plaintiff
filed a motion for partial summary judgment seek-
ing to dismiss these affirmative defenses. This
Court granted plaintiff's motion on June 9, 2003.

On September 29, 2003, plaintiff filed the instant
motion seeking summary judgment on all claims in
its complaint. Defendants responded with a cross-
motion for summary judgment asserting defenses
based on the statute of limitations, personal juris-
diction and plaintiff's alleged failure to state a
prima facie case with respect to any of its claims.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Case 1:08-cv-02814-LAP    Document 9-2    Filed 05/30/2008    Page 25 of 32 Page 2
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

DISCUSSION

I. Summary Judgment Standard

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993). In order to defeat a motion for summary judgment, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Id.* at 248 (internal quotation marks omitted). Where, as here, both parties seek summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."*Scwabenbauer v. Board of Ed.,* 667 F.2d 305, 314 (2d Cir.1981).

II. Goods Sold and Delivered and Breach of Contract Claims

**\*2** Plaintiff claims that it is entitled to summary judgment on its claims for goods sold and delivered and breach of contract as asserted against SSTS America because there is no dispute that the goods

were purchased, sold and delivered pursuant to a valid contract and that plaintiff was not fully paid for those goods. Defendants respond that plaintiff's motion fails because: (1) plaintiff has not stated a prima facie case for goods sold and delivered; (2) the loan obligation was SSTS Korea's not SSTS America's; and (3) the statute of limitations has expired.

A. Goods Sold and DeliveredPrima Facie Showing

Plaintiff asserts that as part of their ongoing business dealings, Daewoo sold and delivered goods to SSTS America between 1997 and 1999 and that SSTS America received and accepted the goods along with the applicable invoices, but that full payment for the goods remains outstanding. Defendant does not dispute that Daewoo sold and delivered goods at a certain price, but argues that there is no proof that Daewoo sold those goods to SSTS America. Defendants claim that the relevant invoices show on their face that they were not issued to SSTS America, but rather, that the goods were instead sold and delivered to SSTS Korea.

The essential elements of an action for goods sold and delivered are the purchase, sale and delivery of goods at an established price and nonpayment therefor. *See"21" Brands, Inc. v. R & J Emmet PLC,* No. 88 Civ. 8392, 1990 WL 180136 at \*4 (S.D.N.Y. Nov. 13, 1990)(finding that action for goods sold and delivered existed where plaintiff had delivered the agreed upon goods in acceptable condition but was not paid); *Sunbeam Corp. v. Morris Distributing Co.,* 389 N.Y.S.2d 173, 174, 55 A.D.2d 722, 723 (3d Dep't 1976) (citations omitted) (stating that an action for goods sold and delivered will lie where plaintiff establishes that there is a purchase, sale and delivery of goods at an established price and nonpayment therefor).

Contrary to defendants' assertions, the record clearly establishes that the goods at issue were sold and delivered to SSTS America. The record shows that Daewoo sent each invoice for the goods at is-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d 08-cv-02814-LAP    Document 9-2    Filed 05/30/2008    Page 26 of 32 Page 3
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))

sue to SSTS America, not SSTS Korea. It is undisputed that SSTS America was located at 1385 Broadway in New York, New York during the relevant time period. Plaintiff has provided the Court with copies of the invoices for the goods that were sold and delivered to SSTS America. Every invoice shows on its face that it was sent to Shinsung Tong-sang at 1385 Broadway, New York, New York. *See* Declaration of T. Steven Har ("Har Decl.") Ex. C. Defendants themselves have conceded that SSTS Korea has not conducted business in the state of New York and does not maintain an office in New York. *See* Defendants' Rule 56.1 Statement ¶¶ 3 and 4. Defendants have also admitted that SSTS America has no power to accept orders on behalf of SSTS Korea. *See id.* ¶ 5. Finally, Mr. Sang Shin, Chief Financial Officer of Daewoo testified at his deposition that the invoices were issued only to SSTS America and that the customer code on the invoice refers to SSTS America. *See* Har Decl. Ex. H. Defendants' assertion that the invoices were issued to SSTS Korea is thus squarely contradicted by the record.

*3 Plaintiff has adequately demonstrated that the subject goods were sold and delivered to SSTS America for a stated price and that payment is outstanding. Accordingly, defendants' argument that plaintiff has failed to plead a prima facie case for goods sold and delivered is without merit.

**B. Breach of Contract and Breach of Guaranty Claims**

Plaintiff also argues that it is entitled to summary judgment on its breach of contract claims against SSTS America and SSTS Korea, as well as on its breach of guaranty claim against SSTS Korea. Plaintiff asserts that in return for Daewoo's agreement to provide loans and financing to SSTS America, a wholly owned subsidiary of SSTS Korea, SSTS Korea agreed to unconditionally guarantee SSTS America's obligations to Daewoo. Daewoo alleges that after it performed all of its obligations under the Agreement, SSTS America breached the

Agreement by failing to provide Daewoo with payment, and that SSTS Korea breached the Agreement by failing to pay Daewoo when SSTS America defaulted on its obligation. Plaintiff asserts that SSTS Korea should thus be ordered to pay it all monies currently outstanding on the Agreement. Defendants respond that SSTS America was not bound by the Agreement, and that SSTS Korea was bound as primary obligor rather than guarantor. Defendants further assert that SSTS Korea has satisfied any obligation that it had under the Agreement. Accordingly, defendants contend, plaintiff's breach of contract claims and its breach of guaranty claim must fail.

**1. Breach of Contract**

Defendants' contention that plaintiff cannot recover for breach of contract against SSTS America is without merit. In order to recover for breach of contract under New York law, plaintiff must establish: (1) the existence of a contract; (2) the existence of consideration; (3) performance by the plaintiff; (4) breach by the defendant; and (5) damages to plaintiff as a result of defendant's breach. *SeeStephens v. American Home Assur. Co.,* 811 F.Supp. 937 (S.D.N.Y.1993)."Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and the case is ripe for summary judgment."*American Express Bank, Ltd. v. Uniroyal, Inc.,* 562 N.Y.S.2d 613, 615, 164 A.D.2d 275, 277 (1st Dep't 1990).

The parties here do not dispute that Daewoo entered an agreement with SSTS America and SSTS Korea wherein Daewoo agreed to provide loans and financing to SSTS America, which would help it to set up and operate its business in New York. Similarly, there is no dispute as to the existence of consideration or performance by plaintiff. The dispute arises with respect to plaintiff's contention that SSTS America breached the Agreement, as defendants assert that SSTS Korea was the only obligor under the contract.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in 1:08-cv-02814-LAP    Document 9-2    Filed 05/30/2008    Page 27 of 32 Page 4
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))

The record in this case establishes that, in fact, both SSTS America and SSTS Korea incurred obligations under the Agreement with Daewoo. The language of the Agreement makes clear that SSTS America was the primary obligor of the loan and that SSTS Korea was the guarantor of the loan. The preamble to the Agreement states that Daewoo shall provide SSTS America with certain general and export-import loans and that SSTS Korea shall "assume all responsibilities in the event that [SSTS America] defaults in its loan repayment."Har Decl. Ex. D. The contract further provides for Daewoo to send invoices to SSTS America and for SSTS America to pay interest to Daewoo. See id. at 4(2). Finally, referring to Daewoo as "A," SSTS America as "B" and SSTS Korea as "C," the Agreement states, "C, which is B's parent company, shall provide A with an unconditional guaranty of all of B's payment and performance obligations to A in the event that B delays or defaults in its loan repayment."Id. at Art. 6.

*4 In light of the plain language in the Agreement, it is simply disingenuous for defendants to argue that the meaning of this two-page contract is ambiguous. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."Concord Finance Corp. v. Wing Fook, Inc., No. 96 Civ. 5293, 1997 WL 375679 at *4 (S.D.N.Y. July 7, 1997). Moreover, Defendants concede in their motion papers that SSTS Korea's obligations were to arise "in the event that [SSTS America]'s repayment of the loan [wa]s delayed," Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in support of Defendants' Cross-Motion ("Def.Mem.") p. 5 (bracket in original). Given the plain language of the contract, as well as defendants' own admissions, it is clear that SSTS America was the primary obligor under the Agreement. Accordingly, as there is no dispute that SSTS America did not pay plaintiff in full for the loans at issue, plaintiff's motion for summary judgment on its claim of

breach of contract is granted with respect to SSTS America.

2. Guaranty of the Loan

As stated above, plaintiff asserts that SSTS Korea agreed unconditionally to guarantee SSTS America's obligations to Daewoo in the loan Agreement, and that when SSTS America failed to repay the loan, SSTS Korea wrongly defaulted on its obligation. Defendants assert that SSTS Korea cannot be liable for breaching a guaranty because it was not a guarantor of the Agreement, but rather the primary obligor.

A contract of guaranty is a promise to answer for the payment of some debt or the performance of some obligation owed by another. See In re Drexel Burnham Lambert Group, 151 B.R.674, 682 (Bkrtcy.S.D.N.Y.1993)."It is a secondary obligation in that it is collateral, and only meaningful in relation to, the independent obligation to pay (i.e., the debt) of the primary obligor, and is contingent upon his default."Michaels v. Chemical Bank, 441 N.Y.S.2d 638, 640, 110 Misc.2d 74, 75 (N.Y.Sup.Ct.1993). An "absolute" guaranty is an unconditional undertaking that the debtor will pay, and on such guaranty the creditor may, upon default, proceed directly against the guarantor without taking any steps to collect the amount due from the debtor. General Phoenix Corp. v. Cabot, 300 N.Y. 87 (1949).

Here, SSTS America has defaulted on its payment obligations to Daewoo. The parties' agreement plainly states that SSTS Korea, "which is [SSTS America's] parent company, shall provide [Daewoo] with an unconditional guaranty of all of SSTS America's payment and performance obligations to [Daewoo] in the event that [SSTS America] delays or defaults in its loan repayment."Har Decl. Ex. D Art. 6. Pursuant to the unambiguous language of the parties' Agreement, SSTS Korea is the unconditional guarantor of SSTS America's obligations to plaintiff. Accordingly, SSTS Korea is liable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Case 1:08-cv-02814-LAP    Document 9-2    Filed 05/30/2008    Page 28 of 32
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))

Page 5

to plaintiff for all monies still owed under the Agreement and plaintiff's motion for summary judgment on its breach of guaranty claim is granted.

C. Statute of Limitations

*5 Defendants assert that plaintiff is barred from pursuing its claims related to breach of contract against defendants because the applicable statute of limitations has expired. Plaintiff responds that this action was brought within an acceptable amount of time because the statute of limitations was tolled by SSTS America's acknowledgment of debt.

Under Section 2-725 of the Uniform Commercial Code, the statute of limitations for an action based on breach of contract for any sale must be commenced within four years of the date of accrual of the cause of action. See U.C.C. § 2-725; Port Authority of New York and New Jersey v. Allied Corp., 914 F.Supp. 960, 962 (S.D.N.Y.1995)."[A] cause of action accrues when the breach occurs." U.C.C. § 2-725(2). Under certain circumstances, however, the limitations period may be tolled. Under New York's General Obligation Law § 17-101, the borrower's acknowledgment of debt in its financial statements tolls or revives the limitations period. See Clarkson Co. v. Shaheen, 533 F.Supp. 905, 932 (S.D.N.Y.1982) (stating that debtor's acknowledgment of its obligation to creditor in its annual report and fact that it carried debt on its books for at least two years was "clear recognition of the continuing validity of the obligation" and therefore action was not barred by the statute of limitations); Chase Manhattan Bank v. Polimeni, 685 N.Y.S.2d 226, 258 A.D.2d 361 (1st Dep't 1999) (stating that debtor's financial statement which carried its debt obligation to creditor constitutes an "acknowledgment or promise" of debts and was sufficient to revive creditor's time-barred claims on those debts).

Defendants argue that goods were last delivered in May 1998 and that the four-year limitations period thus ran out in May 2002. Plaintiff did not file its complaint in this action until November 2002.

However, plaintiff has demonstrated that the statute of limitations was tolled by SSTS America's acknowledgment of debt. The record shows that SSTS America acknowledged its loan obligation to Daewoo in its financial statements and carried the debt on its books from at least 1999 through 2002. See Har Decl. Ex. A. For example, SSTS America's December 31, 1999 financial statements recorded the loan payable to Daewoo in the amount of $4,046,383. See id. The debt to plaintiff also appears in varying amounts on the financial statements for December 31, 2000, December 31, 2001, June 30, 2002 and December 31, 2002, reflecting an amount of $2,646,383 from December 2001 through December 2002. See id. The listings in these financial statements constitute "a clear recognition of the continuing validity of the obligation" to pay plaintiff. Clarkson, 533 F.Supp. at 932.

SSTS America also acknowledged its debt in a March 16, 2000 letter to plaintiff. In that letter, Mr. Ji Ho Kim, General Manager of SSTS America, states that SSTS America owes plaintiff approximately $4 million and proposes a schedule of paying back $100,000 per month starting from the month of April 2000. See Har Decl. Ex. B. Following Mr. Kim's letter, SSTS made thirteen monthly payments to Daewoo from April 2000 to April 2001. See Def. Rule 56.1 Stmt. ¶ 11.[FN2] Letters such as Mr. Kim's have been found to constitute an acknowledgment under § 17-101.[FN3] See e.g. Popular Publications, Inc. v. McCall Corp., 321 N.Y.S.2d 308, 36 A.D.2d 927 (1st Dep't 1971) (finding that a letter stating that indebtedness was unpaid and making a promise to pay constituted acknowledgment under § 17-101). Moreover, partial payment of a debt also serves to toll the statute of limitations on that debt. See United States v. Glens Falls Ins. Co., 546 F.Supp. 643, 645 (N.D.N.Y.1982) ("part payment of a debt starts the statute of limitations running anew in that part payment is tantamount to a voluntary acknowledgment of the existence of the debt"); Schmidt v. Polish People's Republic, 579 F.Supp. 23, 29 (S.D.N.Y.1984).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))

FN2. Defendants argue that this letter did not constitute an acknowledgment of debt because it acknowledged only "general indebtedness." The case on which defendants rely for this proposition, which was decided in 1912, also states however, that where the letter specifically references the debt at issue, rather than merely stating that the writer knows a debt exists, the letter will constitute an acknowledgment. Given that SSTS America specifically referenced a debt of approximately $4 million to plaintiff, defendants' argument that the letter was too general to constitute an acknowledgment is without merit.

FN3. With respect to defendants' argument that Mr. Kim was incapable of acknowledging the debt on behalf of the company, the very case on which defendants rely for that proposition, *Renault v. L.N. Renault & Sons, Inc.,* 90 F.Supp. 630 (E.D.Pa.1950), was overturned on appeal, with the appellate court holding that a promise from an agent of the debtor company with implied authority may indeed function as an acknowledgment sufficient to toll the statute of limitations. *See Renault v. L.N. Renault & Sons, Inc.,* 188 F.2d 317 (3d Cir.1951).

*6 The applicable statute of limitations was thus tolled by defendants' financial statements, Mr. Kim's letter and the partial payment made by SSTS America. Given that defendants' financial statements continued to reflect its debt to plaintiff as late as December 2002, plaintiff's time to file its complaint had not yet expired in 2002 when it commenced this action. Accordingly, defendants' statute of limitations defense is without merit and does not defeat plaintiff's motion for summary judgment on its breach of contract claims.

III. Account Stated

Plaintiff has also moved for summary judgment on

its claim for account stated as asserted against SSTS America. Plaintiff contends that it had reached an agreement with SSTS America regarding the amount of the balance due and that it is thus entitled to the amount agreed upon. Defendants assert that the parties never reached any such an agreement and that plaintiff's account stated claim must therefore fail.

"An 'account stated' is an agreement, express or implied, that a statement of account has been asserted, and has been accepted as correct; both parties must express assent to the account as correct; assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt." *Navimex S.A. De C.V. v. S/S Northern Ice,* 617 F.Supp. 103, 105 (S.D.N.Y.1984)."An essential element of an account stated is an agreement between the parties showing that some fixed amount is due." *D.E.O., Inc. v. Durham,* No. 99 Civ. 0036, 2000 WL 1887830 at *2 (W.D.N.Y. Dec. 29, 2000). Under New York law, "[a]n agreement may ... be implied from the fact that the debtor makes a partial payment toward reducing the balance of the account." *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.,* 615 F.Supp. 426, 429 (S.D.N.Y.1985).

In this case, plaintiff and SSTS America had previous business transactions pursuant to which Daewoo delivered goods and submitted invoices, and for which SSTS America made partial payment. Nothing in the record indicates that SSTS America ever objected to the quality of the goods or the amount stated in the invoices. Although defendants argue that there is no evidence of invoices issued to SSTS America, this argument is flatly contradicted by the record in this case, *see* Har Decl. Ex. C, which includes more than forty invoices clearly showing that they were sent to SSTS America.[FN4]

FN4. Defendants also argue that plaintiff's account stated claim is based only on an approximation of the due amount and must therefore be dismissed. It is evident from plaintiff's complaint and motion papers,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))

however, that plaintiff's claim is not based upon an approximation. The claim is based on the multiple accounts represented by the invoices plaintiff sent to SSTS America, which show that SSTS America owed Daewoo $2,795,858.19 as of May 31, 2001. *See* Declaration of Sang Shin ("Shin Decl.") Ex. C; Har Decl. Ex. C.

Defendants do not dispute that SSTS America never objected to the invoices issued by plaintiff.[FN5] Similarly, defendants concede that SSTS made partial payment to plaintiff on the loan at issue. *See* Def. Rule 56.1 Stmt. ¶ 11. Where a defendant "has both acquiesced in the bills sent to him, and made partial payment against the outstanding balance, plaintiff has established its account stated claim." *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 720 (S.D.N.Y.1986). Because defendant received and retained invoices without objecting to them and also made partial payment to plaintiff on the debt at issue, plaintiff is entitled to summary judgment on its account stated claim.

> FN5. Defendants also argue that only SSTS Korea, not SSTS America, was obligated to repay the loan. This argument has been addressed and disposed of *supra* pages 10-11.Additionally, as stated above, Mr. Ji Ho Kim, General Manage of SSTS America, acknowledged in his letter of March 16, 2000, the outstanding debt and agreed to pay $100,000 per month toward settling the account.

IV. Unjust Enrichment and Quantum Meruit

*7 Plaintiff also seeks summary judgment on its claims against SSTS America for unjust enrichment and quantum meruit. Defendants assert that plaintiff cannot pursue these claims because the existence of a valid, written contract prevents recovery in quasi-contract for occurrences arising out of the same matter.

Quantum meruit and unjust enrichment are quasi-contractual theories employed by courts "when the absence of an enforceable contract would otherwise lead to unjust enrichment of a party." *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 745 F.Supp. 37, 40 (S.D.N.Y.1991)."[T]he existence of a valid and enforceable contract governing the subject matter in issue ordinarily precludes recovery in quasi contract." *Nelson v. Stanley Blacker, Inc.,* 713 F.Supp. 107, 111 (1989)."A quasi contract only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment...." *Violette v. Armonk Associates, L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

There is no dispute that there existed a valid and enforceable written contract which governed the issues which are also the subject of plaintiff's quantum meruit and unjust enrichment claims. In light of this written agreement, plaintiff is precluded from pursuing its quasi-contractual claims, and defendants' motion for summary judgment is granted with respect to these claims.

V. Personal Jurisdiction

Defendants assert that this Court does not have personal jurisdiction over SSTS Korea because SSTS Korea was not properly served and because SSTS Korea has not submitted to jurisdiction in New York.[FN6]

> FN6. During a pre-motion conference on July 10, 2003, the Court entered a limited discovery schedule since the proposed summary judgment motion was to address only whether SSTS America owed money to plaintiff and whether SSTS Korea guaranteed the payments. Plaintiffs complain that because the issue of personal jurisdiction was never addressed at the pre-motion conference, plaintiff did not request to depose certain SSTS officials as it otherwise would have done. Even without the depos-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

itions of the SSTS officials, however, plaintiff has made a sufficient showing that this Court does indeed have personal jurisdiction over SSTS Korea.

New York law controls the issue of personal jurisdiction in this case. *SeePC COM, Inc. v. Proteon, Inc.,* 906 F.Supp. 894, 904 (S.D.N.Y.1995) (stating that in determining whether a federal district court has personal jurisdiction over a party in a diversity case, the law of the forum state applies) (citing *National Cathode Corp. v. Mexus Co.,* 855 F.Supp. 644, 647 (S.D.N.Y.1994); *Glass v. Harris,* 687 F.Supp. 906, 908 (S.D.N.Y.1988)). Under New York C . P.L.R. § 301, "a foreign corporation is subject to general jurisdiction in New York if the corporation is 'doing business' in the state."*Jacobs v. Felix Bloch Erban Verlag Ver Bunhe Film und Funk KG,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2000).

It is well-settled law in New York that jurisdiction over a parent company may be created under the "doing business" test by the activities of its subsidiary within New York. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984). While the presence of a local corporation does not alone create jurisdiction over a related, but independently managed, foreign corporation, *seeid.,* the combination of four factors will allow for jurisdiction over the foreign parent in New York. Where the party advocating jurisdiction can show: (1) common ownership by the parent corporation of the New York subsidiary, (2) financial dependency of the subsidiary, (3) a lack of observance of corporate formalities; and (4) significant control by the parent over the subsidiary's marketing and operational policies, jurisdiction will exist in New York. *Seeid.* 121-123; *Weiss v. La Suisse,* 69 F.Supp.2d 449 (S.D.N.Y.1999); *Taca International Airlines S.A. v. Rolls Royce of England, Limited,* 256 N.Y.S.2d 129 (N.Y.1965).

*8 Plaintiff has adequately demonstrated the existence of the above factors such that jurisdiction properly exists over SSTS Korea, the foreign parent corporation in this case. With respect to common

ownership, there is no dispute that SSTS America is a wholly owned subsidiary of SSTS Korea. The next factor, financial dependency of the subsidiary on the parent corporation, has also been adequately established by plaintiff. "Financial dependency of the subsidiary on the parent corporation exists where the parent ... guarantees the subsidiary's obligations...."*ESI, Inc. v. Coastal Corp.,* 61 F.Supp.2d 35, 53 (S.D.N.Y.1999) (citations omitted). As discussed above, plaintiff has clearly demonstrated through the record that SSTS Korea guaranteed SSTS America's financial obligation to Daewoo. Furthermore, SSTS America's inventory reports show that most of its inventory consists of apparel manufactured by SSTS Korea's other wholly owned subsidiaries. *See* Har Decl. Ex. F. Financing of inventory is another factor which courts have considered in finding subsidiaries financially dependent on the parent corporation. *SeeJerge v. Potter,* 99 Civ. 0312, 2000 WL 1160459 at *3 (S.D.N.Y. Aug. 11, 2000); *Taca,* 15 N.Y.2d 101-02. Accordingly, plaintiff has made a sufficient showing of financial dependency by SSTS America.[FN7]

> FN7. Further evidence of SSTS Korea's financial domination of SSTS America is that in 2001, SSTS Korea arbitrarily moved SSTS America's operating capital to SSTS Korea's subsidiary located in China and then sought to write off the withdrawn capital as a loss for United States tax purposes. *See* Har Decl. Ex. E.

The third factor courts look to in determining whether the subsidiary functions as a "mere department" of the parent corporation such that exercising jurisdiction is appropriate is the degree to which the parent interferes in the assignment of the subsidiary's executive personnel and fails to observe corporate formalities. *SeeWeiss,* 69 F.Supp. at 458. Here, defendants concede that SSTS America prepared annual financial statements in order to prepare its income tax returns and for submission to SSTS Korea, and for no other reasons. *See* Def.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 56.1 Stmt. ¶ 33. Additionally, Mr. Kim, General Manager of SSTS America, indicated that in order for SSTS America to make payments to Daewoo, SSTS Korea's authorization and approval was necessary. *See* Decl. of Ji Ho Kim ("Kim Decl.") ¶ 11. Decision making for the subsidiary by the parent is a factor that weighs in favor of finding the subsidiary to be a "mere department" of the parent. *SeeBergesen d.y. A/S v. Lindholm,* 760 F.Supp. 976, 987 (D.Conn.1991).

As to the final factor, the degree of control over the marketing and operational policies of the subsidiary exercised by the parent, "the parent's degree of control over the marketing and operational policies of the subsidiary is satisfied where the parent's promotional materials or public documents hold out the subsidiary as a branch or division of the parent, or the parent determines the subsidiary's operational policies and strategy."*ESI, Inc.,* 61 F.Supp. at 55 (citations omitted). SSTS Korea's website holds out SSTS America as merely one of its international branches, rather than a separate entity, and represents that SSTS Korea conducts marketing and export operations through its overseas entities, including SSTS America. *See* Har Decl. Ex. G.[FN8] Plaintiff has thus also made a prima facie [FN9] showing as to this final element. As plaintiff has sustained its burden of making a prima facie showing that SSTS America is a mere department of SSTS Korea, this Court may properly exercise jurisdiction over defendant SSTS Korea.[FN10]

FN8. Similarly, SSTS America and SSTS Korea use the same logo. *See* Def. Mem. at 11.

FN9. Because plaintiff has not yet obtained any jurisdictional discovery, it is required to make only a prima facie showing that defendants are subject to jurisdiction in this Court. *SeeJazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir.1998).

FN10. Defendants' recent argument that this case should be dismissed because of a

reorganization that SSTS Korea instituted in Korea in 1999 comes too late. Whether to abstain from a case based on principles of comity is a matter of discretion to be decided by the district court. *SeeUnited Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002). The principles underlying the doctrine of comity include, *inter alia,* fairness to litigants and efficient use of scarce judicial resources. *SeeGoldhammer v. Dunkin' Donuts,* 59 F.Supp.2d 248, 253 (D.Mass.1999). Given that this case has been pending in this Court since December 2002 and that this Court has already devoted sufficient resources to its resolution, including the issuance of a prior written opinion in June 2003, the Court declines to dismiss this case on grounds of comity at this time.

CONCLUSION

**\*9** For the reasons stated above, plaintiff's motion for summary judgment is granted with respect to all claims except unjust enrichment and quantum meruit, as to which defendants' motion for summary judgment is granted. Plaintiff is directed to submit a judgment on notice.

IT IS SO ORDERED.

S.D.N.Y.,2004.
Daewoo Intern. (America) Corp. Creditor Trust v. SSTS America Corp.
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 U.S.P.Q.2d 1523

1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523

(Cite as: 11 U.S.P.Q.2d 1523)

**H**

Girls Clubs of America Inc.

v.

Boys Clubs of America Inc.

District Court, S.D. New York

No. 88 Civ. 1375 (KC)

Decided May 12, 1989

United States Patents Quarterly Headnotes

**JUDICIAL PRACTICE AND PROCEDURE**
**[1] Procedure -- Contempt; sanctions (§ 410.49)**
**REMEDIES**
**Non-monetary and injunctive -- Preliminary injunctions -- Trademarks and unfair trade practices (§ 505.0707.09)**
Organization that had been preliminarily enjoined from changing its name from "Boys Clubs of America" to "Boys and Girls Clubs of America" has not committed contempt of court by its issuance of annual meeting notice proposing vote on change of name to "Boys and Girls Clubs USA," but issuance of injunctive relief is warranted that will delay such vote pending completion of trial on merits of trademark infringement action brought by "Girls Clubs of America."

***1523** Action by Girls Clubs of America Inc. against Boys Clubs of America Inc. for trademark infringement and unfair competition. On plaintiff's motion for an order holding defendant in contempt. Denied; injunctive relief issued.

Prior decision: 6 USPQ2d 2049.

Dewey, Ballantine, Bushby, Palmer & Wood (Thomas V. Heyman, Saul P. Morgenstern, and Morgan T. Sullivan-Walsh, of counsel), New York, N.Y., for plaintiff.

Hall, McNicol, Hamilton & Clark (Thomas A. Dubbs, Sandra W. Jacobson, and Lesley E. Goldberg, of counsel), New York, for defendant.

Conboy, J.

In an Opinion and Order dated March 28, 1988, this Court preliminarily enjoined defendant ("BCA") from changing its name to "Boys and Girls Clubs of America." *Girls Clubs of America v. Boys Clubs of America*, 683 F.Supp. 50, 55 [6 USPQ2d 2049, 2053] (S.D.N.Y. 1988). Shortly thereafter, in response to a request for clarification from defendant's counsel, the Court held that an intra-organizational vote on the proposed name change was also prohibited. *Girls Clubs of America v. Boys Clubs of America*, No. 88 Civ. 1375 (S.D.N.Y. April 15, 1988). The Court's interlocutory order was affirmed on appeal. *Girls Clubs of America v. Boys Clubs of America*, 859 F.2d 148 (2d Cir. 1988). Familiarity with these decisions is assumed. The matter is now before the Court on plaintiff's application for an order holding defendant in civil contempt of the preliminary injunction of March 28, 1988, as clarified by the Court's order of April 15, 1988.

The instant application was inspired by defendant's release, in the middle of March of this year, of a Notice of Annual Meeting to be held on May 14, 1989, in which defendant proposed that the organization vote to change its name to "Boys and Girls Clubs USA." Plaintiff contends principally that the proposed name fails to maintain a "safe distance" from the line drawn by the earlier order and is thus enjoinable. According to plaintiff ("GCA"), defendant's alleged "safe distance" violation, along with evidence allegedly demonstrating defendant's bad faith in the timing and selection of the new proposed name, justifies a finding of contempt. Defendant responds that a) the Court's original order was narrow, explicitly limited to the name "Girls Clubs of America" and not its component words or similar variations, b) even as to the name "Girls Clubs of America," the Circuit affirmed only on the ground that plaintiff had established serious questions going to the merits and a balance of hardships tipping decidedly in its favor, not, as this Court

COPR. © 2008 The Bureau of National Affairs, Inc.

found, on the ground that plaintiff would likely succeed on the merits, c) the relief sought would, if granted, violate *1524 equal protection principles, and d) under the guise of a contempt proceeding plaintiff could not obtain a new preliminary injunction without satisfying the demanding burden of proof for obtaining such relief. A hearing on the matter was scheduled for May 9.

Several days after the memoranda on this application were fully submitted, the Court received a letter, dated May 3, from plaintiff's counsel, Thomas V. Heyman, complaining about defendant's supplemental answer, received on May 2, to an interrogatory served in April of 1988. The interrogatory reads in pertinent part as follows:

7. Identify each expert witness or consultant

a. you intend to present at the trial of this action;

b. who has designed, conducted or supervised any survey or study, or written any report, regarding actual confusion or the likelihood of confusion;

c. who has designed, conducted or supervised any study or survey, or written any report, regarding name recognition or secondary meaning with respect to the names "Girls Clubs of America," "Girls Clubs," "Boys Club of America," 'Boys Clubs," "Boys & Girls Clubs of America" or "Boys & Girls Clubs."

In its supplemental response, defendant indicted that it would call as a witness, John Bunge, an expert who had "conducted a survey with respect to 'confusion.' "

In the May 3 letter, plaintiff's counsel asserted that when he called defendant's counsel to inquire about the timing of the survey, he was told only that it was conducted "some time ago." In addition, he complained, he had not yet received any documents relating to the survey. Mr. Heyman pointed out that the interrogatory requested more than just the iden-

tification of expert witnesses (although Defendant made it clear, in a letter, dated January 6, 1989, in response to plaintiff's complaints about defendant's interrogatory answers, that in its view the Federal Rules did not "entitle [plaintiff] to inquire as to what research has been conducted concerning confusion, likelihood of confusion, name recognition, or secondary meaning.") Mr. Heyman further protested that "[e]ven if at the time defendant initially answered Girls Clubs' interrogatories it had not yet retained someone to conduct a survey, and no survey existed, defendants had a continuing obligation 'seasonally' to supplement its response to Girls Clubs' Interrogatory No. 7, and to identify Mr. Bunge and the existence of survey documents relating thereto, when they came into being." Mr. Heyman also suggested that the circumstances indicated that defendant did not seasonably inform plaintiff of their intention to call Bunge.

Mr. Heyman observed that in response to Request no. 13 of Plaintiff's Request for Production of Documents, in which plaintiff requested documents related to surveys conducted by persons identified in Interrogatory No. 7, defendant responded that the request was vague and over-broad and, in addition, protected by the attorney/client and work product privileges. In light of defendant's earlier invocation of privileges, Mr. Heyman complained, the defendant should not now be "allowed to transform the shield provided by these privileges into a sword." Finally, Heyman argued that defendant was at the last minute trying to challenge the factual basis for the Court's earlier decision without notice.

Thomas A. Dubbs, defendant's lead counsel, responded, by letter dated May 3, that he had not received Bunge's survey until that morning and that the decision to call him as a witness had not been made until "4:30 p.m., Monday, May 1, 1989," the day before Interrogatory 7 was supplemented. The letter went on to say in substance that a) Mr. Heyman should not be surprised that a new survey was conducted because defendant commissioned a survey on a much tighter time frame in anticipation of

COPR. © 2008 The Bureau of National Affairs, Inc.

last year's hearing, b) the survey is probative of the issues raised in the contempt motion, and is not a disguised attack on the original injunctive order, because the relief sought is in effect a separate preliminary injunction application, and c) Interrogatory 7 as drafted could not be reasonably read to seek the identity of trial witnesses. On the timing of the survey, Mr. Dubbs represented as follows:

> The survey was preliminarily tested in February of this year, work was halted for a time when settlement discussions held some glimmer of hope, but work was resumed when settlement became less likely.

> The *interviewing* was not even completed until last *Friday*, April 28, 1989.

(emphasis in original). In light of the late completion of the survey, and the timing of the decision to have Bunge testify, Mr. Dubbs asserted that its supplemental response to Interrogatory 7 was seasonable. Finally, Mr. Dubbs offered to produce Bunge for a deposition on May 5, along with Bunge's files.

On May 4, the Court held a conference to discuss the propriety of allowing Bunge to testify and to clarify the scope of the May 9 hearing. As to the latter, the Court made it clear that it would consider, and expected to *1525 hear arguments on, whether the vote on the proposed name should be enjoined, even if defendant's conduct was ultimately found not to warrant an order of contempt. Mr. Heyman expressed his reluctance to expand the hearing to what he considered to be effectively a full blown trial on the merits of the new name because the timing of the vote and the late revelation of the survey evidence put him at a significant disadvantage. Among other things, he would not be fully ready to present his own expert evidence at the hearing.

Mr. Dubbs stated that the survey was necessary because, he predicted, Mr. Heyman would surely apply to the Court for a temporary restraining order in the event that the contempt motion was denied. As

to Mr. Heyman's claim that Bunge should have been identified much earlier, Mr. Dubbs maintained that non-testifying experts need not be disclosed under the Federal Rules. The Court then asked when Mr. Dubbs first contacted Bunge about doing a survey on the proposed name change. Mr. Dubbs responded as follows:

> MR. DUBBS: I would like to check my time records, but basically the decision was made in late January to go ahead. Then in February he did some pretests. We then got into settlement discussions and we turned off the meter, and then when it looked like--

> THE COURT: Well, let's just be more specific. In late January he got a green light and then in February there were some -- you said some pretesting?

> MR. DUBBS: Correct. That may not be the technical term, but that's the gist of it.

> THE COURT: All right. And then this pretesting continued until -- at what point did you tell him to hold up pending the settlement efforts?

> MR. DUBBS: I would like to check my time records so I don't make a mistake. My recollection now is basically he was on hold for the month of March.

> THE COURT: Okay. Then when in April was he given the green light again?

> MR. DUBBS: I don't recall.

> THE COURT: Do you know how long he has actually worked on this final survey that he has now submitted?

> MR. DUBBS: Well, he finished it Friday or the interviews were finished Friday, is my understanding.

> THE COURT: All right. You mentioned that there was pretesting and then there was a hol-

COPR. © 2008 The Bureau of National Affairs, Inc.

dup for most of the month of March. Would it be fair to say that, pretesting aside, that this work really commenced in the beginning of April and took approximately five weeks to do?

MR. DUBBS: Roughly, but I mean, we didn't know -- the point is we didn't know what the results were until last Friday.

Tr. of May 4 Hearing at 12-14. Mr. Dubbs also insisted that he "did not have any idea whether Mr. Bunge was going to take the stand until 4:30."

The Court did not consider all of the discovery-related complaints raised by Mr. Heyman in his letter, but in light of Mr. Dubbs' representations that he seasonably updated plaintiff's discovery requests, that the last minute completion of the survey was fortuitous, and that Bunge would be made available for a deposition, the Court decided to permit Bunge to testify and proceeded with the hearing as scheduled on May 9. At the conclusion of the hearing, the Court directed the parties to submit post-hearing memoranda by May 11. The matter is now fully submitted.

The Court will first consider the propriety of a contempt citation. As a preliminary matter, the Court notes that the question of defendant's failure to keep a "safe distance" from the line drawn by the Court's earlier order and the question of contempt are analytically distinct, although the two issues often arise together as the case-law relied on by both parties demonstrates. *Cf., e.g., Charles de la Ritz Group v. Quality King*, 664 F.Supp. 152 (S.D.N.Y), *aff'd*, 832 F.2d 1317 [4 USPQ2d 1778] (2d Cir. 1987). "The imposition of a civil contempt order . . . should only be imposed when there is clear and convincing proof of a violation of a court decree." *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980). It is true that a party once found to have infringed a trademark, even in an interlocutory order, has a "duty to keep a safe distance from the line drawn by the district court's injunction," *Oral-B Laboratories, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 [1 USPQ2d 1867, 1869-70]

(2d Cir. 1987), but the case-law indicates that a foray beyond a safe distance must be made with some wilfulness or deviousness before a contempt citation is warranted, *e.g., id.* (in designing new package, defendant ignored the district court's warning that subtle distinctions would not suffice and evidence indicated that new design not only came close to the line but crossed it). That is not the case here.

For one thing, in contrast to the cases cited by GCA, the Court's March 28, 1988 Order was quite narrow. In addition to being literally limited to defendant's proposed incorporation of "Girls Clubs of America," the opinion *1526 rejected several arguments offered by both sides which disregarded the Court's focus on the precise mark at issue. *See id.* at 3 (BCA's argument that "Girls" and "Girls Clubs" are generic terms were irrelevant because plaintiff's trademark had to be considered in its entirety); *Id.* at 7 (existence of third-party users against whom GCA took no action was not relevant because no other organizations were called "Girls Clubs of America" nor did any incorporate entire mark in their names); id. at 10 (GCA acknowledged that use of the name "Girls Clubs of America" by BCA and "Girls Clubs" by local organizations were separate legal issues). In addition, the Court does not question BCA's motives in seeking to change its name. Defendant has become a mixed gender organization and simply seeks to adopt a name that reflects its makeup. Even the first proposed name, which incorporated GCA's entire mark, was not an unnatural or suspicious choice given defendant's existing name. While alternatives exist, including the one before the Court, anything other than "Boys and Girls Clubs of America" would involve a significant alteration of defendant's current name. BCA's interest in preserving the good will it has developed is as legitimate as GCA's. BCA's actions simply do not compare to those of the exploitative commercial defendants in the cases cited by plaintiff. And, of course, defendant has not yet voted on or adopted the proposed name. Accordingly, plaintiff's application for a finding of contempt is denied.

COPR. © 2008 The Bureau of National Affairs, Inc.

1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523
(Cite as: 11 U.S.P.Q.2d 1523)

The conclusion, however, does not shift the burden to plaintiff to make the kind of showing necessary to obtain a preliminary injunction in the first instance, as defendant has argued. Whether or not contempt is appropriate

> [a] trademark infringer, "once caught," should have its conduct carefully scrutinized in future use and should not be allowed to claim the same leniency accorded a good faith user who starts use of the mark which the enjoined defendant has shifted to. Otherwise, the enjoined defendant could comply make a minute change and start a new trademark contest all over again in the context of the contempt hearing as to use of the "new" format.

2 J. McCarthy, *Trademarks and Unfair Competition*, §30:13 at 480 (2d ed. 1984).

A natural starting point in our inquiry is defendant's survey evidence, which was the centerpiece of the May 9 hearing.

> The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey. *Manual for Complex Litigation*, 116 (5th Ed. 1981); 4 Louisell and Mueller, *Federal Evidence* §472 at 957 (1979); 2 J. McCarthy, *Trademarks and Unfair Competition* §32:53 (1973).

*Toys "R", Us, Inc. v. Canarsie Kiddie Shop, Inc.*,

559 F.Supp. 1189, 1205 [217 USPQ 1137, 1149] (E.D.N.Y. 1983). Although the survey evidence has already been admitted, a careful review of the record, applying the factors enumerated above, leads to the conclusion that Bunge's survey lacks any probative value on the question of confusion.

The most glaring, and fatal, flaw in the survey is demonstrated by its irreconcilably conflicting purposes. The stated, and proper, objective of the survey was "to determine whether a likelihood of confusion exists, between Boys & Girls Clubs U.S.A. and Girls Clubs of America, Inc. created by the name change from Boys Clubs of America to Boys & Girls Clubs U.S.A." (Defendant's Ex. D at 2). But the real objective of the survey is revealed in the instructions given by Bunge to his field supervisors. "This survey is being conducted to evaluate consumer's reaction concerning *logos* for various organizations" (Defendant's Ex. D, Appendix) (emphasis added). A review of the survey reveals that respondents were shown an array of cards, the natural focus of which, in terms of placement and size, were various organizational logos, including those of the parties. The cards contain the names of the various organizations but the names, are for the most part, dwarfed in size and placement by the striking logos.

The Court agrees with plaintiff that:

> by focusing on the organizations' logos, rather than their names, defendant focused the attention of the respondents, the interviewers, and the supervisors on the most distinctive feature of the images of the cards. Defendant thus introduced an element of distinctiveness which does not exist when the organizations' names appear with their logos less prominently displayed or without their logos altogether, *e.g.*, in the media, or when they are heard **\*1527** rather than seen. . . . The distinctiveness of the logos, and the prominence with which they were featured in the presentation made to the respondents, improperly skewed the results toward a showing of distinctiveness, and away from sim-

COPR. © 2008 The Bureau of National Affairs, Inc.

ilarity.

Plaintiff's Post-Hearing Memorandum at 16. [FN1] A second serious flaw is Bunge's failure to control or record the order of presentation of the logo cards to respondents. Despite his admission that interviewers were instructed to shuffle the cards for each interview, Bunge made the incredible and counter-intuitive assertion that the placement of the cards, *e.g.* two cards placed next to each other versus the same two cards separated by several or all of the rest, would have no bearing on the responses. Finally, Bunge offered no explanation for his decision to crowd the field with nine different logos when in a survey commissioned in connection with a dispute over logos between two banks, he used only the two banks' logos, and in fact, admitted that he *never* in his long experience in the field used more than two cards. These inadequately explained errors compel the conclusion that the survey was fatally skewed to favor defendant's litigation position and, indeed, was less than honest.

Even without the benefit of the survey, however, the new proposed name presents a close question. On the one hand, applying the "safe distance" rule, reasonable minds could certainly find that changing the proposed name from "Boys and Girls Clubs of America" to "Boys and Girls Clubs U.S.A." is merely an example of inching away from the border of the Court's earlier ruling. Certainly, along a spectrum of alternatives names that would describe a national umbrella organization of mixed gender youth clubs, the new proposal is closer to the earlier, prohibited choice than other possible selections. On the other hand, the Court agrees with defendant that there are a limited number of reasonable alternatives. Moreover, as already noted, the Court is sympathetic to defendant's interest in choosing a name that does not dramatically depart from its existing one.

But without going so far as to say that plaintiff is likely to establish that the new proposed name would cause confusion, evidence elicited at the hearing about the timing and manner in which this came to be heard, along with the closeness of the merits, leads us to the conclusion that the vote should be enjoined pending a later interlocutory or final hearing so that plaintiff will have a full and fair opportunity to argue its case.

The hearing revealed that the timing of the vote and counsel for defendant's development and disclosure of its evidence was much more a product of gamesmanship than the Court was led to believe at the May 4 conference. First, despite defense counsel's representation to the Court that Bunge was first contacted about doing a survey on the new proposed name in "late January," Mr. Bunge testified that he was contacted about doing a survey in mid-October. Bunge received a letter, dated October 12, 1988, from defendant's counsel, informing Bunge of the proceedings to date, expressing interest in doing a survey on "other names in addition to 'Boys & Girls Clubs of America,' " and instructing Bunge to review the Court's earlier decision and other materials in anticipation of a lengthy discussion with Mr. Dubbs on strategy for the then-contemplated survey. Bunge reviewed the materials and then travelled to New York for a meeting with two of defendant's lawyers and two of its top executives. Bunge characterized this as a "get-acquainted session" but he admitted on cross-examination that the target population of the survey and the nature of BCA's solicitations (*e.g.*, by mail) was discussed. That Bunge made a note to himself about using, during the prospective survey, "visual stimuli with and without hands" (meaning Boys Clubs of America with or without the organization's stylized clenched hands logo) is a strong indication of the advanced and comprehensive nature of this "get-acquainted session." It is true that neither the October 12, 1988 letter or the testimony about the November meeting explicitly mention the new proposed name, and Mr. Dubbs may deny, based on a cramped reading of our question to him at the conference held on May 4, that the new name was not proposed to Bunge until sometime after, but, given the extent of Bunge's involvement as early as November 1988, and the testimony of a BCA exec-

COPR. © 2008 The Bureau of National Affairs, Inc.

utive that the new proposed name was being floated around the organization as early as the fall of 1988, such a denial would not ring true.

Mr. Dubbs' representation that he "did not have any idea whether Bunge was going to take the stand until 4:30" on May 2, 1989 is also called into question by Bunge's admission that he knew about the hearing as early as April 23, 1989 and assured defendant's *1528 counsel, in writing, that he knew the dates and that he marked it down in his date book. Without going into detail about a party's obligations under Rule 26(b)(4)(A)(i), one cannot avoid his obligations by the self-serving assertion that an expert's testimony was not an absolute certainty until the eve of a hearing.

Perhaps even more dismaying is that the late completion of the survey evidence was not fortuitous, as the tenor of the May 4 conference suggested, but was rather a product largely of a deadline set by defendant's counsel. On direct examination, Mr. Dubbs asked why active interviewing, which began on February 8, ended on April 28. Bunge responded:

> Because this was now a Friday, I believe -- I'm not looking at my calendar, but it was late that week *and we had a meeting scheduled in your office the 1st and I had to have the project completed at that point for the meeting.*

Hearing Tr. at 92.

The last minute revelation of evidence not only disadvantaged plaintiff by forcing it to digest a significant amount of evidence in a short time, taking time away from the development of its own case, but it limited the Court's ability to consider plaintiff's allegation that defendant in a number of ways violated its discovery obligations. Suffice it to say at this point that defendant's conduct appears to have violated the spirit of the Federal Rules if not the letter.

These events also put the timing of the BCA meet-

ing and of the announcement of the same in a different light. The original, enjoined proposal of a new organizational name was announced a full year before the meeting at which it would be voted upon, and before this Court became involved in the matter. Although the earlier proposal generated controversy within the organization, and the new proposal has done the same, especially in light of the existing injunction, *see, e.g.,* Plaintiff's Ex. 5, the new proposal was announced only sixty days before the May 14 meeting. In short, the timing of the vote in conjunction with the manner in which defendant's counsel developed and revealed its survey evidence leads us to the conclusion that, in effect if not by design, there has been an "unfair jerry-rigging of this process to essentially injure [plaintiff's] ability to mount an argument with respect to the new name." Tr. of May 4 Conference at 20.

"Equity regards as done what ought to have been done . . . and resolves uncertainties against those whose wrongful acts or omissions created them. "*United States ex rel. Schuster v. Vincent,* 524 F.2d 153 (2d Cir. 1975). Had the Court been presented with a more complete picture at the May 4 conference, it most certainly would have granted at least a short continuance of the hearing scheduled for May 9, and a corresponding restraint of the vote, to allow plaintiff's counsel to obtain and develop a response to defendant's evidence. *See Outley v. City of New York,* 837 F.2d 587, 590 (2d Cir. 1988). Such relief is also supported by the case-law on the "safe distance" rule which at least implicitly recognizes the right of a party, who has prevailed on an interlocutory or final injunction application, to procedural fairness in challenging the inevitable variations proffered by the enjoined party. It would be absurd to say that plaintiff gets the benefit of the "safe distance" rule and then deny relief in a close case such as this because the artificial deadlines created by the defendant limit the plaintiff's ability to mount affirmative evidence to support an injunction.

COPR. © 2008 The Bureau of National Affairs, Inc.

Furthermore, it appears to the Court that this situation places the plaintiff at a greater disadvantage than a party who must hurriedly seek injunctive relief in the first instance. In the latter scenario, both the plaintiff and the defendant are forced to prepare for a hearing on extremely short notice. Here, the defendant was able to impose upon the plaintiff the burden of preparing its case on short notice while at the same time methodically, and leisurely preparing its own. Sanctioning such procedures would not only disadvantage a party who has once demonstrated its entitlement to equitable relief but would also tend to subvert the Court's control over the controversy. *See* 2 J. McCarthy, *supra*, §30:13 at 480 ("A trademark infringer, 'once caught,' should have its conduct *carefully* scrutinized in future use.") (emphasis added). Such a result would be unacceptable.

Delaying the May 14, 1989 vote by way of an injunction is not only fair; it is also sensible. Counsel for plaintiff has represented that he is prepared to proceed to a full trial on the merits within a matter of months. Where, as here, a full and fair trial on the merits can be commenced within a matter of months, it is unreasonable to allow this litigation to be sidetracked by artificially created and unfair emergencies. Accordingly, in the exercise of my equitable power " 'to mold each decree to the necessities of the particular case.' "*Oral-B Laboratories*, 810 F.2d at 24 [1 USPQ2d at 1870] (citation omitted), the Court modifies and expands its Order of March 28, 1988 to prohibit BCA from changing its name to "Boys and Girls Clubs USA."

**\*1529** [1] In sum GCA's motion for an order holding BCA in contempt is denied. BCA is, however, hereby prohibited from voting on the proposed resolution to change its name to "Boys and Girls Clubs USA."

SO ORDERED.

FN1 It must be noted that, regardless of the relevance of distinctive logos to the ultimate outcome of this action, the Court, in its earlier opinion, rejected an argument that defendant's distinctive logo lessened the likelihood of confusion. 683 F.Supp. at 53-54 n.3 [6 USPQ2d at 2051 n.3].

S.D.N.Y.

11 U.S.P.Q.2d 1523

END OF DOCUMENT

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

**H**

**Adiel** v. **Coca-Cola** Bottling Co. of New York, Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Chaim ADIEL; Some Like it Hot, Inc., et al.,
Plaintiffs,
v.
COCA-COLA BOTTLING COMPANY OF NEW
YORK, INC., Defendant.
**95 CIV. 0725 (WK).**

Sept. 13, 1995.

*MEMORANDUM AND ORDER*

WHITMAN KNAPP, Senior District Judge.
**\*1** This action is brought by individuals and corporations who had been distributing defendant's soft drink "Coke" under individual distribution agreements entered into during the 1980's until defendant terminated their distributorships on June 1, 1995. Those agreements contain the following relevant provisions:

22. *TERM OF AGREEMENT*

This agreement shall commence on the date hereof and shall expire on May 31, 1990, unless sooner terminated pursuant to the provisions hereof. Distributor shall have the right to renew this Agreement for an additional five (5) year period commencing June 1, 1990. Upon the failure of the Distributor to give such notice as herein provided, this Agreement shall not be renewed and shall expire on May 31, 1990. Time shall be of the essence with respect to the provisions of this paragraph.

24. *AGREEMENT COMPLETE*

This Agreement is intended to, and shall, supersede any and all existing understandings of agreements between the Company and the Distributor, and expresses fully the understanding and agreement between the Company and the Distributor, and both parties agree that there are no promises, terms, conditions, understandings, commitments or obligations in respect of the subject matter of this Agreement, except as set forth herein.

25. *MODIFICATION, AMENDMENT*

This Agreement may not be modified, amended, changed, terminated, or cancelled orally. Except as provided herein, no modification, change or amendment or attempted waiver shall be valid unless in writing signed by both parties.

See, e.g., Ex. A. to Complaint at 9.

It is undisputed that each plaintiff who had been distributing Coke as of May 31, 1990 executed a written renewal notice specifying that the Agreement was to be renewed for a five-year period ending on May 31, 1995. See Def. App. Ex. B. In addition, plaintiffs Hallow Ng and Charles Pelegrino executed Distributor Agreements in June 1992. Pelegrino, prior to executing his agreement, and Ng, on the day he executed his, signed a separate document which defendant refers to as an "Expiration Acknowledgement." See Def. Appendix Ex. C. That document provided in pertinent part:

We want to assure, and to receive your confirmation, that you have read and understood the Distributor's Agreement which defines your rights and obligations. In particular, we are calling it to your attention, and you are acknowledging, that this is a contract for a limited number of years expiring on May 31, 1995 (unless sooner terminated according to its terms). We have not made, are not making and will not make any assurances of renewal or extension of the Distributor's Agreement, whether on the same terms or on a different basis. See [Distribution Agreement] Paragraph 22.

Def. Appendix, Ex. C.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))

On May 18, 1993, defendant informed plaintiffs "for the first time" that it did not intend to renew their distribution agreements and that it planned to "directly service the existing [Coke] accounts within [plaintiffs'] exclusive territories using salaried employees." Complaint at ¶ 76.

*2 The basis of the complaint is that in order to persuade plaintiffs and other distributors to enter into the 1980 agreements, various officers of defendant made oral promises to them that defendant would renew their distribution rights indefinitely until plaintiffs "returned or chose to sell such rights."Complaint at ¶ 68. Plaintiffs allege that such promises actually induced them to enter into the agreements, to purchase for "hundreds of thousands of dollars," id. at ¶ 72, existing Coke accounts, to assume substantial and long-term personal obligations and to "work hard and invest substantial amounts of time, energy, and money to increase the sales of Coke products in [plaintiffs'] respective territories..." Id. at ¶ 74.The complaint contends that defendant had "assured [plaintiffs] that they were building equity in their business, which would be realized in the future when they sold the business or retired."Id.

According to plaintiffs, defendant had never advised them of the possibility that it would not renew their agreements in 1995, and that had they been so advised they would never have entered into the initial distribution agreements. Id. at ¶ 78-79.Moreover, the complaint alleges that defendant has "actively interfer[ed]" with plaintiffs' relationships with their customers, id. at ¶ 82, and that it has "actively disparaged the [[[plaintiffs'] business performance and reputation by claiming falsely that they are no longer capable of adequately servicing their existing accounts," id. at ¶ 83.

The complaint states claims for breach of contract, unjust enrichment, fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, unfair competition, tortious interference with contract, negligent misrepresentation, breach of fiduciary

duty, the violation of New York's Franchise Act and promissory and equitable estoppel. In April 1995, defendant moved to dismiss the complaint. Briefly thereafter, plaintiffs filed an order to show cause seeking a preliminary injunction prohibiting defendant from terminating the distribution agreements on May 31st. At argument on defendant's motion, plaintiffs requested leave to amend their complaint to restate their claims for fraud with greater specificity. To that end plaintiffs have submitted a "Supplemental Memorandum of Law" proposing more specific allegations of fraud.

On May 30, 1995, we dismissed plaintiffs' breach of contract claims as deficient under New York's Statute of Frauds, General Obligations Law § 5-701(a)(1), which requires a signed writing as proof of a contract which by its terms cannot be fully performed within a year. Having found on that occasion that plaintiffs had no contractual right to compel defendant to extend the agreements, we denied plaintiffs' motion for a preliminary injunction.

For reasons which follow, assuming the complaint to have been amended along the lines suggested in plaintiffs' "Supplemental Memorandum," we grant defendant's motion as to plaintiffs' remaining claims except for ones asserting promissory estoppel. For other reasons stated herein, we dismiss the complaint in its entirety as to plaintiffs Ng and Pellegrino.

### DISCUSSION

*3 We address each set of plaintiffs' remaining claims in turn.

#### The Remaining Contractual Claims

Plaintiffs have alleged that by terminating their distribution agreements, defendant breached an implied covenant of good faith and fair dealing. However, under New York law a party's reliance upon express contractual terms insulates it from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

such claims. *See, e.g. Hartford Fire Ins. v. Federated Dept. Stores, Inc.* (S.D.N.Y. 1989) 723 F. Supp. 976. In that case Judge Sweet, applying New York law, observed that

the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract.

*Id.* at 991.The agreements at issue here in no respect required defendant to renew after May 31, 1995. Accordingly, we dismiss plaintiffs' remaining contractual claims.

### Unjust Enrichment

A claim for unjust enrichment is a quasi-contractual one. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter."*Clark-Fitzpatrick, Inc. v. Long Isl. R.R. Co.* (1987) 70 N.Y.2d 382, 388. A "'quasi contract' only applies in the absence of an express agreement..."*Id.*Accordingly, we must dismiss plaintiffs' unjust enrichment claims.

### Fraud

In considering plaintiffs' claims for fraud in the inducement, fraudulent representation and fraudulent concealment, we shall assume the complaint to have been amended to include the allegations set forth in plaintiffs' "Supplemental Memorandum of Law." Defendant argues that the complaint so amended fails to meet several requirements of Rule 9(b). First, it contends that the complaint ought to disclose which of its employees made which representations to *each* plaintiff and when. Second, it asserts that it fails adequately to allege that such employees had fraudulent intent when making representations that defendant did not intend to terminate the distribution arrangement.

With regard to its first argument, defendant notes that plaintiffs have alleged only three particular incidents in support of their fraud in the inducement claims: (1) a March 1985 meeting in which Edward O'Reilly, defendant's C.E.O. at the time, "told the Plaintiffs including Walter Holland * * * that 'you are the owners of the route' and 'will be building equity which will be yours when you sell your business...'" Supp. Mem. at ¶ 8; and (2) a May 1987 interview during which Paul Cunningham, defendant's vice-president at the time, told (id. at ¶ 7)

the Plaintiffs... including... Dewitt Walker... that the purchase of the routes was like buying a house only better because it paid for itself and it would build equity which the Plaintiffs would realize whenever they finally decided to sell the route;

and (3) an October 1987 interview at which Cunningham made similar misrepresentations to "[p]laintiffs, including Bobby Ferrara..." Id.

**\*4** Defendant contends that these incidents, which began in 1985, cannot support the claims of six plaintiffs who executed their distributorship agreements prior to that year. It also argues that the supplemental language similarly fails to support the fraud in the inducement claims made by 12 plaintiffs who had become distributors for defendant prior to October 1987, and eleven plaintiffs who had not yet entered into such agreements at that time. We agree with defendant that the fraud claims lack sufficient specificity.

As defendant points out, plaintiffs must also allege "circumstances that give strong rise to the inference that defendants knew the [alleged oral representations] to be false."*Wexner v. First Manhattan Co.* (2d. Cir. 1990) 902 F.2d 169, 173. We agree with defendant that plaintiffs are simply unable to demonstrate that its agents had lied in 1985 and 1987, when they are claimed to have made the representations that plaintiffs' distributorship would continue indefinitely. There is nothing in the agreements which would have *prevented* defendant from renewing indefinitely, and plaintiffs point to no fact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 4
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

or circumstance establishing that defendant's man-
agement as early as 1987 had made its decision not
to do so (which decision was not announced until
1993).[FN1]

### Unfair Competition

Under New York law, in order to sustain a claim
for unfair competition, plaintiff must show that de-
fendant misappropriated plaintiff's labors or ex-
penditures and that defendant displayed some ele-
ment of bad faith in doing so.
*Davis & Co. Auto Parts, Inc. v. Allied Corp.*
(S.D.N.Y. 1986) 651 F.Supp. 198, 203 (S.D.N.Y.
1986)*citing Saratoga Vichy Spring Co. v. Lehman*
(2d Cir. 1980) 625 F.2d 1037, 1044. As defendant
points out, such bad faith cannot be found where a
defendant's alleged misconduct represents nothing
more than its having exercised its legal rights. *See,
e.g., Saratoga,* 625 F.2d at 1044 (no bad faith
present in defendant's exploitation of a trademark
which it was legally entitled to use); *Tri-Star Pic-
tures, Inc. v. Leisure Time Productions, B.V.* 17
F.3d 38, 45 (2d Cir.), *cert. denied*(1994) 115 S.Ct.
484 (counterclaim alleging unfair competition was
properly dismissed where there was no finding of
contractual breach). Here, the contract in no way
prohibited defendant from terminating the agree-
ments on May 31, 1995. We thus cannot find that
termination to be an adequate basis for plaintiffs'
unfair competition claims. Accordingly, we dismiss
them.

### Tortious Interference with Contract

A claim for tortious interference with contract can
withstand a motion to dismiss only where plaintiff
has alleged (1) the existence of a valid contract
between itself and a third party; (2) defendant's
knowledge of that contract; (3) defendant's inten-
tional procurement of a breach of that contract by
the third party; and (4) damages. *See Nordic Bank
PLC v. Trend Group, Ltd.* (S.D.N.Y. 1985) 619
F.Supp. 542, 560-61. Finding that the complaint fail

to meet these requirements, we dismiss plaintiffs'
claims for tortious interference with contract.

### Negligent Misrepresentation/Breach of Fiduciary Duty

*5 The complaint states claims for negligent mis-
representation and breach of fiduciary duty based
on the aforesaid conduct of defendant. Both of
these causes of action require plaintiff to demon-
strate a special relationship which gives rise to de-
fendant's fiduciary duty. Ordinarily, New York
courts do not recognize a fiduciary relationship
between a franchisee and franchisor. *See, e.g.,
Fashion Boutique of Short Hills, Inc. v. Fendi,
U.S.A., Inc.* (S.D.N.Y. 1992) (M. Cederbaum, D.J.)
1992 U.S. Dist. Lexis 9881; *Bevilacque v. Ford
Motor Co.* (2d Dep't 1986) 509 N.Y.S.2d 595,
599;*Mobil Oil Corp. v. Rubenfeld* (2d Dep't 1975)
370 N.Y.S.2d 943,*aff'd*(1976) 40 N.Y.2d 936. One
New York trial court has found a fiduciary relation-
ship between such parties where the power of the
franchisor was "awesome" in comparison with the
franchisees, a group of Taiwanese immigrants with
no business background or experience. *In re Sbarro
Holding, Inc.* 445 N.Y.S.2d 911, 913,*aff'd*(2d Dep't
1982) 456 N.Y.S.2d 416. The court there found that
the franchisor had served as "developer, architect,
builder, lawyer, supplier and guidance counselor"
to the franchisees. *Id.* The complaint fails to allege
any such extreme circumstances. Accordingly, we
dismiss plaintiffs' claims for breach of fiduciary
duty and for negligent misrepresentation.

### Violation of the New York Franchise Act

The New York Franchise Act (hereinafter "the
Act") prohibits the direct or indirect use of "any
device, scheme, or artifice to defraud" in connec-
tion with "the offer, sale or purchase of any fran-
chise..."N.Y. Gen. Bus. Law § 687 (McKinney's
1984 & Supp. 1994).[FN2]

Defendant offers two arguments to defeat these
claims. With regard to all plaintiffs except Ng and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 5
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

Pellegrino, it contends that they are time-barred. Under one of the Act's provisions, N.Y. Gen. Bus. Law § 691(4),

[a]n action shall not be maintained to enforce a liability created under this section unless brought before the expiration of three years after the act or transaction constituting the violation.

In cases alleging violation of the Act's fraud provision, New York courts have deemed the phrase "the act or transaction constituting the violation" to mean the date upon which a franchisee entered -- through fraudulent inducement, misrepresentation or concealment -- the franchise agreement at issue. *See, e.g. Leung v. Lotus Ride, Inc.* (1st Dep't 1993) 604 N.Y.S.2d 65, 67;*Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc.* (Sup. Ct. Onondaga Co. 1988) 540 N.Y.S.2d 131, 134. Here all plaintiffs except for Ng and Pellegrino entered into the distribution agreements well over three years after they filed this action in February 1995. Accordingly, we dismiss such plaintiffs' claims under the Franchise Act.

As stated above, Ng and Pellegrino entered into their distribution agreements in June 1992 and at around the same time also executed "Expiration Acknowledgments" which unequivocally stated that defendant was not obligated to renew the agreements after May 31, 1995. These "Acknowledgments" contradict any promises that defendant planned to renew the agreements indefinitely. Accordingly we dismiss these plaintiffs' claims under the Act.

### Promissory Estoppel

**\*6** Plaintiffs' promissory estoppel claims proceed on an entirely different basis. In the first place, it is not necessary for such a claim that it be alleged or proved that there was any fraud or irregularity connected with the contracts at their inception. Nor would it be necessary for plaintiffs to prove that defendant or any of its agents intended to defraud

them. All that it would be necessary to establish would be that agents of defendant, acting in the scope of their authority, and intending to promote greater effort on the part of plaintiffs in distributing defendant's products, knowingly or unknowingly induced plaintiffs to believe that they had a continuing equity in their distributorships and observed them making significant investments of time and labor into those businesses which no rational person would have made absent such a representation.

Although plaintiffs' allegations in regards to this count of the complaint are inartful in the extreme, it seems to us that taken together they suggest the possibility of establishing claims for promissory estoppel; and that they should have the opportunity to engage in discovery in that connection.

The promissory estoppel claims asserted by Ng and Pellegrino are on a different footing. Among the requirements of promissory estoppel is *reasonable* reliance upon the alleged promise. *See Trilogy Variety Stores, Ltd. v. City Products Corp.* (S.D.N.Y. 1981) 523 F.Supp. 691, 696-97,*citing James King & Son, Inc. v. DeSantis Construction No. 2 Corp.* (Sup.Ct. New York 1977) 413 N.Y.S.2d 78, 81. As we above noted, each of them executed an "Acknowledgement" which clearly spelled out that plaintiffs had no renewal rights beyond May 31, 1995. We fail to see how, in light of the "Acknowledgments," any reliance on promises to renew the distribution agreements indefinitely could be deemed reasonable. Accordingly, we dismiss these plaintiffs' promissory estoppel claims.FN3

### Equitable Estoppel

We must, however, dismiss all plaintiffs' equitable estoppel claims. Such claims require that a plaintiff allege "[a]n act constituting a concealment of facts or a false misrepresentation" and "[a]ctual or constructive knowledge of the true facts by the wrongdoer."*Trilogy Variety,* 523 F.Supp. at 697,*quoting Special Event Entertainment v. Rockefeller Center*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))

(S.D.N.Y. 1978) 458 F.Supp. 72, 76. As we noted above, plaintiffs have failed to allege any fact supporting its theory that when making the alleged promises any of defendant's employees knew that defendant planned not to renew plaintiffs' distributorships.

## CONCLUSION

For the reasons stated herein, we dismiss all of plaintiffs' claims except for those alleging promissory estoppel. As to plaintiffs Ng and Pellegrino, we dismiss the complaint in its entirety. We refer this action to Magistrate Judge Bernikow, who has already been designated in this case, for all pretrial purposes.

SO ORDERED.

FN1. Having so ruled, we need not consider defendant's argument that the fraud claims must be dismissed because plaintiffs cannot establish *justifiable* reliance upon the alleged promises because such promises are contradicted by the express terms of the distribution agreements. However, we note that all of the cases cited by defendant in support of this argument -- *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.* (2d Cir. 1984) 748 F.2d 729, 735-36; *Abraham v. New York Univ. College of Dentistry,* (1st Dep't 1993) 593 N.Y.S.2d 229, 230; *New York State Urban Development Corp. v. Marcus Garvey Brownstone Houses, Inc.* (2d Dep't 1983) 469 N.Y.S.2d 789, 795; and *Bango v. Naughton* (3d Dep't 1992) 584 N.Y.S.2d 942, 944 -- involve unambiguous disclaimers regarding the extra-contractual promises upon which the plaintiffs had based their fraud claims. By contrast, the contractual provision at issue here, which grants plaintiffs the right to renew the agreements for a five year term, says absolutely nothing with regard to renewal

rights beyond that term.

FN2. The Act defines "franchise" as

a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is entitled to pay, directly or indirectly, a franchise fee.

N.Y. Gen. Bus. Law § 681.

FN3. Indeed, the existence of "Acknowledgements" signed by Ng and Pellegrino appears to corroborate plaintiffs' assertion that the renewal provision in all of the distribution agreements did not address their renewal rights after 1995, and therefore does not preclude them from asserting that they reasonably relied upon the promises allegedly made by defendant's agents.

S.D.N.Y.,1995.
Adiel v. Coca-Cola Bottling Co. of New York, Inc.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.))

**H**

In re Rama Group of Companies, Inc.

W.D.N.Y.,2002.

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

In re RAMA GROUP OF COMPANIES, INC.,
Debtor.

COMMITTEE OF UNSECURED CREDITORS OF
RAMA GROUP OF COMPANIES, INC., Appel-
lant,

v.

GOTTESMAN COMPANY, Appellee.

**Nos. 01-CV-0424E(SR), 01-CV-0446E(SR),
00-BK-12654K.**

May 6, 2002.

MEMORANDUM and ORDER

ELFVIN, J.

*1 This is an appeal by the Committee of Unse-
cured Creditors of Rama Group of Companies, Inc.
(the "Committee") in the above-captioned Chapter
11 proceeding from two orders by United States
Bankruptcy Judge Michael J. Kaplan (collectively
"Orders"). Judge Kaplan's first Order, entered on
May 1, 2001, granted the broker/finder, Gottesman
Company ("Gottesman"), an equitable lien on the
assets of the debtor ("Rama") ("May 1, 2001 Or-
der"). Judge Kaplan's second Order, entered on
May 16, 2001, ruled the amount of Gottesman's
equitable lien to be $199,000 and that Gottesman
may file an unsecured pre-petition claim for the
balance that Gottesman believes is still due ("May
16, 2001 Order").[FN1] For the reasons stated herein,
these Orders will be affirmed, albeit on different
grounds. The Bankruptcy Court found that an equit-
able lien was appropriate under the circumstances
of this case. This Court, however, declines to find
an equitable lien in this case of first impression,
which more clearly implicates the doctrine of con-
structive trusts.[FN2]

FN1. Familiarity with the underlying facts
and the Orders is presumed and they are
not discussed further herein. *See In re
Rama Group of Companies,* 264 B.R. 267
(Bankr.W.D.N.Y.2001).

FN2. This Court declines to decide this
matter of first impression with respect to
equitable liens under New York law. This,
however, is not to say that Judge Kaplan's
finding on this ground is erroneous, a
question this Court does not reach in light
of its affirmation on other grounds.
*See*George Gleason Bogert et al., *Trusts &
Trustees,* § 32 Equitable Liens (2001)
(noting that equitable liens are occasion-
ally confused with constructive trusts and
citing New York cases to that effect).

This Court reviews the Bankruptcy Court's legal
conclusions *de novo* and its findings of fact for
clear error. *Gulf States Exploration Co. v. Manville
Forest Prods. (In re Manville Forest Prods.),* 896
F.2d 1384, 1388 (2d Cir.1990) (citing Fed. R.
Bankr.P. 8013).

No previous court in New York has extended the
doctrine of equitable liens as far as would be re-
quired in order to find an equitable lien under the
facts of this case. This Court declines the invitation
to be the first to do so. In *James v. Alderton Dock
Yards, Ltd.,* 256 N.Y. 298, 303 (1931), the New
York Court of Appeals held that a broker/finder
FN3 was not entitled to an equitable lien on the
proceeds of a sale that he procured because, *inter
alia,* an agreement "to pay a debt out of a desig-
nated fund does not give an equitable lien upon the
fund nor operate as an equitable assignment there-
of."[FN4]Likewise, Gottesman is not entitled to an
equitable lien because there exists only an agree-
ment to pay a commission.[FN5]This type of agree-
ment alone, however, does not give rise to an equit-
able lien.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.))**

FN3. The Committee contends that Gottesman is a "finder" rather than a "broker" and that this distinction is important because, the Committee contends, a prepetition finder lacks standing to claim an equitable lien on the proceeds of a postpetition asset sale. In light of this Court's affirmation on different grounds, this distinction is irrelevant. In *Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88, 93 (2d Cir.1989), the Second Circuit Court of Appeals held that

"[p]roperty in which the debtor holds only legal title and not an equitable interest, however, becomes property of the estate 'only to the extent of a debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold,' [11 U.S.C.] § 541(d). That is, the bankruptcy estate does not include 'property of others in which the debtor ha[s] some minor interest such as a lien or bare legal title," ' *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 8, 103 S. Ct 2309, 2313 n. 8, 76 L.Ed.2d 515 (1983).

Accordingly, the constructive trust that arose here confers on Gottesman an equitable interest superior to that of Rama or the Committee, either of whom could be declared a constructive trustee. Although this Court need not address when the constructive trust arose here - cf. *Cent. Manhattan Prop., Inc. v. D.A. Schulte,* 91 F.2d 728 (2d Cir.) (noting that the imposition of an equitable lien or a constructive trust may relate back to time when debtor obtained equitable relief), *cert. denied,*302 U.S. 743 (1937) - it nonetheless appears that when Gottesman procured the execution of the Asset Purchase Agreement ("APA"), it obtained an inchoate equitable right that ripened upon the closing of the sale transaction. *Cf. In re L.D. Patella Constr. Corp.,* 114 B.R. 53, 59-60 (D.N.J.1990).

FN4. See also *Williams v. Ingersoll,* 89 N.Y. 508, 518 (1882) (same); *Sec. Pac. Mortgage & Real Estate Servs., Inc. v. Republic of the Philippines,* 962 F.2d 204, 209-210 (2d Cir.1992).*Sec. Pac. Mortgage* involved a contract for maintenance services and a subsequent promise to pay the debt, arising under the contract, from the rents and profits of the building. The court there, however, found no equitable lien because the promise to pay a debt from specific funds (*i.e.,* rents and profits) is insufficient to give rise to an equitable lien. Likewise here, a mere promise to pay a debt/commission does not give rise to an equitable lien. Moreover, the argument for an equitable lien is even weaker here where there is arguably no "designated fund" from which the commission was to be paid. Although it may be contended that the sale proceeds constituted such a "designated fund," such is doubtful, and in any event, irrelevant.

FN5. Generally, brokers do not acquire an equitable lien upon either the subject property or the proceeds thereof. *See James* at 303;*M. Lindheim & Co. v. Central Nat'l Realty & Constr. Co.,* 111 A.D. 275 (1st Dep't 1906); *Thorne Real Estate, Inc. v. Nezelek,* 100 A.D.2d 651, 652 (3d Dep't 1984); *cf. Sec. Pac. Mortgage* at 211.This general rule does not apply where the parties contract around it. *Baker v. Cooper,* 201 A.D. 639 (2d Dep't 1922) (finding an equitable lien upon the subject property where, *inter alia,*"under the agreement * * * [the subject property] was intended to be security for the payment to [the broker],

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)
Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.))

and for the debt and obligation which the [property owner] owed to him").

In order to give rise to an equitable lien, there must be an agreement that is intended by the parties to create a "lien upon specific property." *James* at 303.Indeed, *James* holds that an agreement giving rise to an equitable lien "must deal with some particular property either by identifying it or by so describing it that it can be identified and must indicate with sufficient clearness an intent that the property so described or rendered capable of identification is to be held, given or transferred as security for the obligation."*Id.* at 303.[FN6] This Court has found no basis upon which to conclude that there was ever an intent, by anyone, to create a security interest in the sale proceeds in favor of Gottesman. Accordingly, no such agreement existed here.

> FN6. See also *Sec. Pac. Mortgage* at 209 ("in establishing an equitable lien, plaintiff must show a particular agreement by defendant to *confer a security interest* in the property at issue") (emphasis added); *Teichman v. Community Hosp. of W. Suffolk et al.*, 87 N.Y.2d 514, 520 (1996) (applying *James* and finding that a health insurer's contractual "right to a refund" for medical expenses paid did not give rise to an equitable lien on the insured's personal injury settlement proceeds).

The Bankruptcy Court's decision referred to the "arrangement" arrived at under its imprimatur at a hearing on June 13, 2000. *In re Rama* at 271.[FN7] This "arrangement," however, does not appear to have intended a "lien upon specific property" where the Bankruptcy Court merely allowed the proposed asset sale to proceed "without prejudice to any and all claims that [Gottesman] *may* have to proceeds."*Id.* at 268 n. 1 (emphasis added). In other words, it is not apparent that the parties to this "arrangement" intended [FN8] that the proceeds of the sale were "to be held, given or transferred *as security for* the obligation" to pay Gottesman. *James* at 303 (emphasis added).[FN9] Moreover, it is

questionable whether the sale proceeds here constitute "specific property," which is required in order for an equitable lien to arise. *Id.;Sec. Pac. Mortgage* at 209.Accordingly, under *James* and its progeny, no equitable lien could arise in this case. The Bankruptcy Court's decision is nonetheless affirmed, however, because it is supported by New York law governing the imposition of constructive trusts.

> FN7. This Court is not prepared to find that the exchange between counsel and the Bankruptcy Court constituted the type of contract or agreement (express or implied) that is required for the imposition of an equitable lien. *See e.g., Thorne Real Estate* at 652.

> FN8. Even assuming that the "arrangement" was an agreement that could support the imposition of an equitable lien, it is not clear which parties' intent would be required. Would it be sufficient for **Rama, Gottesman**, and the Bankruptcy Court approving the sale to agree that Gottesman shall receive a lien on the sale proceeds? Would the Committee have to be a party to such an agreement?

> FN9. Ostensibly, the Bankruptcy Court did not deem that the APA (or any other contract) provided a basis for Gottesman's equitable lien. *In re Rama* at 271.A contrary finding, however, would not alter this Court's decision because no contract or agreement in the record created a "lien upon specific property."

**\*2** The New York Court of Appeals has held that a

"constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

verts him to a trustee."*Simonds v. Simonds,* 45 N.Y.2d 233, 241 (1978) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386 (1919)).

Preventing unjust enrichment is the primary purpose of this doctrine.*Simonds* at 242 (stating that unjust enrichment "does not require the performance of any wrongful act by the one enriched"). Accordingly, when applying this doctrine, courts in New York endeavor to "identify a party who is holding property 'under such circumstances that in equity and good conscience he ought not to retain it.' " *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 361 (2d Cir.1999) (quoting *Miller v. Schloss,* 218 N.Y. 400, 407 (1916)).[FN10]

> FN10. The New York Court of Appeals has delineated four factors that serve as guideposts for application of a constructive trust. These factors are: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment."*Sharp v. Kosmalski,* 40 N.Y.2d 119, 121 (1976). The *Sharp* factors, however, "are not to be applied with mathematical rigidity, for '[a] constructive trust will be erected whenever necessary to satisfy the demands of justice [and] its applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " *Federation Internationale Du Sport Universitaire v. Greater Buffalo Athletic Corp.,* No. 93-CV-0635E(F), 1994 WL 411908, at *3 (W.D.N.Y. Aug. 4, 1994) (quoting *Latham v. Father Divine,* 299 N.Y. 22, 27 (1949)). To that end, courts in New York have noted that, "[a]lthough these [*Sharp* ] factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.' " *Controle et Revision S.A. v. Refco F/X Assoc., (In re Koreag),* 961 F.2d 341, 352 (2d Cir.1992) (quoting *Simonds* at 241).

Rather than applying the *Sharp* factors talismanically, courts in New York have imposed constructive trusts where "property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan* at 362 (imposing a constructive trust on insurance proceeds, despite the lack of a fiduciary relationship, an express promise, or a transfer in reliance thereon, because the most significant factor -unjust enrichment - existed where a house, which the United States was about to seize, was destroyed by arson and the owner of the house attempted to retain the insurance proceeds).

To deny **Gottesman** its commission from **Rama** would unjustly enrich Rama and, indirectly, its unsecured creditors. Rama agreed pre-petition to pay Gottesman a commission if it procured a buyer that successfully purchased **Rama's** assets. **Gottesman** undisputedly procured Metro, Inc., who entered the APA and purchased **Rama's** assets. But for **Gottesman**, there would be no sale proceeds.[FN11] Rama's bankruptcy proceeding was contemplated by all the parties when the APA was executed 11 days before Rama's petition was filed. Therefore, it is equitable and just that Gottesman should get a commission as promised. 27A Am.Jur.2d, *Equity* § 116 (1996) ("[E]quity regards as done that which ought to be done in fairness and good conscience. * * * [T]he court has the power to compel the parties to do that which ought to be done and which was contemplated by the parties at the time of the transaction.") This Court declines to disturb the Bankruptcy Court's ruling that **Rama** shall pay **Gottesman** $199,000 and that Gottesman maintains the right to file an unsecured pre-petition claim for the balance, if any, owed by Rama.

> FN11. As a practical matter, Gottesman could have objected to the sale procedure and the Bankruptcy Court could have re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.))**

quired Gottesman to get its commission "at the closing." Such commissions are a cost of doing business and it is doubtful that the Bankruptcy Court would intentionally leave Gottesman out in the cold when approving **Rama's** asset sale. Moreover, **Gottesman** should not be punished for not holding the sale hostage over the timing of its commission from Rama.

Accordingly, it is hereby *ORDERED* that the Orders of the United States Bankruptcy Court are hereby affirmed on other grounds.

W.D.N.Y.,2002.
In re Rama Group of Companies, Inc.
Not Reported in F.Supp.2d, 2002 WL 1012974 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))**

**H**

Geneva Pharmaceuticals Technology Corp. v. Barr
Laboratories, Inc.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
GENEVA PHARMACEUTICALS TECHNO-
LOGY CORP. (as successor in interest to Invamed,
Inc.), Plaintiff,
v.
BARR LABORATORIES, INC., Brantford Chem-
icals Inc., Bernard C. Sherman, Apotex Holdings
Inc., Apotex Inc. and Sherman Delaware, Inc ., De-
fendants
APOTHECON, INC., Plaintiff,
v.
BARR LABORATORIES, INC., Brantford Chem-
icals Inc., Bernard C. Sherman, Apotex Holdings
Inc., Apotex Inc. and Sherman Delaware, Inc ., De-
fendants.
**No. 98 Civ.861 RWS, 99 Civ.3607 RWS.**

March 19, 2003.

Pharmaceutical company sued chemicals supplier,
alleging, inter alia, claim that supplier was required
to furnish specified chemical under theory of
promissory estoppel. Supplier moved to strike com-
pany's request for jury trial on estoppel issue. The
District Court, Sweet, J., held that claim was equit-
able in nature, and not covered by Seventh Amend-
ment jury guarantee.

Motion granted.

West Headnotes

**Jury 230 ⬡ 14(1)**

230 Jury
    230II Right to Trial by Jury
        230k14 Particular Actions and Proceedings
            230k14(1) k. In General. Most Cited
Cases
Pharmaceutical company was not entitled to jury

trial, under Seventh Amendment, on promissory es-
toppel claim that it relied to its detriment that sup-
plier would continue to make available specified
chemical; as there was absence of any showing that
reliance was being asserted as substitute for consid-
eration in what would otherwise be contractual rela-
tionship, reliance claim was equitable in nature, and
constitutional guarantee extended only to legal
claims. U.S.C.A. Const.Amend. 7.

Frederick R. Dettmer, New York, NY, Rosen,
Preminger & Bloom, New York, NY, By: David S.
Preminger, White & Case, New York, NY, By:
Wayne A. Cross, Michael J. Gallagher, for Plaintiff
Geneva Pharmaceuticals Technology Corp., of
counsel.
Lord, Bissell & Brook, Chicago, IL, By: Michael J.
Gaertner, David G. Greene, John F. Kloecker, Sta-
cey Y. Dixon, Lord, Bissell & Brook, New York,
NY, By: Cary B. Samowitz, for Defendants Brant-
ford Chemicals, Inc., Bernard C. Sherman, Apotex
Holdings Inc., Apotex Inc. and Sherman Delaware
Inc., of counsel.

*OPINION*

SWEET, J.
**\*1** Defendant Brantford Chemicals Inc.
("Brantford") has moved pursuant to Rule 39(a)(2)
of the Federal Rules of Civil Procedure to strike the
jury demand on the promissory estoppel claim al-
leged in the Seventh Cause of Action ("Count VII")
of the complaint filed by plaintiff Geneva Pharma-
ceuticals Technology Corp. ("Geneva") as suc-
cessor in interest to Invamed, Inc. ("Invamed"). In
addition, Geneva has moved for reconsideration of
this Court's discovery order of January 16, 2003.

For the following reasons, Brantford's motion to
strike the jury demand is granted, and Geneva's mo-
tion for reconsideration is granted in part and
denied in part.

*Prior Proceedings*

Not Reported in F.Supp.2d  Case 1:08-cv-02814-LAP  Document 9-3  Filed 05/30/2008  Page 25 of 29  Page 2
Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))**

Invamed filed its complaint on February 6, 1998, alleging violations of the antitrust laws of the United States and various state law claims arising out of defendants' alleged efforts to monopolize and restrain trade in the markets for an oral anti-coagulant medication known as warfarin sodium. The complaint alleged eleven causes of action against the defendants. The claim at issue, Count VII, alleged promissory estoppel against Brantford, as follows:

In its dealings with Invamed prior to October 1997, including providing supplies of clathrate and providing the "Letter of Access," and in its communications with Invamed prior to October 1997, and in light of the custom and practice in the industry and the prior business dealings between Brantford and Invamed, Brantford understood and intended, or reasonably should have understood and intended, that Invamed reasonably would rely to its detriment on Brantford to supply clathrate to Invamed following Invamed's receipt of approval from the FDA.

Invamed, in fact, in good faith did reasonably rely to its detriment on Brantford to supply clathrate to Invamed following Invamed's receipt of approval f[rom] the FDA.

By virtue of the foregoing, Invamed has been damaged in an amount to be established at trial, but believed to be substantially in excess of $75,000.

Compl. ¶¶ 76-78.

On April 9, 1998, Sherman, Apotex Holdings, Apotex, and Sherman Delaware moved under Fed.R.Civ.P. 12(b)(6) to dismiss Invamed's First, Second, Third, Fourth, Eighth, and Ninth Causes of Action, claiming that there are no allegations in the complaint that would establish the basis for those claims. The Court granted this motion to dismiss with leave to replead. Invamed did not replead.

Apothecon filed a separate suit on May 19, 1999, and the cases were consolidated on July 29, 1999. Apothecon included the same causes of action discussed above as well as a few additional ones.

The defendants moved for summary judgment on August 6, 2001, which motion was considered fully submitted on February 13, 2002. In an opinion dated May 10, 2002, all of the antitrust claims (Invamed Compl. Counts I-V; Apothecon Compl. Counts I-VI) and all of Apothecon's state law claims (Apothecon Compl. Counts VII-XV) were dismissed. Further, Invamed's counts X and XI were dismissed.

**\*2** Brantford moved on January 3, 2003 to strike the jury demand of Geneva as to Count VII. Geneva replied on January 17, 2003.

An opinion issued on January 16, 2003 in response to a series of letters regarding discovery requests. By letter dated January 22, 2203, Geneva moved for reconsideration of one aspect of that order regarding judgment-sharing agreements and also moved for an extension of the deadlines set in that order. Brantford replied by letter dated January 23, 2003.

By memorandum opinion dated January 27, 2003, discovery and trial on Geneva's remaining state claims were stayed pending an appeal of the summary judgment decision rejecting all of the antitrust claims.

Both of the instant motions were considered fully submitted after oral argument on January 29, 2003.

*Discussion*

I. *The Jury Demand Will Be Stricken*

A. *Standard of Review*

The Federal Rules of Civil Procedure contemplate that a jury trial will be conducted on all issues properly triable before a jury once a demand has been made:

unless (1) the parties or their attorneys of record, by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))**

written stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right to a trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

Fed.R.Civ.P. 39(a).

Geneva rests its claim to a jury trial on the Constitution. The Seventh Amendment to the United States Constitution guarantees the right to trial by jury only for "[s]uits at common law." U.S. Const. Amend. VII. The phrase "[s]uits at common law" refers to "suits in which legal rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies were administered. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (*quoting Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830)). *See also Wm. Passalacqua Builders Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 135 (2d Cir.1991) (jury required for alter ego claim).

Whether a suit is legal or equitable is determined by federal law, even while the cause of action is created by state law. *Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963) ("characterization of [a] state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law"); *see also McGuire v. Wilson,* 1988 WL 45627, at *1-*2 (S.D.N.Y. May 4, 1988) (denying motion to strike jury demand). Application of federal law is required so that the right to jury trial will be exercised uniformly as demanded by the Seventh Amendment. *Id.*

To determine whether a particular action will resolve legal rights, courts look first to the nature of the issues involved by comparing the action to the 18th-century action brought in the courts of England prior to the merger of the courts of law and equity, and second to the nature of the remedy sought. *German v. Connecticut Nat'l Bank,* 988 F.2d 1323, 1328 (2d Cir.1993) (*citing Granfinanciera,* 492 U.S. at 42). The second stage of this analysis is more important than the first. *Granfinanciera,* 492 U.S. at 42.

**B. *Applying the Teachings of Merex, Count VII Is Not "Legal" Promissory Estoppel***

**\*3** The Second Circuit has discussed in particular the legal and equitable nature of promissory estoppel in *Merex A.G. v. Fairchild Weston Systs., Inc.,* 29 F.3d 821 (2d Cir.1994). The plaintiff in *Merex* invoked the doctrine of promissory estoppel to recover more than $1.6 million in damages based on the breach of an alleged oral commission agreement. *Id.* at 825. The district court permitted the promissory estoppel claim to go to the jury but only on an advisory basis. *Id.* at 823. The advisory jury rendered a verdict for the plaintiff, but the district court rejected the jury's advice and entered judgment for the defendant. On appeal, the plaintiff challenged the district court's decision, arguing that the plaintiff was entitled to a jury trial on its promissory estoppel claim.

The Second Circuit affirmed the district court's ruling, applying the two-prong test discussed above. It held first that promissory estoppel "eludes classification as either entirely legal or entirely equitable, and the historical evidence is equivocal," but that "its modern uses have historical antecedents in *both* law and equity." *Id.* at 824 (emphasis in original). The court explained that promissory estoppel claims are of two types. First and "most traditionally," promissory estoppel may be invoked under a theory of "detrimental reliance" where the promise to be enforced was expected to and did induce detrimental reliance by the promisee and should be binding and enforceable to prevent injustice. *Id.* (*citing* Restatement (Second) of Contracts § 90 (1981); *Schmidt v. McKay,* 555 F.2d 30, 36 (2d Cir.1977) ( "Schmidt alleges that he reasonably relied on appellees' promises to his detriment and that appellees are bound under the doctrine of promissory estoppel.")). This type of claim is legal in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Document 9-3    Filed 05/30/2008    Page 27 of 29    Page 4
Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))**

nature because its roots are in the common law action of assumpsit. *Id.* at 825 ("[W]here a plaintiff sues for contract damages and uses detrimental reliance as a substitute for consideration, the analogy to actions in assumpsit is compelling."); *seealsoCorbin on Contracts* § 8.11, at 42 ("[I]t is generally accepted that equity gave promissory estoppel relief before the 1500's; thereafter, in the sixteenth and seventeenth centuries the common law courts predicated on the action for assumpsit enforced informal promises based on the reliance principle.") (Joseph M. Perillo, ed., Rev. Ed.1996). Second, promissory estoppel may be pled to provide recovery where "the contract is rendered unenforceable by operation of the Statute of Frauds."*Id.* (*citing*Restatement (Second) of Contracts § 139(1); *Philo Smith & Co. v. USLIFE Corp.,* 554 F.2d 34, 36 (2d Cir.1977) (per curiam)). This type of claim is derived from equitable estoppel and thus is rooted in equity. *Id.*

The Court held that the plaintiff had pled the second type of claim in that it was attempting to bypass the Statute of Frauds. *Merex,* 29 F.3d at 825-26. The Court also concluded that plaintiff's attempt to obtain legal relief was outweighed by "the undeniably equitable nature of the promissory estoppel claim as a whole."*Id.*

*4 Geneva argues that its Count VII falls squarely within the first, and "legal," category of promissory estoppel in that it is a claim based on detrimental reliance. While the language of *Merex* could be construed so broadly, Brantford's argument in opposition is more compelling. Brantford claims that *Merex* was intended only to apply to one certain type of promissory estoppel-that used as a consideration substitute in a contract claim-that is not present here.

A commentator's explication of four distinct "stages" of promissory estoppel in American law sheds light on this theory. According to the commentator, the doctrine of promissory estoppel has evolved, to varying degrees, in the following progression: (1) use as (defensive and offensive) equit-

able estoppel; (2) use as a consideration substitute on contractual claims; (3) use as an independent claim for detrimental reliance; and, finally, (4) use as an equitable tool, with solely equitable rights and remedies. *Corbin,supra,* at § 8.11, at 45-58. Brantford urges that *Merex* stands only for the proposition that cases invoking the second stage of promissory estoppel-use of reliance as a consideration substitute-are "legal" claims, while it is silent on whether the other stages of evolution are more legal than equitable (except to the extent that the use of promissory estoppel to avoid the statute of frauds, an equitable claim according to *Merex,* fits into either the third or fourth categories). Language used in the *Merex* opinion supports this hypothesis: "[W]here a plaintiff sues for contract damages and uses detrimental reliance as a substitute for consideration, the analogy to actions in assumpsit is compelling."*Merex,* 29 F.3d at 825. The distinction also makes sense: in the second stage, using reliance as a consideration substitute, courts are acting defensively in support of contract rights; the third and fourth stages involve courts creating a right where otherwise there would be none. *Corbin,supra,* at § 8.11, at 53. The creation of a new right in the interests of justice is equity in action.

Geneva has asserted a separate claim for promissory estoppel, rather than a contract claim on which it relies on the doctrine to provide consideration. It would thus appear to fall outside of the situation described in *Merex* as compellingly legal in nature.FN1In answer to the first prong of the test, therefore, the instant promissory estoppel claim appears to be more equitable than legal.

> FN1. The law under which this claim is brought (as earlier determined to be that of New Jersey) is perhaps not as cleanly broken from the second stage as it would appear: "New Jersey recognizes promissory estoppel as a cause of action with emphasis on both the contract requirement of a promise (equivalent to an offer) and its equitable pedigree in avoiding injustice by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))**

reliance damage awards." *Corbin,supra,* at § 8.12, at 146-148 (*citing* cases and noting that "the Garden State ... felicitously blends contract, equity and tort notions").

Under New Jersey law, a claim for promissory estoppel requires: (1) a clear and definite promise, (2) the promise is made with the expectation that the promisee will rely on it, (3) the promisee in fact reasonably relied on the promise; and (4) the promisee suffered a definite and substantial detriment as a result of the reliance. *Royal Assoc. v. Concannon,* 200 N.J.Super. 84, 91-92, 490 A.2d 357, 361 (N.J.Super.Ct.App.Div.1985); *R.J. Longo Constr. Co. v. Transit America Inc.,* 921 F.Supp. 1295, 1305 (D.N.J.1996). It is the requirement of a "clear and definite promise" (a requirement that Brantford argued strenuously in its summary judgment motion that Geneva had failed to establish) that makes the New Jersey law more similar to the "contract" stage than not. The "clear and definite promise" is more akin to a contract. Thus it could be argued that New Jersey law (and the instant claim) appear to hover between the second (more "legal") and third (more "equitable") stages of promissory estoppel as determined by *Merex.* Because it is held that the relief sought is equitable in nature, however, and because that factor is more important in determining whether a party has the right to a jury trial, the result would in any case be the same.

As discussed above, it is the second prong-the type of remedy sought-that is most important in determining whether a right to jury trial should obtain. The remedy provided under New Jersey law is equitable in nature. *Corbin,supra,* at § 8.12, at 146 ("New Jersey recognizes promissory estoppel as a cause of action with emphasis on both the contract requirement of a promise (equivalent to an offer) and its equitable pedigree in avoiding injustice by reliance damage awards."). While there is some debate between the parties as to whether Geneva is entitled to expectation damages, and thus is seeking a legal remedy, that contention is rejected. Geneva is not entitled to the benefit of the bargain because there was no bargain. *E.g.,Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 & n. 2 (2d Cir.1989) ("Out-of-pocket damages are particularly appropriate where, as may be the case here, the plaintiff cannot rationally calculate the benefit of the bargain."); *Elvin Assocs. v. Aretha Franklin,* 735 F.Supp. 1177, 1183 (S.D.N.Y.1990) (awarded reliance damages to musical producer, who relied on Aretha Franklin's promise to star in a musical, for custom-made costumes, $12,500 production fee, amounts paid to composer, unpaid debts to collaborator and choreographer, and debts to potential investors for $72,155 they lost in failed venture). Although Geneva seeks monetary damages, those damages are to be awarded for its reliance and are equitable in nature.

**\*5** Given the "protean" nature of promissory estoppel (and the confusing variances in potential claims that may be considered "promissory estoppel") and the equitable remedy sought here in the form of reliance damages, the cause of action is more equitable than legal and a right to jury trial does not attach. Brantford's motion to strike is therefore granted.

## II. *Reconsideration of the Discovery Order*

Geneva has first moved to alter the discovery deadlines set out in the Memorandum Opinion of January 16, 2003. In light of the stay imposed by the Order dated January 27, 2003, however, those dates are no longer binding. Instead, any discovery ordered to be produced that has not yet been produced should be so produced within ten (10) days after the lifting of the stay.

Second, Geneva has moved for reconsideration of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.))

Page 6

one aspect of the January 16, 2003 order in which Brantford's request for production of a judgment-sharing agreement between Invamed and Apothecon was granted. Geneva points to two predicate facts that it claims this Court did not consider. First, Geneva asserts that no Bristol-Myers Squibb employees will be testifying at trial and thus any argument based on potential conflicts arising therefrom are meritless. Second, Geneva states that it has not balked at settlement agreements but that the defendants have been the uncooperative ones. It concludes that until the defendants represent that they are willing to engage in serious negotiations, there is no cause for the production of the judgment-sharing agreements.

In opposition, Brantford points out that nine of the thirty-one witnesses on Geneva's draft witness list were (at least at the time of deposition) Bristol-Myers employees. Further, it points out that even if Bristol-Myers is no longer the employer of these nine witnesses, it does not necessarily remove the potential for bias from trial testimony and does not affect any potential bias that was present at the time of deposition when the persons were still so employed. With regard to the second argument, Brantford points out that Geneva informed Brantford at the mediation/settlement talks that it would not discuss a settlement without Apothecon, and that Geneva had even before that refused to discuss settlement separately, telling defendants that "you have to talk to Apothecon."

The new facts put forward by Geneva are not sufficiently persuasive in light of the above representations by Brantford to justify the granting of their motion for reconsideration. As a result, when the stay is lifted, Geneva is therefore ordered to produce either a judgment-sharing agreement or a signed affidavit by Geneva and Apothecon stating that there is no such agreement between them. Such production should take place within ten (10) days of the lifting of the stay.

Finally, Geneva has sought an order from the Court ordering Brantford to produce any judgment-shar-

ing agreement between it and Barr Laboratories, Inc. Brantford has stated in response that it is willing to comply with such an order, but that there is no such judgment-sharing agreement in effect. In light of the above, Brantford is ordered to produce either a judgment-sharing agreement or a signed affidavit stating that there is no such agreement between it and Barr within ten (10) days of the lifting of the stay.

*Conclusion*

**\*6** For the foregoing reasons, Brantford's request to strike the jury demand is granted, and Geneva's motion for reconsideration is granted in part and denied in part. Any discovery ordered in the January 16, 2003 order-including judgment-sharing agreements or affidavits denying the existence thereof from both parties-should be produced within ten (10) days after the stay is lifted.

It is so ordered.

S.D.N.Y.,2003.
Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.
Not Reported in F.Supp.2d, 2003 WL 1345136 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.