**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| METRO AFFILIATES, INC., et al., | ) | Case No. 02-42560 (PCB) |
| | ) | |
| Debtors. | ) | Jointly Administered |

-------------------------------------------------------------x
| | | |
|---|---|---|
| | ) | |
| GREENWICH INSURANCE COMPANY, | ) | Civil Action No. 08-03814 (LAP) |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GREENWICH STREET CAPITAL | ) | |
| PARTNERS II, L.P., | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

-------------------------------------------------------------x

## BRIEF OF APPELLEE GREENWICH STREET CAPITAL PARTNERS II, L.P.

**DECHERT LLP**

Charles I. Poret
Shmuel Vasser
Davin J. Hall
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Attorneys for Greenwich Street Capital Partners II, L.P.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

COUNTER-STATEMENT OF THE ISSUES ................................................................ 1

STANDARD OF REVIEW ......................................................................................... 2

STATEMENT OF THE CASE ..................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 5

ARGUMENT ............................................................................................................ 15

POINT I:     THE JULY 19TH LETTER IS AN "EXECUTORY CONTRACT"
THAT CANNOT BE ASSUMED UNDER SECTION 365(c)(2)
OF THE BANKRUPTCY CODE ............................................................ 16

    A.     The July 19th Letter is an Executory Contract ......................... 16

         1.     Greenwich Misstates Applicable Second Circuit Law ............... 17

         2.     The July 19th Letter is Executory under the Countryman
Test .......................................................................................... 18

              a.     Limited Use of Funds ....................................................... 18

              b.     Greenwich's Demand Obligation ................................... 19

              c.     Outstanding Funding Obligations ................................... 21

         3.     Greenwich's Legal Argument is Unavailing ............................. 22

    B.     The Bankruptcy Court Did Not Err ....................................... 24

         1.     The Court Found that Performance Was Due on Both Sides ...... 24

         2.     The Legislative History Supports the Bankruptcy Court's
Decision .................................................................................. 24

    C.     Equity Does Not Require the Court to Deem That a Funding
Request Had Been Made ........................................................... 25

POINT II:    THE BANKRUPTCY COURT PROPERLY DENIED
GREENWICH'S CROSS-MOTION FOR SUMMARY
JUDGMENT ....................................................................................... 27

    A.     The Bankruptcy Court Properly Denied Greenwich's Cross-Motion
for Summary Judgment Based Upon the Tripartite Agreement
Expressed in the July 19th and July 20th Letters ....................... 27

      B.     The Bankruptcy Court Properly Denied Greenwich's Cross-Motion
For Summary Judgment on Its Claim of Unjust Enrichment .................. 27

            1.    Where an Express Contract Governs the Same Subject
Matter, the Doctrine of Unjust Enrichment Does Not Apply ...... 28

            2.    Even if the Doctrine of Unjust Enrichment was Applicable
There was No Showing that GSCP was Unjustly Enriched ........ 30

      C.     The Bankruptcy Court Properly Denied Greenwich's Motion For
Summary Judgment on Its Detrimental Reliance Claim.......................... 31

POINT III:     GREENWICH IS NOT ENTITLED TO PREVAIL ON ITS
NEWLY-ASSERTED CLAIM BASED UPON EQUITABLE
ESTOPPEL ............................................................................................ 33

CONCLUSION............................................................................................................ 35

## TABLE OF AUTHORITIES

## CASES

Adiel v. Coca-Cola Bottling Co. of New York, Inc.,
    No. 95-00725, 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995) ............................................32

Associated Banc-Corp. v. John H. Harland Co.,
    No. 06-01097, 2007 WL 128337 (E.D. Wis. Jan. 11, 2007) ............................................28

Authentic Hansom Cabs, Ltd. v. Nisselson,
    No. 03-09468, 2004 WL 2997794 (S.D.N.Y. Dec. 27, 2004) ......................................2, 33

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
    No. 03-01537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) .........................................32

Bayway Refining Co. v. Oxygenated Mktg. and Trading, A.G.,
    215 F.3d 219 (2d Cir. 2000).............................................................................................33

Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J.,
    448 F.3d 573 (2d Cir. 2006).............................................................................................28

COR Route 5 Co. v. The Penn Traffic Co. (In re The Penn Traffic Co.),
    524 F.3d 373 (2d Cir. 2008).............................................................................................17

Carruthers v. Flaum,
    388 F. Supp. 2d 360 (S.D.N.Y. 2005)..............................................................................30

Clark v. Daby,
    751 N.Y.S.2d 622, 300 A.D.2d 732 (3d Dep't. 2002)......................................................30

Commander Oil Corp. v. Advance Food Service Equip.,
    991 F.2d 49 (2d Cir. 1993)...............................................................................................20

Daewoo Int'l (Am.) Corp. v. SSTS Am. Corp.,
    No. 02-9629, 2004 WL 830079 (S.D.N.Y. Apr. 13, 2004) ..............................................21

Dep't of Econ. Dev. v. Arthur Andersen & Co.,
    924 F. Supp. 449 (S.D.N.Y. 1996)...................................................................................19

Eastern Air Lines, Inc. v. Insur. Co. of Pa. (In re Ionosphere Clubs),
    85 F.3d 992 (2d Cir. 1996)...............................................................................................17

Farmer v. Crocker Nat'l Bank (In re Swift Aire Lines, Inc.),
    30 B.R. 490 (B.A.P. 9th Cir. 1983)..................................................................................20

Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.,
    111 F.3d 284 (2d Cir. 1997)........................................................................18

Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of MidCom
    Commc'ns Inc.,
    246 B.R. 296 (E.D. Mich. 2000)...............................................................25

Girls Clubs of America, Inc. v. Boys Clubs of America, Inc.,
    No. 88-1375, 1989 WL 297861 (S.D.N.Y. May 12, 1989) ...............................26

Goldman v. Metro. Life Ins. Co.,
    5 N.Y.3d 561, 587-88 (2005)...................................................................28

Gordon v. Vincent Youmans, Inc.,
    358 F.2d 261 (2d. Cir. 1965)...................................................................20

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000)......................................................................2

Greene v. United States,
    13 F.3d 577 (2d Cir. 1994).......................................................................33

Home Depot USA, Inc. v. Krause Inc.,
    No. 01-50197, 2002 WL 1264001 (N.D. Ill. June 3, 2002)..............................21

In re Cannonsburg Envt'l Assoc.,
    72 F.3d 1260 (6th Cir. 1996) ...................................................................25

In re Chateaugay Corp.,
    102 B.R. 335  (Bankr. S.D.N.Y. 1989)........................................................23

In re Drexel Burnham Lambert Group Inc.,
    151 B.R. 674 (Bankr. S.D.N.Y. 1993)........................................................21

In re Helm,
    335 B.R. 528 (Bankr. S.D.N.Y. 2006).........................................................17

In re Placid Oil Co.,
    72 B.R. 135 (Bankr. N.D. Tex. 1987).........................................................23

In re Riodizio, Inc.,
    204 B.R. 417 (Bankr. S.D.N.Y. 1997).........................................................17

In re Spectrum Info. Tech.,
    190 B.R. 741 (Bankr. E.D.N.Y. 1996).....................................................22, 23

In re Sun Runner Marine, Inc.,
    945 F.2d 1089 (9th Cir. 1991) ...........................................................24

In re Teligent, Inc.,
    268 B.R. 723 (Bankr. S.D.N.Y. 2001) ...............................................17, 23, 25

In re Thrifty Oil Co.,
    212 B.R. 147 (Bankr. S.D. Cal. 1997) ...............................................29

In re Wagner,
    839 F.2d 533 (9th Cir. 1988) ...........................................................23

In re Wegner Farms Co.,
    49 B.R. 440 (Bankr. N.D. Iowa 1985) ...............................................24

Ingram v. Rencor Controls, Inc.,
    256 F. Supp. 2d 12 (D. Me. 2003) ......................................................29

Lippe v. Genlyte Group, Inc.,
    No. 98-8672, 2002 WL 531010 (S.D.N.Y. April 8, 2002) ................................26

MacDraw, Inc. v. CIT Group Equip. Fin. Inc.,
    157 F.3d 956 (2d Cir. 1997)..............................................................28

Martes v. USLIFE Corp.,
    927 F. Supp. 146 (S.D.N.Y 1996)........................................................30

Nau v. Vulcan Rail & Constr. Co.,
    268 N.Y. 188, 36 N.E.2d 106 (N.Y. 1941) ...............................................20

Ostek v. Ostek,
    427 N.Y.S.2d 884, 75 A.D.2d 867 (App. Div. 2d Dep't 1980)........................26

Readco, Inc. v. Marine Midland Bank,
    81 F.3d 295 (2d Cir. 1996)..............................................................34

SCA Tax Exempt Fund Ltd. P'ship v. Kahn,
    No. 91-5912, 1992 WL 219025 (6th Cir. Sept. 10, 1992) ................................29

Sweedler v. Oboler,
    319 N.Y.S.2d 89, 65 Misc.2d 789 (Sup. Ct. N.Y.Co. 1971) ............................26

TVT Records v. The Island Def Jam Music Group,
    412 F.3d 82 (2d Cir. 2005)..................................................................20

Thayer v. Dial Indus. Sales, Inc.,
    85 F. Supp. 2d 263 (S.D.N.Y. 2000) ................................................32

This Is Me, Inc. v. Taylor,
    157 F.3d 139 (2d Cir. 1998)..............................................................20

Tomaso, Feitner and Lane, Inc. v. Brown,
    4 N.Y.2d 391, 151 N.E.2d 221 (N.Y. 1958) ....................................30

U.S. E. Telecomm'c Inc. v. US W. Commc'ns Servs.,
    38 F.3d 1289 (2d Cir. 1994)..............................................................31

U.S. ex rel Schuster v. Vincent,
    524 F.2d 153 (2d Cir. 1975)..............................................................26

Wechsler v. Hunt Health Sys., Ltd.,
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) ..............................................19

## STATUTES

11 U.S.C. § 365..........................................................................12, 16, 24, 25

## LEGISLATIVE HISTORY

H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. &
    Admin.News 1978 ..............................................................................25

S.Rep. No. 95-989, 95th Cong., 2d Sess. 58-59 (1978), U.S.Code Cong. &
    Admin. News 1978 ............................................................................25

## COUNTER-STATEMENT OF THE ISSUES

Whether the Bankruptcy Court properly granted defendant Greenwich Street Capital Partners II, L.P.'s ("GSCP") motion for summary judgment dismissing, with prejudice, the adversary proceeding instituted against it by Greenwich Insurance Company ("Greenwich"), as purported subrogee of debtor Atlantic Express Transportation Group, Inc. ("Atlantic Express"), and properly denied Greenwich's cross-motion for summary judgment, on the grounds that:

1. The contract that Greenwich sought to enforce was, at the time of Atlantic Express' Chapter 11 filing, an executory contract for GSCP to provide a loan or financial accommodation to Atlantic Express and was therefore unenforceable under section 365(c)(2) of the Bankruptcy Code.

2. Greenwich, in paying Atlantic Express' obligation under surety bonds issued by Greenwich, bestowed no benefit on GSCP merely by reason of it being Atlantic Express' majority shareholder, and, therefore, GSCP was not unjustly enriched.

3. GSCP did not act in such a way as to incur obligations to Greenwich outside of the contractual structure of the tripartite agreement between the parties, and was therefore not unjustly enriched, when Greenwich admitted in the parties' Joint Statement Of Material Facts As To Which There Is No Issue To Be Tried (the "Joint Statement"),[1] that prior to issuing the bonds GSCP told Greenwich (i) that GSCP "would

---

[1] The Joint Statement is Document No. 14 on the Bankruptcy Court Docket for this adversary proceeding, and is listed in paragraph 7 of the Designation of Record and Statement of Issues on Appeal ("Designation of Record") prepared and filed by Greenwich.

not agree to indemnify Greenwich if Atlantic Express defaulted in its obligation … and Greenwich had to pay out on the proposed surety bonds"; (ii) that GSCP "would not agree to guarantee Atlantic Express' obligations to Greenwich", and (iii) that GSCP "would not agree to make Greenwich a third party beneficiary of any agreement between GSC[P] and Atlantic Express pursuant to which GSC[P] would provide Atlantic Express with a financing commitment with respect to Atlantic Express' proposed obligations to … Greenwich." (Joint Statement, ¶¶ 18-19).

    4.    Greenwich could not recover under the theory of detrimental reliance when the written tripartite agreement entered into between the parties (Joint Statement, ¶¶ 20-21) superseded a purported earlier oral "promise" by GSCP that it would protect Greenwich in issuing surety bonds on Atlantic Express' behalf, and GSCP's admitted refusal to be a guarantor for Atlantic Express's obligations to Greenwich was a clear and unambiguous statement that no such promise was made.

## STANDARD OF REVIEW

    The standard of review for a grant or denial of summary judgment is *de novo* applying the same standard as the Bankruptcy Court. <u>See, e.g.</u>, <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000). Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. Bankruptcy Rule 8013; <u>Authentic Hansom Cabs, Ltd. v. Nisselson</u>, No. 03-09468, 2004 WL 2997794 at *3 (S.D.N.Y. Dec. 27, 2004).

## STATEMENT OF THE CASE

    This adversary proceeding was brought by Greenwich in an attempt to escape from and foist upon GSCP the consequences of Greenwich's informed decision to issue,

on Atlantic Express' behalf and at its request, $10.5 million in surety bonds to enable
Atlantic Express to obtain insurance premium financing from Cananwill, Inc.
("Cananwill").  There is no dispute that Greenwich issued such bonds despite admittedly
knowing that: (i) GSCP had refused to guarantee Atlantic Express' obligations to
Greenwich under the proposed bonds, (ii) that GSCP had refused Greenwich's request to
indemnify it should Atlantic Express default on its premium payments to Cananwill
thereby causing Greenwich to pay out on the proposed bonds, and (iii) that GSCP had
refused to make Greenwich a third party beneficiary of any commitment by GSCP to
extend a loan or financial accommodation to Atlantic Express with respect to Atlantic
Express' obligations to Cananwill or Greenwich.  (Joint Statement, ¶¶ 18-19).

Instead, Greenwich knowingly settled on a tripartite agreement pursuant to which
it would have no direct rights against GSCP.  Greenwich negotiated an agreement where
pursuant to two letters: (1) GSCP agreed with Atlantic Express to provide it from time to
time with funds if necessary solely to satisfy its obligations to Cananwill or Greenwich
(the "July 19th Letter"), and (2) Atlantic Express represented to Greenwich that the July
19th Letter constituted a commitment by GSCP to provide funding to satisfy Atlantic
Express' obligations to Cananwill or Greenwich **if requested** by Atlantic Express, and
then agreed with Greenwich that if draws were necessary under the July 19th Letter, and
if Atlantic Express failed to make a **request for funding** upon **demand** by Greenwich, or
if GSCP should fail to honor a **request** for funding, then Greenwich would be entitled to
specific performance against **Atlantic Express**  of its obligations under this second letter,
<u>i.e.</u>, to **request** funding from GSCP, or to cause **Atlantic Express** to enforce its rights
under the July 19th Letter (the "July 20th Letter" and, together with the July 19th Letter,

the "July 19th and 20th Letters").  (Joint Statement, ¶¶ 20-21).  In return for this

arrangement, Greenwich took a fee of almost $350,000 (Poret Aff., Ex. N)[2] and issued

the bonds.

Almost a year after the bonds were issued, Atlantic Express defaulted on its last

premium payment to Cananwill of $1,082,410.48, and Cananwill purported to cancel

Atlantic Express' insurance.  (Joint Statement, ¶¶ 23-24).  The parties have agreed in the

Joint Statement that neither Cananwill nor Atlantic Express notified either GSCP or

Greenwich of Atlantic Express' default before Atlantic Express filed its petition under

Chapter 11, which took place about 5 weeks after the default.  (Joint Statement, ¶¶ 25-

26).  There is also no dispute that Greenwich had not included in the bonds an obligation

by Cananwill to notify it of any default by Atlantic Express, even though it had put such a

notice provision in a bond that it had previously issued to Cananwill on Atlantic Express'

behalf.  (Joint Statement, ¶ 27; Wiss Tr. 16:5-19, Laptook Aff., Ex. S).[3]  Greenwich also

admits that it has no evidence that Atlantic Express made any funding request on GSCP

before it filed for Chapter 11 protection.  (Wiss Tr., 71:5-25, 74:25-76:9).

Despite its loss being the direct result of its own knowing decision to issue the

bonds without obtaining a guarantee from GSCP, and its failure to require Cananwill to

give it notice of any default by Atlantic Express, Greenwich brought this adversary

proceeding against GSCP seeking to recover the payment it made under the bonds to

---

[2]     The Poret Affidavit and Exhibits thereto is included in Document No. 10 on the
Bankruptcy Court Docket and is listed in paragraph 3 of the Designation of
Record.

[3]     The Laptook Affidavit and Exhibits thereto is included in Document No. 11 on
the Bankruptcy Court Docket and is listed in paragraph 4 of the Designation of
Record.  The "Wiss Tr." Refers to the deposition of Ronald Wiss, Greenwich's
Rule 30(b)(6) witness.

Cananwill.  Greenwich purported to stand in the shoes of Atlantic Express to enforce the July 19th letter, and asserted alternative theories of unjust enrichment and detrimental reliance.  GSCP denied liability and asserted affirmative defenses, including that the July 19th letter was unenforceable because at the time of Atlantic Express' bankruptcy filing it constituted an executory contract to provide a loan or financial accommodation which Atlantic Express, and therefore Greenwich, could not assume and enforce under Bankruptcy Code Section 365(c)(2).

After discovery, GSCP moved for summary judgment dismissing the adversary proceeding, and Greenwich cross-moved for summary judgment in its favor on all three of its theories for relief.  After the motions were filed, the Bankruptcy Court directed both parties to confer and submit to it a joint statement of material facts not in dispute, after which they filed the Joint Statement.  Relying on the facts jointly agreed to by the parties in the Joint Statement, the Bankruptcy Court granted GSCP's motion and denied that of Greenwich.  On this appeal Greenwich has gone outside of the Joint Statement, and seeks reversal in reliance on disputed facts that were not material to the decision below.

## <u>STATEMENT OF FACTS</u>

In the court below, GSCP and Greenwich each submitted with their cross-motions for summary judgment their own Statements of Material Facts As To Which There Is No Issue To Be Tried ("Party Statements"), and then in their opposition and/or replies each submitted their Objections and Responses to their adversary's Party Statement ("Party

Objections").[4]  After the motions were fully briefed but not yet argued, the Bankruptcy Court directed the parties to prepare and submit the Joint Statement.

The Statement of Facts set forth at pages 2 to 8 of the Bankruptcy Court's Memorandum Decision deciding the cross motions (the "Opinion")[5] is entirely drawn, often verbatim, from the Joint Statement.  (Opinion at 2, n.1).  Nevertheless, in its brief on this appeal ("Greenwich Br."), Greenwich baldly states that the Bankruptcy Court "erred with respect to … the facts" (Greenwich Br. at 16), but it neither says how nor does it identify any facts that the Bankruptcy Court relied upon which it asserts were erroneous.  This is not surprising since the Bankruptcy Court's Statement of Facts came from the Joint Statement that Greenwich helped draft and agreed to.

GSCP agrees with and adopts the Bankruptcy Court's rendition of material facts not in dispute.  However, on certain key issues Greenwich either ignores facts that it agreed were not in dispute, asserts "facts" that have no record support whatsoever, or relies on disputed "facts," which the Bankruptcy Court found were not material in deciding the cross-motions for summary judgment.  The undisputed material facts are as follows:

1.    The Pre-existing Relationship Between Greenwich and Atlantic Express

In early 2001, Atlantic Express first contacted Greenwich, seeking a $6.2 million insurance premium finance surety bond in order to obtain insurance premium financing from Cananwill, Inc. ("Cananwill"), a provider of insurance premium financing.  (Joint

---

[4]    The Party Statements and Party Objections are included in Documents Nos. 10-13 of the Bankruptcy Court Docket, and are listed in paragraphs 3-6 of the Designation of Record.

[5]    The Opinion is Document No. 15 on the Bankruptcy Court's Docket, and is listed in paragraph 9 of the Designation of Record.

Statement, ¶¶ 5-6).  Greenwich, through its chief underwriter, Kieran Moran, performed

an underwriting investigation of Atlantic Express and concluded that it was credit worthy

for such a bond.  (Moran Tr. 8:10-10:10, Laptook Aff., Ex. R).  Greenwich issued the

bond and entered into a Commercial Surety and Indemnity Agreement with Atlantic

Express.  (Joint Statement, ¶ 7).  That bond contained a provision requiring notice to be

sent to Greenwich if there were any defaults that could cause a demand to be made on the

bond.  (Wiss Tr. 15:16-16:14; Poret Supp. Aff., Ex. 7, p. 7, ¶ 3).[6]  Inexplicably,

Greenwich did not require Cananwill to provide it with notice of any default by Atlantic

Express with respect to the bonds at issue in this litigation.  (Joint Statement, ¶ 27; Wiss

Tr. 16:15-19).

     2.     Atlantic Express' Request for And
               <u>Greenwich's Underwriting of New Surety Bonds</u>

In June of 2001, Atlantic Express was seeking to obtain liability insurance for its

bus fleet from Liberty Mutual Insurance Company ("Liberty"), and approached

Cananwill for insurance premium financing for the over $11 million premium that

Liberty required be paid up front to issue such insurance.  As before, Atlantic Express

was told by Cananwill that it needed to obtain insurance premium finance surety bonds

before Cananwill would enter into a new Commercial Insurance Premium Finance

Agreement with it.  Accordingly, Atlantic Express again asked Greenwich to provide

such bonds, this time in the amount of $10.5 million.  (Joint Statement, ¶¶ 8-11).

Greenwich, through Moran, conducted another underwriting investigation of

Atlantic Express and determined that its financial condition had deteriorated since

---

[6]     The Poret Supplemental Affidavit is included in Document No. 12 on the
Bankruptcy Court Docket and is listed in paragraph 5 of the Designation of
Record.

January when Greenwich had last issued an insurance premium surety bond on Atlantic

Express' behalf.  As a result, Greenwich told Atlantic Express that it would not issue new

bonds unless Atlantic Express provided it with collateral or a third-party indemnity.

Atlantic Express could not provide collateral but said that it would discuss the matter of

additional security with GSCP, its majority shareholder.  (Joint Statement, ¶¶ 2, 13-14).

    3.    Greenwich's Negotiations with GSCP

In June 2001, Bradley Kane, an associate employed by GSCP with responsibility

for the Atlantic Express investment, participated in a telephone call with Moran, Nat

Schlenker, who served as Atlantic Express' Chief Financial Officer, and representatives

of Atlantic Express' insurance brokers.  Kane had the authority to approve agreements on

behalf of GSCP.  (Joint Statement, ¶¶ 15-16).  At this point Greenwich diverges from the

Joint Statement.

Greenwich claimed in its Party Statement (which was disputed by GSCP in its

Party Objection), and now argues in its brief, that the purpose of the call was to give

Greenwich some comfort regarding GSCP as an additional source of security, and that

Kane told Moran that GSCP would protect Greenwich in the transaction and would

"guarantee" Atlantic Express' proposed obligation to Greenwich.  (Greenwich Party

Statement, ¶ 21; GSCP Objection, ¶ 21; Greenwich Br. at 10-11).  Moran also claimed

that Kane said that GSCP needed to provide such a "guarantee" in an indirect manner so

that it would not have to make disclosure to its investors.  Id.[7]  Significantly, Moran's

contemporaneous notes of that conversation do not reflect any of these unsupported

---

[7]        The inference to be drawn from Moran's testimony, if accepted, is that Greenwich
        was prepared to and did enter into a scheme with GSCP to fool or defraud

assertions.  (Poret Supp. Aff., Ex. 3).

In complete contradiction of Moran's self-serving and unsupported claims, the parties expressly agreed that prior to issuing the bonds at issue herein: (i) Greenwich was told that GSCP would not agree to indemnify Greenwich if Atlantic Express defaulted in its obligations to Cananwill and Greenwich had to pay out on the proposed surety bonds"; (ii) GSCP "would not agree to guarantee Atlantic Express' obligations to Greenwich"; and (iii) GSCP "would not agree to make Greenwich a third party beneficiary of any agreement between GSC[P] and Atlantic Express pursuant to which GSC[P] would provide Atlantic Express with a financing commitment with respect to Atlantic Express' proposed obligations to Cananwill and/or Greenwich."  (Joint Statement, ¶¶ 18-19).

### 4.    The Tripartite Agreement

Wiss, who was also an experienced attorney (Wiss Tr. 7:5-8:6), took over from Moran and negotiated in tandem a tripartite agreement consisting of the July 19th and July 20th Letters.  (Joint Statement, ¶ 20).  The July 19th Letter was an agreement by GSCP to provide a financial accommodation to Atlantic Express if necessary for the sole purpose of enabling Atlantic Express to meet its obligations to Cananwill or to Greenwich under the proposed bonds:

> This letter shall confirm that [GSCP] will make available to you funds, in an aggregate amount not to exceed $10 million, from time to time until such time that all obligations to Greenwich Insurance Company under, or in respect of, the Cananwill Commercial Insurance Premium Finance Agreement (Quote # GLW0620001008A) are met in their entirety.  Such funds may be used by you **solely** to satisfy your direct or indirect payment obligations to Cananwill, Inc. under, in respect of, the Cananwill Commercial Insurance Premium Finance Agreement (Quote # GLW062001008A) and to Greenwich Insurance Company under, or in

---

GSCP's investors, an absurd suggestion coming from the chief underwriter of a licensed insurance company.

respect of, the bond dated July 20, 2001 issued by Greenwich Insurance Company to Cananwill, Inc. (Emphasis added).

The July 20th Letter was from Atlantic Express to Greenwich, setting forth the conditions under which Atlantic Express could request and use funding from GSCP, and Greenwich's rights against Atlantic Express if it failed to make a funding request:

> Attached is a copy of a commitment letter which [Atlantic Express] has received from [GSCP]. The commitment letter constitutes a commitment by [GSCP] to provide funding in the aggregate amount of $10,000,000, **if requested by [Atlantic Express]**, to enable [Atlantic Express] to satisfy [Atlantic Express'] direct or indirect payment obligations to Greenwich Insurance Company under, or in respect of, the bond dated July 20, 2001 issued by Greenwich Insurance Company to Cananwill, Inc. In the event that draws are necessary under the commitment letter as aforesaid, and if **[Atlantic Express] fails to make a request** for funding under the commitment letter **upon demand** by Greenwich Insurance Company, or if [GSCP] shall fail to honor a **request by [Atlantic Express]** for funding under the commitment letter, then Greenwich Insurance Company shall be entitled to specific performance **against [Atlantic Express] of the obligations of [Atlantic Express] under this letter** or to **cause [Atlantic Express] to enforce [Atlantic Express'] rights under the commitment letter**. (emphasis added).

As of the date of the foregoing letters, no bond had yet been issued. Ultimately, Greenwich issued two bonds dated August 8, 2001, rather than one bond dated July 20, 2001 as referred in the July 19th and July 20th Letters, to secure Atlantic Express' payment obligations to Cananwill under the Premium Finance Agreement. (Joint Statement, ¶ 21).[8] In return, Greenwich took a fee of almost $350,000. (Poret Aff., Ex.

---

[8]     Greenwich goes outside the agreed upon record as contained in the Joint Statement and the Opinion to claim that GSCP's purported promise to Moran to "guarantee" Atlantic Express' obligations and its commitment to Atlantic Express in the July 19th letter were intended to "induce" Greenwich to issue "critical bonding" that Atlantic Express "needed" to obtain new premium financing from Cananwill in order purchase insurance from Liberty Mutual that was "critical" to its ability to operate. (Greenwich Br. at 9-11, 27, 30). Not only is there no support for such allegations, the undisputed testimony by Schlenker was that if Atlantic Express had been unable to obtain insurance premium financing from Cananwill it would have found "a different provider in insurance that might

N).  While Greenwich now argues that GSCP's obligation under the bonds automatically accrued when Atlantic Express later defaulted in its last payment to Cananwill (Greenwich Br. at 19-20), Wiss admitted that Atlantic Express was first required to make a funding request or demand on GSCP pursuant to the July 19th and July 20th Letters. (E.g., Wiss. Tr. 73:17-74:24; September 5, 2002 letter from Wiss to Schlenker, Laptook Ex. K: "In addition, as we discussed yesterday, we require Atlantic Express Transportation Group, Inc. to exercise its rights, pursuant to the letter of July 19 and 20, 2001 (copies enclosed for your convenience), **to make demand** upon Greenwich Street Capital Partners II, L.P. for the payment of funds necessary to satisfy your company's obligations to the bonding companies and to the obligee." (emphasis added).

> 5.    The Funding Agreement Between GSC and Atlantic Express

Greenwich again departs from the material facts set forth in the Joint Statement and the Opinion, to advance the red herring argument that at the same time that the tripartite agreement expressed in the July 19th and July 20th letters was entered into, GSCP and Atlantic Express entered into a purportedly undisclosed Funding Agreement and a Commitment Fee and Collateral Agreement (Poret Supp. Aff., Exhs 1 and 2), intended to "supersede" the July 19th Letter and to defraud Greenwich "by revoking the promise Greenwich relied upon in issuing the Bonds."  (Greenwich Br. at 12, 32). Greenwich's argument distorts the facts and is irrelevant to any issues on this appeal.

---

accept the installment payments in lieu of up front payments," and that this is precisely the type of arrangement that Atlantic Express entered into when it renewed its insurance in 2002, at a time when its finances had deteriorated further.  (Schlenker Tr. 81:23-82:11, 200:8-19, Laptook Aff., Ex. Q); see also Patel Tr. 45:18-46:16, Laptook Aff., Ex. P (insurance premium financing "was an efficient way of paying premiums").

First, rather than superseding the commitment made by GSCP to Atlantic Express in the July 19th Letter, the Funding Agreement raised that commitment from $10 million to $16 million.  (Poret Supp. Aff., Ex. 1, ¶ 1).  Second, the Funding Agreement made plain that outside of a bankruptcy filing, "[t]he commitment hereunder of GSCP to make the Loans is unconditional."  (Id. ¶ 3).  There is nothing sinister about the provision terminating the financing commitment if Atlantic Express filed for bankruptcy protection. (Id.)  Such provision merely reflected applicable law which provides that in bankruptcy an executory contract to provide a financial accommodation may not be assumed and enforced as a matter of law.  See Bankruptcy Code §§ 365(c)(2) and 365(e)(2)(B).[9]

Finally, Greenwich's argument is irrelevant to the issues decided below.  GSCP did not rely upon the purportedly undisclosed Funding Agreement in making its summary judgment motion, and the Bankruptcy Court did not rely upon the Funding Agreement in deciding the cross-motions.  (Greenwich Street Capital Partners II, L.P. Motion For

---

[9]     Moreover, the record is in dispute as to whether Greenwich had knowledge of the Funding Agreement.  First, Schlenker testified that his practice was to send any document referencing Greenwich or Cananwill, including the Funding Agreement, to that entity by instructing his secretary to do so.  (Schlenker Tr. 171:9-175:4).  Schlenker also testified that Atlantic Express' insurance broker, Coverage Consultants, was often his sole point of contact with Greenwich and Cananwill.  (Schlenker Tr. 231:21-25).  Consistent therewith, Wiss testified that in connection with Atlantic Express' request for surety bonds, "there are two levels between Greenwich and Atlantic Express," consisting of Aon that brought the bonding request to Greenwich, and Coverage Consultants who acted on behalf of Atlantic Express.  (Wiss Tr. 22:16-23:5).  Documents produced by Coverage Consultants corroborate Schlenker's testimony and demonstrate that a draft of the Funding Agreement was sent to Cananwill along with drafts of what became the July 19th and July 20th Letters.  (Poret Supp. Aff., Ex. 6).  Thus, the evidence indicates no attempt to hide the existence of the Funding Agreement.

Summary Judgment Pursuant to Section 365(c)(2) of the United States Bankruptcy Code at 5, fn.1;[10] Opinion at 6, n.2, 13, n.6.).[11]

      6.    <u>Atlantic Express' Default and Bankruptcy Filing</u>

On or about July 2, 2002, almost a year after Greenwich issued the bonds, Atlantic Express defaulted on its obligations to Cananwill under the Premium Finance Agreement by failing to make the last monthly installment payment.  On July 15, 2002, Cananwill issued a Notice of Intent to Cancel Insurance, and on August 2, 2002, it issued a Notice of Cancellation.  (Joint Statement, ¶¶ 23-24).  Although obligated to do so, Atlantic Express did not inform Greenwich that it was unable to pay Cananwill, that it had defaulted on its obligations under the Premium Finance Agreement, or that Cananwill had cancelled that agreement.  (Joint Statement, ¶ 26).

Similarly, Greenwich did not receive notice from Cananwill of Atlantic Express' default until after Atlantic Express filed its petition under Chapter 11 on August 16, 2002.[12]  (Joint Statement, ¶¶ 28-30).  While Wiss claimed that Greenwich expected Cananwill to notify it if Atlantic Express defaulted in paying a premium, he admitted that Greenwich did not include such a default notice in the bonds at issue as it had done in the

---

[10]    GSCP's Motion for Summary Judgment is included in Document No. 10 on the Bankruptcy Court Docket and is listed at paragraph 3 of the Designation of Record.

[11]    By raising this issue Greenwich is attempting to provide a purported basis for its equitable estoppel argument (Greenwich Br. at 32-33), which it improperly raises for the first time on this appeal.

[12]    Cananwill apparently tried to provide Notice of Cancellation to Greenwich by sending such notice to Greenwich on August 2, 2002, care of Aon Risk Services, the broker who brought the bonding request to Greenwich and who acted as Greenwich's intermediary with Atlantic Express through its broker, Coverage Consultants.  (Poret Supp. Aff., Ex. 7; Wiss Tr. 22:20-23:5).

previous $6.2 million bond it issued on Atlantic Express' behalf in January, 2001.  (Joint Statement, ¶ 27; Wiss Tr. 16:15-19; 69:17-70:1; see also Wiss Tr. 80:16-81:74 (Wiss refused to pay a default charge to Cananwill because it failed to give Greenwich notice and a chance to cure  the default).

Significantly, it is also undisputed that neither Cananwill nor Atlantic Express notified GSCP of Atlantic Express' default or the notice of cancellation (Joint Statement, ¶ 25), and Greenwich admitted that it was aware of no evidence that Atlantic Express ever requested GSCP to provide funding under the July 19th and July 20th letters prior to the time that Atlantic Express filed for protection under the bankruptcy law (Wiss. Tr. 74:18-75:5; Moran Tr. 28:4-13).  In fact, Schlenker explicitly testified that he never made such a demand.  (Schlenker Tr. 202:18-203:9, 209:13-20; 211:14-21, 224:9-19).

Nevertheless, Greenwich once again departs from the Joint Statement and its own admission that it had no evidence that Atlantic Express had made a pre-filing demand for funds on GSCP, to assert as a purported "fact" that sometime after the bankruptcy filing Schlenker allegedly told Wiss "that GSCP had known about the default when it occurred and that he made a demand for funds from GSCP but had not received any substantive response."  (Greenwich Br. at 14).  Not only is this inadmissible hearsay "evidence," but Wiss' own contemporaneous notes of his conversation with Schlenker do not reflect either of the hearsay assertions made by Greenwich as to GSCP's purported knowledge of the default or purported receipt of a demand for payment.  (Poret Supp. Aff., Exhs 4 and 5).[13]

---

[13]     Moreover, in contrast to Greenwich's insinuation that GSCP must have known about Atlantic Express' default because it attended Atlantic Express board meetings and received periodic reports from Schlenker and Atlantic Express'

## **ARGUMENT**

The Bankruptcy Court correctly set forth the legal standards governing motions and cross-motions for summary judgment, and Greenwich does not argue that the Bankruptcy Court erred in this respect.  In short, a party seeking summary judgment must show by admissible evidence that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law.  If the moving party meets that standard, the burden shifts to the party opposing summary judgment to come forward with enough admissible evidence showing that there exists a genuine issue of material fact to support a jury verdict in its favor.  A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits admissible evidence such that a trial would be required to resolve the difference.  Where, as here, there are cross-motions for summary judgment, the court must consider each motion separately with respect to analyzing whether any material facts are in dispute.  (Opinion at 9-11).

GSCP based its motion for summary judgment solely on material facts not in dispute as set forth in the Joint Statement, and the Bankruptcy Court rendered its decision granting GSCP's motion based entirely on those very same stipulated facts.  Accordingly, the only issue with respect to GSCP's motion is whether the Court properly applied the law to the undisputed material facts relied upon by GSCP.  As will be shown below, the Bankruptcy Court correctly applied the law to the undisputed material facts in rendering summary judgment in GSCP's favor.

---

President (Greenwich Br. at 7, 13), Schlenker testified that GSCP was a "hands off" and "passive" investor in Atlantic Express before the time of the bankruptcy filing.  (Schlenker Tr. 31:7-32:4).

In contrast, Greenwich relied below and on this appeal both on purported "facts" that were in dispute and on rank hearsay contradictory to the Joint Statement it agreed to. Even though it does so, Greenwich does not argue that a trial is necessary, but, instead insists that as a matter of law its motion for summary judgment should have been granted and GSCP's denied.  (Greenwich Br. 16, 34).  As will be shown below, Greenwich's appeal should be denied in all respects.

## Point I

### THE JULY 19TH LETTER IS AN "EXECUTORY CONTRACT" THAT CANNOT BE ASSUMED UNDER SECTION 365(c)(2) OF THE BANKRUPTCY CODE[14]

#### A.     The July 19th Letter is an Executory Contract

Because Greenwich concedes that the July 19th letter is a "financial accommodation" under section 365(c)(2) of the Bankruptcy Code (Greenwich Br. at 17), the only substantive issue before this Court is whether the obligations under the letter are "executory."  Greenwich argues that the July 19th letter is not executory, because (in its view) only GSCP is obligated to pay funds to Atlantic Express, with no corresponding material obligations being owed by Atlantic Express to GSCP.  Greenwich, however, ignores a number of material obligations still owing by Atlantic Express as of the petition date.  Because these obligations were still outstanding, the July 19th Letter is an executory contract under section 365 of the Bankruptcy Code and, accordingly, cannot be assumed pursuant to section 365(c)(2) or enforced against GSCP.

---

[14]     Generally, section 365(a) of the Bankruptcy Code authorizes a trustee or debtor-in-possession to assume or reject an executory contract, subject to court approval. Section 365(c)(2) of the Bankruptcy Code, however, prevents the trustee or a debtor-in-possession from assuming an "executory contract" to "make a loan or extend other debt financing or financial accommodations, to or for the benefit of the debtor."  Thus, if an executory contract is one for a financial accommodation, it cannot be assumed.

1.    Greenwich Misstates Applicable Second Circuit Law

The Bankruptcy Code does not define the term "executory contract."  In its brief,

Greenwich erroneously argues that in COR Route 5 Co. v. The Penn Traffic Co. (In re

The Penn Traffic Co.), 524 F.3d 373 (2d Cir. 2008), the Second Circuit Court of Appeals

adopted the "Countryman" standard for determining executoriness, pursuant to which a

contract is executory if the obligations of the debtor and the non-debtor counterparty are

so far unperformed that the failure of either to complete performance would constitute a

"material" breach thereunder.  Penn Traffic, 524 F.3d at 379.  The Court of Appeals did

not adopt the Countryman test in Penn Traffic.[15]

Rather, in Penn Traffic, the Court of Appeals clearly stated that "[w]e do not have

to determine the precise contours of the test for executoriness to resolve the issues here

on appeal," because, as the Bankruptcy Court had already found, the obligations owed by

each contract counterparty in Penn Traffic were so far unperformed that the Countryman

test was met.  Penn Traffic, 524 F.3d at 379.  See generally Teligent, 268 B.R. at 731

(contract was "executory under the Countryman Test, and a fortiori, under the 'some

performance due' test"); In re Helm, 335 B.R. 528, 535 (Bankr. S.D.N.Y. 2006)

(Countryman test more stringent than "some performance" test).

---

[15]    The Second Circuit Court of Appeals has defined an "executory contract as one
'on which performance remains due to some extent on both sides.'"  COR Route
5 Co. v. The Penn Traffic Co. (In re The Penn Traffic Co.), 524 F.3d 373, 379 (2d
Cir. 2008) (citing Eastern Air Lines, Inc. v. Insur. Co. of Pa. (In re Ionosphere
Clubs), 85 F.3d 992, 999 (2d Cir. 1996); accord In re Teligent, Inc., 268 B.R. 723,
729-30 (Bankr. S.D.N.Y. 2001); In re Riodizio, Inc., 204 B.R. 417, 424 n.5
(Bankr. S.D.N.Y. 1997).  This has been referred to as the "legislative history" or
the "some performance" test.  See Teligent, 268 B.R. at 729.   Under this test, a
contract "is executory if each side must render performance, on account of an
existing legal duty or to fulfill a condition, to obtain the benefit of the other
party's performance."  Riodizio, 204 B.R. at 424.

Like <u>Penn Traffic</u>, regardless of which test ought to be applied in this appeal, because there are material obligations imposed on each of Atlantic Express and GSCP, the July 19th Letter is an executory contract even under the Countryman test and, therefore, clearly satisfies the "some performance" test.

2.    <u>The July 19th Letter is Executory under the Countryman Test</u>

The July 19th Letter is executory because there were mutual, material obligations still owed by each of Atlantic Express and GSCP on the petition date.[16]  *First*, Atlantic Express was obligated to use the funds solely to satisfy its payment obligations to Cananwill or Greenwich.  *Second*, under the tripartite agreement, Atlantic Express was required to make a demand upon GSC to provide funding.  *Third*, after making such a demand, GSCP was required to provide funding in an amount up to $10 million.  <u>See</u> <u>supra</u> pp. 9-10.

*a.    Limited Use of Funds*

The funds to be provided under July 19th Letter were to be "used by [Atlantic Express] **solely to satisfy [its] direct or indirect payment obligations to Cananwill, Inc.** under, in respect of, the Cananwill Commercial Insurance Premium Finance Agreement (Quote # GLW062001008A) **and to Greenwich Insurance Company under**, or in respect of, the bond dated July 20, 2001 issued by Greenwich Insurance Company to Cananwill, Inc."  (Joint Statement, ¶ 20(a) (emphasis added)).

If Atlantic Express were to use such funds (had they been provided), other than to pay the insurance obligations, it would have materially breached its obligations under the

---

[16]    "Under New York law, a material breach is a breach that 'go[es] to the root of the agreement between the parties . . . [and] 'is so substantial that it defeats the object of the parties in making the contract.'" <u>Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.</u>, 111 F.3d 284, 289 (2d Cir. 1997) (citations omitted).

July 19th Letter.  See, e.g., Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp.

449, 483 (S.D.N.Y. 1996) (substantial violation of limited use of funds covenant in

agreement would constitute material breach under New York law); see also Wechsler v.

Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 416 (S.D.N.Y. 2004) (seller's failure to

transfer funds received to third-party buyer subsequent to sale of receivables to same, as

required by agreement, was material breach).  Clearly, based on this limited-use

provision, the July 19th Letter was executory as of the petition date.

> b.    *Greenwich's Demand Obligation*

In addition, the July 20th Letter (which was negotiated in tandem with the July

19th Letter) described the July 19th Letter as a:

> [C]ommitment by [GSCP] to provide funding in the aggregate amount of
> $10,000,000, **if requested by [Atlantic Express]**, to enable [Atlantic
> Express] to satisfy [Atlantic Express'] direct or indirect payment
> obligations to Greenwich Insurance Company under, or in respect of, the
> bond dated July 20, 2001 issued by Greenwich Insurance Company to
> Cananwill, Inc.   In the event that draws are necessary under the
> commitment as aforesaid, and **if [Atlantic Express] fails to make a
> request for funding under** the commitment letter upon demand by
> Greenwich Insurance Company, or **if [GSCP] shall fail to honor a
> request by [Atlantic Express] for funding under the commitment
> letter**, then Greenwich Insurance Company shall be entitled to specific
> performance against [Atlantic Express] . . . or to cause [Atlantic Express]
> to enforce [its] rights under the commitment letter.

(Joint Statement, ¶ 20(b) (emphasis added)).  Greenwich argues that this language does

not give rise to a demand obligation on the part of Atlantic Express, insisting that the

letter runs only between Atlantic Express and Greenwich.  (Greenwich Br. at 20.)

Because the July 19th and July 20th Letters were negotiated and drafted in parallel

(by Greenwich and GSCP), Greenwich's argument that they cannot be construed to

require a demand on the part of Atlantic Express for funds is disingenuous at best.  Under

New York law, "all writings which form part of a single transaction and are designed to

- 19 -

effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." TVT Records v. The Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005), quoting from This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); accord Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941) (finding that agreements at issue "were executed at substantially the same time, related to the same-subject-matter, were contemporaneous writings and must be read together as one.").  Nowhere in Greenwich's brief does it even claim that the parties did not intend for the July 19th and July 20th Letters to form one integrated contract, and it cannot because Wiss admitted that the parties agreed to a tripartite arrangement.  (E.g., Wiss Tr. 31:19-20 ("…we came up with a tripartite arrangement.")).  See Commander Oil Corp. v. Advance Food Service Equip., 991 F.2d 49, 52-53 (2d Cir. 1993) (whether multiple writings should be construed as one agreement depends on intent of parties; generally, separate agreement are construed as one agreement if they relate to same subject and are executed simultaneously); Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) ("it is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together").  Thus, under the terms of the July 19th and July 20th Letters, GSCP's obligation to loan Atlantic Express funds to satisfy its payment obligations to Greenwich and Cananwill arose when, and only when, Atlantic Express made a request for funding.

Indeed, when the party providing the financial accommodation requires that a demand be made prior to funding, the financial accommodation is executory.  See, e.g., Farmer v. Crocker Nat'l Bank (In re Swift Aire Lines, Inc.), 30 B.R. 490, 491, 496

(B.A.P. 9th Cir. 1983) (pre-petition demand not properly made to draw on debtor's equity

owner's letter of credit in favor of debtor necessitated finding that contract was

executory).

     Greenwich attempts to write this demand obligation out of the contract by

erroneously citing a <u>Drexel</u> case for the proposition that a "the beneficiary of the guaranty

need not inform the guarantor of a default as a prerequisite to the guarantor's obligation

to pay."  (Greenwich Br. at 20.)  Greenwich, however, omits text from that quote that

provides "absent a contract provision to the contrary," there is no such notice

requirement.  <u>In re Drexel Burnham Lambert Group Inc.</u>, 151 B.R. 674, 683 (Bankr.

S.D.N.Y. 1993).  Here, there is obviously such a notice requirement.  Additionally, it

relies on <u>Daewoo Int'l (Am.) Corp. v. SSTS Am. Corp.</u>, No. 02-9629, 2004 WL 830079

(S.D.N.Y. Apr. 13, 2004), for the unremarkable proposition that an unconditional

guarantor is liable on a debt when the primary obligor defaults.  (<u>See</u> Greenwich Br. at

20.)  That case did not address demand obligations at all and, as such, fails to support

Greenwich's argument.[17]

*c.     Outstanding Funding Obligations*

     Finally, the July 19th Letter confirmed that GSCP would "make available to

[Atlantic Express] funds, in an aggregate amount not to exceed $10 million."  This is

obviously a material obligation on the part of GSCP.  <u>See</u> <u>Home Depot USA, Inc. v.</u>

<u>Krause, Inc.</u>, No. 01-50197, 2002 WL 1264001, at *1 (N.D. Ill. June 3, 2002) (court held

that payment was a significant unperformed obligation -- "if both parties have substantial

unperformed obligations the contract is executory even though one party's unperformed

---

[17]    Nor is this a case concerning the enforcement of a guarantee.  GSCP explicitly
refused to provide a guarantee.  (Joint Statement, ¶ 19).

- 21 -

obligation only involves the payment of money"). Accordingly, the contract is executory and the Bankruptcy Court properly found that it could not be enforced against GSCP.[18]

As such, because (a) the failure to use GSCP's funds in the manner provided in the July 19th Letter would have been a material breach, (b) no demand was ever made on GSCP for funds, and (c) no funds were provided, the July 19th Letter is an executory contract even under the Countryman test and, therefore, subject to section 365(c)(2) of the Bankruptcy Code.

### 3.    Greenwich's Legal Argument is Unavailing

Given Atlantic Express' obligations to use the funds in a limited manner (as described above), it is unclear how Greenwich can characterize the July 19th Financial Accommodation as lacking "continuing obligations." (Greenwich Br. at 18.) Instead, Greenwich states that the only performance left to be rendered under the July 19th Financial Accommodation is the payment of money, and that a mere payment obligation is insufficient to render a contract executory.

The case law upon which Greenwich relies for this argument is inapposite and simply inapplicable to the case at hand. Greenwich cites a series of cases where one party to a contract has already performed all material obligations, with the only material obligation of the other party is the payment of money. See, e.g., In re Spectrum Info.

---

[18]    Although not necessary to the facts or its conclusions of law, the Bankruptcy Court also noted that "Greenwich ignores the fact that Atlantic Express' major obligation to [GSCP] was the implicit obligation in the July 19th and July 20th Letters to repay the monies advanced, an obligation made explicit in the [Funding] Agreement. While for the purpose of considering [GSCP]'s motion the court must assume that Greenwich did not have actual knowledge of the [Funding] Agreement … the court concludes that that Greenwich's lack of knowledge of the [Funding] Agreement does not raise a material issue of fact. Opinion at 13, n.6.

Tech., 190 B.R. 741, 747 (Bankr. E.D.N.Y. 1996) (employee had no further obligations under employment-related agreements and debtor was only obligated to pay money); In re Placid Oil Co., 72 B.R. 135 (Bankr. N.D. Tex. 1987) (debtor's only duty under premium financing agreement was to pay money); In re Chateaugay Corp., 102 B.R. 335 (Bankr. S.D.N.Y. 1989) (breach of sale agreement simply gave rise to indemnity payment).

In these cases, all that was owed by one party was a simple debt to another party for a trade debt or a financial debt. For example, the House of Representatives' report quoted in the Spectrum decision simply illustrated that a "note is not usually an executory contract if the only performance that remains is repayment." Spectrum, 190 B.R. at 747. Greenwich is thus relying on "situations akin to accounts payable and accounts receivable where one party has fully performed, and the only remaining obligation is the other party's duty to pay for that performance. In contrast, if both parties have substantial, unperformed obligations, the contract is executory even though the uncompleted obligation of one of the parties only involves the payment of money." Teligent, 238 B.R. at 732; see also In re Wagner, 839 F.2d 533, 538 (9th Cir. 1988) (although lower courts had characterized providing a certain bill of sale as a "menial task," the Court of Appeals reversed, finding that the failure to provide a bill of sale would have been a material breach of the contract under state law).

Since Atlantic Express was required (a) to use the funds for the sole purpose as set forth in the July 19th Letter, as well as (b) to make a demand upon GSCP, the cases upon which Greenwich relies are unavailing.

**B.      The Bankruptcy Court Did Not Err**

1.      The Court Found that Performance Was Due on Both Sides

Greenwich argues that the Bankruptcy Court turned executory contract analysis "on its head," because it allegedly concluded that a contract to make a loan or financial accommodation is executory if the party providing the funding has yet to perform, regardless of whether the counterparty has any obligations.  (Greenwich Br. at 17.)  This interpretation of the Bankruptcy Court's decision is flawed.

Although the Bankruptcy Court held that "any pre-petition agreement for a loan or financial accommodation that is unperformed on the petition date must per se be executory," (Opinion at 12), it understood the parties each to have substantial, unperformed obligations under the July 19th Letter and the July 20th Letter.  See id. at 13, n.6.

Moreover, Greenwich's concession that the July 19th Letter is a "financial accommodation" (Greenwich Br. at 17) belies its position that Atlantic Express did not have an obligation to repay the funds provided and that the Bankruptcy Court departed from traditional executory contract analysis, since most financial accommodations are in fact debt financings.   See, e.g., In re Sun Runner Marine, Inc., 945 F.2d 1089, 1092 (9th Cir. 1991) (financial accommodation is the extension of credit); In re Wegner Farms Co., 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985) ("[S]tatements accompanying section 365(c)(2) seem to limit the thrust of this section to **contracts to make loans or other traditional kinds of debt financing arrangements**.") (emphasis added).

2.      The Legislative History Supports the Bankruptcy Court's Decision

The legislative history to section 365(c)(2) supports the Bankruptcy Court's decision.  In enacting section 365, the Senate stated that "[t]he **purpose** of this subsection

is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans [or] lease financing." S.Rep. No. 95-989, 95th Cong., 2d Sess. 58-59 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5844-5845. (Emphasis added).

"Section 365(c)(2) was intended to deal with a specific fear: forcing a lender to extend new cash or new credit to a trustee or his assignee through the assumption of a pre-petition financial agreement. Contracts to make loans, extend debt financing, extend financial accommodations or issue a security of the debtor were variations of the type of agreement that raised this concern." Teligent, 238 B.R. at 737.

With that in mind, the clear implication of section 365(c)(2) "is that a nondebtor may not be required (by way of contractual assumption) to make new, additional extensions of credit to a debtor that has become insolvent." Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of MidCom Commc'ns Inc., 246 B.R. 296, 300 (E.D. Mich. 2000); accord In re Cannonsburg Envt'l Assoc., 72 F.3d 1260, 1266 (6th Cir. 1996). "Thus, under [the Bankruptcy Code], contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee." H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. & Admin.News 1978, p. 6304. Greenwich's instant appeal should be denied.

### C.    Equity Does Not Require the Court to Deem That a Funding Request Had Been Made

Greenwich contends that equity required the Bankruptcy Court to have deemed that Atlantic Express made a pre-filing demand for funding on GSCP. (Greenwich Br. at 21-23). It does so based upon arguments that are unsupported by the record and which contradict the Joint Statement.

Greenwich's argument assumes and would require a finding that GSCP had pre-filing notice of Atlantic Express' default and conspired with Atlantic Express to avoid providing it with funding.  It argues without citation to record support that "Atlantic Express and **GSCP** faced a **choice** between utilizing $1 million of GSCP's money to pay Cananwill or foisting that million-dollar burden onto Greenwich which, **as they knew**, would be required to pay Cananwill pursuant to the Bonds."  (Greenwich Br. at 21, emphasis added).  Greenwich also charges without cited support that "Rather than fulfill **their** obligations, **GSCP** and Atlantic Express **chose**, wrongfully, to ignore them and to do so at Greenwich's expense."  (Greenwich Br. at 21-22, emphasis added).[19]

However, the agreed upon facts are that GSCP was not given notice of Atlantic Express' default and did not receive a pre-filing funding demand from Atlantic Express. (Joint Statement, ¶ 25; Wiss Tr. 74:18-75:5).[20]  Greenwich has no basis to argue that

---

[19]    None of the cases Greenwich relies upon enforces a loan agreement or credit facility on the basis of the equities.  See Girls Clubs of America, Inc. v. Boys Clubs of America, Inc., No. 88-1375, 1989 WL 297861 (S.D.N.Y. May 12, 1989) (invoking equities to grant injunctive relief where defendant disclosed relevant evidence at the last minute); U.S. ex rel Schuster v. Vincent, 524 F.2d 153 (2d Cir. 1975) (invoking equities to remedy detainment of parolee for additional three years due to litigation by state over venue of his claim and demand for signature on parole agreement); Lippe v. Genlyte Group, Inc., No. 98-8672, 2002 WL 531010 (S.D.N.Y. April 8, 2002) (invoking equities to require defendant to deliver property deed to entity who paid for and took possession almost eighteen years earlier); Ostek v. Ostek, 427 N.Y.S.2d 884, 75 A.D.2d 867(App. Div. 2d Dep't 1980) (invoking equities in imposing constructive trust on husband who allowed taxes to fall into arrears in order to gain sole title at foreclosure sale over former wife); Sweedler v. Oboler, 319 N.Y.S.2d 89, 65 Misc.2d 789 (Sup. Ct. N.Y.Co. 1971) (invoking equities to require bank to make payment on unendorsed checks where holder of bank account had taken possession of property bargained for).

[20]    Had GSCP received such notice and demand before Atlantic Express filed its petition, it could have protected itself by, inter alia, ascertaining whether Atlantic Express really needed funding as opposed to choosing to use its cash for other purposes (plus obtaining notes and a security agreement for the funding).

GSCP knew of the default but chose to foist its obligations onto Greenwich.  Conversely,

Greenwich could have protected itself by insisting on Cananwill giving it notice of

default as it did in the first bond it issued for Atlantic Express.  Equity clearly does not

require that Greenwich be relieved of the consequences of its own knowing decisions,

and demand should not be deemed to have been made.

<u>**Point II**</u>

**THE BANKRUPTCY COURT PROPERLY DENIED**
<u>**GREENWICH'S CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

**A.     The Bankruptcy Court Properly Denied Greenwich's Cross-Motion
For Summary Judgment Based Upon the Tripartite Agreement
Expressed in the July 19th and July 20th Letters**

As is shown in Point I above, the Bankruptcy Court properly denied Greenwich's

request to enforce the July 19th and 20th Letters because they constituted an agreement to

provide Atlantic Express with a financial accommodation that remained executory at the

time of Atlantic Express' bankruptcy filing.  GSCP had no obligation to provide funding

to Atlantic Express until it was requested to do so, and Atlantic Express, had it made such

a request, was obligated to use such funds solely to fulfill its obligations to Cananwill or

Greenwich.  Neither of these material obligations was fulfilled by Atlantic Express before

it filed for protection under Chapter 11.  Therefore, the Bankruptcy Court properly denied

summary judgment to Greenwich on its purported contract claim.

**B.     The Bankruptcy Court Properly Denied Greenwich's Cross-Motion
For Summary Judgment on Its Claim of Unjust Enrichment**

The Bankruptcy Court held that GSCP was not unjustly enriched by reason of it

being Atlantic Express' majority shareholder when Greenwich, as it contracted to do,

paid Atlantic Express' obligation to Cananwill.  It also held that GSCP was not unjustly

enriched because it did not act in a manner so as to incur obligations to Atlantic Express

- 27 -

outside of the parties' contractual arrangement.  (Opinion at 14-15).  The Bankruptcy

Court's holdings should be affirmed on this appeal.

        1.      Where an Express Contract Governs the Same Subject
              Matter, the Doctrine of Unjust Enrichment Does Not Apply

Under New York law, unjust enrichment is quasi-contract claim, and "the

existence of a valid and enforceable written contract governing a particular subject matter

ordinarily precludes recovery in quasi-contract [i.e., unjust enrichment] for events arising

out of the same subject matter."  MacDraw, Inc. v. CIT Group Equip. Fin. Inc., 157 F.3d

956, 964 (2d Cir. 1997) (internal quotations omitted); see also Beth Israel Med. Ctr. v.

Horizon Blue Cross and Blue Shield of N.J., 448 F.3d 573, 586 (2d Cir. 2006) ("The

theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law

creates *in the absence of any agreement*.") (emphasis in original); Goldman v. Metro.

Life Ins. Co., 5 N.Y.3d 561, 587-88 (2005) (no unjust enrichment when matter is

controlled by contract).  In the instant action, the July 19th and 20th Letters constitute a

valid and enforceable (outside of bankruptcy) contract governing the conditions and

obligations that had to be met before GSCP was obligated to provide funding to Atlantic

Express.  Therefore, the doctrine of unjust enrichment does not apply as a matter of law.

Moreover, a plaintiff cannot use a claim for unjust enrichment to "obtain benefits

after the fact that he was unable to obtain during negotiations."  Associated Banc-Corp. v.

John H. Harland Co., No. 06-01097, 2007 WL 128337, at *1 (E.D. Wis. Jan. 11, 2007)

(granting defendant's motion to dismiss a claim for unjust enrichment on this grounds

and discussing the underlying case law).  The Bankruptcy Court found, and Greenwich

has acknowledged, that:

> Greenwich asked GSCP to provide Greenwich with a guarantee of
> Atlantic Express's obligations;

GSCP refused to provide such a guarantee to Greenwich and, in addition, refused to make Greenwich a third-party beneficiary of any agreement between GSCP and Atlantic Express;

GSCP instead agreed to execute a limited funding agreement with Atlantic Express and, on this basis, Greenwich agreed to issue the security bonds.

(See Opinion at ¶¶ 17-21; accord Joint Statement, at ¶¶ 17-21). Greenwich cannot now rely upon this court's equitable powers to transmute this limited funding obligation into the very guarantee that GSCP refused to provide. See SCA Tax Exempt Fund Ltd. P'ship v. Kahn, No. 91-5912, 1992 WL 219025, at *7 (6th Cir. Sept. 10, 1992) (table) (noting that, if plaintiff sought a conventional guarantee rather than a limited funding agreement, then plaintiff had the opportunity to negotiate for such a guarantee, and declining, partly on this basis, to treat the limited funding obligation as a conventional guarantee); John H. Harland Co., 2007 WL 128337, at *1; see also Ingram v. Rencor Controls, Inc., 256 F. Supp. 2d 12, 24 (D. Me. 2003) (holding that the claim of unjust enrichment does not permit a plaintiff to make an "end run around a voluntary structuring of relationships and their consequences"). Cf. In re Thrifty Oil Co., 212 B.R. 147 (Bankr. S.D. Cal. 1997), aff'd, 249 B.R. 537 (S.D. Cal. 2000), aff'd, 322 F.3d 1039 (9th Cir.) (holding that, when parties consciously negotiate a particular deal structure, the court will not ignore the actual structure as documented by the parties -- despite facts that individual transactions were collectively designed to replicate a particular transaction, and that the different transactions were reflected in an "integrated agreement").

As a result, Greenwich is foreclosed as a matter of law from seeking recovery from GSCP on the grounds of unjust enrichment and the Bankruptcy Court should be affirmed for this reason alone.

2.     Even if the Doctrine of Unjust Enrichment was Applicable
There was No Showing that GSCP was Unjustly Enriched

Greenwich argues here and below that GSCP was unjustly enriched because as

Atlantic Express' majority shareholder it benefited from the enhanced value Greenwich's

payment provided to Atlantic Express.  (Greenwich Br. at 27-28)[21].  The Bankruptcy

Court properly rejected such contention, holding that "[a]ny benefit conferred on GSCP

could only have been the indirect result of being the majority shareholder," but that such

relationship alone was "an insufficient basis for Greenwich's unjust enrichment claim

against GSCP."  (Opinion at 15); see Martes v. USLIFE Corp., 927 F. Supp. 146, 149

(S.D.N.Y 1996) (defendant was not unjustly enriched by plaintiff's inability to collect

under insurance policy issued by former subsidiary; defendant "simply owned stock" and

this did not provide basis for suggesting it received or possessed anything that belonged

to plaintiff); Clark v. Daby, 751 N.Y.S.2d 622, 623, 300 A.D.2d 732, 732 (3d Dep't.

2002) ("[I]t is the plaintiff's burden to 'demonstrate that services were performed *for the*

*defendant* resulting in [the latter's] unjust enrichment.'") (emphasis in original); accord

Carruthers v. Flaum, 388 F. Supp. 2d 360, 370 (S.D.N.Y. 2005).  Therefore, even if

GSCP in some sense benefited, the "mere fact that the plaintiff's activities bestowed a

benefit on the defendant is insufficient to establish a cause of action for unjust

enrichment."  Clark, 751 N.Y.S.2d at 623, 300 A.D.2d at 732.

---

[21]     Greenwich also argues for the first time that "as a practical matter, …, the debt to
Cananwill was an obligation of GSCP."  (Greenwich Br. at 28).  However, the
record is undisputed that GSCP made no representations to Cananwill, and
explicitly told Greenwich that it would not guarantee Atlantic Express' debt, or
indemnify Greenwich, or make it a third party beneficiary of any financial
accommodation promised to Atlantic Express.  See Tomaso, Feitner and Lane,
Inc. v. Brown, 4 N.Y.2d 391, 151 N.E.2d 221 (1958) (promise by stockholder to
corporation to reimburse costs could not be directly enforced by third-party
creditor).

The Bankruptcy Court also inquired as to whether GSCP "acted in such a way as to incur obligations to [Greenwich] outside the contractual structure." (Opinion at 15), citing to <u>U.S. E. Telecomm's, Inc. v. US W. Commc'ns Servs., Inc.</u>, 38 F.3d 1289, 1297 (2d Cir. 1994). Greenwich argues that GSCP acted to incur such extra contractual obligations based upon the disputed purported promise from Kane to Moran that "GSCP would protect Greenwich in the transaction and would guarantee the Atlantic Express obligation, but that it would have to be done by a writing that did not show an obligation running directly from GSCP to Greenwich." (Greenwich Br. at 27). However, the record is clear that GSCP refused to give Greenwich the guarantee it asked for and Greenwich, with the benefit of counsel, accepted the tripartite agreement that would only enable it "to step into the shoes of Atlantic Express and enforce the obligation of GSCP to Atlantic Express." (Opinion at 15) Accordingly, the Bankruptcy Court found that, "the actions and express statements of GSCP made clear to Greenwich that GSCP would not guarantee Atlantic Express' obligations, and that GSCP "did not act[] in such a way as to incur obligations to [Greenwich]." <u>Id.</u> That finding is not clearly erroneous and the Bankruptcy Court should be affirmed in dismissing Greenwich's unjust enrichment claim.

### C.     The Bankruptcy Court Properly Denied Greenwich's Motion For Summary Judgment on Its Detrimental Reliance Claim

There is no dispute that the doctrine of detrimental reliance is analyzed as a claim of promissory estoppel, and that promissory estoppel requires that three elements be met: (i) a clear and unambiguous promise; (ii) a reasonable and foreseeable reliance by the party to whom the promise is made; and (iii) an injury sustained by the party asserting the

estoppel by reason of his reliance.  (Opinion at 15-16; Greenwich Br. at 29.)  See Thayer
v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263, 271 (S.D.N.Y. 2000) (same).

Greenwich argues that it received from Kane a clear and unambiguous promise
that GSCP would protect it and guarantee Atlantic Express' obligations, and forseeably
relied upon such promise in issuing surety bonds on Atlantic Express' behalf.
(Greenwich Br. at 30-31.)  At the same time, it admits that GSCP refused to guarantee
Atlantic Express' obligations to it or to give Greenwich any direct rights against GSCP.
(Joint Statement at ¶ 18-19).  It defies credulity to argue that under these circumstances
Greenwich received a "clear and unambiguous" promise of protection that it reasonably
relied upon.

Moreover, GSCP disputed Greenwich's assertion of such an oral promise, and
Moran's contemporaneous notes do not reflect that it was made.  (Poret Supp. Aff. Ex. 3).
But even if Kane had earlier made such an oral promise, once the matter was passed over
to Wiss it was clearly understood that Greenwich was not getting a guarantee, but only
rights against Atlantic Express as embodied in the July 19th and 20th letters.  As the
Bankruptcy Court correctly found, such subsequent written agreement superseded any
purported earlier promise made by Kane.  Thayer at 268; see also Adiel v. Coca-Cola
Bottling Co. of New York, Inc., No. 95-00725, 1995 WL 542432, at *6 (S.D.N.Y. Sept.
13, 1995) (where certain plaintiffs executed an acknowledgment agreement that "clearly
spelled out" that plaintiffs had no renewal rights beyond a certain date, court "fail[ed] to
see how, in light of the 'Acknowledgements,' any reliance on promises to renew the
distribution agreements indefinitely could be deemed reasonable"); Banco Espirito Santo

de Investimento, S.A. v. Citibank, N.A., No. 03-01537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003).

Finally, any injury sustained by Greenwich was self inflicted. For a $350,000 fee it took the chance that Atlantic Express would default in making premium finance payments to Cananwill, resulting in a call for payment on the bonds. However, Greenwich failed to require Cananwill to provide it with notice of any such default, even though it included such protection in an earlier bond. As such, Greenwich meets none of the three elements of promissory estoppel and its cross-motion for summary judgment was properly denied.

### Point III

### GREENWICH IS NOT ENTITLED TO PREVAIL ON ITS NEWLY-ASSERTED CLAIM BASED UPON EQUITABLE ESTOPPEL

Greenwich asserts for the first time on this appeal that it is entitled to prevail on the basis of equitable estoppel. It rests its claim on the argument that GSCP and Atlantic Express defrauded it when they entered into the purportedly undisclosed Funding Agreement and the Commitment Fee and Collateral Agreement "which purport to revoke the GSCP Commitment Letter and, with it the promise that Greenwich relied upon in issuing the Bonds." (Greenwich Br. at 32.) Greenwich does not claim that it was prevented from making this argument to the Bankruptcy Court.

"It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994); accord Bayway Refining Co. v. Oxygenated Mktg. and Trading, A.G., 215 F.3d 219, 222 n.2 (2d Cir. 2000); Authentic Hansom Cabs. Ltd. v. Nisselson, No. 03-09468, 2004 WL 2997794, at *4 (S.D.N.Y. Dec. 27, 2004) (applying rule in appeal of

Bankruptcy Court Order granting summary judgment). "This general rule may be disregarded in two circumstances: (1) where consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295, 302 (2d Cir. 1996).

First, no manifest injustice would result if the Court does not consider this issue. The premise of Greenwich's argument is that GSCP and Atlantic Express engaged in conduct which amounted to fraud when they entered into the purportedly undisclosed Funding Agreement. Not only could Greenwich have made this argument below, it rests upon the false premise that the Funding Letter acted to revoke GSCP's commitment to Atlantic Express. The Funding Agreement, however, does not revoke such commitment. Rather it raises it from $10 million to $16 million, and confirms that the commitment is "unconditional" outside of bankruptcy once Atlantic Express' chief financial officer certified that Atlantic Express lacked funds from other sources sufficient to satisfy its obligations to Cananwill or Greenwich. (Poret Supp. Aff. Ex. 1, ¶¶ 1-3.)

Second, the argument fails to meet the exception because there would be a need for additional fact-finding before it could be applied. The question of whether GSCP and Atlantic Express disclosed the Funding Agreement to Cananwill and Greenwich is a disputed fact, and there is abundant evidence that the Funding Agreement was disclosed or, at least, intended to be disclosed. <u>See</u> <u>supra</u> pp. 11-13. While the Bankruptcy Court noted that there was no claim that the Funding Agreement was not authentic (Opinion at p. 6, n. 2), it made no finding, nor could it, that GSCP failed to make disclosure or that Greenwich did not have knowledge of the agreement (Opinion at. p. 13, n.6).

Accordingly, Greenwich does not meet the second exception to the general rule of not considering newly advanced arguments on appeal, and also does not meet the substantive elements of equitable estoppel by reason of its argument resting on material facts which were very much in dispute.

## CONCLUSION

Based upon the forgoing, GSCP respectfully requests the Court to affirm the Order of the Bankruptcy Court in all respects.

Dated:  June 30, 2008
      New York, New York

**DECHERT LLP**

/s/ Charles I. Poret
Charles I. Poret
Shmuel Vasser
Davin J. Hall
1095 Avenue of the Americas
New York, New York  10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
charles.poret@dechert.com

*Attorneys for Greenwich Street*
*Capital Partners II, L.P.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re:                                          )          Chapter 11
                                                )
METRO AFFILIATES, INC., et al.,                 )          Case No. 02-42560 (PCB)
                                                )
                        Debtors.                )          Jointly Administered
-----------------------------------------------------------------x
                                                )
GREENWICH INSURANCE COMPANY,                    )          Civil Action No. 08-03814 (LAP)
                                                )
                        Appellant,              )
                                                )
            v.                                  )
                                                )
GREENWICH STREET CAPITAL                        )
PARTNERS II, L.P.,                              )
                                                )
                        Appellee.               )
                                                )
-----------------------------------------------------------------x

**COMPENDIUM OF UNREPORTED CASES CITED WITHIN BRIEF**
**OF APPELLEE GREENWICH STREET CAPITAL PARTNERS II, L.P.**

**CASE**                                                                                                                    **TAB**

Adiel v. Coca-Cola Bottling Co. of New York, Inc.,
     No. 95-00725, 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995) .............................................1

Associated Banc-Corp. v. John H. Harland Co.,
     No. 06-01097, 2007 WL 128337 (E.D. Wis. Jan. 11, 2007) .............................................2

Authentic Hansom Cabs, Ltd. v. Nisselson,
     No. 03-09468, 2004 WL 2997794 (S.D.N.Y. Dec. 27, 2004) .............................................3

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
     No. 03-01537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ..........................................4

Daewoo Int'l (Am.) Corp. v. SSTS Am. Corp.,
     No. 02-9629, 2004 WL 830079 (S.D.N.Y. Apr. 13, 2004) .................................................5

Girls Clubs of America, Inc. v. Boys Clubs of America, Inc.,
     No. 88-1375, 1989 WL 297861 (S.D.N.Y. May 12, 1989) ................................................6

Home Depot USA, Inc. v. Krause, Inc.,
     No. 01-50197, 2002 WL 1264001 (N.D. Ill. June 3, 2002).................................................7

Lippe v. Genlyte Group, Inc.,
     No. 98-8672, 2002 WL 531010 (S.D.N.Y. April 8, 2002) .................................................8

SCA Tax Exempt Fund Ltd. P'ship v. Kahn,
     No. 91-5912, 1992 WL 219025 (6th Cir. Sept. 10, 1992) .................................................9

# TAB 1

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

**H**

Adiel v. Coca-Cola Bottling Co. of New York, Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Chaim ADIEL; Some Like it Hot, Inc., et al.,
Plaintiffs,
v.
COCA-COLA BOTTLING COMPANY OF NEW
YORK, INC., Defendant.
**95 CIV. 0725 (WK).**

Sept. 13, 1995.

*MEMORANDUM AND ORDER*

WHITMAN KNAPP, Senior District Judge.
**\*1** This action is brought by individuals and corporations who had been distributing defendant's soft drink "Coke" under individual distribution agreements entered into during the 1980's until defendant terminated their distributorships on June 1, 1995. Those agreements contain the following relevant provisions:

22. *TERM OF AGREEMENT*

This agreement shall commence on the date hereof and shall expire on May 31, 1990, unless sooner terminated pursuant to the provisions hereof. Distributor shall have the right to renew this Agreement for an additional five (5) year period commencing June 1, 1990. Upon the failure of the Distributor to give such notice as herein provided, this Agreement shall not be renewed and shall expire on May 31, 1990. Time shall be of the essence with respect to the provisions of this paragraph.

24. *AGREEMENT COMPLETE*

This Agreement is intended to, and shall, supersede any and all existing understandings of agreements between the Company and the Distributor, and expresses fully the understanding and agreement between the Company and the Distributor, and both parties agree that there are no promises, terms, conditions, understandings, commitments or obligations in respect of the subject matter of this Agreement, except as set forth herein.

25. *MODIFICATION, AMENDMENT*

This Agreement may not be modified, amended, changed, terminated, or cancelled orally. Except as provided herein, no modification, change or amendment or attempted waiver shall be valid unless in writing signed by both parties.

See, e.g., Ex. A. to Complaint at 9.

It is undisputed that each plaintiff who had been distributing Coke as of May 31, 1990 executed a written renewal notice specifying that the Agreement was to be renewed for a five-year period ending on May 31, 1995. See Def. App. Ex. B. In addition, plaintiffs Hallow Ng and Charles Pelegrino executed Distributor Agreements in June 1992. Pelegrino, prior to executing his agreement, and Ng, on the day he executed his, signed a separate document which defendant refers to as an "Expiration Acknowledgement." See Def. Appendix Ex. C. That document provided in pertinent part:

We want to assure, and to receive your confirmation, that you have read and understood the Distributor's Agreement which defines your rights and obligations. In particular, we are calling it to your attention, and you are acknowledging, that this is a contract for a limited number of years expiring on May 31, 1995 (unless sooner terminated according to its terms). We have not made, are not making and will not make any assurances of renewal or extension of the Distributor's Agreement, whether on the same terms or on a different basis. See [Distribution Agreement] Paragraph 22.

Def. Appendix, Ex. C.

Case 1:08-cv-03814-LAP     Document 11-2     Filed 06/30/2008     Page 5 of 70

On May 18, 1993, defendant informed plaintiffs "for the first time" that it did not intend to renew their distribution agreements and that it planned to "directly service the existing [Coke] accounts within [plaintiffs'] exclusive territories using salaried employees." Complaint at ¶ 76.

**\*2** The basis of the complaint is that in order to persuade plaintiffs and other distributors to enter into the 1980 agreements, various officers of defendant made oral promises to them that defendant would renew their distribution rights indefinitely until plaintiffs "returned or chose to sell such rights."Complaint at ¶ 68. Plaintiffs allege that such promises actually induced them to enter into the agreements, to purchase for "hundreds of thousands of dollars," id. at ¶ 72, existing Coke accounts, to assume substantial and long-term personal obligations and to "work hard and invest substantial amounts of time, energy, and money to increase the sales of Coke products in [plaintiffs'] respective territories..." Id. at ¶ 74.The complaint contends that defendant had "assured [plaintiffs] that they were building equity in their business, which would be realized in the future when they sold the business or retired."Id.

According to plaintiffs, defendant had never advised them of the possibility that it would not renew their agreements in 1995, and that had they been so advised they would never have entered into the initial distribution agreements. Id. at ¶ 78-79.Moreover, the complaint alleges that defendant has "actively interfer[ed]" with plaintiffs' relationships with their customers, id. at ¶ 82, and that it has "actively disparaged the [[[plaintiffs'] business performance and reputation by claiming falsely that they are no longer capable of adequately servicing their existing accounts," id. at ¶ 83.

The complaint states claims for breach of contract, unjust enrichment, fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, unfair competition, tortious interference with contract, negligent misrepresentation, breach of fiduciary

duty, the violation of New York's Franchise Act and promissory and equitable estoppel. In April 1995, defendant moved to dismiss the complaint. Briefly thereafter, plaintiffs filed an order to show cause seeking a preliminary injunction prohibiting defendant from terminating the distribution agreements on May 31st. At argument on defendant's motion, plaintiffs requested leave to amend their complaint to restate their claims for fraud with greater specificity. To that end plaintiffs have submitted a "Supplemental Memorandum of Law" proposing more specific allegations of fraud.

On May 30, 1995, we dismissed plaintiffs' breach of contract claims as deficient under New York's Statute of Frauds, General Obligations Law § 5-701(a)(1), which requires a signed writing as proof of a contract which by its terms cannot be fully performed within a year. Having found on that occasion that plaintiffs had no contractual right to compel defendant to extend the agreements, we denied plaintiffs' motion for a preliminary injunction.

For reasons which follow, assuming the complaint to have been amended along the lines suggested in plaintiffs' "Supplemental Memorandum," we grant defendant's motion as to plaintiffs' remaining claims except for ones asserting promissory estoppel. For other reasons stated herein, we dismiss the complaint in its entirety as to plaintiffs Ng and Pellegrino.

DISCUSSION

**\*3** We address each set of plaintiffs' remaining claims in turn.

*The Remaining Contractual Claims*

Plaintiffs have alleged that by terminating their distribution agreements, defendant breached an implied covenant of good faith and fair dealing. However, under New York law a party's reliance upon express contractual terms insulates it from

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

such claims. *See, e.g. Hartford Fire Ins. v. Federated Dept. Stores, Inc.* (S.D.N.Y. 1989) 723 F. Supp. 976. In that case Judge Sweet, applying New York law, observed that

the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract.

*Id.* at 991.The agreements at issue here in no respect required defendant to renew after May 31, 1995. Accordingly, we dismiss plaintiffs' remaining contractual claims.

### Unjust Enrichment

A claim for unjust enrichment is a quasi-contractual one. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter."*Clark-Fitzpatrick, Inc. v. Long Isl. R.R. Co.* (1987) 70 N.Y.2d 382, 388. A "'quasi contract' only applies in the absence of an express agreement...'*Id.*Accordingly, we must dismiss plaintiffs' unjust enrichment claims.

### Fraud

In considering plaintiffs' claims for fraud in the inducement, fraudulent representation and fraudulent concealment, we shall assume the complaint to have been amended to include the allegations set forth in plaintiffs' "Supplemental Memorandum of Law." Defendant argues that the complaint so amended fails to meet several requirements of Rule 9(b). First, it contends that the complaint ought to disclose which of its employees made which representations to *each* plaintiff and when. Second, it asserts that it fails adequately to allege that such employees had fraudulent intent when making representations that defendant did not intend to terminate the distribution arrangement.

With regard to its first argument, defendant notes that plaintiffs have alleged only three particular incidents in support of their fraud in the inducement claims: (1) a March 1985 meeting in which Edward O'Reilly, defendant's C.E.O. at the time, "told the Plaintiffs including Walter Holland * * * that 'you are the owners of the route' and 'will be building equity which will be yours when you sell your business...'" Supp. Mem. at ¶ 8; and (2) a May 1987 interview during which Paul Cunningham, defendant's vice-president at the time, told (id. at ¶ 7)

the Plaintiffs... including... Dewitt Walker... that the purchase of the routes was like buying a house only better because it paid for itself and it would build equity which the Plaintiffs would realize whenever they finally decided to sell the route;

and (3) an October 1987 interview at which Cunningham made similar misrepresentations to "[p]laintiffs, including Bobby Ferrara..." Id.

**\*4** Defendant contends that these incidents, which began in 1985, cannot support the claims of six plaintiffs who executed their distributorship agreements prior to that year. It also argues that the supplemental language similarly fails to support the fraud in the inducement claims made by 12 plaintiffs who had become distributors for defendant prior to October 1987, and eleven plaintiffs who had not yet entered into such agreements at that time. We agree with defendant that the fraud claims lack sufficient specificity.

As defendant points out, plaintiffs must also allege "circumstances that give strong rise to the inference that defendants knew the [alleged oral representations] to be false."*Wexner v. First Manhattan Co.* (2d. Cir. 1990) 902 F.2d 169, 173. We agree with defendant that plaintiffs are simply unable to demonstrate that its agents had lied in 1985 and 1987, when they are claimed to have made the representations that plaintiffs' distributorship would continue indefinitely. There is nothing in the agreements which would have *prevented* defendant from renewing indefinitely, and plaintiffs point to no fact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or circumstance establishing that defendant's management as early as 1987 had made its decision not to do so (which decision was not announced until 1993).[FN1]

### Unfair Competition

Under New York law, in order to sustain a claim for unfair competition, plaintiff must show that defendant misappropriated plaintiff's labors or expenditures and that defendant displayed some element of bad faith in doing so. *Davis & Co. Auto Parts, Inc. v. Allied Corp.* (S.D.N.Y. 1986) 651 F.Supp. 198, 203 (S.D.N.Y. 1986)*citing Saratoga Vichy Spring Co. v. Lehman* (2d Cir. 1980) 625 F.2d 1037, 1044. As defendant points out, such bad faith cannot be found where a defendant's alleged misconduct represents nothing more than its having exercised its legal rights. *See, e.g., Saratoga,* 625 F.2d at 1044 (no bad faith present in defendant's exploitation of a trademark which it was legally entitled to use); *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.* 17 F.3d 38, 45 (2d Cir.), *cert. denied*(1994) 115 S.Ct. 484 (counterclaim alleging unfair competition was properly dismissed where there was no finding of contractual breach). Here, the contract in no way prohibited defendant from terminating the agreements on May 31, 1995. We thus cannot find that termination to be an adequate basis for plaintiffs' unfair competition claims. Accordingly, we dismiss them.

### Tortious Interference with Contract

A claim for tortious interference with contract can withstand a motion to dismiss only where plaintiff has alleged (1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach of that contract by the third party; and (4) damages. *See Nordic Bank PLC v. Trend Group, Ltd.* (S.D.N.Y. 1985) 619 F.Supp. 542, 560-61. Finding that the complaint fail

to meet these requirements, we dismiss plaintiffs' claims for tortious interference with contract.

### Negligent Misrepresentation/Breach of Fiduciary Duty

**\*5** The complaint states claims for negligent misrepresentation and breach of fiduciary duty based on the aforesaid conduct of defendant. Both of these causes of action require plaintiff to demonstrate a special relationship which gives rise to defendant's fiduciary duty. Ordinarily, New York courts do not recognize a fiduciary relationship between a franchisee and franchisor. *See, e.g., Fashion Boutique of Short Hills, Inc. v. Fendi, U.S.A., Inc.* (S.D.N.Y. 1992) (M. Cederbaum, D.J.) 1992 U.S. Dist. Lexis 9881; *Bevilacque v. Ford Motor Co.* (2d Dep't 1986) 509 N.Y.S.2d 595, 599;*Mobil Oil Corp. v. Rubenfeld* (2d Dep't 1975) 370 N.Y.S.2d 943,*aff'd*(1976) 40 N.Y.2d 936. One New York trial court has found a fiduciary relationship between such parties where the power of the franchisor was "awesome" in comparison with the franchisees, a group of Taiwanese immigrants with no business background or experience. *In re Sbarro Holding, Inc.* 445 N.Y.S.2d 911, 913,*aff'd*(2d Dep't 1982) 456 N.Y.S.2d 416. The court there found that the franchisor had served as "developer, architect, builder, lawyer, supplier and guidance counselor" to the franchisees. *Id.* The complaint fails to allege any such extreme circumstances. Accordingly, we dismiss plaintiffs' claims for breach of fiduciary duty and for negligent misrepresentation.

### Violation of the New York Franchise Act

The New York Franchise Act (hereinafter "the Act") prohibits the direct or indirect use of "any device, scheme, or artifice to defraud" in connection with "the offer, sale or purchase of any franchise..."N.Y. Gen. Bus. Law § 687 (McKinney's 1984 & Supp. 1994).[FN2]

Defendant offers two arguments to defeat these claims. With regard to all plaintiffs except Ng and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pellegrino, it contends that they are time-barred. Under one of the Act's provisions, N.Y. Gen. Bus. Law § 691(4),

[a]n action shall not be maintained to enforce a liability created under this section unless brought before the expiration of three years after the act or transaction constituting the violation.

In cases alleging violation of the Act's fraud provision, New York courts have deemed the phrase "the act or transaction constituting the violation" to mean the date upon which a franchisee entered -- through fraudulent inducement, misrepresentation or concealment -- the franchise agreement at issue. *See, e.g.* *Leung v. Lotus Ride, Inc.* (1st Dep't 1993) 604 N.Y.S.2d 65, 67; *Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc.* (Sup. Ct. Onondaga Co. 1988) 540 N.Y.S.2d 131, 134. Here all plaintiffs except for Ng and Pellegrino entered into the distribution agreements well over three years after they filed this action in February 1995. Accordingly, we dismiss such plaintiffs' claims under the Franchise Act.

As stated above, Ng and Pellegrino entered into their distribution agreements in June 1992 and at around the same time also executed "Expiration Acknowledgments" which unequivocally stated that defendant was not obligated to renew the agreements after May 31, 1995. These "Acknowledgments" contradict any promises that defendant planned to renew the agreements indefinitely. Accordingly we dismiss these plaintiffs' claims under the Act.

### Promissory Estoppel

**\*6** Plaintiffs' promissory estoppel claims proceed on an entirely different basis. In the first place, it is not necessary for such a claim that it be alleged or proved that there was any fraud or irregularity connected with the contracts at their inception. Nor would it be necessary for plaintiffs to prove that defendant or any of its agents intended to defraud

them. All that it would be necessary to establish would be that agents of defendant, acting in the scope of their authority, and intending to promote greater effort on the part of plaintiffs in distributing defendant's products, knowingly or unknowingly induced plaintiffs to believe that they had a continuing equity in their distributorships and observed them making significant investments of time and labor into those businesses which no rational person would have made absent such a representation.

Although plaintiffs' allegations in regards to this count of the complaint are inartful in the extreme, it seems to us that taken together they suggest the possibility of establishing claims for promissory estoppel; and that they should have the opportunity to engage in discovery in that connection.

The promissory estoppel claims asserted by Ng and Pellegrino are on a different footing. Among the requirements of promissory estoppel is *reasonable* reliance upon the alleged promise. *See* *Trilogy Variety Stores, Ltd. v. City Products Corp.* (S.D.N.Y. 1981) 523 F.Supp. 691, 696-97, *citing* *James King & Son, Inc. v. DeSantis Construction No. 2 Corp.* (Sup.Ct. New York 1977) 413 N.Y.S.2d 78, 81. As we above noted, each of them executed an "Acknowledgement" which clearly spelled out that plaintiffs had no renewal rights beyond May 31, 1995. We fail to see how, in light of the "Acknowledgments," any reliance on promises to renew the distribution agreements indefinitely could be deemed reasonable. Accordingly, we dismiss these plaintiffs' promissory estoppel claims.FN3

### Equitable Estoppel

We must, however, dismiss all plaintiffs' equitable estoppel claims. Such claims require that a plaintiff allege "[a]n act constituting a concealment of facts or a false misrepresentation" and "[a]ctual or constructive knowledge of the true facts by the wrongdoer." *Trilogy Variety,* 523 F.Supp. at 697, *quoting* *Special Event Entertainment v. Rockefeller Center*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.))**

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 9 of 79    Page 6

(S.D.N.Y. 1978) 458 F.Supp. 72, 76. As we noted above, plaintiffs have failed to allege any fact supporting its theory that when making the alleged promises any of defendant's employees knew that defendant planned not to renew plaintiffs' distributorships.

CONCLUSION

For the reasons stated herein, we dismiss all of plaintiffs' claims except for those alleging promissory estoppel. As to plaintiffs Ng and Pellegrino, we dismiss the complaint in its entirety. We refer this action to Magistrate Judge Bernikow, who has already been designated in this case, for all pretrial purposes.

SO ORDERED.

> FN1. Having so ruled, we need not consider defendant's argument that the fraud claims must be dismissed because plaintiffs cannot establish *justifiable* reliance upon the alleged promises because such promises are contradicted by the express terms of the distribution agreements. However, we note that all of the cases cited by defendant in support of this argument -- *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.* (2d Cir. 1984) 748 F.2d 729, 735-36; *Abraham v. New York Univ. College of Dentistry,* (1st Dep't 1993) 593 N.Y.S.2d 229, 230; *New York State Urban Development Corp. v. Marcus Garvey Brownstone Houses, Inc.* (2d Dep't 1983) 469 N.Y.S.2d 789, 795; and *Bango v. Naughton* (3d Dep't 1992) 584 N.Y.S.2d 942, 944 -- involve unambiguous disclaimers regarding the extra-contractual promises upon which the plaintiffs had based their fraud claims. By contrast, the contractual provision at issue here, which grants plaintiffs the right to renew the agreements for a five year term, says absolutely nothing with regard to renewal

rights beyond that term.

> FN2. The Act defines "franchise" as
>
> > a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
> >
> > (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is entitled to pay, directly or indirectly, a franchise fee.
>
> N.Y. Gen. Bus. Law § 681.

> FN3. Indeed, the existence of "Acknowledgements" signed by Ng and Pellegrino appears to corroborate plaintiffs' assertion that the renewal provision in all of the distribution agreements did not address their renewal rights after 1995, and therefore does not preclude them from asserting that they reasonably relied upon the promises allegedly made by defendant's agents.

S.D.N.Y.,1995.
Adiel v. Coca-Cola Bottling Co. of New York, Inc.
Not Reported in F.Supp., 1995 WL 542432 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 128337 (E.D.Wis.)
**(Cite as: 2007 WL 128337 (E.D.Wis.))**

C

Associated Banc-Corp v. John H. Harland Co.
E.D.Wis.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Wisconsin.
ASSOCIATED BANC-CORP., Plaintiff,
v.
JOHN H. HARLAND CO., Defendant.
No. 06-C-1097.

Jan. 11, 2007.

John R. Schreiber, Randall L. Nash, O'Neil Can-
nonHollman DeJong SC, Milwaukee, WI, for
Plaintiff.

**DECISION AND ORDER**

WILLIAM C. GRIESBACH, United States District
Judge.
*1 Defendant John H. Harland Co. (Harland), a
Georgia corporation, has moved to dismiss the
plaintiff's claim for unjust enrichment, one of two
claims the plaintiff brought in a complaint it filed
on October 20, 2006. According to the complaint,
Harland is a provider of checks to banking institu-
tions. Harland agreed with plaintiff Associated
Banc to provide Associated's customers with
checks for four years or until the agreement was
terminated. After Associated terminated the agree-
ment (with the proper notice required under that
agreement), Harland promised to forward any or-
ders it received to the new supplier chosen by Asso-
ciated. Nevertheless, Harland continued to take
some 12,433 orders for checks that it received from
Associated's customers. Associated claims that
these check orders constituted a benefit that Har-
land was not entitled to receive, which in the
plaintiff's view constitutes unjust enrichment.

Harland moves to dismiss the unjust enrichment
claim on two grounds. First, it asserts that the
agreement between the parties governs the dispute
rather than principles of equity. Second, it claims

the plaintiff suffered no injury and therefore lacks
standing to bring an unjust enrichment claim.

Because the matter is before me on a motion to dis-
miss, the complaint's allegations control, Delgado
v. Jones, 282 F.3d 511, 515 (7th Cir.2002), and the
complaint sets forth the claim with brevity:

Harland indicated to Associated that it would refer
any check orders received after the effective date of
the termination of the Agreement, that being May
9, 2006, to a company with which Associated con-
tracted to provide those services. After May 9,
2006, Harland refused to provide approximately
12,433 orders to the company with which Associ-
ated had contracted to provide those services.

(Compl.¶ 11.) Further, the complaint alleges, "[a]s
a result of the allegations contained in Paragraph
11, a benefit has been conferred upon Harland by
Associated."(Compl.¶ 12.)

**I. Existence of a Contract Precludes Resort to
Unjust Enrichment**

As noted, the defendant raises two arguments in
support of its motion to dismiss. The first of these
relies on the general rule that when two parties
have entered into a contract, a claim for unjust en-
richment is barred unless the claim arises from as-
pects of the business relationship not within the
scope of the contract. Meyer v. The Laser Vision In-
stitute, 2006 WI App 70, 714 N. W.2d 223, 230
(Wis.Ct.App.2006). Unjust enrichment is an equit-
able remedy premised on compensating a party for
an unbargained-for benefit it provided. When the
parties *have* bargained for certain benefits, it makes
no sense to resort to anything other than the bargain
initially struck, or else the disappointed party could
obtain benefits after the fact that he was unable to
obtain during negotiations.

Associated does not argue that the dispute at issue
here exceeds the scope of the contract the parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

signed. Instead, it argues the existence of a contract is not damning because any enrichment occurred *after* Associated terminated the contract, and the claim is based on Harland's refusal to refer some 12,433 check orders to another company following that termination. Yet the fact that the contract may have been terminated is irrelevant to the question of whether a contract governed the business relationship between the parties as to the dispute in question. As the Seventh Circuit has noted,"[t]he reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Utility Audit, Inc. v. Horace Mann Service Corp.,* 383 F.3d 683, 689 (7th Cir.2004) (citing Illinois law). Thus, it does not matter whether the contract has expired or not; what's important is whether the agreement covered the general scope of the business relationship at issue and whether it was the sort of thing that might have been accounted for in the contract. "In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim."*Id.*

**\*2** Indeed, another Seventh Circuit case (applying similar Illinois law) found a plaintiff barred from asserting unjust enrichment following the termination of a contract.

After Heinold terminated the contract, it retained many of FCT's customers. FCT claimed that retention of those customers unjustly enriched Heinold because Heinold no longer divided its sales commissions with FCT.... Under Illinois law, a plaintiff may not state a claim for unjust enrichment when a contract governs the relationship between the parties.... The fact that the agreement between Heinold and FCT did not explicitly provide for allocation of customers or commissions upon termination does not allow FCT to now invoke a quasi-contract remedy. In entering into the agreement, FCT assumed the risk of losing customers to Heinold in return for Heinold's trading services.

FCT could have, but did not provide for the allocation of this risk under the terms of the contract. FCT may not unilaterally alter the terms of the contract by now claiming unjust enrichment.

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985) (citations omitted).

Here, just as in *Heinold,* the claim asserts that the defendant wrongfully continued to do business with customers even after the contract was terminated. The fact that the enrichment occurred after the contract was terminated does not mean the dispute should not have been accounted for in the contract: "[t]he fact that the agreement ... did not explicitly provide for allocation of customers or commissions upon termination does not allow FCT to now invoke a quasi-contract remedy."*Id.* Indeed, when a contract like the one at issue here involves the provision of services to third parties who are apparently outside the control of the plaintiff (Associated's customers), one would expect that the contract would spell out the supplier's duties in the event of early termination. Accordingly, given the existence of a contract between the parties, the unjust enrichment claim must be dismissed.

**II. Complaint Fails to State a Claim for Unjust Enrichment**

I also conclude that, even apart from the existence of a contract, the unjust enrichment claim fails as a matter of law. An unjust enrichment claim requires proof of three elements: (1) a benefit that has been conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the benefit; and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment. *Staver v. Milwaukee County,* 2006 WI App 33, 712 N.W.2d 387, 393 (Wis.Ct.App.2006). The claim alleged in the complaint has difficulty meeting aspects of all three of these elements. First, it is doubtful that providing checks to Associated's cus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tomers is the sort of "benefit" that would be considered unjust enrichment. Unjust enrichment involves getting something for nothing, not providing a product for a price: "recovery for unjust enrichment is based upon the inequity of allowing the defendant to *retain a benefit without paying for it* ..."*Ramsey v. Ellis,* 484 N.W.2d 331, 333 (1992) (italics added). The typical case involves a plaintiff who performs services or provides valuable goods to a defendant, who knowingly accepts the goods or services without payment. *See, e.g., Boulanger Const. Co., Inc. v. United Fire and Cas. Co.,* 2005 WI App 1, 2004 WL 2676561, *3 (Wis.Ct.App.2004) (subcontractor may seek recovery directly from homeowner for additional work performed to owner's benefit).

**\*3** The plaintiff describes the "benefit" conferred upon the defendant as Harland's continued providing of checks to Associated's customers even after the agreement between plaintiff and defendant was properly terminated. But by providing checks to Associated's customers, it is difficult to say that Harland was "retaining" any benefit "without paying for it." It is thus doubtful that Harland's refusal to forward check orders to another company was the sort of "enrichment" meant to be remedied by resort to principles of equity, and Associated has not provided any precedent for finding that Harland's continued performance under a terminated contract constitutes "enrichment."

In any event, the defendant focuses on the fact that any benefit Harland did receive was not conferred upon it by the plaintiff, another requirement of an unjust enrichment claim.[FN1] *Staver,* 712 N.W.2d at 393;*Halverson v. River Falls Youth Hockey Ass'n,* 593 N.W.2d 895, 900 (Wis.Ct.App.1999) ("A plaintiff may recover on a quasi-contract claim for unjust enrichment when the plaintiff has conferred a benefit upon the defendant ...") Two reasons suggest themselves. First, any profits Harland made on the additional checks it provided (the extent of any benefit it received) did not come at Associated's expense but at the expense of either Associated's cus-

tomers or the new company that Associated had chosen to provide the checks. That is, even if (in the abstract) Associated were to show that Harland was unjustly enriched, it would make no sense to turn around and award Harland's unjust profits to *Associated.*Second, by its own admission, Associated terminated the check agreement with Harland. If Harland chose to continue providing services to Associated's customers, it necessarily did so *despite* Associated's wishes. Accordingly, unlike the contractor who performs valuable services that enrich a homeowner, Associated cannot now claim that it somehow "conferred" any benefit on the defendant. In sum, even if Harland received some unjust benefit, that benefit was not one conferred by the plaintiff.[FN2]

> FN1. The defendant frames this issue as one of Article III standing, arguing that the plaintiff has suffered no injury. Although the questions involve similar factual issues, I conclude that the plaintiff might indeed have standing if it alleges, for example, that its customers (on whose behalf it is negotiating) were forced to deal with a check provider not authorized to provide them with checks. It could assert an injury-in-fact resulting from the fact that the defendant failed to live up to a promise it made it. Perhaps its business suffered. Although I conclude herein that Associated is not entitled to recoup any "benefit" Harland may have received, i.e., that it is not a proper party to assert unjust enrichment, this is not the same as concluding that Associated itself has suffered no injury.

> FN2. To the extent Associated suffered financial loss, that loss may be recoverable in some other fashion. If it asserts that its contract (or some other agreement) with Harland required Harland to cease providing checks to its customers, it may sue Harland for breach of that agreement and recover any losses it sustained.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Associated protests that the focus should be on the defendant's enrichment, not on the plaintiff's own losses: "[D]amages in an unjust enrichment claim are measured by the benefit conferred upon the defendant."*Ramsey v. Ellis,* 484 N.W.2d 331, 333 (1992). While superficially true, the distinction made by the *Ramsey* court arose only in the context of whether the damages were based on quantum meruit or on unjust enrichment. In *Ramsey,* upon which Associated relies, the court reiterated that one of the elements of unjust enrichment is that the benefit must be conferred upon the defendant *by the plaintiff. Id.* at 333.Indeed, no case holds that *any* plaintiff may bring a claim for unjust enrichment regardless of whether that plaintiff suffered a loss linked to the enrichment. Such a result finds no basis in law or equity.

**\*4** In sum, accepting all of the complaint's allegations as true, and taking them in the light most favorable to the plaintiff, I conclude that it fails to state a claim for unjust enrichment. That claim, accordingly, is **DISMISSED.**

**SO ORDERED.**

E.D.Wis.,2007.
Associated Banc-Corp v. John H. Harland Co.
Slip Copy, 2007 WL 128337 (E.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

H

Authentic Hansom Cabs, Ltd. v. Nisselson
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
AUTHENTIC HANSOM CABS, LTD., Appellant,
v.
Alan NISSELSON, Trustee for the Chapter 11 Estate of John Fayolle and Riverbank Landscape,
Ltd., Frank Sinatra, Trustees for the Chapter 11 Estate of Aristocratic Coach Corp., Anchor Paper
Stock Co ., Inc., and 504 West 38 L.L.C., Appellees.
**No. 03 CV 9468(GBD).**

Dec. 27, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** Appellant, a sublessee of a Chapter 11 debtor-tenant, brought an adversary proceeding in the Bankruptcy Court for declaratory judgment regarding the status of its sublease. On summary judgment motion, the Bankruptcy Court, Robert D. Drain, J., held *inter alia* that the sublease was properly terminated based on Appellant's nonpayment of rent. Appellant appeals the judgment. This Court having carefully considered the briefs of the parties and the record evidence, affirms the judgment of the Bankruptcy Court.

*BACKGROUND*

Authentic Hansom Cabs ("Authentic"), Sublessee of certain property located at 504-506 West 38th Street in New York City ("38th Street Property"), brought this adversary proceeding in the Bankruptcy Court against Alan Nisselson (the "Fayolle Trustee"), in his capacity as Chapter 11 Trustee of the Estate of John Fayolle, as sublessor. On May 15, 2000, involuntary bankruptcy petitions were filed against John B. Fayolle ("Fayolle"), Riverb-

ank Landscape, Ltd. ("Riverbank"), and Aristocratic Coach Corporation ("Aristocratic"). Both Riverbank and Aristocratic owned fee title to two pieces of real estate. Aristocratic owned title to 634 West 52nd Street, New York, New York (the "Aristocratic Premises"). Authentic, of which Fayolle was Vice President, operated a stable for carriage horses of Central Park at the Aristocratic Premises. Riverbank owned an adjacent property to the Aristocratic Premises, 639-41 West 51st Street (the "Riverbank Premises"). As principal of Riverbank, Fayolle leased the Riverbank Premises to Hudson River Lounge, LLC, an adult entertainment establishment. The Riverbank Premises and the Aristocratic Premises are together referred to as the "Blockfront Properties." Along with the Blockfront Properties, Fayolle entered into a ten-year lease with Anchor Paper Stock Co., Inc. ("Anchor") for the 38th Street Property, where Fayolle was a tenant (the "Overlease"). At the end of its term, the Overlease provided the tenant with an option to buy the 38th Street Property.

The leasehold became the property of the Fayolle Trustee, who decided to market the Blockfront Properties as a package free and clear of their existing tenancies. The Trustee, therefore, entered into an agreement with Authentic and the Hudson River Lounge freeing up the Blockfront Properties for sale (the "Hudson River Settlement Agreement"). Under the Hudson River Settlement Agreement, Authentic agreed to terminate its lease of the Aristocratic Premises, and Hudson River Lounge agreed to terminate its lease of the Riverbank Premises. In return, the Fayolle Trustee agreed to make two payments to Authentic totaling $100,000 under certain specified conditions.[FN1] By Order dated February 5, 2002, the Bankruptcy Court (Hon. Richard Bohanon, J.), approved the Fayolle Trustee's proposed sale, the Hudson River Settlement Agreement, and the Fayolle Trustee's entry into the Sublease for the 38th Street Property.

FN1. The Bankruptcy Court determined

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

that these conditions were not satisfied. *See* *In re Fayolle,* 300 B.R. 843, 851-52 (Bankr.S . D.N.Y.2003). This finding is not an issue in this appeal.

**\*2** Authentic never made any rental payments to the Fayolle Trustee under the Sublease. Additionally, the record does not reflect that Authentic physically occupied the rental property, or even stored its belongings there, as Authentic contends. FN2 On August 29, 2002, the roof partially collapsed rendering the rental property uninhabitable. Because of the hazardous condition of the site, access to the premises was barred and the premises remain padlocked. Thus, Authentic has yet to physically occupy, or otherwise affirmatively use, the 38th Street Property.

> FN2. Mr. Fayolle did allege that his own personal property was kept at the premises. (Fayolle Aff'd. in further Supp. of Authentic's Mot. for partial Summ. J. at ¶ 26).

By letter dated, July 25, 2002, the Fayolle Trustee notified Authentic that "by reason of Sublessee's defaults under the caption Sublease, including without limitation to Paragraph 5 of the Sublease" he chose to terminate the Sublease (the "Termination Letter"). In a letter dated, August 14, 2002, Authentic rejected the termination of the Sublease asserting that the "default/termination notice [was] defective, invalid and inappropriate". The letter further stated that "Authentic disputes, that [it] has defaulted and the Sublease has been terminated."On August 29, 2002, the roof of the 38th Street Property collapsed. The premises were ordered padlocked by the New York City Building Department because it was unsafe.

On September 18, 2002, Authentic brought an adversary proceeding in the Bankruptcy Court, seeking declaratory relief on three claims: a declaration that the Sublease remained in full force and effect; that Authentic had the right to offset monies due and owing from the Trustees against any rent due and owing under the Sublease; and a mandatory injunction compelling the Trustees to immediately transfer and deliver the sum of $75,000.00 to Authentic. Appellant and Appellees both before the Bankruptcy Court.

*Termination of the Sublease*

Paragraph 5 of the Sublease establishes Authentic's monthly rental obligations. FN3 It states, with the exception of rent payments from Sublessor to Overlessor "and any other obligation of Sublessor expressly set forth herein, Sublessor shall have no obligations of payment or performance under the Overlease, all of the same to be undertaken and paid or performed by Sublessee."*Id* . According to Paragraph 2 of the Sublease, the Overlease is a part of the Sublease. FN4 With regards to Authentic's obligations to the Fayolle Trustee under the Sublease, paragraph 7 of the Sublease states in relevant part:

> FN3. Paragraph 5 states in relevant part, "(a) Sublesee shall pay to Sublessor, as minimum fixed rent during the term of this Sublease, in monthly installments on the first day of each and every calendar month, with no abatement, deduction, counterclaim or setoff whatsoever ...".

> FN4. Paragraph 2 reads, "Sublessor hereby sublets to Sublessee, and Sublessee hereby hires from Sublessor, the Demised Premises consisting of the entire Building, as described in the Overlease, a true copy of which is attached as Exhibit A, and made a part hereof."

For purposes of this Sublease, to the extent that the terms, covenants, and conditions of the Overlease are not herein modified, cancelled or amended, such terms, covenants and conditions on the part of the Sublessor thereunder to be performed, observed or complied with are hereby incorporated herein and made a part hereof with the same force and effect as though set forth at length herein. The said obligations created by the Overlease and incorpor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 3
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

ated herein by reference, imposed upon Sublessor, are hereby impressed upon Sublessee.

**\*3** Also, paragraph 17 of the Sublease provides that the "Sublease is and shall be in all respects subject and subordinate to the terms, covenants, conditions and prohibitions set forth in the Overlease" and that "[i]n the event of any conflict between the Sublease and the Overlease, the Overlease shall control."

Paragraph 22 of the Sublease grants the sublessee the option to purchase the 38th Street Property on the condition that "(a) at the time of Sublessee's exercise of the Option, and at the time of closing of the assignment of the Overlease from Sublessor to Sublessee ("Closing"), there shall be no breach or default by Sublessee of any term, provision or condition of this Sublease, nor shall any circumstances exist which, with the passage of time, or giving of notice, or both, would constitute such a breach or default ."

The Sublease does not have a provision concerning default by the Sublessee or termination of the Sublease. Absent such provisions modifying the default or termination provisions of the Overlease, the Bankruptcy Court determined that the Overlease governed the Fayolle Trustee's right to terminate the Sublease and applied Paragraph 17(2) of the Overlease. Paragraph 17(2) states:

[I]f Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required: then and in any of such events Owner may without notice, re-enter the demised premises either [by] force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effects and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

Pursuant to this language, the Bankruptcy Court

held that because Authentic defaulted in the payment of rent under the Sublease, the Fayolle Trustee had a right to terminate the Sublease which he did under the Termination Letter.

## DISCUSSION

### A. STANDARD OF REVIEW

A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts. *See* 28 U.S.C. § 158(a); *Abrass v. White,* No. 03CV64ORL31 2003 WL 23009855, at \*2 (M.D.Fla. Mar. 24, 2003). Appeals to a district court from an order of a bankruptcy court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts...." 28 U.S.C. § 158(c)(2). A district court may not set aside findings of fact unless clearly erroneous. Fed. R. Bankr.P. 8013; *In re Manville Forest Products Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990). A finding of fact is clearly erroneous if the court is "left with the definite and firm conviction that a mistake has been committed." *In re Manville,* 896 F.2d at 1388 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *accord* *Abrass,* 2003 WL 23009855 at \*2.

**\*4** However, a bankruptcy court's conclusions of law are reviewed de novo. *In re Manville,* 896 F.2d at 1388. It is settled law that a grant of summary judgment is reviewed de novo to determine if there are genuine issues of material fact. *See* *Greene v. United States,* 13 F.3d 577, 580 (2d Cir.1994); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). There can be no genuine issues of material fact if both parties requested summary judgment. *See, e.g .,Greene,* 13 F.3d at 580. Moreover, in this case, Appellant does not contend that there is a genuine issue of material fact requiring trial. *See* *In re Fayolle,* 300 B.R. 843, 845 (Bankr.S.D.N.Y.2003)(stating that, in the instant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

matter, "there [were] no material issues of disputed fact, as this [was] fundamentally a documentary dispute"). Rather Appellant argues that the Bankruptcy Court incorrectly applied the controlling law to the facts of this case. Namely, that the Bankruptcy Court erroneously determined that the Fayolle Trustee was entitled to terminate the sublease.

Appellant argues that the Bankruptcy Court incorrectly held that Paragraph 17 of the Overlease was "incorporated by reference" into the Sublease. Appellant's second point is that, even so, "the termination was invalid as a matter of law and summary proceedings were necessary to extinguish Authentic's rights both to possession under the Sublease and to control the option."Appellant's Br. at 9. Appellant contends that the Bankruptcy Court erroneously found that summary proceedings were unnecessary in this case. Point III further argues that if it was determined that Authentic was not in possession, under the law, a summary proceeding was still necessary to extinguish Authentic's leasehold where Authentic was still claiming a right of possession. Lastly, Appellant argues that the alleged notice of default served by the Fayolle Trustee's attorney was ineffective as a matter of law and was not properly served upon Authentic as required under the Sublease.

Appellees counter that the Court should dismiss arguments all but Appellant's last argument because those issues were not raised below and preserved for appeal, and thus were waived. Further, in response to Appellant's last argument, Appellees contend that the Sublease should not be reinstated because under Paragraph 17(2) of the Overlease defaults for non-payment of rent are incurable.

*B. ARGUMENTS NOT PRESERVED FOR APPEAL*

It is established law that "an appellate court will not consider an issue raised for the first time on appeal."*Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G.,* 215 F.3d 219, 222 n. 2 (2d Cir.2000); *Greene,* 13 F.3d at 586. This is the rule

even where "the new appellate claim is purely a legal question following a summary dismissal proceeding."*Schmidt v. The Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984). However, the appellate court may disregard the general rule when necessary to remedy an obvious or manifest injustice. *See Greene,* 13 F.3d at 586;*Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 527 (2d Cir.1990); *see also Sojak v. Hudson Waterways Corp.,* 590 F.2d 53, 54-55 (2d Cir.1978) (finding a jury verdict entered without legal support to be manifest injustice).

**\*5** The Bankruptcy Court's ruled that "[b]ecause Authentic defaulted in the payment of rent under the Sublease (not paying any monthly rent, among other amounts), the Fayolle Trustee therefore had the right, under Paragraph 17(2) of the Overlease as incorporated in the Sublease, to terminate the Sublease, which he did under the Termination Letter[,]"*see In re Fayolle,* 300 B.R. 843, 853-54 (Bankr.S.D.N.Y.2003). From this language, Appellant contends that the Bankruptcy Court "actually considered" the issues of non-incorporation by reference. *See* Appellant Reply Br. at 17 (citing 4 C.J.S. *Appeal & Error,* § 213). According to Appellant, because the Bankruptcy Court incorporated Paragraph 17(2) of the Overlease to find that Authentic's non-payment of rent allowed the Fayolle Trustee to terminate the Sublease, the Bankruptcy Court, therefore, must have considered that Paragraph 17(2) was not incorporated. This argument is circular and unsupported by the case law.

In *Air Et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 493 (2d Cir.1985), the Second Circuit determined that an issue was not considered by the district court because the defendant-appellant was represented by "competent counsel who took a calculated risk in not presenting an alternative interpretation of his client's case" to the lower court. Thus, the Second Circuit held that such a "strategically motivated attack" was not manifest injustice. *Id.;see also Schmidt v. Polish People's Republic,* 742 F .2d 67, 70 (2d Cir.1984) (holding that because plaintiff

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

consistently argued in the district court that New York law applied, plaintiff was barred at the appellate level from arguing that another state's law, and not New York's, applied).

Similarly here, Appellant did not present the alternative argument to the Bankruptcy Court that Paragraph 17 of the Overlease was not incorporated by reference into the Sublease. What Authentic did argue was that Paragraph 17 of the Overlease was incorporated into the Sublease to support its position that the Sublease was improperly terminated. Authentic instead argued that under Paragraph 17(1) of the Overlease, the Sublease was not properly terminated because Authentic it was entitled to notice and an opportunity to cure its non-payment default. *See, e.g.,* R.11 at ¶¶ 33-34 & n. 10; *see also In re Fayolle,* 300 B.R. 854 ("Authentic relies, however, on the wrong provision of the Overlease: paragraph 17(1), which expressly does not apply to defaults in the payment of rent").

Appellant further argues that, although it was not briefed, the issue of the Overlease's incorporation was extensively debated during oral argument before the Bankruptcy Court, and thus the issue was preserved on appeal. Appellant contends the issue is not one of preservation of issues on appeal but whether the issue was properly presented to the appellate panel. However, such a distinction is unsubstantiated. Issues not argued in briefs are considered waived and not addressed on appeal. *See Norton v. Sam's Club,* 145 F .3d 114, 117 (2d Cir.1998). Moreover, the Second Circuit has held "merely incorporating by reference" an argument presented below, addressing an argument initially raised in a footnote, "stating an issue without advancing an argument, or raising an issue for the first time in a reply brief" was inadequate to preserve an issue for appellate review. *Id.;see also Frank v. United States,* 78 F.3d 815, 833 (2d Cir.1996)*vacated on other grounds,*521 U.S. 1114, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997) (collecting cases).

**\*6** Appellant's sole support for the proposition that

"an issue actually considered by the trial court ... may be considered on appeal," *see*4 C.J.S. *Appeal & Error* § 213, states that "[t]o be considered on review, a matter must have been timely presented to the trial court in a manner sufficient to obtain a ruling thereon...."*Id.*During oral argument, and to support its argument that it did not receive proper notice of the Sublease's termination, Appellant argued to the Bankruptcy Court that the Sublease did not suggest that the trustee stepped into the overlandlord Anchor's position. R.29 at 37-40. This prompted the Bankruptcy Court to ask Appellant whether the Overlease was incorporated into the Sublease. *Id.* at 40.The transcript does not indicate that the purpose of this discussion was to obtain a ruling from the Bankruptcy Court on the issue of the Overlease's incorporation by reference. Nor does the transcript indicate that Appellant argued to the Bankruptcy Court that Paragraph 17 of the Overlease was not incorporated into the Sublease to obtain such a finding from the Bankruptcy Court. Moreover, in its Post-Hearing Memorandum of Law in Support of Motion For Summary Judgment ("Post-Hearing Memo") to the Bankruptcy Court, the issue of non-incorporation was not raised or mentioned. *See Warren v. Garvin,* 219 F.3d 111, 113 n. 2 (2d Cir.2000) (holding that although appellant addressed the issue at oral argument in response to questions from the appellate panel, the issue was not raised in appellant's brief and therefore not reviewable on appeal).

Appellant contends that "so long as the facts necessary have been fully developed, obviating any further need to establish a record," and "where only an application of the law to the facts is required, and the argument raised is slightly more precise or slightly different, this Court may review same without restriction."Appellant's Reply Br. at 20, n. 14 (collecting cases). However, the cases cited by Appellant for this proposition does not cure its waiver. *See, e.g.,Restrepo v. McElroy,* 369 F.3d 627, 633 n. 10 (noting that the petitioner-appellee's decision to raise an argument on appeal which was not raised in his habeas petition was understandable

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

because none of the Second Circuit's cases dealing with the issue was decided when he applied for habeas relief); *Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir.1996)* (accepting appellant's new legal argument on appeal because it concerned an issue "already considered at some length" by the lower court). Even accepting Appellant's contention that it's non-incorporation argument is a new legal issue raised on appeal, this Court exercises its discretion, and does not consider this legal argument. *See Ford, 81 F.3d at 307* (noting that the Second Circuit "reserve[s] considerable discretion to review purely legal questions not formally raised [below]" if it is not necessary to make any additional factual determinations). Appellant has demonstrated no manifest injustice.

**\*7** In *Higgins v. New York Stock Exch.,* the Second Circuit found appellant's time-of-accrual argument "different in emphasis from the point pressed on appeal", it was not waived for appellate review. *942 F.2d 829, 832 (2d Cir.1991)* (finding that appellant "argued before the district court that his claim against the Exchange did not accrue until after he knew the exact amount of *damages* caused by the Exchange's decision."). However, the Court did reject appellant's assertion, that its equitable tolling argument should be accepted on appeal because the argument was the "mirror image" of appellant's argument below. *Id. at 831.*In this case, Appellant's argument is not "slightly more precise" or "slightly different" as it contends, but wholly different and new. The alternative argument that the Overlease was not incorporated by reference into the Sublease was not presented to the Bankruptcy Court and cannot be reviewed on appeal.

Also not preserved for appeal is Appellant's alternative argument that if Paragraph 17 was properly incorporated by reference into the Sublease, the termination was ineffective. Appellant's contends that if Paragraph 17 is determined to be incorporated into Sublease, and therefore there was a valid termination, the Bankruptcy Court erroneously determined that summary proceedings was not needed to ter-

minate Authentic's tenancy. On the record before this Court, these arguments were not advanced below and are not subject to review.

## C. THE TERMINATION LETTER WAS EFFECTIVE NOTICE AND NOT DEFECTIVE

Appellant's final argument for reversal of the Bankruptcy Court's decision is that assuming the Fayolle Trustee was entitled to terminate the lease for non-payment of rent under Paragraph 17(2), the Bankruptcy Court erred in upholding the termination because the Termination Letter was defective.

Appellant's primary argument is that service of the Termination Letter or notice to Appellant by the Fayolle Trustee was not in accordance with the terms of the Sublease. Paragraph 13 of the Sublease requires that "notices ... hereby shall be sent by registered or certified mail, postage prepaid, return receipt requested to ... Sublessee at 105 West 55th Street, Suite 8D, New York, New York 10019, attention John Fayolle."Appellant contends that although the Termination Letter was sent by certified mail, it improperly omitted the suite number of Fayolle who lives in an eighty-unit residence with no doorman. He thus argues that he did not receive timely notice. Further, appellant argues that delivery of the Termination Letter to Authentic's attorneys by fax on August 9, 2002, was not a valid replacement because it was too late for them to seek a *Yellowstone* injunction to toll the termination and preserve Authentic's right to cure the default. *See First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr., 21 N.Y.2D 630, 290 N.Y.S.2d 721 (1968)* (affording injunctive relief in landlord-tenant disputes to avoid a forfeiture of the leasehold).

**\*8** However, a *Yellowstone*"injunction is not available where a default cannot be cured."*Boyarsky v. Froccaro, 479 N.Y.S.2d 606, 610-11 (N.Y.Sup.Ct.1984); cf.King Party Ctr. of Pitkin Ave. v. Minco Realty, LLC, 729 N.Y.S.2d 183 (2d Dep't 2001)* (holding that a *Yellowstone* injunction is inappropriate after the expiration of the cure peri-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.))**

od). In this action, Paragraph 17(2) of the Overlease states that the "Tenant hereby waives the service of notice of [Owner's] intention to re-enter and institute legal proceedings to that effect."Therefore, the Bankruptcy Court properly determined that "Authentic waived notice of termination for failure to pay rent."Paragraph 17(2) does not say anything about curing defaults for payment of rent. Thus, Appellant could not cure its default for non-payment of rent. See*In Re Fayolle,* 300 B.R. at 855;*see also* Appellant's Reply Br. at 15 (stating that Authentic agrees with Appellees' that a *Yellow-stone* injunction is not appropriate).[FN5]

> [FN5.] Further, there is no need to address Appellant's contention that it was not advised by the Termination Letter on how to cure its default because Paragraph 17(2) does not provide Appellant with the right to cure.

Although Appellant does not suggest that "the sending of a termination notice was authorized by contract" it also argues that to the extent that Appellees did serve notice, Appellees were bound by what was served, and that if a termination notice was inadequate as to its contents, it is ineffective to terminate a tenancy. *See* Appellant's Reply Br. at 14. The thrust of Appellant's argument is that the July 25, 2002, Termination Letter did not contain "a specific recitation of the facts upon which the notice is based, which in this case would be the amount due."Appellant's. Br. at 41. Pursuant to § 17(2) of the Overlease, no notice is required to be given to a tenant who has defaulted on its obligation to pay rent. Since Authentic admits it never paid any rent whatsoever, it was not entitled to receive notice. Even if notice was required, the notice given to Authentic was legally sufficient as it was clear, unambiguous and unequivocal. *Ellivkroy Realty Corp. v. HDP 86 Sponsor Corp.,* 556 N.Y.S.2d 339, 340 (N.Y.App.Div.1990); *City of Buffalo Urban Renewal Agency v. Lane Bryant Queens, Inc.,* 456 N.Y.S.2d 568, 569 (N.Y.App.Div.1982), *aff'd,*464 N.Y.S.2d 754 (N.Y.1983) (citations omit-

ted). The notice indicated that the termination was for failure to timely pay rent, cited the specific provision of the lease claimed to be violated, and provided the date the lease would be terminated. Thus, even though Authentic had waived the right to receive any notice, the notice properly set forth the requisite information. *See,Saab Enterprises, Inc. v. Bell,* 603 N.Y.S.2d 879, 880 (N.Y.App.Div.1993).

In light of the foregoing, the judgment appealed from is therefore affirmed.

S.D.N.Y.,2004.
Authentic Hansom Cabs, Ltd. v. Nisselson
Not Reported in F.Supp.2d, 2004 WL 2997794 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

H

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
BANCO ESPIRITO SANTO DE INVESTIMENTO, S.A., Plaintiff,
v.
CITIBANK, N.A., Defendant.
**No. 03 Civ. 1537(MBM).**

Dec. 22, 2003.

**Background:** Investor in notes issued by investment fund sued promoter following decline in value. Promoter moved to dismiss.

**Holdings:** The District Court, Mukasey, J., held that:

(1) there was no oral contract committing promoter to supervise fund and provide information to investor;

(2) there was no violation of covenant of good faith and fair dealing;

(3) there was no recovery on theory of promissory estoppel;

(4) investor could not recover as third party beneficiary of administrative contracts between promoter and fund;

(5) there was no liability for fraud;

(6) there was no breach of fiduciary duty; and

(7) there was no unjust enrichment.

Case dismissed with prejudice.

West Headnotes

**[1] Contracts 95 ⟲193**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k193 k. Money, Investments, and Securities. Most Cited Cases

There was no oral contract, under New York law, committing promoter of investment to skillfully manage funds, keep investor informed as to status of investment and provide investor with other relevant information, when marketing presentations, offering memorandum, and letter of intent all disclaimed intent of promoter to be bound outside of commitments contained in offering memorandum, which did not include those in question.

**[2] Contracts 95 ⟲326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of Action. Most Cited Cases

Under New York law, absence of any enforceable contract committing promoter of investment funds to skillfully manage funds, keep investor informed as to status of investment and provide investor with other relevant information, precluded claim that promoter breached implied covenant of good faith and fair dealing in contract performance.

**[3] Estoppel 156 ⟲85**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k82 Representations
                156k85 k. Future Events; Promissory Estoppel. Most Cited Cases

Under New York law of promissory estoppel, promoter of investment fund made no promises regarding supervision or supplying of information to investors, when promoter emphasized that it was entering into no agreements beyond written terms of offering memorandum, which did not include commitments in question.

**[4] Estoppel 156 ⟲85**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

156k82 Representations
   156k85 k. Future Events; Promissory Estoppel. Most Cited Cases
Under New York law governing estoppel, investors in investment fund could not reasonably rely on alleged oral representations of promoter, that it would personally supervise fund and continually provide investor with information, in view of sophistication of parties, failure of investor to have commitments memorialized in offering memorandum, and investor's denial in writing of any reliance on representations of promoter.

**[5] Contracts 95 ⟲⟶187(1)**

95 Contracts
 95II Construction and Operation
  95II(B) Parties
   95k185 Rights Acquired by Third Persons
    95k187 Agreement for Benefit of Third Person
     95k187(1) k. In General. Most Cited Cases
Under New York law, investor in investment funds was not third party beneficiary under administrative contracts between funds' promoter and portfolio manager, which committed promoter to assist manager in specified ways; by their terms administrative agreements benefitted only parties and successors, any obligations to investors were those owed generally to shareholders, reliance on commitments was unreasonable, and promoter was promisor, rather than promisee, whose intention to benefit third party was of primary importance.

**[6] Contracts 95 ⟲⟶187(1)**

95 Contracts
 95II Construction and Operation
  95II(B) Parties
   95k185 Rights Acquired by Third Persons
    95k187 Agreement for Benefit of Third Person
     95k187(1) k. In General. Most Cited Cases
Under New York law, investor was not third party

beneficiary of contracts obligating investment fund's promoter to provide specified services to fund, despite claim that fund was affiliate of promoter that would not sue to enforce contractual rights, leaving investor as only contract enforcer; third party standing to sue required absence of any party that could sue, not any party that would sue.

**[7] Contracts 95 ⟲⟶187(1)**

95 Contracts
 95II Construction and Operation
  95II(B) Parties
   95k185 Rights Acquired by Third Persons
    95k187 Agreement for Benefit of Third Person
     95k187(1) k. In General. Most Cited Cases
Under New York law presence in contract, calling for promoter of investments funds to provide specified services to fund, of provision limiting liability to acts of deliberate or bad faith conduct, precluded any liability of investment fund promoter to investor, as third party beneficiary of contract, when no such conduct was alleged.

**[8] Fraud 184 ⟲⟶13(2)**

184 Fraud
 184I Deception Constituting Fraud, and Liability Therefor
  184k8 Fraudulent Representations
   184k13 Falsity and Knowledge Thereof
    184k13(2) k. Knowledge of Defendant. Most Cited Cases
Under New York law, failure to allege that investment funds promoter knew funds were in difficult financial situations, at time it allegedly made fraudulent misrepresentations inducing investors to acquire fund's notes, precluded liability for fraud in inducement.

**[9] Fraud 184 ⟲⟶32**

184 Fraud
 184II Actions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 26 of 79
Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

184II(A) Rights of Action and Defenses
    184k32 k. Effect of Existence of Remedy
by Action on Contract. Most Cited Cases
Under New York law, claims that promoter of investment funds misrepresented extent of its intended supervisory role in fund management, and its intention to keep investor informed, could not be used to support fraud in inducement claims when they were also used in support of breach of contract claims.

**[10] Fraud 184 ⚖36**

184 Fraud
    184II Actions
        184II(A) Rights of Action and Defenses
        184k36 k. Defenses. Most Cited Cases
Under New York law, investor could not claim it was induced to make investments in fund in reliance upon fraudulent representations of promoter, in light of frequent disclaimers contained in various documents associated with transaction.

**[11] Fraud 184 ⚖32**

184 Fraud
    184II Actions
        184II(A) Rights of Action and Defenses
        184k32 k. Effect of Existence of Remedy
by Action on Contract. Most Cited Cases
Breach of fiduciary duty could not be established, under New York law, against promoter of investment funds, when based on claim that promoter failed to carry out supervisory and informational duties that were also alleged as basis of breach of contract claims, there was no special relationship of trust, and there was no showing of deceitful intent.

**[12] Implied and Constructive Contracts 205H ⚖3**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
        205Hk2 Constructive or Quasi Contracts
        205Hk3 k. Unjust Enrichment. Most

Cited Cases
Promoter of investment funds alleged to have been misrepresented to investors was not unjustly enriched, under New York law, through receipt of administrative funds, and alleged incident of self-dealing, when fees and self-dealing were authorized under contract documents.

Linda C. Goldstein, Covington & Burling, New York, New York, New York, for Plaintiff.
Eugene D. Gullard, Peter D. Trooboff, Covington & Burling, Washington D.C., for Plaintiff.
David L. Carden, Jayan W. Tambe, Todd R. Geremia, Jones, Day, Reavis & Pogue, New York, New York, for Defendant.

OPINION AND ORDER

MUKASEY, J.
**\*1** Plaintiff Banco Espirito Santo de Investimento, S.A., ("BESI") invested in two structured finance funds, Captiva I and Captiva III, marketed and later managed by defendant Citibank. To make these investments, BESI signed contracts with the Captiva funds. After losing money on these investments, BESI has sued on theories of breach of contract, fraud in the inducement, promissory estoppel, breach of fiduciary duties, breach of the duty of good faith and fair dealing, and unjust enrichment. Citibank has moved to dismiss. For the reasons set forth below, Citibank's motion is granted.

I.

Plaintiff BESI is incorporated under the laws of Portugal with its headquarters and principal place of business in Portugal. (Compl.¶ 4) Defendant Citibank is a federally-chartered banking corporation with its headquarters and principal place of business in New York. (Compl.¶ 5) BESI is seeking damages of at least $25 million, exclusive of interest and costs. (Compl.¶¶ 2,6) Diversity jurisdiction therefore is present, *see*28 U.S.C. § 1332(a)(2), and venue in this court is proper under 28 U.S.C. § 1391 because Citibank resides in this district.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

(Compl.¶¶ 5,7) New York law, upon which the parties have relied, controls. See *Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ,* 160 F.3d 124, 128 (2d Cir.1998) (parties' consent to application of forum law completes choice of law inquiry); *American Fuel Corp. v. Utah Energy Development Co.,* 122 F.3d 130, 134 (2d Cir.1997) (same).

## II.

The following facts are drawn from BESI's complaint and related documents. Both parties have submitted several documents in addition to the complaint in aid of deciding Citibank's motion to dismiss. BESI has not objected to the additional documents submitted by Citibank and has submitted additional documents itself. All of the documents reviewed for the purposes of deciding Citibanks' motion to dismiss are well within the scope of this court's review on a dismissal motion as they are incorporated into the complaint either by reference or through BESI's reliance in making the allegations in the complaint. See *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (the review of documents on a dismissal motion may encompass "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (citations omitted); *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (the review may include a pertinent document where "the complaint contains only 'limited quotation' from that document"). Accepting all BESI's allegations as true, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), "and draw[ing] all reasonable inferences in the plaintiff's favor," *Thomas v. City of New York,* 143 F.3d 31, 37 (2d Cir.1998) (internal quotation marks and citation omitted), BESI has failed to state a claim for relief.

*2 The parties here are sophisticated, international banking institutions. In March 1997, BESI invested $10 million in a structured finance fund created by Citibank called Captiva Finance Ltd. ("Captiva I"). (Compl.¶ 11) In May 1998, BESI invested $15 million in another structured finance fund also created by Citibank called Captiva III Finance Ltd. ("Captiva III"). (Compl.¶ 13) The investment funds, consisting of senior debt obligations of U.S. corporations, issued two classes of interest-bearing notes: Class A Notes, which were secured, and Income Notes, which were unsecured and subordinated to the Class A Notes. (Compl.¶ 8,12) BESI opted to buy the unsecured, subordinated Income Notes. (Compl.¶¶ 11,13) BESI claims that it invested in both Captiva funds in reliance on the oral and written statements made or provided by Citibank's representatives. (*Id.*)

Prior to BESI's initial investment, Citibank marketed Captiva I to BESI through two representatives, Phillipe Collot and Stephanie Golamco. (Compl.¶ 8) Collot and Gollamco represented that Citibank would take a proactive role in monitoring the fund and would keep BESI informed about its status. (Compl.¶ 10) Collot and Golamco also represented that the Income Notes were a good investment "for investors seeking preservation of capital," which BESI had explained was its goal. (*Id.*) BESI further explained that because it was unfamiliar with the U.S. market it would be relying "on Citibank to perform the supervisory and management functions that BESI would ordinarily perform in relation to its investment."(*Id.*) Collot and Gollamco represented that Captiva I's performance from its inception had been consistent with BESI's goal. (*Id.*)

Collot and Golamco proffered two writings that confirmed their "oral representations." (*Id.*) In November 1995, they produced a chart on the Income Notes entitled "Investment Objective" showing that the notes were for investors seeking "[p]reservation of capital" who could accept "[m]oderate risk to principal" and that "the fidu-

ciary arm of Citibank" would oversee the fund.(*Id* .) A second document, provided later, contained figures as of March 1996 alleging to the same effect. (*Id.*) In spring 1998, Collot and Golamco made the same representations concerning Captiva III as they had concerning Captiva I. (Compl.¶ 12) Both of these writings contained a disclaimer, which stated that "[a]n offering can be made only through the Offering Memorandum" and that all statements in the writings were "qualified by reference to the Offering Memorandum."(Tambe Dec., Exs. G at 1; H at 1) The Offering Memorandum for each Captiva fund contains a further disclaimer, which states: "No person has been authorized to give any information or to make any representations other than those contained in this [ ] Memorandum and, if given or made, such information or representations must not be relied upon."(Tambe Dec ., Exs. B at iv; C at 4)

**\*3** In May 1998, BESI signed a letter of intent sent to BESI by Citibank confirming BESI's commitment to invest $15 million in Captiva III. (Tambe Dec., Ex. F) A copy of the Offering Memorandum, or Private Placement Memorandum, for Captiva III was attached to the letter. (*Id.*) The letter states that Income Notes for Captiva III would be allocated to BESI "in the terms set out in the Private Placement Memorandum."(*Id.*) The letter also contains a disclaimer, which states: "You hereby represent to Citibank that you have independently and without relying upon Citibank or any other person, and based on such documents and information as you have deemed appropriate, made your own credit analysis and decision to purchase the Notes."(*Id.*)

On July 8, 1999, Citibank sent BESI a letter announcing that Citibank would take over as portfolio manager of Captiva I because the existing manager had made "poor investment decisions" and had failed to deal with "serious loan portfolio problems." (Compl.¶ 15) Citibank also informed BESI that Citibank would be charging a fee, in addition to its fee as Administrative Agent, for "supervising" the fund. (*Id.*) After taking over as

portfolio manager, Citibank began providing BESI more detailed information about the Captiva funds, showing the increasing default rate for the funds' loans. (Compl.¶ 19) In June 2000, Citibank provided to BESI statements audited by PriceWaterhouse Coopers that revealed additional bad loans. (*Id.*) Then in August 2000, Citibank informed BESI that "[b]eginning in the third quarter of 1998, the value of Captiva's portfolio declined markedly."(*Id.*) Golamco told BESI in December 2000 that Citibank "had to realize some important losses in recent weeks" in Captiva I and that BESI should expect significant losses of capital. (Compl.¶ 20) In a meeting on February 5, 2001, Citibank reiterated its warning to expect significant losses in capital and informed BESI that Captiva I had been distressed almost from the start. (Compl.¶ 21) On October 1, 2001, Citibank informed BESI that the expected loss in principal was increasing for Captiva III and that the fund would have to cease paying interest to BESI if the default rate increased. (Compl.¶ 22) Quarterly reports in 2002 projected no return of principal for either Captiva fund. (Compl.¶ 24)

### III.

#### A. Plaintiff's Contract Claims

BESI alleges that Citibank "made promises, assurances and representations on which BESI relied in deciding to purchase Income Notes issued by Captiva I." (Compl.10) Specifically, BESI claims that Citibank made three express promises: (1) to "actively monitor and supervise the Captiva investment vehicles with a high degree of skill and vigilance and for the purpose of preserving BESI's capital"; (2) to "keep BESI currently and adequately informed concerning the status of its investments"; and (3) to "provide BESI with other relevant and timely information."(Compl.¶ 34) According to BESI, these promises were made orally by Collot and Golamco during various meetings at which they marketed the Captiva funds, and in writing in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

two investor presentations produced by Collot and Golamco in November 1995 and March 1996. (Compl.¶ 10) BESI argues that these promises are enforceable.

**\*4** BESI has asserted claims for breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. Each of these claims is based upon the same three specific promises, discussed above, allegedly made by Citibank and its representatives concerning the Captiva funds.

1. Breach of Contract

[1]"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998) (internal quotation marks and citation omitted); *seealsoRoberts v. Karimi,* 251 F.3d 404, 407 (2d Cir.2001) ("[A] plaintiff in a breach of contract case must prove ... that an enforceable contract existed...."). BESI has failed to allege facts sufficient to show that an enforceable contract existed between BESI and Citibank.

"Absent a mutual intention to be bound, there can be no contract ."*Advanced Marine Technicians, Inc. v. Burnham Securities, Inc.,* 16 F.Supp.2d 375, 380 (S.D.N.Y.1998)."Under New York law, ... if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then."*Ciaramella v. Reader's Digest Assn., Inc.,* 131 F.3d 320, 322 (2d Cir.1997); *seealsoScheck v. Francis,* 26 N.Y.2d 466, 469-70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493 (1970) (same)."[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.... [I]ndeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception."*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74-75 (2d Cir.1984). In determining

whether an agreement existed, the court should look at the parties' "expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances."*Id.*"The point of these rules is to give parties the power to ... maintain complete immunity from all obligation until a written agreement is executed."*Id.*"This rule holds even if the parties have orally agreed upon all the terms of the proposed contract.... Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings."*Id.*

Citibank argues that the three specific statements characterized by plaintiff as promises were made during marketing negotiations and were accompanied by language expressly disclaiming any intention to be bound other than by the Offering Memoranda and related written agreements. (Defendant's Memorandum of Law in Support of Its Motion to Dismiss ("Df.Mem.") 10-14) The only agreement between BESI and Citibank is the letter of intent sent to BESI by Citibank that BESI signed, confirming its commitment to invest in Captiva III. (Tambe Dec., Ex. F) As already discussed, this letter contained an express disclaimer that stated: "You hereby represent to Citibank that you have independently and *without relying upon Citibank* or any other person, and based on such documents and information as you have deemed appropriate, made your own credit analysis and *decision to purchase the Notes."(Id.)* (emphasis added) The letter was also accompanied by the Offering Memorandum for Captiva III, (*id.*), which contained an additional disclaimer that stated: "No person has been authorized to give any information or to make any representations other than those contained in this [ ] Memorandum and, if given or made, such information or representations must not be relied upon."(Tambe Dec., Ex. C at 4) The Offering Memorandum for Captiva I contained this same disclaimer. (Tambe Dec., Ex. B at iv) Further, both of the marketing presentations BESI points to as the bases for promises made by Citibank state that "[a]n offering can be made only through the Offering Memorandum"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

and that all statements in the presentations were "qualified by reference to the Offering Memorandum."(Tambe Dec., Exs. G at 1; H at 1)

**\*5** BESI contends that the disclaimers in the marketing presentations, the Offering Memoranda, and the letter of intent have no effect on its breach of contract claim because the disclaimers apply only to "representations" and not to "promises." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Mem.") 12-13) According to BESI: "The distinction between a 'promise,' on the one hand, and a 'representation' or 'information' on the other, is fundamental."[FN1] (Pl.Mem.12) BESI further contends that had Citibank wanted to disclaim liability for "promises," it should have said so by explicit reference to promises, but because it did not, an enforceable agreement exists between the parties by virtue of Citibank's "promises." (Pl.Mem.13)

> FN1. BESI incompletely and misleadingly quotes *Falcon Crest Diamonds, Inc. v. Dixon,* 173 Misc.2d 450, 655 N.Y.S.2d 232 (Sup.Ct. N.Y. County 1996), as stating a general definition of "representation" (Pl.Mem.12), whereas the court in that case actually did nothing more than apply to an insurance contract the statutory definition of "representation" set forth in the New York Insurance Law. *SeeId.*(citing Insurance Law § 3105(a)). Of course, that law has no application in this case. BESI also cites *Sommer v. Guardian Life Ins. Co. of America,* 281 N.Y. 508, 24 N.E.2d 308 (1939), another insurance case, as stating a general definition of "representation". (Pl.Mem.12) However, in the language quoted by plaintiff, the court did not define "representation" generally, but only described the particular representations made by the insured in that case.*Id.* at 513, 24 N.E.2d 308. Further, the court observed that the insured had made representations "without qualification or reserva-

tion," *id.,* but here Citibank qualified its representations according to the disclaimer language included in several material documents.

BESI's argument is based on a distinction without a difference. As Citibank puts it: "[E]very promise *is* a representation-a representation that a party will undertake to do something."(Defendant's Reply Memorandum in Further Support of Defendant's Motion to Dismiss ("Df. Reply Mem.") 3) Or, as Judge Koeltl put it: "[A] promise to perform is not only a prediction, but is generally also a representation of present intent. Promises and representations are simply not mutually exclusive."*United States v. Sattar,* 272 F.Supp.2d 348, 376 (S.D.N.Y.2003) (internal quotation marks omitted); *seealsoStamelman v. Fleishman-Hillard, Inc.,* No. 02 CIV 8318, 2003 WL 21782645, at \*6 (S.D.N.Y.2003) (characterizing promises as representations); 4 Williston on Contracts § 8:4 (4th ed.) ("[W]here the party making a representation asserted that he would do or refrain from doing something in the future he made a promise, though it might also be considered a representation of his intent."). At bottom, BESI's semantic argument is based on nothing but *ipsedixit.*[FN2]

> FN2. BESI itself uses "promises" and "representations" interchangeably in its own complaint, characterizing Citibank's oral statements, the very statements that underlie BESI's contract claims, as both promises and representations. Plaintiff alleges that Citibank produced "two written investor presentations that confirmed its *oral representations"* in that the presentations "promised ongoing oversight of the portfolio by the fiduciary arm of Citibank."(Compl.¶ 10(c)) (internal quotation marks omitted) Although BESI argues in its motion papers that Citibank's oral statements are not representations, a party is not entitled to amend its complaint through statements made in motion papers.

*Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998). Therefore, accepting the allegations of plaintiff's complaint as true, namely that Citibank's oral statements constitute representations, on the face of the complaint Citibank's statements fall within the scope of its disclaimers.

The disclaimers in the marketing presentations, the Offering Memoranda, and the letter of intent "constitute objective signs" of Citibank's "expressed intentions" not to be bound by any statements outside the Offering Memoranda. *See R.G. Group, Inc. .,* 751 F.2d at 74-75. Citibank gave BESI "forthright, reasonable signals that it mean[t] to be bound only by a written agreement" and that the binding written agreement would be the Offering Memoranda for the Captiva funds. *See id.* It is no proper exercise of authority for this court to frustrate that intent, particularly given the "level of investment and complexity" of the dealings at issue. *See id.* Accordingly, BESI's claim for breach of contract is dismissed.[FN3]

> FN3. Citibank argues also that BESI's breach of contract claim is barred by the Statute of Frauds. (Df. Mem. 14-15; Df. Reply Mem. 5-8) Because this claim has been dismissed for failure to show an enforceable agreement, the court need not consider this additional argument.

### 2. Duty of Good Faith and Fair Dealing

[2] "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Education Testing Service,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995). However, there can be no breach of the duty of good faith and fair dealing when there is no "valid and binding contract from which such a duty would arise." *American-European Art Assocs. ., Inc. v. Trend Galleries, Inc.,* 227 A.D.2d 170, 171, 641 N.Y.S.2d 835, 836 (1st Dep't 1996) (dismissing cause of action for breach of the duty of good faith and fair dealing

after finding that no contract existed); *see also Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1996) (holding that the determination that no contract existed disposed of cause of action for breach of the duty of good faith and fair dealing); *United Magazine Co. v. Murdoch Magazines Distribution, Inc.,* 146 F.Supp.2d 385, 405 (S.D.N.Y.2001) ("A cause of action for breach of this implied covenant [of good faith and fair dealing], however, is dependent upon the existence of an enforceable contract."); *Kreiss v. McCowan DeLeeuw & Co.,* 37 F.Supp.2d 294, 301 (S.D.N.Y.1999) ("[N]o implied duty of good faith and fair dealing may attach to an unenforceable contract."); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 534 (S.D.N.Y.1996) (holding that the parties did not owe each other this duty because no agreement existed between them and the duty does not provide an independent basis for recovery).

**\*6** BESI claims that because Citibank "put the interests of itself or favored persons above those of BESI, Citibank has breached its *contractual* duty of acting in good faith and fair dealing with BESI." (Compl.¶ 53) (emphasis added) Plaintiff concedes that this duty is "contractual." The contracts from which this duty purportedly has arisen here, according to BESI, are the three promises BESI attributes to Citibank as discussed above. Because, as explained above, these purported promises do not give rise to any contract between BESI and Citibank, there can be no implied duty of good faith and fair dealing imposed on Citibank by any such contract. Accordingly, BESI's claim for breach of the duty of good faith and fair dealing is dismissed.

### 3. Promissory Estoppel

"In New York a claim for promissory estoppel requires 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.' " *R.G. Group,* 751 F.2d at 78 (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

*Ripple's of Clearview, Inc. v. LeHavre Associates,* 88 A.D.2d 120, 123, 452 N.Y.S.2d 447, 449 (1982)). BESI alleges that it relied on Citibank's "promises, representations, statements and failures to disclose in deciding to buy and to hold Income Notes in Captiva I and III, and Citibank intended that BESI so rely." (Compl.¶ 48) However, even accepting this allegation as true, it is insufficient to support a claim for promissory estoppel.

### a. Promise

[3] In *R.G. Group,* the plaintiff brought a claim for promissory estoppel, and the Court of Appeals found that "the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract."751 F.2d at 78. No contract was signed. *Id. at* 74.The Court affirmed dismissal of a promissory estoppel claim, holding: "Under those circumstances, there was never a 'clear and unambiguous promise' to plaintiffs...."*Id.*Similarly, here Citibank indicated numerous times that it had no intent to enter into any agreements with BESI outside the written terms of the Offering Memoranda; thus, Citibank avoided any "clear and unambiguous promise" to BESI. Plaintiff's cause of action for promissory estoppel is simply an attempt to circumvent Citibank's express and repeated insistence that there were no promises made to plaintiff outside the Offering Memoranda. "[P]laintiff manifestly cannot make an end run around [defendant's] reservation against undertaking any legal obligation absent a signed contract by recharacterizing the contract claim as one of promissory estoppel."*Advanced Marine,* 16 F.Supp.2d at 381. As in *Advanced Marine,* BESI's promissory estoppel claim fails essentially for the same reason as its contract claim.

### b. Reliance

[4]"In assessing the reasonableness of a plaintiff's alleged reliance, [the court] consider[s] the entire context of the transaction, including factors such as

its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003). In *Harsco Corp. v. Segui,* 91 F.3d 337 (2d Cir.1996), a buyer and a seller entered into a written agreement stating that the seller was making no representations outside the written agreement. *Id. at* 345.However, the buyer alleged that the seller had made several misrepresentations outside the contract concerning the subject of the contract. *Id.* The Court of Appeals found no reasonable reliance in light of the disclaimer and the sophistication of the parties. *Id.;seealso*Chromalloy American Corp. v. Universal Housing Systems of America, Inc., 495 F.Supp. 544, 551 (S.D.N.Y.1980) (where the plaintiff had made statements "expressly disclaiming any intention to be bound until the execution of [a written agreement]," the court found that the defendant had not satisfied the elements of promissory estoppel because the defendant had not established reasonable reliance).

**\*7** Similarly, in *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531 (2d Cir.1997), two large, sophisticated traders negotiated the sale of several million dollars of bank debt. *Id. at* 1533.During the negotiations, the seller's representative made false statements concerning the debtor's financial condition. *Id. at* 1543.*Id.* The Court of Appeals held:

[when] a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.

*Id.* at 1543 (quoting *Rodas v. Manitaras,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)) (internal quotation marks omitted). Because the buyer neither secured documentation for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 33 of 79 Page 10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))

seller's representations nor included them in the agreement, the Court found that the buyer's reliance on the seller's representations was unreasonable. *Id.*

In *Emergent Capital,* 343 F.3d 189, the manager of a multimillion dollar investment fund invested several million dollars in an Internet-based business. *Id.* at 192-93.The business in which the fund manager invested made representations both orally and in writing-just as Citibank allegedly did here-as to the value of the investment, on which the fund relied and which later turned out to be false. *Id.* However, the Court of Appeals, reviewing the granting of a motion to dismiss, found that the fund manager's reliance was unreasonable in light of the sophistication of the parties and the fund manager's failure to protect itself by insisting that the representations be included in the written agreement. *Id.* at 196.The Court further found that the fact the representations were made in writing "should have served as additional notice to [the fund manager] that this allegedly significant representation should be reflected in the contract."*Id.* In other words, the Court observed that because these representations were not made merely in passing in a conversation but were also made in writing, the fund manager was on notice that these were potentially important facts that should have been memorialized in the written contract.

Here, just as in the above cases, BESI's purported reliance on Citibank's representations was unreasonable in light of the sophistication of the parties, the express disclaimers in the various documents sent to BESI, and BESI's failure to include the purported promises in a written agreement. Not only did plaintiff not memorialize Citibank's purported representations in the Offering Memoranda governing plaintiff's investments, but plaintiff expressly denied in writing any reliance on representations from Citibank. (Tambe Dec., Ex. F) Accordingly, BESI's promissory estoppel cause of action is dismissed.

C. Third-Party Beneficiary

*8 [5] BESI alleges that under the Administrative Agreements between Citibank and the Captiva entities, Citibank agreed "to perform, in good faith, supervisory duties with respect to the Captiva investment portfolios," which "included periodically reviewing the portfolio manager's performance, monitoring the portfolios, and providing periodic reports and recommendations to the Administrative Committee with respect to the portfolios."(Compl.¶ 39). BESI further alleges that it "was an intended third-party beneficiary of Citibank's obligations under the Administrative Agreement," (*id.* at ¶ 40), and that as an intended third-party beneficiary of these agreements, it has standing to sue Citibank for breach of these agreements. (Pl.Memo.18-22)

1. Intention of the Parties to the Agreements

"New York law follows the Restatement (Second) of Contracts § 302[ ] in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract."*Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991). Under section 302 of the Second Restatement of Contracts, a party qualifies as an intended third-party beneficiary of a contract when the following conditions are met:

recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302 (1981)."If the obligation to perform to the third-party beneficiary is not expressly stated in the contract, the court may look to surrounding circumstances to determine whether the contracting parties intended to benefit a third party."*United International Holdings, Inc. v. The Wharf (Holdings) Ltd.,* 988 F.Supp. 367, 371 (S.D.N.Y.1997)."Among the circumstances to be considered is whether manifesta-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 11
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

tion of the intention of the promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable."*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208 (1985) (internal quotation marks omitted).

BESI argues that the Administrative Agreements manifest "an intent that Income Noteholders such as BESI be able to enforce them."(Pl.Memo.21) It cites a clause limiting Citibank's liability as Administrative Agent contained in each of the agreements as an acknowledgment of duties owed by Citibank to BESI as a shareholder of Captiva. (*Id.*) The clause states:

[Citibank] shall [not] have any liability to [Captiva], or to its shareholders or creditors, for any error in judgment, mistake of law, or for any loss arising out of any investment, or for any other act or omission in the performance of its, his or her obligations to [Captiva] except for liability to which it would be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of its, his or her duties and obligations hereunder....

*\*9 (Tambe Dec., Exs. D at 8; E at 7) BESI cites no authority for the view that such a clause expresses an intent by parties to a contract to bestow on a third party a benefit arising out of that contract. Indeed, BESI's argument betrays a disregard for the plain intent of the parties to the contract, which was to limit duties rather than to generate an additional duty. This clause acknowledges only that Citibank may owe some duty to BESI in BESI's capacity as a shareholder of Captiva, not as a third-party beneficiary of the Administrative Agreements.

BESI also quotes language in the agreements that it claims "require[s] Citibank to make recommendations directly to 'the holders of the Income Notes." ' (Pl.Memo.19) Based on this language, BESI argues that "[w]here performance is rendered directly to a third party under the terms of an agreement,

that party must be considered an intended beneficiary." (Pl.Memo.19) (internal quotation marks omitted) However, this partial quotation omits significant language. Citibank is not obligated to make general recommendations to Income Noteholders concerning the funds, but to make recommendations only "with respect to the termination of the Financial Manager." (Tambe Dec., Exs. D at 1; E at 1) Even assuming that this provision were evidence of an intent to benefit BESI, the only such benefit would be a recommendation from Citibank concerning the termination of the financial manager. However, BESI's claim is in no way based on a purported failure to make such a recommendation, and BESI cannot, by sheer will or wish, expand a single, specific duty to include other duties not expressed in the agreements. In fact, the limited liability clause cited by plaintiff states that Citibank "assumes no responsibility under this Agreement other than to render the services called for hereunder." (Tambe Dec., Exs. D at 8; E at 7)

Additionally, the promises that plaintiff claims Citibank breached arise out of oral and written statements by Citibank that are not contained in or associated with the Administrative Agreements. BESI cannot rely on a duty arising out of the Administrative Agreements to claim breach of other duties arising out of different agreements. *SeeESI, Inc. v. Coastal Power Production Co.,* 995 F.Supp. 419, 432 (S.D.N.Y.1998) (dismissing claim for damages as third-party beneficiary where breach alleged by plaintiff was of a contract other than the contract to which plaintiff was a third-party beneficiary).

BESI cites language in the Administrative Agreements, but overlooks one significant clause. Both agreements contain a "succession" clause expressly identifying to whose benefit the agreements inure and restricting assignability of the agreements. The succession clause states:

This Agreement shall inure to the benefit of and be binding upon the successors to the parties hereto. No assignment of this Agreement shall be made without the consent of the other party, provided,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

however, that the Company may assign its interest in this Agreement to the Trustee under the Indenture.

**\*10** (Tambe Dec., Exs. D at 9; E at 7-8) In *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157 (S.D.N.Y.1998), the court addressed precisely the same facts, where a third party brought an action to enforce a contract as beneficiary and the contract contained language specifying to whose benefit the agreement inured and prohibiting assignment. *Id.* at 163-64. The court held: "The prohibition on assignments and the specification that the contract inures to the benefit of and binds the parties ... makes plain the parties' intention to preclude third-party enforcement." *Id.* at 163; *see also United,* 988 F.Supp. at 373; *Sazerac Co. v. Falk,* 861 F.Supp. 253, 258 (S.D.N.Y.1994). I find this reasoning persuasive, and the presence of similar language in the Administrative Agreements further undermines the claim that the parties to those agreements intended to benefit BESI.

BESI also has not established that its reliance on the Administrative Agreements as a third-party beneficiary was reasonable and probable. *See Fourth Ocean,* 66 N.Y.2d at 44, 495 N.Y.S.2d 1, 485 N.E.2d 208. As already discussed, Citibank included disclaimers in numerous documents submitted to plaintiff stating that plaintiff should not rely on any representations outside the Offering Memoranda. Further, the Administrative Agreements state that defendant undertook to provide the services set forth in those agreements "consistent with the objectives and policies" in the Offering Memoranda. (Tambe Dec., Exs. D at 1; E at 1) In light of the sophistication of the parties, Citibank's many disclaimers and the express limitation of defendant's duties in the Administrative Agreements to those consistent with the Offering Memoranda, any reliance by BESI on the Administrative Agreements was unreasonable and improbable.

Even if BESI were correct that defendant owed BESI all the duties it owed Captiva in the Administrative Agreements, BESI still would have failed to es-

tablish the requisite intent to make it a third-party beneficiary of the Administrative Agreements for one obvious reason: these duties flow from Citibank to Captiva, and Citibank, according to the facts alleged by BESI, is the promisor, not the promisee. "In ascertaining the rights of an asserted third party beneficiary, the intention of the promisee is of primary importance...." *Drake v. Drake,* 89 A.D.2d 207, 209, 455 N.Y.S.2d 420, 422 (4th Dep't 1982); *see also United,* 988 F.Supp. at 371 ("When determining the intentions of the contracting parties, the intention of the promisee governs."); *Dep't of Economic Development v. Arthur Andersen & Co.,* 924 F.Supp. 449, 482 (S.D.N.Y.1996) ("[G]reat weight is accorded to the expressed intent of the promisee.") (internal quotation marks omitted)."[T]he absence of any duty of the promisee to the beneficiary has been held to negate an intention to benefit...."66 N.Y.S.2d at 44-45. BESI has failed to plead a single fact alleging any duty owed by Captiva, as the promisee, to BESI under the Administrative Agreements or under any other agreements. BESI has also failed to plead any facts that show an intent on the part of Captiva to benefit BESI under the Administrative Agreements or under any other agreements. Accepting all plaintiff's allegations as true, they establish only that defendant, as promisor, made several promises to Captiva. This is insufficient to render BESI an intended third-party beneficiary of those promises.

### 2. Recovery by Others under the Agreements

**\*11** [6] BESI further argues that it is an intended third-party beneficiary of the Administrative Agreements because "no one else can recover under the contracts."(Pl.Memo.19) According to BESI, Citibank "created and structured the Captiva investment vehicles in order to effectuate a private placement of notes for foreign investors," and "the Captiva entities had only nominal equity capitalization."(Compl.¶ 25) BESI alleges that the Captiva entities "lacked any genuine separate identity and management and have at most served as administrative agents for Citibank."(*Id.*) BESI speculates

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

that "the Captiva entities would never enforce the Administrative Agreements against Citibank," and therefore BESI "is entitled to do so as a third party beneficiary of those contracts."(Pl.Memo.20)

Under New York law, when there is no showing of "some obligation or duty running from the promisee to the third party beneficiary," a third party still may enforce a contract when "no one other than the third party can recover if the promisor breaches the contract."*Fourth Ocean,* 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208. As discussed above, BESI has not alleged facts to show any obligation or duty running to it from the Captiva entities, yet BESI argues that it can enforce the Administrative Agreements because it is the only one that can recover for Citibank's breaches of the Administrative Agreements given that the Captiva entities likely will not attempt to recover against Citibank. However, New York law permits third-party recovery when no other person *can* recover, not simply when no other person *will* recover. Taking plaintiff's allegations as true, the Captiva funds, even if dominated by Citibank, can recover against Citibank for any breaches of the Administrative Agreements.[FN4] BESI would expand the law to permit recovery under a standard of mere unlikelihood of recovery by others, but that is not the law in New York.

> **FN4.** BESI asserts in a footnote that its "allegations are sufficient to pierce the corporate veil between the Captiva entities and Citibank."(Pl. Memo. 20 n. 8) However, BESI does not explain how piercing the corporate veil is relevant to its claims. Piercing the corporate veil "is used to hold individuals liable for the actions of a corporation they control" or "to hold a corporation accountable for actions of its shareholders."*American Fuel,* 122 F.3d at 134. Plaintiff is not seeking to hold Citibank liable for actions of the Captiva entities, nor is it seeking to hold Citibank liable for actions of Citibank's shareholders.

Plaintiff is seeking to hold Citibank liable for Citibank's own actions, and no corporate veil need be pierced to advance such claims. Further, even if veil piercing were somehow relevant to BESI's claims, BESI has failed to allege facts that would warrant such relief. *SeeTelecom International America, Ltd. v. AT & T Corp.,* 280 F.3d 175, 200-01 (2d Cir.2001) (dismissing piercing counterclaim where plaintiff "created [subsidiary] as a separate entity with only as much capital as then-currently needed" in order to "limit [plaintiff's] potential losses from" the venture with defendant, and subsidiary's "financial condition" was fully and fairly disclosed to defendant). The financial condition of the Captiva entities was fully and fairly disclosed to BESI prior to its investment. (Tambe Dec., Exs. B at 45-56; C at 38-54)

### 3. Limited Liability Clause

[7] Although this court has already found that BESI has failed to show that it is an intended third-party beneficiary of the Administrative Agreements, even assuming such a showing *arguendo,* BESI's claim still would fail. As BESI points out, the Administrative Agreements contain a clause that limits defendant's liability for claims arising under the Administrative Agreements to "willful misfeasance, bad faith, gross negligence or reckless disregard of its, his or her duties and obligations."(Tambe Dec., Exs. D at 8; E at 7) "New York law generally enforces contractual provisions absolving a party from its own negligence."*Colnaghi U .S.A., Ltd. v. Jewelers Protection Services, Ltd.,* 81 N.Y.2d 821, 823, 595 N.Y.S.2d 381, 382, 611 N.E.2d 282 (1993)."Where the language of the exculpatory agreement expresses in unequivocal terms the intention of the parties to relieve a defendant of liability for the defendant's negligence, the agreement will be enforced."*Lago v. Krollage,* 78 N.Y.2d 95, 99-100, 571 N.Y.S.2d 689, 692, 575 N.E.2d 107 (1991).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

**\*12** Under the limited liability clause, BESI can recover against Citibank for breach of duties arising under the Administrative Agreements only upon specific factual allegations of deliberate or bad faith conduct. However, other than plaintiff's conclusory allegation that Citibank "performed its duties under the Administration Agreements in bad faith, with reckless disregard and willful malfeasance of its contractual obligations, and in a grossly negligent manner," (Compl.¶ 41), plaintiff alleges no specific "actions by defendant evincing a reckless disregard for the rights of plaintiff or smacking of intentional wrongdoing."*Retty Fin. v. Morgan Stanley Dean Witter & Co.,* 293 A.D.2d 341, 341, 740 N.Y.S.2d 198, 198 (1st Dep't 2002) (internal quotation marks omitted). At most, BESI has alleged facts suggesting Citibank acted negligently, but negligence is not adequate to overcome the limited liability clause. BESI's sole conclusory allegation is insufficient as a matter of law. *See Tevdorachvili v. The Chase Manhattan Bank,* 103 F.Supp.2d 632, 644 (E.D.N.Y.2000) (observing that plaintiff alleged, "by nothing more than a rhetorical flourish, that [defendant] was 'reckless' " and holding that "[i]n the absence of factual allegations showing more, heated language and indignation will not suffice to bootstrap that cause of action into a cause of action for negligence, gross negligence, or recklessness."). Further, BESI has not articulated any reason why the limited liability clause should not be enforced, nor has it even challenged the enforceability of the clause.

For all these reasons, BESI's third-party beneficiary claim is dismissed.

**D. Fraudulent Inducement**

[8] BESI asserts that it entered into investment agreements with the Captiva entities because of Citibank's fraudulent inducements and suffered losses as a result. (Compl.¶¶ 45-46) BESI alleges that Citibank "made material misstatements of fact to BESI, and failed to disclose material facts that were inconsistent with Citibank's statements and representations, which induced BESI to buy Captiva I and III Income Notes."(*Id.* at 45) These failures to disclose purportedly include "failure to disclose that Captiva I's loan portfolio was distressed almost from the very start" and "failure to disclose that the loans in the Captiva I and III portfolios were created in a climate of lax underwriting standards."(*Id.*) BESI further alleges that "Citibank intended that BESI rely" on these misstatements and failures to disclose, (*id.*), and that BESI actually did rely on them "in deciding to buy and hold Captiva I and III Income Notes."(*Id.* at ¶ 46) As explained below, these allegations are insufficient to sustain a claim for fraud.

1. Knowledge of Falsity and Intent to Defraud

"The elements of a fraud claim under New York law are a material, false representation, an intent to defraud thereby, and reasonable reliance, causing damage to the plaintiff."*May Dep't Stores Co. v. International Leasing Corp., Inc.,* 1 F.3d 138, 141 (2d Cir.1993); *see also Caputo v. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001). Under Rule 9(b) of the Federal Rules of Civil Procedure, "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b); *see also Olsen v. Pratt & Whitney Aircraft,* 136 F.3d 273, 275 (2d Cir.1998). Although knowledge may be averred generally, a plaintiff must "allege circumstances that give rise to a strong inference that the defendants knew the statements to be false," even where the plaintiff "has adequately identified the statements alleged to be misrepresentations and properly indicated when, where and by whom they were made."*Wexner v. First Manhattan Co.,* 902 F.2d 169, 173 (2d Cir.1990).

**\*13** Taking all BESI's allegations as true, it has failed to plead a cause of action for fraudulent inducement because it has not alleged that Citibank knew the statements to be false at the time the statements were made or that Citibank intended to de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraud BESI. Nor has BESI alleged any facts to support a reasonable inference of knowledge and intent on the part of Citibank. According to BESI, it invested in the Captiva funds in 1997 and 1998. (Compl.¶¶ 1,11-13) Later, in 2001, Citibank informed BESI that Captiva I had been distressed from almost the very start and that loans in both Captiva portfolios had been made in a climate of lax underwriting standards. (*Id.* at 14) BESI claims that Citibank failed to disclose these facts, and these purported failures to disclose constitute part of the basis for the fraud claim. (*Id.* at 45). Plaintiff must allege facts sufficient to support a strong inference that Citibank knew of the distressed condition of Captiva I when Citibank made specific statements to plaintiff in 1997 representing the condition of the fund; that Citibank knew of the lax underwriting standards involving the Captiva funds when Citibank made specific statements to plaintiff in 1997 and 1998 representing the condition of the funds; and that Citibank made these specific statements in 1997 and 1998 with the intent to defraud plaintiff. However, BESI has alleged no facts to support a strong inference that Citibank possessed in 1997 and 1998 the knowledge it possessed in 2001 concerning the funds. Therefore, BESI has failed to plead all the necessary elements for its fraud claim.

### 2. Promises as Basis for Fraud Claim

[9] The complaint is unclear as to what specific misstatements form the basis for BESI's fraudulent inducement claim. BESI alleges that it invested in the Captiva entities "in reliance on the promises and statements" made by Citibank. (Compl.¶¶ 11,13,46) To the extent the three promises purportedly made by Citibank that serve as the basis for BESI's contract claims also serve as the basis for its fraudulent inducement claim, the fraud claim is barred.

Under New York law, "to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove a breach of duty distinct from, or

in addition to, the breach of contract."*Non-Linear Trading Co. v. Braddis Associates, Inc.,* 243 A.D.2d 107, 118, 675 N.Y.S.2d 5, 13 (1st Dep't 1998) (quoting *North Shore Bottling Co. v. Schmidt & Sons,* 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 92, 239 N.E.2d 189 (1968)) (internal quotation marks omitted). The plaintiff must allege fraud based on facts different from those underlying a breach of contract claim and allege damages "that would not be recoverable under a contract measure of damages."*J.E. Morgan Knitting Mills, Inc. v. Reeves Brothers, Inc.,* 243 A.D.2d 422, 423, 633 N.Y.S.2d 211, 211 (1st Dep't 1997)."[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations ."*Rocanova v. Equitable Life Assurance Society of the United States,* 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940 (1994); *seealsoInternational Cabletel Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486 (S.D.N.Y.1997)."In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."*Telecom International,* 280 F.3d at 196.

**\*14** As already discussed, BESI alleges as the basis for its contract claims that Citibank made three express promises: (1) to "actively monitor and supervise the Captiva investment vehicles with a high degree of skill and vigilance and for the purpose of preserving BESI's capital"; (2) to "keep BESI currently and adequately informed concerning the status of its investments"; and (3) to "provide BESI with other relevant and timely information."(Compl.¶ 34) It appears from plaintiff's complaint that these same three promises form at least part of the basis for plaintiff's fraudulent inducement claim. (Compl. ¶¶ 11,13) BESI cannot bring a fraud claim upon the same factual allegations as its breach of contract claim. *Telecom International,* 280 F.3d at 196;*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 19-20 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-03814-LAP     Document 11-2     Filed 06/30/2008     Page 39 of 79 Page 16

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

Cir.1996).

Further, the promises attributed to Citibank relate to future performance."Absent a present intention to deceive, a statement of future intentions, promises or expectations is not actionable on the grounds of fraud."*Non-Linear,* 675 N.Y.S.2d at 13. As already discussed, BESI has not alleged any intention to deceive it or facts suggesting Citibank knew the statements were false when made. Therefore, these promises do not provide the basis for a fraudulent inducement claim.

### 3. Reliance

[10] Under New York law, "where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed ."*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 734 (2d Cir.1984) (citing *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)). In *Danann,* the parties agreed in their contract that the defendant made no representations other than those specifically set forth in the contract and that neither party entered the agreement in reliance upon any representation not embodied in the contract. *See* 5 N.Y.2d at 320, 184 N.Y.S.2d 599, 157 N.E.2d 597. The Court held: "Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."*Id.* at 320-21. *"Danann* therefore stands for the principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into the contractual relationship."748 F.2d at 735.

Under the *Danann* rule, BESI's reliance was unreasonable in light of defendant's several disclaimers. Indeed, as already discussed, BESI expressly conceded in its letter of intent with Citibank concerning Captiva III that BESI had not relied on any

Citibank representations. (Tambe Dec., Ex. F) BESI also does not dispute that it was aware of the disclaimers in the Offering Memoranda and the presentations produced by Citibank, and the related transaction documents, such as the Administrative Agreements, expressly refer to the terms and policies set forth in the Offering Memoranda. Finally, as already discussed, the parties here are sophisticated international banking institutions, and yet BESI made no attempt to include Citibank's purported representations in any written agreement. Therefore, even accepting BESI's allegations of reliance upon Citibank's representations as true, these allegations are inadequate to sustain a cause of action for fraud.

**\*15** For all these reasons, BESI's claim for fraudulent inducement is dismissed.

### E. Breach of Fiduciary Duty

BESI claims that Citibank owed BESI fiduciary duties and that Citibank breached these duties. (Compl.¶ 50) BESI alleges that Citibank "dominated and exercised complete control over the Captiva investment vehicles to the extent that there was no independent management of Captiva I and Captiva III to protect the interests of the Captiva entities and the Income Note holders."(*Id.*) Plaintiff further alleges that Citibank "admitted in Income Note holder correspondence that, in exploring alternative 'exit' strategies for investors, 'it would be our fiduciary duty to offer this option to all other Income Note investors." ' (*Id.*) Plaintiff argues that Citibank's fiduciary duties arise from its promises "to exercise 'special vigilance' in protecting BESI's interests by using Citibank's worldwide resources in order to avoid harm to the value of the Captiva portfolios, and to engage in 'ongoing oversight of the portfolio by the fiduciary arm of Citibank .'" ' (Pl.Mem.32) According to BESI: "By emphasizing that Citibank would so act, Citibank persuaded BESI to entrust to Citibank the supervisory and management functions that BESI ordinarily performs with respect to its investments." (*Id.*) As explained

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 40 of 79    Page 17

below, even taking all BESI's allegations as true, this claim fails.

### 1. Breach of Fiduciary Duty and Breach of Contract

[11] New York law recognizes a fiduciary relationship "when one person is under a duty to act for or to give advice for the benefit of another within the scope of the relation."*Levitin v. PaineWebber, Inc.,* 159 F.3d 698, 707 (2d Cir.1998) (quoting *Flickinger,* 947 F.2d at 599) (internal quotation marks omitted). However, being a party to a contract does not itself impose a fiduciary duty. Rather, this duty must arise from "a position of trust or special confidence ... that impose[s] obligations beyond the express agreements" between the parties. *Bridgestone,* 98 F.3d at 20. In other words, if this trust or special confidence in a person has "solely to do with his carrying out his obligations under the contract" between the parties, no fiduciary duty exists. *Id.* A plaintiff must "demonstrate a legal duty separate from the duty to perform under the contract" for a fiduciary duty to exist. *Id.;seealsoMia Shoes, Inc. v. Republic Factors Corp.,* No. 96 Civ. 7974, 1997 WL 525401, at *2 (S.D.N.Y.1997) (dismissing a claim for breach of fiduciary duty and holding that "a fiduciary duty generally does not arise out of a contractual relationship between parties with comparable bargaining power where the duties of the parties are dictated by the terms of the contract")."A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand."*William Kaufman Org., Ltd. v. Grarham & James, LLP,* 269 A.D.2d 171, 173, 703 N.Y.S.2d 439, 442 (1st Dep't 2000); *seealsoSteinberg v. DiGeronimo,* 255 A.D.2d 204, 204, 680 N.Y.S.2d 93, 94 (1st Dep't 1998) (dismissing breach of fiduciary duty claim as "deficient because based on the unenforceable contract"). Breach of fiduciary duty is a tort claim, and as the New York Court of Appeals has held:

**\*16** [a] tort obligation is a duty ... apart from and independent of promises made and therefore apart from the manifested intention of the parties to a

contract. Thus, a defendant may be liable in tort ... when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations.... [W]here a party is merely seeking to enforce its bargain, a tort claim will not lie.

*New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 288, 662 N.E.2d 763 (1995); *accordMedical Research Assoc., P.C. v. Medcon Financial Services, Inc.,* 253 F.Supp.2d 643, 649-50 (S.D.N.Y.2003) (granting summary judgment where breach of fiduciary duty claim was based upon the same allegations underlying the breach of contract claim).

Here, Citibank's purported promises to supervise and manage the Captiva entities provide the basis for both BESI's breach of contract claim and its breach of fiduciary duty claim. BESI argues that these promises constitute an enforceable contract between the parties, and therefore the duties arising from these promises are contractual. Because a fiduciary duty cannot arise simply from a contract, no such duty exists between the parties here.

The only allegation underlying BESI's fiduciary duty claim that arguably does not underlie BESI's breach of contract claim is that Citibank promised to explore alternative exit strategies with BESI. (Compl.¶ 50) However, BESI does not allege that Citibank breached this duty. Plaintiff makes no reference to exit strategies in the complaint, nor does plaintiff allege that Citibank impeded it from disposing of the Captiva portfolios or even failed to provide advice on how to do so. Rather, BESI claims only that Citibank failed to oversee the funds in such a way as to protect BESI's investment. In other words, Citibank's breach, according to BESI, was not failure to advise BESI on how to get its money out, but failure to secure the money while it was in. Therefore, even taking this allegation as true, it has no bearing on plaintiff's claims in this case.

### 2. Relationship between BESI and Citibank

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 41 of 79
Not Reported in F.Supp.2d                                                                    Page 18
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

Under New York law, "[a] debtor-creditor relationship is not by itself a fiduciary relationship although the addition of a relationship of confidence, trust, or superior knowledge or control may indicate that such a relationship exists." *In re Mid-Island Hospital, Inc. v. Empire Blue Cross and Blue Shield,* 276 F.3d 123, 130 (2d Cir.2002) (internal quotation marks omitted); *seealsoFallon v. Wall St. Clearing Co.,* 182 A.D.2d 245, 250, 586 N.Y.S.2d 953, 957 (1st Dep't 1992) ("A debtor-creditor relationship, standing alone, does not create a fiduciary duty of the latter to the former."). "[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hospital,* 276 F.3d at 130. Where "there is no allegation of anything other than an ordinary commercial relationship," no fiduciary duties can be found. *Id.*

**\*17** BESI claims that Citibank is the alter ego of the Captiva entities and that this gives rise to fiduciary duties flowing from Citibank direct to BESI. (Compl.¶ 50) As already discussed, BESI has failed to allege sufficient facts to warrant piercing the corporate veil between Citibank and the Captiva entities. *SeeTelecom,* 280 F.3d at 200-01. However, even assuming *arguendo* that BESI could pierce that veil, its claim would fail. The relationship between BESI and Citibank, as the alter ego of the Captiva entities, would be simply a relationship between a creditor and a debtor. BESI holds debt securities issued by the Captiva entities, or by Citibank if the veil is pierced. (Compl.¶ 8) A debt security is "[a] security representing funds borrowed by the corporation from the holder of the debt obligation."Black's Law Dictionary 1359 (7th ed.1999). Here, the debtor "corporation" would be Citibank, as the alter ego of the Captiva entities, and the "holder of the debt obligation," or creditor, would be BESI. (Compl.¶¶ 1,8) BESI's allegations show two sophisticated entities dealing with one another at arms length and no facts demonstrating extraordinary circumstances. Therefore, even if the

corporate veil were pierced, Citibank would owe BESI no fiduciary duty.

### 3. Deceitful Intent

Under New York law, "an action for breach fiduciary duty [ ] requires a showing of 'deceitful intent' on the part of the fiduciary." *Flickinger,* 947 F.2d at 599 (quoting *Horn v. 440 East 57th Co.,* 151 A.D.2d 112, 120, 547 N.Y.S.2d 1, 5 (1989)). As discussed above in connection with BESI's fraudulent inducement claim, BESI has not alleged that Citibank intended to deceive, nor has BESI alleged any facts to support a strong inference of deceitful intent. Thus, even assuming *arguendo* that Citibank were to have owed BESI fiduciary duties, BESI still would fail to state a claim for breach of such duties by failing to plead this necessary element.

For all these reasons, BESI's claim for breach of fiduciary duty is dismissed.

### F. Unjust Enrichment

[12] BESI alleges that Citibank "has been unjustly enriched to the full extent of the fees that it and its affiliates have derived from Captiva I and III...." (Compl.¶ 55) According to BESI, these fees "were collected from funds invested with the Captiva entities by BESI and other Noteholders."(Pl.Memo.36) BESI argues that the Income Noteholders "hold the residual interest in any remaining assets of the Captiva portfolios after payment of all other obligations."(*Id.*) BESI further alleges that Citibank has also been unjustly enriched by "self-interested transactions or conduct that has injured BESI to the benefit of Citibank (and its affiliates or favored customers)." (Compl.¶ 55)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *In re Mid-Island Hospital,* 276 F.3d at

129;seealsoClark v. Daby, 300 A.D.2d 732, 732, 751 N.Y.S.2d 622, 623 (3d Dep't 2002). In *Clark*, the Court held: "Notably, it is the plaintiff's burden to demonstrate that services were performed *for the defendant* resulting in the latter's unjust enrichment, and the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment."751 N.Y.S.2d at 623-24 (citations and internal quotation marks omitted) (emphasis in original). Unjust enrichment is a quasi-contractual remedy. *See*Granite Partners, LP v. Bear, Stearns & Co., 17 F.Supp.2d 275, 311 (S.D.N.Y.1998)."[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."*U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.,* 38 F.3d 1289, 1296 (2d Cir.1994) (internal quotation marks omitted)."This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract."*Granite Partners,* 17 F.Supp.2d at 311 (citing *Graystone Materials, Inc. v. Pyramid Champlain Co.,* 198 A.D.2d 740, 604 N.Y.S.2d 295 (3d Dep't 1993); *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 583 N.Y.S.2d 497 (2d Dep't 1992)). New York courts have declined to dismiss quasi-contract claims in cases involving written contracts only where defendants have acted in such a way as to incur obligations to the plaintiff outside the contract. *See*U.S. East, 38 F.3d at 1297.

**\*18** BESI alleges two sources for its unjust enrichment claim. The first is the administrative fees paid to Citibank by the Captiva entities. However, these fees are expressly governed by the Administrative Agreements between Citibank and these entities, and in any event were not paid by BESI but rather by the Captiva entities. (Tambe Dec., Exs. D at 6-7; E at 5-6) The second is allegedly self-interested transactions engaged in by Citibank. Just as with the fees, these transactions are expressly covered by

the terms of the agreements, namely the Offering Memoranda, governing BESI's investment in the Captiva funds. (Tambe Dec., Exs. B at 25-26; C at 18-19) BESI has failed to demonstrate that Citibank acted in such a way as to assume any obligations outside these agreements, especially in light of Citibank's many disclaimers, as already discussed.

Further, even assuming that BESI's claim were not defeated by express agreements, BESI has failed to demonstrate any injustice here. "To invoke equity requires the indispensable ingredient that between the two parties involved there must be an injustice."*Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 58 (2d Cir.1982); *seealso*Medical Self Care, Inc. v. National Broadcasting Co., No. 01 Civ. 4191, 2003 WL 1622181, at *8 (S.D.N.Y.2003) (applying New York law and finding no unjust enrichment because no injustice). There is no injustice here because Citibank simply received fees due it under the Administrative Agreements, (Tambe Dec ., Exs. D at 6-7; E at 5-6), and to the extent Citibank engaged in any self-interested transactions (and there is nothing other than mere speculation on the part of BESI that Citibank did engage in such transactions, (Compl.¶ 3,29-30,53)), Citibank reserved the right to engage in such transactions by the express terms of the Offering Memorandum. (Tambe Dec., Exs. B at 25-26; C at 18-19) There is no injustice where a party merely exercises its contractual rights. Additionally, as noted, the fees received by Citibank came from Captiva, not from BESI. *See*Id.(applying New York law and finding no unjust enrichment where money received by defendant came from third party rather than plaintiff).

For these reasons, BESI's unjust enrichment claim is dismissed.

### IV.

"[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint."*Van Buskirk v. The New York Times*

Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.))**

*Co.,* 325 F.3d 87, 91 (2d cir.2003)."[A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated."*Id.* (internal quotation marks omitted). In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."*Olsen,* 136 F.3d at 276;*seealsoLuce III v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (same)."Where ... plaintiffs specifically request leave to amend in the event that the court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile."*Caputo,* 267 F.3d at 191;*seealsoLuce III,* 802 F.2d at 56-57 (finding abuse of discretion where plaintiff requested leave to amend and court refused). BESI has not requested leave to amend, and for good reason. Each of BESI's claims, including its fraud claim, fails on grounds that cannot be remedied by amendment. Most notably, the many disclaimers discussed above are fatal to most of BESI's claims, and the remaining claims fail for related reasons or for reasons not curable by amendment. Indeed, BESI would have to do more than merely add facts to its complaint; it would have to extract certain facts and replace them with contrary allegations. For these reasons, amendment would be futile.

**\*19** For the reasons set forth above, Citibank's motion to dismiss is granted and BESI's complaint is dismissed. Citibank has also made a motion to stay discovery pending determination of its motion to dismiss. The motion to dismiss having been granted, the motion to stay is moot.

S.D.N.Y.,2003.
Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.
Not Reported in F.Supp.2d, 2003 WL 23018888 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

H

Daewoo Intern. (America) Corp. Creditor Trust v.
SSTS America Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DAEWOO INTERNATIONAL (AMERICA)
CORP. CREDITOR TRUST, Plaintiff,
v.
SSTS AMERICA CORP., and Shingsung Tongsang
Co., Ltd. Defendant.
**No. 02 Civ. 9629(NRB).**

April 13, 2004.

Steven Har, Duane Morris LLP, New York, NY, for
Plaintiff.
Eric S. Weinstein, Feldman, Weinstein, LLP, New
York, NY, for Defendant.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Plaintiff, Daewoo International (America) Corp.
Creditor Trust ("Daewoo" or "Plaintiff") and de-
fendants SSTS America Corp. ("SSTS America")
and Shinsung Tongsan Co., Ltd. ("SSTS Korea")
(collectively, "defendants") cross-move for sum-
mary judgment. Daewoo seeks an order awarding
judgment in its favor on all claims in the complaint
and defendants seek dismissal of plaintiff's com-
plaint in its entirety. For the following reasons,
both plaintiff's and defendants' motions are granted
in part and denied in part.

BACKGROUND

A. Plaintiff's Allegations Against SSTS [FN1]

> FN1. Our summary of plaintiff's allega-
> tions is based on plaintiff's Complaint and
> the parties' Local Rule 56.1 Statements.

Plaintiff alleges that in or about July 1995, SSTS
entered into an agreement (the "Agreement") with
Daewoo wherein Daewoo would provide loans and
financing to SSTS America in order to help it set up
and operate its business in the state of New York.
Under the Agreement, Daewoo would provide
SSTS America with loans to be paid back on a
monthly basis plus interest. According to the
plaintiff, the Agreement also called for Daewoo to
provide a line of credit to SSTS America in the
amount of up to $2,500,000 per year, which was to
be adjusted from time to time. Under this provision,
SSTS America was to purchase all goods through
Daewoo. Daewoo would then invoice SSTS Amer-
ica for the goods and SSTS America would pay
Daewoo the invoiced amount plus interest and a
commission. While the defendant made certain pay-
ments in accordance with the Agreement, plaintiff
alleges that it failed to pay all monies owed.

B. The Present Action

Plaintiff filed the instant action against defendants
in New York State Supreme Court asserting causes
of action for breach of contract, account stated,
goods sold and delivered, breach of guaranty, un-
just enrichment and quantum meruit. On December
4, 2002, the case was removed to this Court, and on
January 24, 2003 SSTS America filed its answer in-
cluding as affirmative defenses the rights of re-
coupment and setoff. On April 4, 2003 plaintiff
filed a motion for partial summary judgment seek-
ing to dismiss these affirmative defenses. This
Court granted plaintiff's motion on June 9, 2003.

On September 29, 2003, plaintiff filed the instant
motion seeking summary judgment on all claims in
its complaint. Defendants responded with a cross-
motion for summary judgment asserting defenses
based on the statute of limitations, personal juris-
diction and plaintiff's alleged failure to state a
prima facie case with respect to any of its claims.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

DISCUSSION

I. Summary Judgment Standard

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ."Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir.1993). In order to defeat a motion for summary judgment, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."Id. at 248 (internal quotation marks omitted). Where, as here, both parties seek summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."Scwabenbauer v. Board of Ed., 667 F.2d 305, 314 (2d Cir.1981).

II. Goods Sold and Delivered and Breach of Contract Claims

**\*2** Plaintiff claims that it is entitled to summary judgment on its claims for goods sold and delivered and breach of contract as asserted against SSTS America because there is no dispute that the goods were purchased, sold and delivered pursuant to a valid contract and that plaintiff was not fully paid for those goods. Defendants respond that plaintiff's motion fails because: (1) plaintiff has not stated a prima facie case for goods sold and delivered; (2) the loan obligation was SSTS Korea's not SSTS America's; and (3) the statute of limitations has expired.

A. Goods Sold and DeliveredPrima Facie Showing

Plaintiff asserts that as part of their ongoing business dealings, Daewoo sold and delivered goods to SSTS America between 1997 and 1999 and that SSTS America received and accepted the goods along with the applicable invoices, but that full payment for the goods remains outstanding. Defendant does not dispute that Daewoo sold and delivered goods at a certain price, but argues that there is no proof that Daewoo sold those goods to SSTS America. Defendants claim that the relevant invoices show on their face that they were not issued to SSTS America, but rather, that the goods were instead sold and delivered to SSTS Korea.

The essential elements of an action for goods sold and delivered are the purchase, sale and delivery of goods at an established price and nonpayment therefor. See"21" Brands, Inc. v. R & J Emmet PLC, No. 88 Civ. 8392, 1990 WL 180136 at *4 (S.D.N.Y. Nov. 13, 1990)(finding that action for goods sold and delivered existed where plaintiff had delivered the agreed upon goods in acceptable condition but was not paid); Sunbeam Corp. v. Morris Distributing Co., 389 N.Y.S.2d 173, 174, 55 A.D.2d 722, 723 (3d Dep't 1976) (citations omitted) (stating that an action for goods sold and delivered will lie where plaintiff establishes that there is a purchase, sale and delivery of goods at an established price and nonpayment therefor).

Contrary to defendants' assertions, the record clearly establishes that the goods at issue were sold and delivered to SSTS America. The record shows that Daewoo sent each invoice for the goods at is-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

sue to SSTS America, not SSTS Korea. It is undisputed that SSTS America was located at 1385 Broadway in New York, New York during the relevant time period. Plaintiff has provided the Court with copies of the invoices for the goods that were sold and delivered to SSTS America. Every invoice shows on its face that it was sent to Shinsung Tongsang at 1385 Broadway, New York, New York. *See* Declaration of T. Steven Har ("Har Decl.") Ex. C. Defendants themselves have conceded that SSTS Korea has not conducted business in the state of New York and does not maintain an office in New York. *See* Defendants' Rule 56.1 Statement ¶¶ 3 and 4. Defendants have also admitted that SSTS America has no power to accept orders on behalf of SSTS Korea. *See id.* ¶ 5. Finally, Mr. Sang Shin, Chief Financial Officer of Daewoo testified at his deposition that the invoices were issued only to SSTS America and that the customer code on the invoice refers to SSTS America. *See* Har Decl. Ex. H. Defendants' assertion that the invoices were issued to SSTS Korea is thus squarely contradicted by the record.

**\*3** Plaintiff has adequately demonstrated that the subject goods were sold and delivered to SSTS America for a stated price and that payment is outstanding. Accordingly, defendants' argument that plaintiff has failed to plead a prima facie case for goods sold and delivered is without merit.

B. Breach of Contract and Breach of Guaranty Claims

Plaintiff also argues that it is entitled to summary judgment on its breach of contract claims against SSTS America and SSTS Korea, as well as on its breach of guaranty claim against SSTS Korea. Plaintiff asserts that in return for Daewoo's agreement to provide loans and financing to SSTS America, a wholly owned subsidiary of SSTS Korea, SSTS Korea agreed to unconditionally guarantee SSTS America's obligations to Daewoo. Daewoo alleges that after it performed all of its obligations under the Agreement, SSTS America breached the Agreement by failing to provide Daewoo with payment, and that SSTS Korea breached the Agreement by failing to pay Daewoo when SSTS America defaulted on its obligation. Plaintiff asserts that SSTS Korea should thus be ordered to pay it all monies currently outstanding on the Agreement. Defendants respond that SSTS America was not bound by the Agreement, and that SSTS Korea was bound as primary obligor rather than guarantor. Defendants further assert that SSTS Korea has satisfied any obligation that it had under the Agreement. Accordingly, defendants contend, plaintiff's breach of contract claims and its breach of guaranty claim must fail.

1. Breach of Contract

Defendants' contention that plaintiff cannot recover for breach of contract against SSTS America is without merit. In order to recover for breach of contract under New York law, plaintiff must establish: (1) the existence of a contract; (2) the existence of consideration; (3) performance by the plaintiff; (4) breach by the defendant; and (5) damages to plaintiff as a result of defendant's breach. *See Stephens v. American Home Assur. Co.,* 811 F.Supp. 937 (S.D.N.Y.1993).* "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and the case is ripe for summary judgment." *American Express Bank, Ltd. v. Uniroyal, Inc.,* 562 N.Y.S.2d 613, 615, 164 A.D.2d 275, 277 (1st Dep't 1990).

The parties here do not dispute that Daewoo entered an agreement with SSTS America and SSTS Korea wherein Daewoo agreed to provide loans and financing to SSTS America, which would help it to set up and operate its business in New York. Similarly, there is no dispute as to the existence of consideration or performance by plaintiff. The dispute arises with respect to plaintiff's contention that SSTS America breached the Agreement, as defendants assert that SSTS Korea was the only obligor under the contract.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The record in this case establishes that, in fact, both SSTS America and SSTS Korea incurred obligations under the Agreement with Daewoo. The language of the Agreement makes clear that SSTS America was the primary obligor of the loan and that SSTS Korea was the guarantor of the loan. The preamble to the Agreement states that Daewoo shall provide SSTS America with certain general and export-import loans and that SSTS Korea shall "assume all responsibilities in the event that [SSTS America] defaults in its loan repayment."Har Decl. Ex. D. The contract further provides for Daewoo to send invoices to SSTS America and for SSTS America to pay interest to Daewoo. *Seeid.* at 4(2). Finally, referring to Daewoo as "A," SSTS America as "B" and SSTS Korea as "C," the Agreement states, "C, which is B's parent company, shall provide A with an unconditional guaranty of all of B's payment and performance obligations to A in the event that B delays or defaults in its loan repayment."*Id.* at Art. 6.

**\*4** In light of the plain language in the Agreement, it is simply disingenuous for defendants to argue that the meaning of this two-page contract is ambiguous. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."*Concord Finance Corp. v. Wing Fook, Inc.,* No. 96 Civ. 5293, 1997 WL 375679 at *4 (S.D.N.Y. July 7, 1997).* Moreover, Defendants concede in their motion papers that SSTS Korea's obligations were to arise "in the event that [SSTS America]'s repayment of the loan [wa]s delayed," Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in support of Defendants' Cross-Motion ("Def.Mem.") p. 5 (bracket in original). Given the plain language of the contract, as well as defendants' own admissions, it is clear that SSTS America was the primary obligor under the Agreement. Accordingly, as there is no dispute that SSTS America did not pay plaintiff in full for the loans at issue, plaintiff's motion for summary judgment on its claim of

breach of contract is granted with respect to SSTS America.

**2. Guaranty of the Loan**

As stated above, plaintiff asserts that SSTS Korea agreed unconditionally to guarantee SSTS America's obligations to Daewoo in the loan Agreement, and that when SSTS America failed to repay the loan, SSTS Korea wrongly defaulted on its obligation. Defendants assert that SSTS Korea cannot be liable for breaching a guaranty because it was not a guarantor of the Agreement, but rather the primary obligor.

A contract of guaranty is a promise to answer for the payment of some debt or the performance of some obligation owed by another. *SeeIn re Drexel Burnham Lambert Group,* 151 B.R.674, 682 (Bkrtcy.S.D.N.Y.1993)."It is a secondary obligation in that it is collateral, and only meaningful in relation to, the independent obligation to pay (*i.e.,* the debt) of the primary obligor, and is contingent upon his default."*Michaels v. Chemical Bank,* 441 N.Y.S.2d 638, 640, 110 Misc.2d 74, 75 (N.Y.Sup.Ct.1993). An "absolute" guaranty is an unconditional undertaking that the debtor will pay, and on such guaranty the creditor may, upon default, proceed directly against the guarantor without taking any steps to collect the amount due from the debtor. *General Phoenix Corp. v. Cabot,* 300 N.Y. 87 (1949).

Here, SSTS America has defaulted on its payment obligations to Daewoo. The parties' agreement plainly states that SSTS Korea, "which is [SSTS America's] parent company, shall provide [Daewoo] with an unconditional guaranty of all of SSTS America's payment and performance obligations to [Daewoo] in the event that [SSTS America] delays or defaults in its loan repayment."Har Decl. Ex. D Art. 6. Pursuant to the unambiguous language of the parties' Agreement, SSTS Korea is the unconditional guarantor of SSTS America's obligations to plaintiff. Accordingly, SSTS Korea is liable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

to plaintiff for all monies still owed under the Agreement and plaintiff's motion for summary judgment on its breach of guaranty claim is granted.

C. Statute of Limitations

**\*5** Defendants assert that plaintiff is barred from pursuing its claims related to breach of contract against defendants because the applicable statute of limitations has expired. Plaintiff responds that this action was brought within an acceptable amount of time because the statute of limitations was tolled by SSTS America's acknowledgment of debt.

Under Section 2-725 of the Uniform Commercial Code, the statute of limitations for an action based on breach of contract for any sale must be commenced within four years of the date of accrual of the cause of action. *See* U.C.C. § 2-725; *Port Authority of New York and New Jersey v. Allied Corp.,* 914 F.Supp. 960, 962 (S.D.N.Y.1995). "[A] cause of action accrues when the breach occurs." U.C.C. § 2-725(2). Under certain circumstances, however, the limitations period may be tolled. Under New York's General Obligation Law § 17-101, the borrower's acknowledgment of debt in its financial statements tolls or revives the limitations period. *See Clarkson Co. v. Shaheen,* 533 F.Supp. 905, 932 (S.D.N.Y.1982) (stating that debtor's acknowledgment of its obligation to creditor in its annual report and fact that it carried debt on its books for at least two years was "clear recognition of the continuing validity of the obligation" and therefore action was not barred by the statute of limitations); *Chase Manhattan Bank v. Polimeni,* 685 N.Y.S.2d 226, 258 A.D.2d 361 (1st Dep't 1999) (stating that debtor's financial statement which carried its debt obligation to creditor constitutes an "acknowledgment or promise" of debts and was sufficient to revive creditor's time-barred claims on those debts).

Defendants argue that goods were last delivered in May 1998 and that the four-year limitations period thus ran out in May 2002. Plaintiff did not file its complaint in this action until November 2002.

However, plaintiff has demonstrated that the statute of limitations was tolled by SSTS America's acknowledgment of debt. The record shows that SSTS America acknowledged its loan obligation to Daewoo in its financial statements and carried the debt on its books from at least 1999 through 2002. *See* Har Decl. Ex. A. For example, SSTS America's December 31, 1999 financial statements recorded the loan payable to Daewoo in the amount of $4,046,383. *See id.* The debt to plaintiff also appears in varying amounts on the financial statements for December 31, 2000, December 31, 2001, June 30, 2002 and December 31, 2002, reflecting an amount of $2,646,383 from December 2001 through December 2002. *See id* . The listings in these financial statements constitute "a clear recognition of the continuing validity of the obligation" to pay plaintiff. *Clarkson,* 533 F.Supp. at 932.

SSTS America also acknowledged its debt in a March 16, 2000 letter to plaintiff. In that letter, Mr. Ji Ho Kim, General Manager of SSTS America, states that SSTS America owes plaintiff approximately $4 million and proposes a schedule of paying back $100,000 per month starting from the month of April 2000. *See* Har Decl. Ex. B. Following Mr. Kim's letter, SSTS made thirteen monthly payments to Daewoo from April 2000 to April 2001. *See* Def. Rule 56.1 Stmt. ¶ 11.[FN2] Letters such as Mr. Kim's have been found to constitute an acknowledgment under § 17-101.[FN3] *Seee.g. Popular Publications, Inc. v. McCall Corp.,* 321 N.Y.S.2d 308, 36 A.D.2d 927 (1st Dep't 1971) (finding that a letter stating that indebtedness was unpaid and making a promise to pay constituted acknowledgment under § 17-101). Moreover, partial payment of a debt also serves to toll the statute of limitations on that debt. *See United States v. Glens Falls Ins. Co.,* 546 F.Supp. 643, 645 (N.D.N.Y.1982) ("part payment of a debt starts the statute of limitations running anew in that part payment is tantamount to a voluntary acknowledgment of the existence of the debt"); *Schmidt v. Polish People's Republic,* 579 F.Supp. 23, 29 (S.D.N.Y.1984).

FN2. Defendants argue that this letter did not constitute an acknowledgment of debt because it acknowledged only "general indebtedness." The case on which defendants rely for this proposition, which was decided in 1912, also states however, that where the letter specifically references the debt at issue, rather than merely stating that the writer knows a debt exists, the letter will constitute an acknowledgment. Given that SSTS America specifically referenced a debt of approximately $4 million to plaintiff, defendants' argument that the letter was too general to constitute an acknowledgment is without merit.

FN3. With respect to defendants' argument that Mr. Kim was incapable of acknowledging the debt on behalf of the company, the very case on which defendants rely for that proposition, *Renault v. L.N. Renault & Sons, Inc.,* 90 F.Supp. 630 (E.D.Pa.1950), was overturned on appeal, with the appellate court holding that a promise from an agent of the debtor company with implied authority may indeed function as an acknowledgment sufficient to toll the statute of limitations. *See Renault v. L.N. Renault & Sons, Inc.,* 188 F.2d 317 (3d Cir.1951).

**\*6** The applicable statute of limitations was thus tolled by defendants' financial statements, Mr. Kim's letter and the partial payment made by SSTS America. Given that defendants' financial statements continued to reflect its debt to plaintiff as late as December 2002, plaintiff's time to file its complaint had not yet expired in 2002 when it commenced this action. Accordingly, defendants' statute of limitations defense is without merit and does not defeat plaintiff's motion for summary judgment on its breach of contract claims.

III. Account Stated

Plaintiff has also moved for summary judgment on

its claim for account stated as asserted against SSTS America. Plaintiff contends that it had reached an agreement with SSTS America regarding the amount of the balance due and that it is thus entitled to the amount agreed upon. Defendants assert that the parties never reached any such an agreement and that plaintiff's account stated claim must therefore fail.

"An 'account stated' is an agreement, express or implied, that a statement of account has been asserted, and has been accepted as correct; both parties must express assent to the account as correct; assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt." *Navimex S.A. De C.V. v. S/S Northern Ice,* 617 F.Supp. 103, 105 (S.D.N.Y.1984). "An essential element of an account stated is an agreement between the parties showing that some fixed amount is due." *D.E.O., Inc. v. Durham,* No. 99 Civ. 0036, 2000 WL 1887830 at \*2 (W.D.N.Y. Dec. 29, 2000). Under New York law, "[a]n agreement may ... be implied from the fact that the debtor makes a partial payment toward reducing the balance of the account." *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.,* 615 F.Supp. 426, 429 (S.D.N.Y.1985).

In this case, plaintiff and SSTS America had previous business transactions pursuant to which Daewoo delivered goods and submitted invoices, and for which SSTS America made partial payment. Nothing in the record indicates that SSTS America ever objected to the quality of the goods or the amount stated in the invoices. Although defendants argue that there is no evidence of invoices issued to SSTS America, this argument is flatly contradicted by the record in this case, *see* Har Decl. Ex. C, which includes more than forty invoices clearly showing that they were sent to SSTS America. FN4

FN4. Defendants also argue that plaintiff's account stated claim is based only on an approximation of the due amount and must therefore be dismissed. It is evident from plaintiff's complaint and motion papers,

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.))**

however, that plaintiff's claim is not based upon an approximation. The claim is based on the multiple accounts represented by the invoices plaintiff sent to SSTS America, which show that SSTS America owed Daewoo $2,795,858.19 as of May 31, 2001. *See* Declaration of Sang Shin ("Shin Decl.") Ex. C; Har Decl. Ex. C.

Defendants do not dispute that SSTS America never objected to the invoices issued by plaintiff.[FN5] Similarly, defendants concede that SSTS made partial payment to plaintiff on the loan at issue. *See* Def. Rule 56.1 Stmt. ¶ 11. Where a defendant "has both acquiesced in the bills sent to him, and made partial payment against the outstanding balance, plaintiff has established its account stated claim." *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 720 (S.D.N.Y.1986). Because defendant received and retained invoices without objecting to them and also made partial payment to plaintiff on the debt at issue, plaintiff is entitled to summary judgment on its account stated claim.

> FN5. Defendants also argue that only SSTS Korea, not SSTS America, was obligated to repay the loan. This argument has been addressed and disposed of *supra* pages 10-11. Additionally, as stated above, Mr. Ji Ho Kim, General Manage of SSTS America, acknowledged in his letter of March 16, 2000, the outstanding debt and agreed to pay $100,000 per month toward settling the account.

IV. Unjust Enrichment and Quantum Meruit

**\*7** Plaintiff also seeks summary judgment on its claims against SSTS America for unjust enrichment and quantum meruit. Defendants assert that plaintiff cannot pursue these claims because the existence of a valid, written contract prevents recovery in quasi-contract for occurrences arising out of the same matter.

Quantum meruit and unjust enrichment are quasi-contractual theories employed by courts "when the absence of an enforceable contract would otherwise lead to unjust enrichment of a party." *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 745 F.Supp. 37, 40 (S.D.N.Y.1991). "[T]he existence of a valid and enforceable contract governing the subject matter in issue ordinarily precludes recovery in quasi contract." *Nelson v. Stanley Blacker, Inc.,* 713 F.Supp. 107, 111 (1989). "A quasi contract only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment...." *Violette v. Armonk Associates, L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

There is no dispute that there existed a valid and enforceable written contract which governed the issues which are also the subject of plaintiff's quantum meruit and unjust enrichment claims. In light of this written agreement, plaintiff is precluded from pursuing its quasi-contractual claims, and defendants' motion for summary judgment is granted with respect to these claims.

V. Personal Jurisdiction

Defendants assert that this Court does not have personal jurisdiction over SSTS Korea because SSTS Korea was not properly served and because SSTS Korea has not submitted to jurisdiction in New York.[FN6]

> FN6. During a pre-motion conference on July 10, 2003, the Court entered a limited discovery schedule since the proposed summary judgment motion was to address only whether SSTS America owed money to plaintiff and whether SSTS Korea guaranteed the payments. Plaintiffs complain that because the issue of personal jurisdiction was never addressed at the pre-motion conference, plaintiff did not request to depose certain SSTS officials as it otherwise would have done. Even without the depos-

itions of the SSTS officials, however, plaintiff has made a sufficient showing that this Court does indeed have personal jurisdiction over SSTS Korea.

New York law controls the issue of personal jurisdiction in this case. *See PC COM, Inc. v. Proteon, Inc.,* 906 F.Supp. 894, 904 (S.D.N.Y.1995) (stating that in determining whether a federal district court has personal jurisdiction over a party in a diversity case, the law of the forum state applies) (citing *National Cathode Corp. v. Mexus Co.,* 855 F.Supp. 644, 647 (S.D.N.Y.1994); *Glass v. Harris,* 687 F.Supp. 906, 908 (S.D.N.Y.1988)). Under *New York C . P.L.R. § 301,* "a foreign corporation is subject to general jurisdiction in New York if the corporation is 'doing business' in the state."*Jacobs v. Felix Bloch Erban Verlag Ver Bunhe Film und Funk KG,* 160 F.Supp.2d 722, 731 (S.D.N.Y.2000).

It is well-settled law in New York that jurisdiction over a parent company may be created under the "doing business" test by the activities of its subsidiary within New York. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984). While the presence of a local corporation does not alone create jurisdiction over a related, but independently managed, foreign corporation, *seeid.,* the combination of four factors will allow for jurisdiction over the foreign parent in New York. Where the party advocating jurisdiction can show: (1) common ownership by the parent corporation of the New York subsidiary, (2) financial dependency of the subsidiary, (3) a lack of observance of corporate formalities; and (4) significant control by the parent over the subsidiary's marketing and operational policies, jurisdiction will exist in New York. *Seeid.* 121-123;*Weiss v. La Suisse,* 69 F.Supp.2d 449 (S.D.N.Y.1999); *Taca International Airlines S.A. v. Rolls Royce of England, Limited,* 256 N.Y.S.2d 129 (N.Y.1965).

**\*8** Plaintiff has adequately demonstrated the existence of the above factors such that jurisdiction properly exists over SSTS Korea, the foreign parent corporation in this case. With respect to common

ownership, there is no dispute that SSTS America is a wholly owned subsidiary of SSTS Korea. The next factor, financial dependency of the subsidiary on the parent corporation, has also been adequately established by plaintiff. "Financial dependency of the subsidiary on the parent corporation exists where the parent ... guarantees the subsidiary's obligations...."*ESI, Inc. v. Coastal Corp.,* 61 F.Supp.2d 35, 53 (S.D.N.Y.1999) (citations omitted). As discussed above, plaintiff has clearly demonstrated through the record that SSTS Korea guaranteed SSTS America's financial obligation to Daewoo. Furthermore, SSTS America's inventory reports show that most of its inventory consists of apparel manufactured by SSTS Korea's other wholly owned subsidiaries. *See* Har Decl. Ex. F. Financing of inventory is another factor which courts have considered in finding subsidiaries financially dependent on the parent corporation. *See Jerge v. Potter,* 99 Civ. 0312, 2000 WL 1160459 at *3 (S.D.N.Y. Aug. 11, 2000); *Taca,* 15 N.Y.2d 101-02. Accordingly, plaintiff has made a sufficient showing of financial dependency by SSTS America.[FN7]

> **FN7.** Further evidence of SSTS Korea's financial domination of SSTS America is that in 2001, SSTS Korea arbitrarily moved SSTS America's operating capital to SSTS Korea's subsidiary located in China and then sought to write off the withdrawn capital as a loss for United States tax purposes. *See* Har Decl. Ex. E.

The third factor courts look to in determining whether the subsidiary functions as a "mere department" of the parent corporation such that exercising jurisdiction is appropriate is the degree to which the parent interferes in the assignment of the subsidiary's executive personnel and fails to observe corporate formalities. *See Weiss,* 69 F.Supp. at 458. Here, defendants concede that SSTS America prepared annual financial statements in order to prepare its income tax returns and for submission to SSTS Korea, and for no other reasons. *See* Def.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 56.1 Stmt. ¶ 33. Additionally, Mr. Kim, General Manager of SSTS America, indicated that in order for SSTS America to make payments to Daewoo, SSTS Korea's authorization and approval was necessary. *See* Decl. of Ji Ho Kim ("Kim Decl.") ¶ 11. Decision making for the subsidiary by the parent is a factor that weighs in favor of finding the subsidiary to be a "mere department" of the parent. *See* *Bergesen d.y. A/S v. Lindholm,* 760 F.Supp. 976, 987 (D.Conn.1991).

As to the final factor, the degree of control over the marketing and operational policies of the subsidiary exercised by the parent, "the parent's degree of control over the marketing and operational policies of the subsidiary is satisfied where the parent's promotional materials or public documents hold out the subsidiary as a branch or division of the parent, or the parent determines the subsidiary's operational policies and strategy." *ESI, Inc.,* 61 F.Supp. at 55 (citations omitted). SSTS Korea's website holds out SSTS America as merely one of its international branches, rather than a separate entity, and represents that SSTS Korea conducts marketing and export operations through its overseas entities, including SSTS America. *See* Har Decl. Ex. G.[FN8][FN9] Plaintiff has thus also made a prima facie showing as to this final element. As plaintiff has sustained its burden of making a prima facie showing that SSTS America is a mere department of SSTS Korea, this Court may properly exercise jurisdiction over defendant SSTS Korea.[FN10]

FN8. Similarly, SSTS America and SSTS Korea use the same logo. *See* Def. Mem. at 11.

FN9. Because plaintiff has not yet obtained any jurisdictional discovery, it is required to make only a prima facie showing that defendants are subject to jurisdiction in this Court. *See* *Jazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir.1998).

FN10. Defendants' recent argument that this case should be dismissed because of a

reorganization that SSTS Korea instituted in Korea in 1999 comes too late. Whether to abstain from a case based on principles of comity is a matter of discretion to be decided by the district court. *See* *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002). The principles underlying the doctrine of comity include, *inter alia,* fairness to litigants and efficient use of scarce judicial resources. *See* *Goldhammer v. Dunkin' Donuts,* 59 F.Supp.2d 248, 253 (D.Mass.1999). Given that this case has been pending in this Court since December 2002 and that this Court has already devoted sufficient resources to its resolution, including the issuance of a prior written opinion in June 2003, the Court declines to dismiss this case on grounds of comity at this time.

CONCLUSION

**\*9** For the reasons stated above, plaintiff's motion for summary judgment is granted with respect to all claims except unjust enrichment and quantum meruit, as to which defendants' motion for summary judgment is granted. Plaintiff is directed to submit a judgment on notice.

IT IS SO ORDERED.

S.D.N.Y.,2004.
Daewoo Intern. (America) Corp. Creditor Trust v. SSTS America Corp.
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

11 U.S.P.Q.2d 1523                                                          Page 1
1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523
(Cite as: 11 U.S.P.Q.2d 1523)

Girls Clubs of America Inc.

v.

Boys Clubs of America Inc.

District Court, S.D. New York

No. 88 Civ. 1375 (KC)

Decided May 12, 1989
United States Patents Quarterly Headnotes

**JUDICIAL PRACTICE AND PROCEDURE**
**[1] Procedure -- Contempt; sanctions (§ 410.49)**
**REMEDIES**
**Non-monetary and injunctive -- Preliminary injunctions -- Trademarks and unfair trade practices (§ 505.0707.09)**
Organization that had been preliminarily enjoined from changing its name from "Boys Clubs of America" to "Boys and Girls Clubs of America" has not committed contempt of court by its issuance of annual meeting notice proposing vote on change of name to "Boys and Girls Clubs USA," but issuance of injunctive relief is warranted that will delay such vote pending completion of trial on merits of trademark infringement action brought by "Girls Clubs of America."

**\*1523** Action by Girls Clubs of America Inc. against Boys Clubs of America Inc. for trademark infringement and unfair competition. On plaintiff's motion for an order holding defendant in contempt. Denied; injunctive relief issued.

Prior decision: 6 USPQ2d 2049.

Dewey, Ballantine, Bushby, Palmer & Wood (Thomas V. Heyman, Saul P. Morgenstern, and Morgan T. Sullivan-Walsh, of counsel), New York, N.Y., for plaintiff.

Hall, McNicol, Hamilton & Clark (Thomas A. Dubbs, Sandra W. Jacobson, and Lesley E. Goldberg, of counsel), New York, for defendant.

Conboy, J.

In an Opinion and Order dated March 28, 1988, this Court preliminarily enjoined defendant ("BCA") from changing its name to "Boys and Girls Clubs of America."*Girls Clubs of America v. Boys Clubs of America*, 683 F.Supp. 50, 55 [6 USPQ2d 2049, 2053] (S.D.N.Y. 1988). Shortly thereafter, in response to a request for clarification from defendant's counsel, the Court held that an intra-organizational vote on the proposed name change was also prohibited. *Girls Clubs of America v. Boys Clubs of America*, No. 88 Civ. 1375 (S.D.N.Y. April 15, 1988). The Court's interlocutory order was affirmed on appeal. *Girls Clubs of America v. Boys Clubs of America*, 859 F.2d 148 (2d Cir. 1988). Familiarity with these decisions is assumed. The matter is now before the Court on plaintiff's application for an order holding defendant in civil contempt of the preliminary injunction of March 28, 1988, as clarified by the Court's order of April 15, 1988.

The instant application was inspired by defendant's release, in the middle of March of this year, of a Notice of Annual Meeting to be held on May 14, 1989, in which defendant proposed that the organization vote to change its name to "Boys and Girls Clubs USA." Plaintiff contends principally that the proposed name fails to maintain a "safe distance" from the line drawn by the earlier order and is thus enjoinable. According to plaintiff ("GCA"), defendant's alleged "safe distance" violation, along with evidence allegedly demonstrating defendant's bad faith in the timing and selection of the new proposed name, justifies a finding of contempt. Defendant responds that a) the Court's original order was narrow, explicitly limited to the name "Girls Clubs of America" and not its component words or similar variations, b) even as to the name "Girls Clubs of America," the Circuit affirmed only on the ground that plaintiff had established serious questions going to the merits and a balance of hardships tipping decidedly in its favor, not, as this Court

COPR. © 2008 The Bureau of National Affairs, Inc.

1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523

**(Cite as: 11 U.S.P.Q.2d 1523)**

found, on the ground that plaintiff would likely succeed on the merits, c) the relief sought would, if granted, violate **\*1524** equal protection principles, and d) under the guise of a contempt proceeding plaintiff could not obtain a new preliminary injunction without satisfying the demanding burden of proof for obtaining such relief. A hearing on the matter was scheduled for May 9.

Several days after the memoranda on this application were fully submitted, the Court received a letter, dated May 3, from plaintiff's counsel, Thomas V. Heyman, complaining about defendant's supplemental answer, received on May 2, to an interrogatory served in April of 1988. The interrogatory reads in pertinent part as follows:

7. Identify each expert witness or consultant

a. you intend to present at the trial of this action;

b. who has designed, conducted or supervised any survey or study, or written any report, regarding actual confusion or the likelihood of confusion;

c. who has designed, conducted or supervised any study or survey, or written any report, regarding name recognition or secondary meaning with respect to the names "Girls Clubs of America," "Girls Clubs," "Boys Club of America," 'Boys Clubs," "Boys & Girls Clubs of America" or "Boys & Girls Clubs."

In its supplemental response, defendant indicted that it would call as a witness, John Bunge, an expert who had "conducted a survey with respect to 'confusion.' "

In the May 3 letter, plaintiff's counsel asserted that when he called defendant's counsel to inquire about the timing of the survey, he was told only that it was conducted "some time ago." In addition, he complained, he had not yet received any documents relating to the survey. Mr. Heyman pointed out that the interrogatory requested more than just the iden-

tification of expert witnesses (although Defendant made it clear, in a letter, dated January 6, 1989, in response to plaintiff's complaints about defendant's interrogatory answers, that in its view the Federal Rules did not "entitle [plaintiff] to inquire as to what research has been conducted concerning confusion, likelihood of confusion, name recognition, or secondary meaning.") Mr. Heyman further protested that "[e]ven if at the time defendant initially answered Girls Clubs' interrogatories it had not yet retained someone to conduct a survey, and no survey existed, defendants had a continuing obligation 'seasonably' to supplement its response to Girls Clubs' Interrogatory No. 7, and to identify Mr. Bunge and the existence of survey documents relating thereto, when they came into being." Mr. Heyman also suggested that the circumstances indicated that defendant did not seasonably inform plaintiff of their intention to call Bunge.

Mr. Heyman observed that in response to Request no. 13 of Plaintiff's Request for Production of Documents, in which plaintiff requested documents related to surveys conducted by persons identified in Interrogatory No. 7, defendant responded that the request was vague and over-broad and, in addition, protected by the attorney/client and work product privileges. In light of defendant's earlier invocation of privileges, Mr. Heyman complained, the defendant should not now be "allowed to transform the shield provided by these privileges into a sword." Finally, Heyman argued that defendant was at the last minute trying to challenge the factual basis for the Court's earlier decision without notice.

Thomas A. Dubbs, defendant's lead counsel, responded, by letter dated May 3, that he had not received Bunge's survey until that morning and that the decision to call him as a witness had not been made until "4:30 p.m., Monday, May 1, 1989," the day before Interrogatory 7 was supplemented. The letter went on to say in substance that a) Mr. Heyman should not be surprised that a new survey was conducted because defendant commissioned a survey on a much tighter time frame in anticipation of

COPR. © 2008 The Bureau of National Affairs, Inc.

11 U.S.P.Q.2d 1523                                                                    Page 3
1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523
**(Cite as: 11 U.S.P.Q.2d 1523)**

last year's hearing, b) the survey is probative of the issues raised in the contempt motion, and is not a disguised attack on the original injunctive order, because the relief sought is in effect a separate preliminary injunction application, and c) Interrogatory 7 as drafted could not be reasonably read to seek the identity of trial witnesses. On the timing of the survey, Mr. Dubbs represented as follows:

> The survey was preliminarily tested in February of this year, work was halted for a time when settlement discussions held some glimmer of hope, but work was resumed when settlement became less likely.

> The *interviewing* was not even completed until last *Friday*, April 28, 1989.

(emphasis in original). In light of the late completion of the survey, and the timing of the decision to have Bunge testify, Mr. Dubbs asserted that its supplemental response to Interrogatory 7 was seasonable. Finally, Mr. Dubbs offered to produce Bunge for a deposition on May 5, along with Bunge's files.

On May 4, the Court held a conference to discuss the propriety of allowing Bunge to testify and to clarify the scope of the May 9 hearing. As to the latter, the Court made it clear that it would consider, and expected to **\*1525** hear arguments on, whether the vote on the proposed name should be enjoined, even if defendant's conduct was ultimately found not to warrant an order of contempt. Mr. Heyman expressed his reluctance to expand the hearing to what he considered to be effectively a full blown trial on the merits of the new name because the timing of the vote and the late revelation of the survey evidence put him at a significant disadvantage. Among other things, he would not be fully ready to present his own expert evidence at the hearing.

Mr. Dubbs stated that the survey was necessary because, he predicted, Mr. Heyman would surely apply to the Court for a temporary restraining order in the event that the contempt motion was denied. As

to Mr. Heyman's claim that Bunge should have been identified much earlier, Mr. Dubbs maintained that non-testifying experts need not be disclosed under the Federal Rules. The Court then asked when Mr. Dubbs first contacted Bunge about doing a survey on the proposed name change. Mr. Dubbs responded as follows:

> MR. DUBBS: I would like to check my time records, but basically the decision was made in late January to go ahead. Then in February he did some pretests. We then got into settlement discussions and we turned off the meter, and then when it looked like--

> THE COURT: Well, let's just be more specific. In late January he got a green light and then in February there were some -- you said some pretesting?

> MR. DUBBS: Correct. That may not be the technical term, but that's the gist of it.

> THE COURT: All right. And then this pretesting continued until -- at what point did you tell him to hold up pending the settlement efforts?

> MR. DUBBS: I would like to check my time records so I don't make a mistake. My recollection now is basically he was on hold for the month of March.

> THE COURT: Okay. Then when in April was he given the green light again?

> MR. DUBBS: I don't recall.

> THE COURT: Do you know how long he has actually worked on this final survey that he has now submitted?

> MR. DUBBS: Well, he finished it Friday or the interviews were finished Friday, is my understanding.

> THE COURT: All right. You mentioned that there was pretesting and then there was a hol-

dup for most of the month of March. Would it be fair to say that, pretesting aside, that this work really commenced in the beginning of April and took approximately five weeks to do?

MR. DUBBS: Roughly, but I mean, we didn't know -- the point is we didn't know what the results were until last Friday.

Tr. of May 4 Hearing at 12-14. Mr. Dubbs also insisted that he "did not have any idea whether Mr. Bunge was going to take the stand until 4:30."

The Court did not consider all of the discovery-related complaints raised by Mr. Heyman in his letter, but in light of Mr. Dubbs' representations that he seasonably updated plaintiff's discovery requests, that the last minute completion of the survey was fortuitous, and that Bunge would be made available for a deposition, the Court decided to permit Bunge to testify and proceeded with the hearing as scheduled on May 9. At the conclusion of the hearing, the Court directed the parties to submit post-hearing memoranda by May 11. The matter is now fully submitted.

The Court will first consider the propriety of a contempt citation. As a preliminary matter, the Court notes that the question of defendant's failure to keep a "safe distance" from the line drawn by the Court's earlier order and the question of contempt are analytically distinct, although the two issues often arise together as the case-law relied on by both parties demonstrates. *Cf., e.g., Charles of the Ritz Group v. Quality King*, 664 F.Supp. 152 (S.D.N.Y), *aff'd*, 832 F.2d 1317 [4 USPQ2d 1778] (2d Cir. 1987). "The imposition of a civil contempt order . . . should only be imposed when there is clear and convincing proof of a violation of a court decree."*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980). It is true that a party once found to have infringed a trademark, even in an interlocutory order, has a "duty to keep a safe distance from the line drawn by the district court's injunction,"*Oral-B Laboratories, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 [1 USPQ2d 1867, 1869-70]

(2d Cir. 1987), but the case-law indicates that a foray beyond a safe distance must be made with some wilfulness or deviousness before a contempt citation is warranted, *e.g., id.* (in designing new package, defendant ignored the district court's warning that subtle distinctions would not suffice and evidence indicated that new design not only came close to the line but crossed it). That is not the case here.

For one thing, in contrast to the cases cited by GCA, the Court's March 28, 1988 Order was quite narrow. In addition to being literally limited to defendant's proposed incorporation of "Girls Clubs of America," the opinion **\*1526** rejected several arguments offered by both sides which disregarded the Court's focus on the precise mark at issue. *See id.* at 3 (BCA's argument that "Girls" and "Girls Clubs" are generic terms were irrelevant because plaintiff's trademark had to be considered in its entirety); *Id.* at 7 (existence of third-party users against whom GCA took no action was not relevant because no other organizations were called "Girls Clubs of America" nor did any incorporate entire mark in their names); id. at 10 (GCA acknowledged that use of the name "Girls Clubs of America" by BCA and "Girls Clubs" by local organizations were separate legal issues). In addition, the Court does not question BCA's motives in seeking to change its name. Defendant has become a mixed gender organization and simply seeks to adopt a name that reflects its makeup. Even the first proposed name, which incorporated GCA's entire mark, was not an unnatural or suspicious choice given defendant's existing name. While alternatives exist, including the one before the Court, anything other than "Boys and Girls Clubs of America" would involve a significant alteration of defendant's current name. BCA's interest in preserving the good will it has developed is as legitimate as GCA's. BCA's actions simply do not compare to those of the exploitative commercial defendants in the cases cited by plaintiff. And, of course, defendant has not yet voted on or adopted the proposed name. Accordingly, plaintiff's application for a finding of contempt is denied.

COPR. © 2008 The Bureau of National Affairs, Inc.

The conclusion, however, does not shift the burden to plaintiff to make the kind of showing necessary to obtain a preliminary injunction in the first instance, as defendant has argued. Whether or not contempt is appropriate

> [a] trademark infringer, "once caught," should have its conduct carefully scrutinized in future use and should not be allowed to claim the same leniency accorded a good faith user who starts use of the mark which the enjoined defendant has shifted to. Otherwise, the enjoined defendant could comply make a minute change and start a new trademark contest all over again in the context of the contempt hearing as to use of the "new" format.

2 J. McCarthy, *Trademarks and Unfair Competition*, §30:13 at 480 (2d ed. 1984).

A natural starting point in our inquiry is defendant's survey evidence, which was the centerpiece of the May 9 hearing.

> The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey. *Manual for Complex Litigation*, 116 (5th Ed. 1981); 4 Louisell and Mueller, *Federal Evidence* §472 at 957 (1979); 2 J. McCarthy, *Trademarks and Unfair Competition* §32:53 (1973).

*Toys "R", Us, Inc. v. Canarsie Kiddie Shop, Inc.*,

559 F.Supp. 1189, 1205 [217 USPQ 1137, 1149] (E.D.N.Y. 1983). Although the survey evidence has already been admitted, a careful review of the record, applying the factors enumerated above, leads to the conclusion that Bunge's survey lacks any probative value on the question of confusion.

The most glaring, and fatal, flaw in the survey is demonstrated by its irreconcilably conflicting purposes. The stated, and proper, objective of the survey was "to determine whether a likelihood of confusion exists, between Boys & Girls Clubs U.S.A. and Girls Clubs of America, Inc. created by the name change from Boys Clubs of America to Boys & Girls Clubs U.S.A." (Defendant's Ex. D at 2). But the real objective of the survey is revealed in the instructions given by Bunge to his field supervisors. "This survey is being conducted to evaluate consumer's reaction concerning *logos* for various organizations" (Defendant's Ex. D, Appendix) (emphasis added). A review of the survey reveals that respondents were shown an array of cards, the natural focus of which, in terms of placement and size, were various organizational logos, including those of the parties. The cards contain the names of the various organizations but the names, are for the most part, dwarfed in size and placement by the striking logos.

> The Court agrees with plaintiff that:

> by focusing on the organizations' logos, rather than their names, defendant focused the attention of the respondents, the interviewers, and the supervisors on the most distinctive feature of the images of the cards. Defendant thus introduced an element of distinctiveness which does not exist when the organizations' names appear with their logos less prominently displayed or without their logos altogether, *e.g.*, in the media, or when they are heard **\*1527** rather than seen. . . . The distinctiveness of the logos, and the prominence with which they were featured in the presentation made to the respondents, improperly skewed the results toward a showing of distinctiveness, and away from sim-

COPR. © 2008 The Bureau of National Affairs, Inc.

11 U.S.P.Q.2d 1523                                                                                                              Page 6
1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523
**(Cite as: 11 U.S.P.Q.2d 1523)**

ilarity.

Plaintiff's Post-Hearing Memorandum at 16. [FN1] A second serious flaw is Bunge's failure to control or record the order of presentation of the logo cards to respondents. Despite his admission that interviewers were instructed to shuffle the cards for each interview, Bunge made the incredible and counter-intuitive assertion that the placement of the cards, *e.g.* two cards placed next to each other versus the same two cards separated by several or all of the rest, would have no bearing on the responses. Finally, Bunge offered no explanation for his decision to crowd the field with nine different logos when in a survey commissioned in connection with a dispute over logos between two banks, he used only the two banks' logos, and in fact, admitted that he *never* in his long experience in the field used more than two cards. These inadequately explained errors compel the conclusion that the survey was fatally skewed to favor defendant's litigation position and, indeed, was less than honest.

Even without the benefit of the survey, however, the new proposal name presents a close question. On the one hand, applying the "safe distance" rule, reasonable minds could certainly find that changing the proposed name from "Boys and Girls Clubs of America" to "Boys and Girls Clubs U.S.A." is merely an example of inching away from the border of the Court's earlier ruling. Certainly, along a spectrum of alternatives names that would describe a national umbrella organization of mixed gender youth clubs, the new proposal is closer to the earlier, prohibited choice than other possible selections. On the other hand, the Court agrees with defendant that there are a limited number of reasonable alternatives. Moreover, as already noted, the Court is sympathetic to defendant's interest in choosing a name that does not dramatically depart from its existing one.

But without going so far as to say that plaintiff is likely to establish that the new proposed name would cause confusion, evidence elicited at the hearing about the timing and manner in which this came to be heard, along with the closeness of the merits, leads us to the conclusion that the vote should be enjoined pending a later interlocutory or final hearing so that plaintiff will have a full and fair opportunity to argue its case.

The hearing revealed that the timing of the vote and counsel for defendant's development and disclosure of its evidence was much more a product of gamesmanship than the Court was led to believe at the May 4 conference. First, despite defense counsel's representation to the Court that Bunge was first contacted about doing a survey on the new proposed name in "late January," Mr. Bunge testified that he was contacted about doing a survey in mid-October. Bunge received a letter, dated October 12, 1988, from defendant's counsel, informing Bunge of the proceedings to date, expressing interest in doing a survey on "other names in addition to 'Boys & Girls Clubs of America,' " and instructing Bunge to review the Court's earlier decision and other materials in anticipation of a lengthy discussion with Mr. Dubbs on strategy for the then-contemplated survey. Bunge reviewed the materials and then travelled to New York for a meeting with two of defendant's lawyers and two of its top executives. Bunge characterized this as a "get-acquainted session" but he admitted on cross-examination that the target population of the survey and the nature of BCA's solicitations (*e.g.*, by mail) was discussed. That Bunge made a note to himself about using, during the prospective survey, "visual stimuli with and without hands" (meaning Boys Clubs of America with or without the organization's stylized clenched hands logo) is a strong indication of the advanced and comprehensive nature of this "get-acquainted session." It is true that neither the October 12, 1988 letter or the testimony about the November meeting explicitly mention the new proposed name, and Mr. Dubbs may deny, based on a cramped reading of our question to him at the conference held on May 4, that the new name was not proposed to Bunge until sometime after, but, given the extent of Bunge's involvement as early as November 1988, and the testimony of a BCA exec-

utive that the new proposed name was being floated around the organization as early as the fall of 1988, such a denial would not ring true.

Mr. Dubbs' representation that he "did not have any idea whether Bunge was going to take the stand until 4:30" on May 2, 1989, is also called into question by Bunge's admission that he knew about the hearing as early as April 23, 1989 and assured defendant's **\*1528** counsel, in writing, that he knew the dates and that he marked it down in his date book. Without going into detail about a party's obligations under Rule 26(b)(4)(A)(i), one cannot avoid his obligations by the self-serving assertion that an expert's testimony was not an absolute certainty until the eve of a hearing.

Perhaps even more dismaying is that the late completion of the survey evidence was not fortuitous, as the tenor of the May 4 conference suggested, but was rather a product largely of a deadline set by defendant's counsel. On direct examination, Mr. Dubbs asked why active interviewing, which began on February 8, ended on April 28. Bunge responded:

> Because this was now a Friday, I believe -- I'm not looking at my calendar, but it was late that week *and we had a meeting scheduled in your office the 1st and I had to have the project completed at that point for the meeting.*

Hearing Tr. at 92.

The last minute revelation of evidence not only disadvantaged plaintiff by forcing it to digest a significant amount of evidence in a short time, taking time away from the development of its own case, but it limited the Court's ability to consider plaintiff's allegation that defendant in a number of ways violated its discovery obligations. Suffice it to say at this point that defendant's conduct appears to have violated the spirit of the Federal Rules if not the letter.

These events also put the timing of the BCA meet-

ing and of the announcement of the same in a different light. The original, enjoined proposal of a new organizational name was announced a full year before the meeting at which it would be voted upon, and before this Court became involved in the matter. Although the earlier proposal generated controversy within the organization, and the new proposal has done the same, especially in light of the existing injunction, *see, e.g.*, Plaintiff's Ex. 5, the new proposal was announced only sixty days before the May 14 meeting. In short, the timing of the vote in conjunction with the manner in which defendant's counsel developed and revealed its survey evidence leads us to the conclusion that, in effect if not by design, there has been an "unfair jerry-rigging of this process to essentially injure [plaintiff's] ability to mount an argument with respect to the new name." Tr. of May 4 Conference at 20.

"Equity regards as done what ought to have been done . . . and resolves uncertainties against those whose wrongful acts or omissions created them." *United States ex rel. Schuster v. Vincent*, 524 F.2d 153 (2d Cir. 1975). Had the Court been presented with a more complete picture at the May 4 conference, it most certainly would have granted at least a short continuance of the hearing scheduled for May 9, and a corresponding restraint of the vote, to allow plaintiff's counsel to obtain and develop a response to defendant's evidence. *See Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988). Such relief is also supported by the case-law on the "safe distance" rule which at least implicitly recognizes the right of a party, who has prevailed on an interlocutory or final injunction application, to procedural fairness in challenging the inevitable variations proffered by the enjoined party. It would be absurd to say that plaintiff gets the benefit of the "safe distance" rule and then deny relief in a close case such as this because the artificial deadlines created by the defendant limit the plaintiff's ability to mount affirmative evidence to support an injunction.

1989 WL 297861 (S.D.N.Y.), 11 U.S.P.Q.2d 1523

**(Cite as: 11 U.S.P.Q.2d 1523)**

Furthermore, it appears to the Court that this situation places the plaintiff at a greater disadvantage than a party who must hurriedly seek injunctive relief in the first instance. In the latter scenario, both the plaintiff and the defendant are forced to prepare for a hearing on extremely short notice. Here, the defendant was able to impose upon the plaintiff the burden of preparing its case on short notice while at the same time methodically, and leisurely preparing its own. Sanctioning such procedures would not only disadvantage a party who has once demonstrated its entitlement to equitable relief but would also tend to subvert the Court's control over the controversy. *See* 2 J. McCarthy, *supra*, §30:13 at 480 ("A trademark infringer, 'once caught,' should have its conduct *carefully* scrutinized in future use.") (emphasis added). Such a result would be unacceptable.

Delaying the May 14, 1989 vote by way of an injunction is not only fair; it is also sensible. Counsel for plaintiff has represented that he is prepared to proceed to a full trial on the merits within a matter of months. Where, as here, a full and fair trial on the merits can be commenced within a matter of months, it is unreasonable to allow this litigation to be sidetracked by artificially created and unfair emergencies. Accordingly, in the exercise of my equitable power " 'to mold each decree to the necessities of the particular case.' "*Oral-B Laboratories*, 810 F.2d at 24 [1 USPQ2d at 1870] (citation omitted), the Court modifies and expands its Order of March 28, 1988 to prohibit BCA from changing its name to "Boys and Girls Clubs USA."

**\*1529** [1] In sum GCA's motion for an order holding BCA in contempt is denied. BCA is, however, hereby prohibited from voting on the proposed resolution to change its name to "Boys and Girls Clubs USA."

SO ORDERED.

FN1 It must be noted that, regardless of the relevance of distinctive logos to the ultimate outcome of this action, the Court, in

its earlier opinion, rejected an argument that defendant's distinctive logo lessened the likelihood of confusion. 683 F.Supp. at 53-54 n.3 [6 USPQ2d at 2051 n.3].

S.D.N.Y.

11 U.S.P.Q.2d 1523

END OF DOCUMENT

COPR. © 2008 The Bureau of National Affairs, Inc.

TAB 7

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1264001 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1264001 (N.D.Ill.))**

C

Home Depot, Inc. v. Krause
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
HOME DEPOT USA, INC.

v.

KRAUSE, INC.
**No. 01 C 50197.**

June 3, 2002.

MEMORANDUM OPINION AND ORDER

REINHARD, J.

**\*1** The Home Depot U.S.A., Inc. ("Home Depot"),
a creditor of debtor, Krause, Inc., appeals from an
order of the bankruptcy court approving debtor's re-
jection of an executory contract. At the time the or-
der was entered, debtor was operating as debtor in
possession in a chapter 11 proceeding. During the
pendency of the appeal, after briefing was com-
pleted, the case was converted to chapter 7. The
chapter 7 trustee, Bernard Natale, appeared before
the court on behalf of the bankruptcy estate in this
appeal and is hereby substituted as the appellee.
Debtor filed a voluntary chapter 11 bankruptcy
case, the filing of which constitutes an order for re-
lief, on June 13, 2000. On December 28, 2000,
debtor filed its motion to reject the executory con-
tract. The bankruptcy court entered an order ap-
proving the rejection on March 21, 2001. Home De-
pot filed timely notice of appeal. Jurisdiction is
proper under 28 U.S.C. § 158(a)(1).[FN1]

> FN1. The court asked for supplemental
> briefs on whether the conversion of the
> case to chapter 7 rendered the appeal moot.
> Because a ruling in favor of Home Depot
> on the issue of the effective date of rejec-
> tion could affect amounts it could seek to
> recover as administrative expenses under

11 U.S.C. § 503(b), the appeal is not moot.
See*In re UNR Indus., Inc.,* 20 F.3d 766,
768 (7th Cir.1994)(as long as some form of
meaningful relief is possible case is not
moot).

The contract at issue is the Vendor Buying Agree-
ment ("VBA") between debtor, as vendor, and
Home Depot. The VBA is the only evidence in the
record. Included as a part of the VBA is a Purchase
Order Agreement ("POA"). (POA ¶ 23) The POA
provides that every purchase order from Home De-
pot to debtor is subject to all terms and conditions
contained in the POA. (*Id.* ¶ 1) Among its other
terms, the POA requires debtor to indemnify Home
Depot (*id.* ¶ 17), to "procure and maintain Products
Liability and completed Operations Liability Insur-
ance on an occurrence basis with limits of not less
than $2,000,000 per occurrence ..."(*id.* ¶ 18), and to
name Home Depot as an additional insured under
the policy. (*Id.*) It appears from the motion, briefs,
and arguments of counsel in the bankruptcy court,
and on appeal, that, at the time of the filing of the
bankruptcy petition, Home Depot had pending un-
filled orders with debtor, that subsequently Home
Depot placed new orders and that Home Depot later
cancelled all its outstanding orders with debtor in
December 2000, prior to the motion to reject the
executory contract being filed. While it does not
appear from the record that evidence of these facts
was presented or stipulated, it does appear the
parties assume these facts to be correct.

The debtor in possession may reject an executory
contract in a chapter 11 case. 11 U.S.C. §§ 365(a),
1107(a). A contract is executory where significant
unperformed obligations remain on both sides and
the nonperformance of either party would constitute
a material breach. See*In re Streets & Beard Farm
P'ship,* 882 F.2d 233, 235 (7th Cir.1989). The Pur-
chase Order Agreement, which is expressly incor-
porated into the VBA, provides among other things
that debtor has a continuing obligation to procure
and maintain product liability insurance covering

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims from debtor's products on an occurrence basis. This obligation existed as of the order for relief and constituted a continuing obligation. Debtor, therefore, had a significant unperformed obligation under the VBA. Similarly, as of the filing of the bankruptcy case, creditor had the obligation to pay for products delivered to it under the VBA. Failure of either party to perform its obligation would constitute a material breach. *See id.* Home Depot argues it had no obligations under the VBA and, therefore, the VBA could not be executory. However, the POA, which forms a part of the VBA, expressly makes all purchase orders subject to the POA and therefore a part of the VBA. (POA ¶¶ 1, 23) Home Depot was obligated to pay for delivered product. This was a significant unperformed obligation. *See In re Teligent, Inc.,* 268 B.R. 723, 732 (Bankr.S.D.N.Y.2001) (if both parties have substantial unperformed obligations the contract is executory even though one party's unperformed obligation only involves the payment of money). Accordingly, the contract was executory and the bankruptcy court properly allowed debtor to reject it.

**\*2** Home Depot also argues the bankruptcy court erred in providing in the order that "any claim which Home Depot may have or allege to have arising from the Debtor's rejection of the VBA is to be treated, '... as if such claim had arisen before the date of filing of the [Debtor's] petition." ' Home Depot suspects the purpose of this language being included in the order drafted by debtor's counsel is to preclude Home Depot from seeking administrative expense status under 11 U.S.C. § 503(b) for claims arising from post-petition purchase orders. The question of administrative expense status was not before the bankruptcy court and its decision to approve the rejection of the contract does not decide the issue. Debtor's counsel acknowledged it was not seeking to determine administrative expense claims with the motion to reject. (Tr. Jan. 17, 2001, p. 16). While under 11 U.S.C. § 365(g)(1) rejection constitutes a breach of the contract immediately before the date of the filing of the petition for the entire contract (there is no bifurcation into per-

formed and unperformed portions), *see Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 41 (3rd Cir.1989), a creditor still may be entitled to administrative expense status for post-petition, pre-rejection contract performance. *See id.* All the bankruptcy court concluded was that the post-petition orders were not separate contracts but were governed by the VBA, a pre-petition executory contract subject to rejection.

Home Depot also challenges the portion of the bankruptcy court's order deeming the rejection effective December 1, 2000. Debtor's motion sought a December 1, 2000 effective date. (R. 155 ¶ 9). Home Depot did not argue against this effective date in the bankruptcy court and the argument is therefore waived. *See In re: Rimsat, Ltd.,* 212 F.3d 1039, 1048 (7th Cir.2000).

For the foregoing reasons, the order of the bankruptcy court approving the rejection of the VBA is affirmed.

JUDGMENT IN A CIVIL CASE

[] Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

• Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the order of the bankruptcy court approving the rejection of the VBA is affirmed.

N.D.Ill.,2002.
Home Depot, Inc. v. Krause
Not Reported in F.Supp.2d, 2002 WL 1264001 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.))

Lippe v. Genlyte Group Inc.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Richard A. LIPPE, John J. Robbins and Archie R.
Dykes, as Trustees of the Keene Creditors Trust,
Plaintiffs,
v.
THE GENLYTE GROUP INCORPORATED,
Bairnco Corporation, Arlon, Inc., and Genlyte
Thomas Group, LLC, Defendants.
No. 98 CIV. 8672(DC).

April 8, 2002.

Meltzer, Lippe, Goldstein & Schlissel, LLP, By
Thomas J. McGowan, Esq., Steven D. Sidrane,
Esq., Mineola, for Plaintiffs.
McCarter & English LLP, By Charles F. Rysavy,
Esq., Newark, NJ, for Defendants.

MEMORANDUM DECISION

CHIN, D.J.
*1 In this diversity case, the parties assert compet-
ing claims to the proceeds of the sale of certain real
property. Plaintiffs Richard A. Lippe, John J. Rob-
bins, and Archie R. Dykes, as Trustees of the
Keene Creditors Trust (the "Trust"), move for sum-
mary judgment pursuant to Fed.R.Civ.P. 56, seek-
ing a declaration that they are entitled to the pro-
ceeds of the sale, free of any claims or liens of de-
fendants. Defendants The Genlyte Group Incorpor-
ated and Genlyte Thomas Group LLC (together,
"Genlyte") cross-move for summary judgment for
an award of the proceeds.[FN1] For the reasons set
forth below, the Trust's motion for summary judg-
ment is denied and Genlyte's cross-motion is gran-
ted.

> FN1. On October 18, 2001, the Trust and
> defendants Bairnco Corporation and Arlon
> Inc. executed a stipulation pursuant to

Fed.R.Civ.P. 41(a)(1) discontinuing the ac-
tion without prejudice as against each oth-
er.

BACKGROUND

A. Facts

Except as otherwise noted, the principal facts are
not in dispute.

On July 31, 1984, Keene Corporation ("Keene"),
plaintiffs' predecessor, and KCS Lighting, Inc.
("KCS"), defendants' predecessor, executed an As-
set Purchase Agreement (the "Agreement")
whereby Keene sold certain assets to KCS for $52.5
million plus the assumption of certain liabilities.
(Fuller Aff. ¶ 2; Defs. Mot. Summ. J. Ex. A). Cer-
tain real property located in Olive Branch, Missis-
sippi (the "Property") was included in this sale.
(Fuller Aff. ¶ 3). The parties intended and under-
stood that title to the Property was to be transferred
to KCS under the Agreement. (Id. ¶ 4). Inexplic-
ably, however, no deed transferring the Property to
KCS was ever executed. (Id. ¶ 5).

Nonetheless, in July 1984, Genlyte took possession
of the Property and remained in possession until
1999. (Defs. Mem. Supp. Summ. J. at 1). Genlyte
paid real estate taxes on the Property from 1984
through at least 1995, although tax bills were fre-
quently addressed to Keene. (Defs. Mot. Summ. J.
Ex. D; Lane Aff. ¶¶ 9-10). Keene has apparently
paid the real estate taxes since 1996, when this dis-
pute surfaced. (Defs.Mot.Summ.J. Ex. D).

On January 1, 1987, KCS merged into Genlyte, and
all property owned by KCS was transferred to
Genlyte. (Fuller Aff. ¶ 9). On December 3, 1993,
Keene filed a voluntary petition under Chapter 11
of the Bankruptcy Code. (Pls. Mem. Supp. Summ.
J. at 2). By order dated September 28, 1994, the
Bankruptcy Court for the Southern District of New
York set December 5, 1994 as the deadline (the

Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.))**

"Bar Date") for filing proof of claims for general claims asserted against Keene.(*Id.*). On December 2, 1994, Genlyte filed a proof of claim against Keene, but did not assert any claims related to the Property. (*Id.* at 3; Pls. Mot. Summ. J. Ex. H). At that point, of course, there was no issue. Genlyte was in possession of the Property and no issue had been raised as to title.

By letter dated February 15, 1996, counsel for Genlyte informed Keene that, at some point during the bankruptcy proceedings, Genlyte discovered a "title issue" related to the Property. (Defs.Mot.Summ. J. Ex. C). The letter explained that although the Property was purchased by Genlyte in connection with the Agreement, and it was understood by all parties that the Property was to be transferred to Genlyte, due to a "clerical error" title to the Property erroneously remained in Keene's name. (*Id.*). The letter requested that Keene execute a stipulation *nunc pro tunc* establishing record title in Genlyte's name, and attached a draft stipulation for that purpose. (*Id.*). Keene did not execute the stipulation. (Defs.Mem.Supp.Summ. J. ¶ 15). On June 12, 1996, a bankruptcy plan of reorganization was confirmed and the Trust was established, and Lippe, Robbins, and Dykes were appointed Trustees. (Am.Compl.¶¶ 4-10). Pursuant to the reorganization, assets held in Keene's name, including the purported title to the Property, were transferred to the Trust. (*Id.* ¶ 4).

*\*2* On August 31, 1998, all assets owned by Genlyte were transferred to Genlyte Thomas. (Fuller Aff. ¶ 10). By letter dated November 16, 1998, Genlyte again asked Keene to transfer record title to the Property to Genlyte Thomas, by executing a quitclaim deed, *nunc pro tunc,* which Genlyte enclosed. (Defs.Mot.Summ. J. Ex. D). Keene did not execute the quitclaim deed. (Defs.Mem.Supp.Summ. J. ¶ 17).

**B**. *Prior Proceedings*

On December 8, 1998, the Trust filed this action to quiet title. (*Id.* ¶ 18). On December 14, 1998, Genlyte filed an action to quiet title in the United States District Court for the Northern District of Mississippi. (*Id.* ¶ 19). Because the Trust was a party in a related action pending before me, on June 4, 1999, the parties executed a stipulation dismissing the Mississippi action and transferring the action pending in the Southern District of New York to me. (Defs.Mot.Summ. J. Ex. E).

As part of the same stipulation, the parties agreed to the sale of the Property to a third party. (*Id.*). At some point, Genlyte had put the Property on the market and in early 1999 a prospective buyer was located. (Defs.Mem.Supp.Summ. J. ¶ 20). The parties agreed that the Property could be sold to the third party, with the proceeds of the sale to be held in escrow pending the outcome of this case. (*Id.;* Defs. Mot. Summ. J. Ex. E).

The Trust filed an amended complaint on October 18, 2001, and Genlyte filed an answer to the amended complaint on October 31, 2001, asserting counterclaims. On November 30, 2001, the parties cross-moved for summary judgment.

## DISCUSSION

**A.** *Choice of Law*

In a diversity case involving a contract that contains a choice of law clause, the district court must apply the law of the forum state to determine whether and to what extent the parties' contractual choice of governing law will be honored. *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001); *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir.1987). Where a contract contains an express choice of law provision, New York law is well established: " 'Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." ' *Fieger,* 251 F.3d at 393 (citation omitted). Here, § 15 of the Agreement expressly provides that the Agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"shall be governed by the laws of the State of New York as applied to contracts made and fully performed in New York." (Defs.Mot.Summ. J. Ex. A). Keene was a New York corporation; the contract was executed in New York; and the closing on the sale of the assets under the Agreement was held in New York. (*Id.*). Moreover, both parties cite New York law extensively in their briefs. Finally, the parties have not alleged fraud or any violation of public policy with respect to this provision. Accordingly, the Court will apply New York law. *Fieger,* 251 F.3d at 393.

**B. *The Merits***

**\*3** The Trust moves for summary judgment seeking a declaration that it is entitled to the proceeds of the sale of the Property free of any claims or liens by Genlyte.[FN2] The Trust does not dispute that Keene sold the Property to Genlyte and that Genlyte paid for the Property and took possession of it for approximately fifteen years. The Trust argues, however, that Genlyte is now barred from asserting any claim to title to the Property by New York's statute of limitations and Genlyte's failure to file a claim by the court-ordered Bar Date in Keene's bankruptcy proceeding. Genlyte cross-moves for summary judgment, arguing that the Agreement required the Trust to transfer title to the Property to Genlyte, and that the Trust breached the Agreement in failing to do so. Genlyte also argues that the parties intended that Genlyte receive title to the Property under the Agreement, and that, even though the deed was never delivered, Genlyte possesses equitable title to the Property.

> FN2. Genlyte has asserted that legal entitlement to these proceeds derives from and is equivalent to legal entitlement to the Property prior to its sale. (Defs.Mem.Supp.Summ. J. ¶ 20). The Trust does not dispute this assertion.

I address the Trust's two defenses to Genlyte's claims of ownership of the Property in reverse or-

der. First, the Trust argues that Genlyte is barred from asserting any claim to the Property because it did not file a proof of claim by the Bar Date set in Keene's bankruptcy case. This contention is rejected. Under Fed. R. Bankr.P. 3002(a), an unsecured creditor must file a proof of claim for any claim asserted against the property of the debtor. Under the Bankruptcy Code, a "creditor" is defined, in part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A "claim" is defined, in part, as a right to payment, or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment ...." 11 U.S.C. § 101(5)(A)-(B).

Simply put, at the time of the Bar Date, Genlyte was not a "creditor" within the meaning of the Code because it was not seeking payment, nor was it asserting a right to payment. Genlyte was not asserting a "claim" against Keene; it was not seeking a sum of money and thus it was not obliged to file a proof of claim. Instead, the dispute did not arise until 1996, when Genlyte realized there was an issue with respect to title. Even then, however, it was not asserting a "claim" or seeking money; it was merely seeking to quiet title to the Property.

Second, the Trust argues that Genlyte's claim that the Trust breached the Agreement is barred by New York's six-year statute of limitations. *See* N.Y. C.P.L.R. § 213(2) (McKinney 1990). The Trust freely admits that it failed to transfer title to the Property at the closing and that "there can be no question" that it thereby breached the Agreement. (Pls. Mem. Supp. Summ. J. at 5). In fact, § 2.2 of the Agreement required Keene, as Seller, to deliver to Genlyte, as Purchaser, at the closing "such bills of sale, assignments, endorsements and other instruments as may reasonably be requested by the Purchaser to convey and vest in the Purchaser all of the Seller's rights, title and interest in" all of the assets. (Defs.Mot.Summ. J. Ex. A). Additionally, however, § 11 provides:

**\*4** After the Closing, for no further consideration,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.))**

the Seller shall perform all such other actions and shall execute, acknowledge and deliver all such assignments, transfers, consents and other documents as the Purchaser or its counsel may reasonably request to vest in the Purchaser, and to protect the Purchaser's right, title and interest in, and enjoyment of, the Assets intended to be assigned and transferred to the Purchaser pursuant to this Agreement.

(*Id.*).

The Trust argues that its breach occurred on July 1, 1984 (the date of the Agreement), and that any contract claim by Genlyte that the Trust breached the Agreement therefore would be barred by New York's six-year statute of limitations. C.P.L.R. § 213(2). This defense fails, however, for two reasons. First, even assuming the Trust breached § 2.2 by failing to deliver a deed at the closing, the Trust's continuing failure to comply with § 11 constitutes a separate, continuing breach. As set forth above, § 11 of the Agreement provides that *after the closing,* the Trust shall deliver all such documents as Genlyte or it counsel may "reasonably request to vest in [Genlyte]," and "protect [Genlyte's] right, title and interest in, and enjoyment of" the Property. (Defs.Mot.Summ. J. Ex. A). The parties have pointed to no provision in the Agreement setting forth a termination date by which the obligations imposed by § 11, to be fulfilled "after the closing," would expire.

Genlyte first discovered that title to the Property remained in Keene's name in 1996. (Defs.Mot.Summ. J. Ex. C). Upon discovery, pursuant to § 11 of the Agreement, Genlyte requested that Keene deliver the deed to the Property and execute documents necessary to transfer title to Genlyte. (*Id.*). Keene failed to comply. Therefore, Keene breached its obligations under § 11 of the Agreement in 1996. Genlyte filed this action to quiet title in 1998. To the extent Genlyte asserts a breach of contract claim, the claim is timely.

Second, the defense fails because this is an action

to quiet title. In New York, such an action is never barred by the statute of limitations, because the right to quiet title is a " 'continuing right which exists as long as there is an occasion for its exercise.' " *Orange and Rockland Utilities, Inc. v. Philwold Estates, Inc.,* 437 N.Y.S.2d 291, 294 (1981) (quoting *Ford v. Clendenin,* 215 N.Y. 10, 16 (1915)). Here, Genlyte has a continuing right to seek to quiet title. This action revolves around the transfer of real property, and accordingly, in New York, the claims at issue here are properly analyzed under property law. *Bean v. Walker,* 464 N.Y.S.2d 895, 896-97 (4th Dep't 1983).

Legal title is formal title that is evidenced by a deed or other instrument constituting evidence of ownership rights in property. *See* Black's Law Dictionary 1493 (7th ed.1999). Equitable title, on the other hand, is "a beneficial interest in property and ... gives the holder the right to acquire formal legal title."(*Id.*). In New York, transfer of legal title to property can be effected only by actual physical delivery and acceptance of an executed deed. *Mitchell v. Bartlett,* 51 N.Y. 447, 447 (1873) ("[L]egal title cannot vest under a deed before its delivery."); N.Y. Real Prop. § 244 (McKinney 1989). Upon the execution of a contract for the sale of land, however, the purchaser acquires equitable title to the property, and the vendor is treated as the owner of purchase money, *i.e.,* personal property. *Bean,* 464 N.Y.S.2d at 897 (citing *Williams v. Haddock,* 145 N.Y. 144, 150 (1895)); *Penny Lane Owners Corp. v. Conthur Development Co.,* No. 94 Civ. 0940, 2000 WL 178189, at *10 (Feb. 16, 2000 S.D.N.Y.) (citations omitted). The vendor holds the legal title in trust for the purchaser, and has an equitable lien against the property for payment of the purchase price. *Bean,* 464 N.Y.S.2d at 897;*Penny Lane,* 2000 WL 178189, at *10. Legal title does not vest in the purchaser until the contract terms are satisfied. *Bean,* 464 N.Y.S.2d at 897 (citations omitted).

**\*5** Here, Genlyte has equitable title to the Property, and is entitled to formal legal title as well, because

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.))**

it has fulfilled the terms of the contract and paid the purchase price in full. Clearly, the parties intended Genlyte to receive legal title to the Property under the Agreement. Absent a fraudulent intent to withhold the deed or wilfully breach the Agreement, which is not alleged, the Trust's failure to transfer the title can only be explained as inadvertent. Yet, now, more than fourteen years later, the Trust argues that even though it sold the Property to Genlyte and Genlyte paid for and took possession of the Property, and both parties behaved as though Genlyte possessed legal title to the Property, the Trust should nonetheless receive what would clearly be a windfall simply because the Trust failed to deliver a deed. Equity will not countenance such an inequitable result. *See Williams,* 145 N.Y. at 150 ("Courts of equity regard that as done which ought to be done; they look at the substance of things, and not at the mere form of agreements, to which they give the precise effect which the parties intended."); *Bean,* 464 N.Y.S.2d at 898 ("If a forfeiture would result in the inequitable disposition of property and an exhorbitant [sic] monetary loss, equity can and should intervene.") (citations omitted). Here, substance must be elevated over form, and the parties' intent under the Agreement must control. The Trust has already received that to which it was entitled under the Agreement. Equity therefore requires that Genlyte also receive the full benefit of its bargain, namely, unfettered ownership of the Property.[FN3]

> FN3. Under Mississippi law, the outcome would likely be the same. Miss.Code Ann. § 89-1-1 provides: "Any interest in or claim to land may be conveyed to vest immediately or in the future, by writing signed and delivered; and such writing shall have the effect to *transfer, according to its terms, the title* of the person signing and delivering it ... as fully and perfectly as if it were transferred by feeoffment with livery of seizin ...." § 89-1-1 (2001) (emphasis added). *See also Ricks v. Merchants Nat. Bank & Trust Co. of Vicks-*

*burg,* 2 So.2d 344, 346 (Miss.1941) (noting that the legislature, by deleting the words "by deed or will" from statute, intended to enlarge the right to convey any interest in land "by permitting it to be done *not only by deed* or will but by *any other instrument of writing* signed and delivered, by which either the legal or equitable title to land might become vested in a purchaser ....") (emphasis added); *Taylor v. Welch,* 609 So.2d 1225, 1232 (Miss.1992) (finding that valid, effective delivery was sufficient to convey title and noting "primary question" in determining whether delivery is valid is intention of grantor).

## CONCLUSION

For the reasons set forth above, the Trust's motion for summary judgment is denied and Genlyte's cross-motion is granted. The Trust is hereby ordered to deliver the proceeds of the sale of the Property to Genlyte forthwith, less any amount of real estate taxes the Trust can establish it paid on the Property. The Clerk of the Court shall enter judgment dismissing the complaint and awarding Genlyte the proceeds of the sale, with any accrued interest, as well as with costs, on the counterclaims.

SO ORDERED.

S.D.N.Y.,2002.
Lippe v. Genlyte Group Inc.
Not Reported in F.Supp.2d, 2002 WL 531010 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

**C**

SCA Tax Exempt Fund Ltd. Partnership v. Kahn
C.A.6 (Tenn.),1992.

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
SCA TAX EXEMPT FUND LIMITED PARTNERSHIP, Plaintiff-Appellant,
v.
Barry KAHN, Jerry McGinty, Richard Hettig, John Hettig, Hettig Pension/Retirement, Hettig/Kahn Development, Hettig & Company, Defendants-Appellees.
**No. 91-5912.**

Sept. 10, 1992.

On Appeal from the United States District Court for the Eastern District of Tennessee, No. 89-00821; Jordan, D.J.
E.D.Tenn.

AFFIRMED.

Before BOYCE F. MARTIN, Jr. and RYAN, Circuit Judges, and WILHOIT, District Judge.FN*

RYAN, Circuit Judge.
**\*1** Plaintiff SCA Tax Exempt Fund Limited Partnership appeals from the district court's grant of summary judgment to defendants Barry Kahn, Jerry McGinty, Richard Hettig, John Hettig, Hettig Pension/Retirement, Hettig/Kahn Development, and Hettig & Company, in SCA's diversity contract action against defendants. SCA's action was based on an agreement, the Limited Operating Deficit Guaranty, under which the defendants agreed to fund the operating deficits of a developer.

On appeal, SCA raises three issues:

1. Does section 524(e) of the Bankruptcy Code, providing that a bankruptcy does not discharge the liabilities of non-filing co-debtors, apply to the guaranty?

2. Is the guaranty a "contract ... of" the developer, thus implicating section 365(c)(2) of the Bankruptcy Code, which provides that a trustee in bankruptcy can not assume an executory contract under which a party has contracted to loan money to the debtor?

2. Is the guaranty an executory contract, thus implicating section 365(c)(2) of the Bankruptcy Code?

We conclude that the summary judgments should be affirmed.

I.

Plaintiff SCA is a Delaware limited partnership. In October 1988, SCA purchased a bond in the amount of $17,950,000 from the Health, Education and Housing Facilities Board of Knox County, Tennessee. The proceeds of the bond were loaned to Steeplechase Falls Ventures, Ltd., a limited partnership (the Developer). The Developer was to use the funds to construct Steeplechase Falls Apartments, an apartment project in Knoxville (the Development). In addition to purchasing the bond, SCA also made a direct loan of $150,000 to the Developer. Thus, SCA's total commitment to the Development was $18,100,000. The defendants are limited partners in the Developer.

Although Knox County issued the bond, it was secured solely by the apartment project and its revenues, not the revenue of Knox County. As part of the financing requirements, the defendants executed a document styled "Limited Operating Deficit Guaranty." The guaranty provided:

If at any time during the three (3) year period fol-

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 74 of 79

974 F.2d 1339    Page 2
974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.))
**(Cite as: 974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.)))**

lowing the Completion Date or until Sustaining Occupancy ... the Developer requires any funds in connection with the ownership and operation of the Development, including ... funds for the payment of taxes, payments of principal and interest on the Note ... then in such event the Guarantor agrees to lend to the Developer all such funds which may be required to pay, when due, all such expenses....[FN1]

The defendants were not, however, obligated to advance additional funds if the loss exceeded $1,810,000. Defendants executed the guaranty as part of the consideration for SCA to purchase the bond.

In September 1989, the Developer, but not the defendants, filed a Chapter 7 bankruptcy petition. The parties have stipulated that at the time of filing, the Development had not yet experienced any operating deficits. The defendants, however, apparently realized that the Development would soon begin losing money, and hoped that filing under Chapter 7 would relieve them of their obligations under the guaranty.

**\*2** After the Chapter 7 filing, the Development incurred significant operating deficits, totaling over $900,000 as of October 1990 and projected to exceed $1,810,000. The defendants did not provide money to the Developer to fund these deficits.

In November 1989, SCA filed a three-count complaint, one count of which sought a declaratory judgment that defendants are liable for deficits of the Developer up to $1,810,000.[FN2] On cross-motions for summary judgment, the district court granted summary judgment to defendants on two counts. The parties then stipulated that the remainder of the case should be dismissed. The district court, in June 1991, dismissed the third count without prejudice, and entered final judgment for the defendants. SCA timely appeals.

## II.

This court's review of a grant of summary judgment

is *de novo,* and we apply the same test as the district court. *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). The court possesses diversity jurisdiction in this case, and the action is based on the deficit guaranty, a contract between the parties. In diversity cases, this court ordinarily construes contracts by applying the law of the forum state. In this case, the guaranty explicitly provides that the rights of all parties shall be governed by the law of Tennessee and neither party disputes the use of Tennessee law. The substantive rights of the parties to a contract are governed by the law of the state contemplated by the parties. *Mackey v. Judy's Foods, Inc.,* 867 F.2d 325, 328 (6th Cir.1989). Tennessee law thus governs the interpretation of the guaranty.

### A.

Application of Section 524(e) of the Bankruptcy Code

This case involves two sections of the Bankruptcy Code, section 524(e) and 365(c)(2). We shall consider each, in turn. Section 524(e) provides:

Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

11 U.S.C. § 524(e).[FN3]

SCA argues that because section 524(e) applies to the guaranty, the liabilities of defendants under the guaranty are not subject to discharge under the separate bankruptcy proceeding. In the bankruptcy proceeding, the debtor is the Developer; the defendants have not declared personal bankruptcy. By pursuing this claim, SCA attempts to collect funds based on the guaranty. The guaranty is separate from the bond itself, and SCA's claim is separate from the bankruptcy proceeding.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.))
**(Cite as: 974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.)))**

The key to this issue is the proper characterization of the guaranty. In arguing that section 524(e) applies, SCA assumes that the guaranty is a *loan* guaranty, and that the defendants are thus *loan* guarantors. The defendants contend that the guaranty is not a loan guaranty but rather an agreement to lend money.

SCA claims that bankruptcy proceedings do not discharge the liability of a co-debtor guarantor upon a loan made to an entity that had declared bankruptcy if the co-debtor had not itself declared bankruptcy. Most of the cases on which SCA relies involved creditors seeking repayment from the guarantor of the loan where the co-debtor-the entity that actually received the loan proceeds-filed for bankruptcy. *See, e.g., Union Carbide v. Newboles, 686 F.2d 593 (7th Cir.1982).*[FN4]

**\*3** In this case, however, the defendants did not promise to repay the loan if the Developer defaulted. The guaranty only provided that if the Development suffered operating deficits, the defendants "agree[ ] to lend to the Developer all such funds which may be required to pay" operating deficits up to $1,810,00. The district court found: "The word 'lend' in this context is plain, simple, and unambiguous." The guaranty does not even mention the bond. In sum, by its terms, the guaranty did not make the defendants co-debtors on the bond. Section 524 thus does not apply.

SCA makes two other arguments somewhat related to this issue. First, SCA argues that certain provisions of the deficit guaranty make it clear that the defendants undertook to fund the Developer's operating deficits absolutely and unconditionally. Factually, SCA is correct, for the guaranty states:

[T]he purpose and intent of the Guarantor that its obligations under this Guaranty shall be absolute and unconditional under any and all circumstances and it shall be released therefrom only upon payment of all sums due hereunder....

SCA argues that the defendants must fund the deficits, thus permitting the Developer to fulfill its bond obligations to SCA, even though the Developer is in bankruptcy.

The guaranty does give SCA, the bondholder, the right to enforce the guaranty. This means that SCA could require the defendants to loan funds to the Developer but for the bankruptcy of the Developer. The effect of the bankruptcy filing is, however, the key question of the appeal, and we analyze below the relevant provision of the Bankruptcy Code, section 365(c)(2).

Second, SCA argues that the district court's decision will effectively make all loan guarantees unenforceable following the bankruptcy of the principal obligor. This argument is meritless. The case law is very clear: loan guarantees are enforceable after the bankruptcy of the principal obligor. *See Union Carbide, 686 F.2d at 594*. The contract at issue here, however, is not a loan guarantee. Nowhere in the guaranty does it state that the defendants will pay the interest and principal due on the bond if the Developer cannot. SCA could have required the defendants to personally guarantee repayment of the bond, but SCA and the defendants did not enter into this kind of agreement.

B.

Application of Section 365(c)(2) of the Bankruptcy Code

The Bankruptcy Code provides, in relevant part:

The trustee may not assume or assign an executory contract or unexpired lease of the debtor ... if-

....

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor....

11 U.S.C. § 365(c). SCA argues that section 365

974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.))
**(Cite as: 974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.)))**

does not apply for two reasons: 1) the guaranty is not a contract of the debtor, and 2) it is not an executory contract.

### 1.

### The Guaranty as a Contract of the Developer

SCA contends that SCA, and not the Developer, is the real party to the contract; therefore, section 365(c)(2) does not apply to attempts by SCA to enforce the contract.

**\*4** Section 365(c)(2) states that the "trustee may not assume or assign an executory *contract* or unexpired lease *of the debtor.*" (Emphasis added.) Thus, we must determine whether the guaranty is a "contract ... of" the Developer. On this issue, the district court held:

[T]he Developer was an intended third-party beneficiary of the Deficit Guaranty, if not a party to it. It is plain that a purpose of the defendant Guarantors' promise in the Deficit Guaranty to cover the Developer's operating deficits from time to time up to a stated aggregate limit was to help to insure the Developer's financial viability.

Based on this reasoning, the district court concluded that the deficit guaranty was a contract of the Developer.

Although scant authority guides us on this question, we conclude that the district court correctly held that the guaranty was a contract of the Developer, thus implicating section 365(c)(2). We reach this conclusion based on three aspects of the guaranty, the first of which was discussed by the district court. We agree with the district court's conclusion that the Developer's status as an intended third party beneficiary is strong evidence that the guaranty is a contract of the Developer.

Inquiry into the Developer's status as an intended third party beneficiary implicates Tennessee law, which holds: "The requisites necessary to establish a third party beneficiary relationship are: (1) a valid contract made upon sufficient consideration between promisor and promisee; and (2) the clear intent to have the contract operate for the benefit of the third party." *United Am. Bank of Memphis v. Gardner,* 706 S.W.2d 639, 641 (Tenn.App.1985). Neither side disputes the Developer's status as an intended third party beneficiary of the guaranty, nor should they. SCA gave consideration for the guaranty in the form of its purchase of the bond, and SCA and the defendants clearly intended the guaranty to benefit the Developer.

Tennessee law also firmly establishes that an intended beneficiary may maintain an action in his own name against the promisor. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1356 (6th Cir.1991). Thus, the Developer had the right to enforce the guaranty against the defendants, and if the Developer incurred losses but had not declared bankruptcy, it could have required the defendants to loan it funds to cover the losses. We conclude, as did the district court, that the existence of a right in the Developer to enforce the guaranty indicates that the guaranty was a contract of the Developer.

Going beyond the district court's analysis, we conclude that two other aspects of the guaranty indicate that it was a contract of the Developer. We note first that the guaranty required the Developer to take action other than merely accepting a benefit. The Developer must, under the guaranty, both incur a loss and agree to the loan terms. These steps constitute performance that SCA cannot, by itself, undertake. The guaranty is a contract of the Developer because the Developer must take action independent of SCA to receive benefits.

**\*5** We note, in addition, that the nature of the defendants' potential performance under the guaranty indicates that it was a contract of the Developer. Under the guaranty, the performance does not run to SCA; rather, it runs directly to the Developer. The guaranty obligates the defendants to loan money to the Developer, not SCA. Further, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

974 F.2d 1339
974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.))
**(Cite as: 974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.)))**

Case 1:08-cv-03814-LAP    Document 11-2    Filed 06/30/2008    Page 77 of 79    Page 5

guaranty does not even give SCA first priority to the loan proceeds-the guaranty does not require the Developer to apply the proceeds to the bond obligations before paying other expenses but provides only that the loan proceeds shall be used to pay any expenses in connection with ownership. The fact that the defendants' performance under the guaranty runs to the Developer and not to SCA further indicates that the guaranty is a contract of the Developer.

2.

The Executory Nature of the Guaranty

SCA also contends that the guaranty is not an executory contract because SCA has already performed its obligations by buying the bond and loaning the Developer additional funds.

The district court did not specifically address an argument discussing the executory nature of the contract. Nevertheless, as to the application of section 365(c)(2), the district court held:

To the extent that SCA would have the defendant Guarantors make advances to the Developer to cover operating deficits with respect to the Project, the Court perceives no functional difference between this lawsuit and an attempt by a trustee in bankruptcy or a debtor-in-possession to enforce a prepetition contract to make a loan, to extend other debt financing, or to extend financial accommodations.

The district court construed the statute as creating "what is in effect a condition subsequent to a lender's contractual obligation to advance funds, that the obligation ceases if the borrower becomes bankrupt before the funds are advanced."

A proper characterization of the parties in relation to the guaranty is critical to the correct resolution of this issue. This case is unusual because it involves a possible executory contract in a third party beneficiary context. The guaranty is an odd contract-

while SCA provided the consideration for the defendants' promise to fund the operating deficits, the defendants' performance was not to benefit SCA directly. Rather, the defendant's performance, loaning money, was to benefit the Developer who would then use the money to pay expenses on the Development, expenses that presumably include payments on the bond held by SCA.

This court has not addressed the specific subsection-section 365(c)(2)-at issue here. This court has, however, considered section 365 in the context of a land sale contract, and in so doing discussed the meaning of "executory contract." In *In re Terrell,* 892 F.2d 469 (6th Cir.1989), this court held:

The legislative history ... indicates that Congress intended the term to be defined as a contract "on which performance remains due to some extent on both sides."

**\*6** *Id.* at 471 (quoting S.Rep. No. 95-989, 95th Cong., 2d Sess., at 58). *Terrell* also held that "federal law defines the term executory contract but that 'the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law....' " 892 F.2d at 471 (quoting *In re Cochise College Park, Inc.,* 703 F.2d 1339, 1348 n. 4 (9th Cir.1983)).

SCA argues that it has completely performed, and that there is nothing left for it to do. While this assertion may be factually correct, it is irrelevant because SCA's performance is not the proper focus. As we have held, the guaranty is a contract of the Developer. Thus, we must look to see whether any performance remains due on the part of the Developer, and, additionally, whether any performance remains due on the part of the defendants.

Turning initially to the question of the Developer's performance, we note that the district court held the Developer has not yet performed because the Developer did not incur operating losses *while not in bankruptcy.* We agree with the district court's hold-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing that section 365(c)(2) effectively created a condition precedent in the contract-that the Developer not be in bankruptcy at the time it incurred operating deficits. The Developer has failed to fulfill this condition.

In addition, there is a further aspect to the performance required of the Developer: the Developer must agree to accept a loan. The guaranty does not provide that the defendants will *give* the Developer the money to fund the operating deficits; rather, it provides that the defendants must *loan* the money. Therefore, part of the remaining performance is for the Developer to promise to repay the loan at the interest rates specified in the guaranty. This promise is performance that has not yet occurred.

The question of the defendants' performance is easier. The guaranty calls for the defendants to loan money to the Developer; obviously the defendants have not done so. Thus, performance remains due on the part of the defendants.

SCA asserts that this court's decision in *In re Edward M. Johnson and Assocs., Inc.,* 845 F.2d 1395 (6th Cir.1988), supports its position. In *Johnson,* the defendant contracted to sell all the stock in his company to a larger corporation. Part of the purchase agreement required the defendant to pay off certain accounts payable of his former company. After the defendant sold his company, it petitioned for bankruptcy. The trustee, on behalf of the defendant's former company, attempted to collect funds for the accounts payable pursuant to the agreement with defendant. This court held that the trustee, as trustee of an intended third party beneficiary to a contract, could enforce the contract.

SCA argues that *Johnson* supports its argument that SCA can enforce the guaranty, either directly or indirectly, by compelling the Developer to enforce it, thus requiring the defendants to loan funds to the Developer. SCA's reliance is misplaced. *Johnson* did not involve an executory contract-there was no performance that remained for the debtor-company. The accounts payable existed before the debtor-

company petitioned for bankruptcy, and defendant had promised to pay those accounts before the petition in bankruptcy. In the present case, the guaranty is executory, and at the time of the bankruptcy petition the Developer had not incurred any losses.

**\*7** We conclude that although SCA provided consideration for defendants' promise to loan money, for the purposes of applying section 365(c) of the Bankruptcy Code, the relevant parties to the guaranty are the Developer and the defendants. We further conclude that performance remains due on the part of both the Developer and the defendants. The guaranty is thus executory, and the Developer, now in bankruptcy, cannot assume the guaranty. Therefore, neither the Developer nor SCA may enforce the terms of the guaranty against the defendants.

As a final observation, we note that if SCA wanted the defendants to personally guarantee the repayment of the bond, it could have required the defendants to execute a conventional guaranty, requiring that if the Developer defaulted on the bond payments, SCA would gain the right to collect directly from the defendants. Nevertheless, SCA did not demand this type of guaranty. Instead, SCA required the defendants to execute the contract at issue, under which the defendants' liability to the Developer does not survive the Developer's bankruptcy filing. While this may not have been the result hoped for SCA, it is the result compelled by the language of the guaranty.

### III.

The judgment of the district court is AFFIRMED.

FN* The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

FN1. The guaranty refers to the defendants, collectively, as the "Guarantor."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Counts II sought damages for a breach of contract, and Count III sought imposition of a constructive trust. In this appeal, SCA does not raise issues relating to these counts.

FN3. The referenced exception, section 524(a)(3), is not relevant to this case.

FN4. SCA also directs this court to *Rich v. Clayton Mark & Co.,* 250 F.2d 622 (8th Cir.1957). While the *Rich* court required the co-signees of a letter guaranty to pay a debt of the principal obligor, the principal obligor in that case had not filed a bankruptcy petition. As such, we find *Rich* inapposite.

C.A.6 (Tenn.),1992.

SCA Tax Exempt Fund Ltd. Partnership v. Kahn

974 F.2d 1339, 1992 WL 219025 (C.A.6 (Tenn.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re:                                              )        Chapter 11
                                                    )
METRO AFFILIATES, INC., et al.,                     )        Case No. 02-42560 (PCB)
                                                    )
                            Debtors.                )        Jointly Administered
-----------------------------------------------------------------x
                                                    )
GREENWICH INSURANCE COMPANY,                        )        Civil Action No. 08-03814 (LAP)
                                                    )
                            Appellant,              )
                                                    )
        v.                                          )
                                                    )
GREENWICH STREET CAPITAL                            )
PARTNERS II, L.P.,                                  )
                                                    )
                            Appellee.               )
                                                    )
-----------------------------------------------------------------x

## CERTIFICATE OF SERVICE

ANDREA CHOUPROUTA, being duly sworn, deposes and says:

       I am not a party to the action, am over the age of eighteen years of age and reside in Nassau County, New York.

       On June 30, 2008, I caused to be served, true and correct copy of the Brief of Appellee Greenwich Street Capital Partners II, L.P. with accompanying Compendium of Unreported Cases Cited Within Brief of Appellee Greenwich Street Capital Partners II, L.P. upon the party listed below by First Class Mail.

Karen Lynn Gilman
Wolff & Samson, P.C.
140 Broadway
46th Floor
New York, NY 10005

*/s/ Andrea Chouprouta*
Andrea Chouprouta